**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| CONNECTIONS COMMUNITY SUPPORT PROGRAMS, INC., | Case No. 21-10723 (xxx) |
| Debtor.[1] | |

**DECLARATION OF ROBERT D. KATZ, CHIEF RESTRUCTURING OFFICER, IN SUPPORT OF CHAPTER 11 PETITION AND FIRST DAY PLEADINGS**

I, Robert D. Katz, hereby declare, pursuant to 28 U.S.C. § 1746, under penalty of perjury as follows:

1. I am the Chief Restructuring Officer (the "**CRO**"), of Connections Community Support Programs, Inc. ("**CCSP**", the "**Debtor**" or the **"Organization"**), a non-profit organization providing critical healthcare services to thousands of patients in Delaware every year. I am authorized to submit this declaration (the "**Declaration**") on behalf of the Debtor. To the best of my knowledge and except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with members of the Debtor's management team and advisors, my review of relevant documents and information concerning the Debtor's business, financial affairs, and restructuring initiatives, or my opinions based upon my experience and knowledge. If called as a witness, I could and would testify competently to the facts set forth in this Declaration.

2. I have been employed as the Chief Restructuring Officer of CCSP since April 15, 2021. Prior to that date, I, along with my firm EisnerAmper LLP (**"EisnerAmper"**), was engaged

---

[1] The Debtor in this chapter 11 case, along with the last four digits of its tax identification number, is as follows: Connections Community Support Programs, Inc. (3030). The address of the Debtor's corporate headquarters is 3812 Lancaster Pike, Wilmington, Delaware 19805.

as financial advisor to the Debtor in March 2020 to assist with cash flow projections, variance analysis and recommending improvements to the Organization's cost structure.  As of February 2021, EisnerAmper was further engaged to assist to improve the Debtor's billing practices and assist the Debtor in the collection of certain aged receivables.  In these roles, I have become familiar with the day-to-day business operations, financial affairs and books and records of the Debtor.

3.      I am a Managing Director in EisnerAmper's Financial Advisory Services Group. For over 35 years, I have worked with public and private middle-market companies, both in and out of bankruptcy, facing operational or financial challenges to create and execute the strategy needed to restructure or improve operating performance.  During this time, I have served as a Chief Restructuring Officer, Interim President, Chief Financial Officer, Chief Operating Officer, or Treasurer, for approximately 15 to 20 companies in this District and throughout the country.  In addition, I have served as a financial advisor in over 100 cases.  Representative cases in which I have acted in such roles include: *In re Earth Pride Organics, LLC /Lancaster Fine Foods, Inc.*, Case No: No 17-13816 (ELF) (Bankr. E.D. Pa.); *In re Colorep, Inc.*, Case No. 2:13-bk-27689-EB (Bankr. C.D. Ca.) (jointly administered with *In re Transprint USA, Inc.*, Case No. 2:13-bk-27698 (Bankr. C.D. Ca.)); *In re Oldco M. Corporation (f/k/a Metaldyne Corporation)*, et al., Case No. 1:09-bk-13412-MG (Bankr. S.D.N.Y.); *In re General Assignment for the Benefit of Creditors*, Superior Court of New Jersey Chancery Division, Docket # 308205; *In re Classic Sleep Products, Inc.*, Case No. 1:10-bk-10077-NVA (Bankr. D. Md.); *In re We The People USA, Inc.*, Debtor, Case No. 1:10-10503-KJC (Bankr. D. Del.) (jointly administered with *In re We The People LLC, Debtor*, Case No. 1:10-10504-KJC (Bankr. D. Del.)); *In re S.A.M. Graphics, Inc.*, Case No. 3:11-17642-KCF (Bankr. D.N.J.); *In re: Lower Bucks Hospital, et al.*, Case No. 10-10239 (ELF) (Bankr. E.D. Pa.); *In re Pharmaceutical Formulations, Inc.*, Case No. 05-

11910-MFW (Bankr. D. Del.); and *Hallowell Industries, Inc.*, Case No. 90-14859 (BIF) (Bankr. E.D. Pa.).

4.      I submit this Declaration to assist the Court and parties-in-interest in understanding the circumstances that led to the commencement of this chapter 11 case (the "**Chapter 11 Case**") and in support of: (a) the Debtor's petition for relief under title 11 of the United States Code (the "**Bankruptcy Code**") filed on the date hereof (the "**Petition Date**"); and (b) the relief that the Debtor has requested from the Court pursuant to the motions and applications described herein (collectively, the "**First Day Pleadings**").

5.      To familiarize the Court with the Debtor and the relief the Debtor seeks early in this Chapter 11 Case, I have organized this Declaration in two parts.  Part I of this Declaration provides a description of the Organization's business, capital structure, and the circumstances surrounding the filing of the Chapter 11 petition.  Part II of this Declaration sets forth the relevant facts in support of the Debtor's various First Day Pleadings filed concurrently herewith.

6.      The volunteer four-member Board of CCSP, current management and I take seriously CCSP's mission to "ensure *everyone* has 24/7 access to quality health care and treatment for substance use and mental health disorders, while simultaneously aiding them in lifelong recovery, providing support services that will allow them to return to a stable and productive lifestyle."  The irony is that this commitment led to this Chapter 11 filing.

7.      Through the bankruptcy process, the Organization seeks to restructure its operations through a sale of substantially all of its assets as a going concern to:

(a) ensure the seamless continuation of critical healthcare services the Organization provides to over 10,000 residents of Delaware every year;

(b) preserve as many of the 1100 essential jobs that the Organization's employees (the "**Employees**") perform every day to provide these critical healthcare services;

(c)  maximize the value of the Organization's assets;

(d) address the unanticipated and catastrophic impact that the ongoing COVID-19 pandemic has had on the already struggling Organization;

(e) address the Organization's ongoing and unsustainable litigation;

(f) reduce the Organization's substantial overhead resulting from the recent loss of contracts to provide health services to the Delaware Department of Corrections (the "**DOC**") and certain above-market leases; and

(g) resolve substantial billing and collection issues, which have markedly decreased the Organization's liquidity.

8.      We remain hopeful and are working diligently with the Prepetition Secured Lender and the proposed purchaser of certain of CCSP's assets to ensure that the Organization's important mission will continue and services that are essential to help people that struggle with a drug addiction crisis that his gripped this nation and the State of Delaware for too long.

## PART I.      BACKGROUND

### A.      DESCRIPTION AND HISTORY OF THE DEBTOR'S OPERATIONS.

9.      The Organization is a multifaceted not-for-profit 501(c)(3) health and human services organization operating and founded in Delaware with over one hundred (100) locations throughout the State of Delaware and more than eleven hundred (1,100) employees (the "**Employees**").  As a non-profit, CCSP has no owners or equity holders who receive distributions or other value from the Debtor.  Instead, CCSP exists to pursue its mission of providing therapy and other treatment services for addiction, mental health, and intellectual disabilities issues to its thousands of patients.

10.      Since its founding in 1985, CCSP has grown from providing assistance to older adults with lifelong histories of psychiatric hospitalization to one of Delaware's largest nonprofit organizations that touches the lives of approximately ten thousand (10,000) of Delaware's most

vulnerable citizens and their families, dealing with behavioral health and substance use disorders, housing challenges, and developmental and intellectual disabilities.

11.     The predecessor of CCSP was founded in 1985 when Church Home Foundation responded to a Delaware Division of Substance Abuse and Mental Health ("**DSAMH**") RFP to provide daily living skills to elderly clients who had spent most of their lives in the Delaware State Hospital (later Delaware Psychiatric Center) and was awarded the contract.  Thereafter, in 1990 Church Home Foundation split into two (2) entities, Ingleside Homes ("**Ingleside**") and CCSP.  In 1992, CCSP divested from Ingleside and became an independent Delaware non-profit corporation under section 501(c)(3) of title 26 of the United States Code.

12.     CCSP strives to ensure that all of its patients have 24/7 access to quality health care and treatment for substance use and mental health disorders, while simultaneously aiding patients in lifelong recovery and providing treatment and support services.

13.     As a multifaceted health and human services organization, CCSP's experience in providing an array of services to the people of Delaware from varied cultural and ethnic backgrounds is vast. CCSP has also successfully provided services to adults and children at various levels along the continuum of care, from long- and short-term residential programs, community- and home-based programs, outpatient programs, medication assisted treatment (MAT), peer support programs, recovery residences and now telehealth services.  The Debtor's patients come from a variety of contexts in the community, including individuals living independently, group homes, recovery residences, supportive housing, intact families, justice involved, and returning from incarceration, residential, and out-of-home placements.

14.     The Organization has five primary lines of business - (i) psychiatric/behavioral health services, (ii) substance use disorder treatment, (iii) housing and veterans' services, (iv)

intellectual disabilities services, and (v) operation support services.  The Organization leases four hundred and eight (408) properties (including 389 leased facilities associated with housing and veterans' services) and owns forty eight (48) properties.

B.      **THE ORGANIZATION'S GOVERNANCE AND CAPITAL STRUCTURE.**

1.      **The Debtor's governance.**

15.     The Organization is a Delaware non-profit corporation managed by a Board of four members from the Delaware community, dedicated to CCSP's mission   Indeed, CCSP's Board members volunteer all of their time as Board members as a service to their community and to further the Organization's mission.

16.     CCSP's Chief Executive Officer and President is Dr. William Northey.  Its Chief Financial Officer is Michael Haldeman and its General Counsel is Steven Davis.  Dr. Northey became interim Chief Executive Officer and President in October, 2019, with the retirement of CCSP's former Chief Executive Officer and President, Catherine Devaney McKay.  In August, 2020, the Board appointed Dr. Northey as CCSP's permanent Chief Executive Officer and President.  Mr. Haldeman has served as Chief Financial Officer since September 9, 2019.  Mr. Davis joined CCSP as its General Counsel on January 5, 2009.

17.     As CRO, I work closely with the senior management team set forth above, but report directly to the Board.  In addition, personnel from my firm, EisnerAmper LLP, assist me in fulfilling my duties as CRO.

2.      **The Debtor's non-debtor affiliates.**

18.      To fulfill its mission and provide a full array of support services for some of Delaware's most vulnerable citizens, CCSP owns or manages certain active non-debtor affiliates that either, in turn, own property housing patients of CCSP or that are currently developing

affordable housing options in Delaware.  Specifically, CCSP is the General Partner and manages and owns, directly or indirectly one hundred percent of the following non-debtor entities: Quaker Arts, LLC, Marcella's House Limited Partnership, and Claymont Street Apartments, L.P.  In connection with these limited partnership entities, CCSP also controls 100% of the interests in each of Housing First, Inc., which serves as the general partner of Marcella's House Limited Partnership, and Housing First II, Inc., which serves as the general partner of Claymont Street Apartments, L.P.  Finally, certain non-debtor affiliates are defunct entities that exist only as a result of prior mergers or in connection with projects to develop affordable housing that are no longer operating.   These now defunct and non-operational entities are: Homeward Bound, Inc., Addictions Coalition of Delaware, Inc., Connections Delaware Corporation, and Affordable Housing Opportunities, Inc.

19.      The Debtor believes that such non-debtor affiliates have little to no monetary value, i.e., that the sum of their liabilities, primarily in the form of mortgages on properties such entities own, does not exceed the value of the assets of such non-debtor entities.   However, the housing and other basic necessities provided through such affiliates are invaluable to CCSP's patients and clients and the larger Delaware community.  CCSP pays certain lease obligation of its clients in property owned by such non-debtor affiliates or leases such property itself (for use by CCSP patients and clients).  Substantially all such lease payments are pass through transactions in which CCSP either holds funds in trust received from government programs for its patients and clients to pay such lease obligations or pays such lease obligations directly with funds available to CCSP through such government programs.  Moreover, CCSP apportions some of its management and other overhead costs to such entities.  CCSP will seek authority to continue its pre-petition practices of paying obligations to and receiving payment from such non-debtor entities.

**3.** **The Debtor's prepetition debt**.

**a.** **The Prepetition Loan Agreements**

20. The Debtor has two loans (and a corporate credit card) with its pre-petition secured lender, Wilmington Savings Fund Society, FSB (the "**Prepetition Secured Lender**" or "**WSFS**") WSFS secured by liens on substantially all of the Debtor's assets. As of the Petition Date, the total due under such secured loans, inclusive of principal and interest was approximately $9.8 million.

21. WSFS has had a banking and/or lending relationships with the Organization from at least 1997. Specifically, on February 28, 2018, CCSP entered into certain Business Loan Agreement with WSFS, as amended by the Postclosing Undertaking Letter Agreement dated February 28, 2018, the Second Loan and Note Modification Agreement dated April 25, 2019, the Third Loan and Note Modification Agreement dated as of September 30, 2019, the Fourth Loan and Note Modification Agreement dated December 18, 2019, the Forbearance Agreement, dated as of June 19, 2020, the First Amendment to Forbearance Agreement, dated as of June 30, 2020, and the Second Amendment to Forbearance Agreement, dated September 18, 2020 (as amended, the "**Prepetition Revolver Loan Agreement**").

22. In addition, on April 24, 2019, CCSP entered into that certain Business Loan Agreement with WSFS, as amended by that certain Forbearance and Amendment Agreement, dated June 19, 2020 the First Amendment to Forbearance Agreement, dated June 30, 2020, and the Second Amendment to Forbearance Agreement, dated September 18, 2020 (as so amended, the "**Prepetition Term Loan Agreement**" and, together with the Prepetition Revolver Loan Agreement, the "**Prepetition Loan Agreements**" or the "**Prepetition Credit Facilities**"). As of the Petition Date, CCSP owed WSFS approximately $9,775,000 under the terms of the Prepetition

Term Loan Agreements.   WSFS was owed slightly in excess of approximately $100,000 in connection with a company credit card as of the Petition Date, as well.

23.     To secure the obligations of the Debtor under the Prepetition Loan Agreements (and te corporate credit card), WSFS has a lien on substantially all of the Debtor's assets, including, but not limited to certain of the Debtor's otherwise unencumbered real estate and the Debtor's accounts receivable.

24.     As of the Petition Date, the Debtor was in maturity default under the Prepetition Credit Agreements, the forbearance agreement with WSFS had expired and CCSP's liquidity was severely restricted.

25.     Through the efforts of CCSP's senior management and the Organization's professional advisors, CCSP was able to obtain the consent of WSFS to continue to fund critical expenses, including CCSP's payroll and related employee expenses.  The ongoing discussions with WSFS culminated in the proposed interim order pursuant to which WSFS has agreed to allow the Debtor to continue to use WSFS's cash collateral to fund the Debtor's bankruptcy case in accordance with the budget (the "**Budget**") in connection therewith.

26.     Through the efforts of CCSP's senior management and the Organization's professional advisors, CCSP was able to obtain the consent of WSFS to continue to fund critical expenses, including CCSP's payroll and related employee expenses.  The ongoing discussions with WSFS culminated in the term sheet from WSFS (the "**Term Sheet**") pursuant to which WSFS has agreed to allow the Debtor to continue to use WSFS's cash collateral in accordance with the budget (the "**Budget**") in connection therewith.

**b.      The Mortgaged Properties**

27.      In addition to the secured debt owed to WSFS, the Debtor owns certain real estate encumbered by liens of the National Council on Agricultural Life & Labor Research Fund, Inc., the Delaware State Housing Authority, and the United States of America, acting through the Rural Housing Services and the United States Department of Agriculture.  CCSP may have additional secured debt owed to vendors in connection with properly perfected purchase money security agreements and certain equipment leases, to the extent that such leases are not, in fact "true" leases. The Debtor's review of such additional potential secured obligations remains ongoing and is estimated potentially to be in excess of $20 million.

**c.      Unsecured Debt.**

28.      As a result of restrictions to the Organization's liquidity and its ability during the past several months to make only critical payments, as of the Petition Date CCSP's unpaid debt to vendors and landlords totaled approximately $12 million.

**C.      CIRCUMSTANCES LEADING TO THE COMMENCEMENT OF THIS CHAPTER 11 CASE.**

29.      Despite the improvements made by the Organization in its operations over the past year, due to the magnitude of the lawsuits, the loss of $60 million of contract revenue, trailing overhead expenses in conjunction with the lost contract, a United States Depart of Justice (USDOJ) investigation, insufficient and subpar billing and collection, system and processes  and the Covid 19 Pandemic the Organization seeks chapter 11 relief in an effort to sell its assets as a going concern under section 363 of the Bankruptcy Code to one or more potential purchasers in accordance with procedures (the "**Bidding Procedures**"), approval of which CCSP shall request form this Court.  Critically, the Chapter 11 process will permit the Debtors to address and alleviate burdensome costs deriving from (i) the COVID-19 pandemic that has negatively impacted the

Organization and its revenue, (ii) the loss of contracts with the DOC that had accounted for approximately $60 million in annual revenue for CCSP, (iii) the inability of CCSP to adjust its overhead and exit contracts and leases in a timely manner in connection with the loss of the DOC contracts, (iv) liquidity issues as a result of the loss of availability under CCSP's Prepetition Credit Facilities, and (iv) ongoing and costly litigation with, among others, (x) contract counterparties and (y) former clients, mostly arising in connection with the former DOC contracts and an investigation by the United States Department of Justice that resulted in the recently filed DOJ Litigation (as defined below).

1.      **Impact of the COVID-19 pandemic.**

30.      CCSP provides largely in-person therapy and medically assisted treatment ("**MAT**") programs for its patients and clients, and their families, struggling with drug addiction and mental health issues.   As a result of the COVID-19 pandemic, CCSP has been required to curtail certain in-person treatment.  In addition, CCSP has incurred significant and unexpected costs for the past year as a result of infection with or exposure to the COVID-19 virus among its Employees and patients, including in particular overtime for its Employees, covering for fellow Employees exposed or infected, and the costs associated with obtaining additional personal protective equipment ("**PPE**") and implementing measures critical to preventing the spread of the virus.  CCSP estimates that because of the COVID-19 pandemic its revenues have declined during the last twelve (12) month period, while its expenses have increased during such time period.  As a non-profit corporation, CCSP had and has little or no reserve funds to address such exigencies.

31.      The COVID-19 pandemic has, in addition, only further exacerbated billing and collection issues that have plagued CCSP for several years.  Indeed, as of the Petition Date CCSP has approximately $11.7 million in accounts receivable that are aged over ninety (90) days and,

therefore, ineligible as part of the borrowing base under the Debtor's Prepetition Credit Facilities. Furthermore, CCSP had an additional charge off of approximately $7 million as of June 30, 2020 for receivables that were deemed to be not collectible.

**2.      The DOC Contracts and loss of the same.**

32.      A noted above, in April, 2020, the DOC terminated its contracts with the Debtor. The contracts with the DOC (collectively the "**DOC Contracts**") consisted of agreements entered into between the State of Delaware and CCSP (i) in July 2012 for mental health, substance abuse and DUI services and (ii) in June 2014 for the health services generally in the Delaware state prison system. The services provided through the July 2012 agreements contributed approximately $12,000,000 to CCSP's annual revenue. The DOC's subsequent health services contracts added an additional approximately $48,000,000 to the annual gross revenue of CCSP.

33.      Although CCSP was able to right size its operations to some extent following the loss of the DOC Contracts, significant overhead in connection with such contracts and the services provided thereunder remained, including certain above market lease obligations that CCSP did not (and does not) require. In addition, CCSP continued to be party to numerous lawsuits, including those filed by inmates in connection with the services provided under the DOC Contracts, primarily in connection with the general health services DOC Contracts and certain former employees of CCSP. CCSP is also now a defendant in actions brought by the U.S. Department of Justice ("DOJ"). The costs associated with such legacy lawsuits as of the Petition Date totaled in excess of $1,000,000 annually.

**3.      Default under the Prepetition Credit Facilities and Resulting Liquidity Constraints.**

34.      On March 20, 2020, the scheduled maturity date of the revolving line of credit made available by WSFS to CCSP occurred, and the loan became due and payable in full. At that time,

CCSP had nearly fully drawn the entire $12,000,000 commitment available under the revolving line of credit.  Because CCSP was in default, CCSP could not access additional liquidity through such loans.

35.   In April 2020, WSFS determined that approximately $3,000,000 in accounts receivable formerly eligible for inclusion in the borrowing base under the Prepetition Credit Facilities was no longer eligible.  In addition, and as outlined above, the Organization took an approximate $7 million additional charge off/loss on its financial statements for these and additional aged and past due accounts receivable.

36.   In connection with the pre-petition forbearance agreement, CCSP made payments totaling $1 million and then in addition four monthly payments of $500,000 each, beginning on September 30, 2020 to WSFS that reduced that outstanding principal balance to approximately $9,000,000 or 25% of the outstanding principal loan balance with no availability for further borrowings.  Accordingly, even though CCSP had reduced the principal due under the Prepetition Revolver Agreement by approximately $3.0 million since June 2020, by January 1, 2021, CCSP remained in default, with no forbearance and little to no access to additional liquidity from WSFS. All such events of default are continuing.

### 4.   Litigation Expenses and DOJ Investigation/Lawsuits

37.   At the same time as it was facing these liquidity issues, CCSP was also incurring substantial litigation expenses, primarily in connection with its former DOC contracts and an investigation by the DOJ into alleged false claims submitted by CCSP in connection with CCSP's MAT programs.   In addition to over one hundred (100) lawsuits by inmates in the DOC, CCSP also was sued by BayHealth and separately by ChristianaCare for alleged unpaid bills relating to

treatment provided by such institutions for prisoners served by CCSP.  CCSP incurred in excess

of $500,000 in legal fees defending lawsuits related to the DOC contracts.

38.     In approximately March 2019, the DOJ began investigating certain billing issues

and alleged noncompliant methadone documentation as a result of allegations made by two former

employees of CCSP, included in a *qui tam* False Claim Act lawsuit (the "**Qui Tam Action**") filed

under seal by such former employees on March 7, 2019, in the United States District Court for the

District of Delaware, case number 19-475 (CFC).  Although the Qui Tam Action was filed under

seal, CCSP became aware of certain of the allegations when the DOJ began its investigation of

CCSP.

39.     After over two years of such investigation and the Organization incurring over $2

million of costs, on April 9, 2021, the DOJ ultimately filed its Complaint in Intervention joining

in certain counts of the Qui Tam Action and seeking treble damages for the $4,356,910.90 that

CCSP allegedly overbilled Medicaid.  Although CCSP had been cooperating with the DOJ and

had argued to the DOJ that it had an inability to pay any significant judgment in connection with

the allegations, the DOJ insisted that CCSP agree to a $10,000,000 dollar judgment, with a $1

million upfront payment and payment of the remainder of such judgment over time.  Not only

could CCSP not afford to pay any such judgment, it could no longer afford to pay its outside

attorneys representing it in the investigation.  Only when CCSP sought additional time to respond

to additional interview and document request from the DOJ and refused to acquiesce to a judgment

that it could never afford to pay, did the DOJ file its Complaint in Intervention.

40.     I am told that CCSP believes it has legitimate defenses to the False Claim Act

allegations in the Qui Tam Action and the accompanying Complaint in Intervention.  I have been

advised that among other things, the alleged improper coding and billing that are the bases for the

alleged overbilling were the product of inadequate and incorrect codes provided by the very third-party managed care organizations through which CCSP was forced to bill by the United States government.  If CCSP billed as the DOJ suggests it should have billed, then none of the services provided by CCSP to its clients were paid by the managed care organizations (collectively the "**MCOs**").   The irony is, that this is one of the ongoing struggles.  CCSP currently has complied with billing under the new codes and these codes have been rejected by CCSP's payers including but not limited to AmeriHealth and Highmark HealthOptions amongst others.

41.     Notwithstanding repeated requests by CCSP to the MCOs that this billing issue be rectified, CCSP was faced with the Hobson's choice of providing critical services and not receiving the very compensation that allowed CCSP to continue to provide such services or billing with the incorrect code and receiving compensation at a higher than permitted (but still inadequate rate). Indeed, when the DOJ instructed CCSP to stop these billing practices, CCSP stopped such practices.  As a result, CCSP stopped receiving any compensation at all for the critical therapy services that were being provided, further exasperating its liquidity needs.

42.     Again, the irony of this is that certain billing codes that have been insisted on, that are not recognized by Payors and that potentially tens of thousands of Delaware residents who are in need of critical services may not be able to receive them.  I have been advised that, to the extent that CCSP is liable at all to the government, CCSP has counterclaims against the government for unpaid fees and services.  In addition, CCSP has claims against each of the MCOs through which it was compelled to bill.

43.     Also on April 9, 2021, the DOJ filed a separate lawsuit in the United States District Court for the District of Delaware, case number 21-514 (the "**CSA Action**") against each of CCSP, its former President and Chief Executive Officer, its current President and Chief Executive Officer,

and its current General Counsel for alleged violations of the Controlled Substances Act. Specifically, through the CSA Action, the DOJ seeks civil penalties for alleged failures to complete properly certain required documentation for transfers of controlled substances, methadone and buprenorphine (both used by CCSP to treat clients suffering from opioid addiction), first brought to CCSP's attention as a result of a Drug Enforcement Agency (the "**DEA**") audit conducted on March 4, 2019, and subsequent review of records of CCSP by the DEA and the DOJ. This records review and subsequent investigation, like the investigation in connection with Qui Tam Action stretched for over two years, compelling CCSP to incur additional and significant outside legal fees

44.     I have been advised, that at their base, the allegations set forth in the CSA relate to alleged failures by CCSP to record properly transfers of substances between CCSP facilities that occurred for the last time almost two years ago. There do not appear to be allegations in the CSA Complaint that such alleged record keeping oversights are continuing. Nor is there any allegation in the CSA Complaint that any of the controlled substances were improperly dispensed or diverted, again because I have been told that they were not.

45.     I have been advised that although the CSA Complaint is replete with allegations about the amount of time such controlled substances remained unaccounted for, ultimately CCSP was able to (i) account for all of such controlled substances and (ii) implement procedures and training promptly to ensure that all required records going forward were properly created and maintained. To be clear, it is my understanding from our clinical operations that transfers of these controlled substances are now properly documented and that those records are properly maintained. Moreover, the person who was ultimately running the Organization when these transgressions happened is no longer affiliated with the Organization. The multimillions of dollars

spent defending these actions may have made a significant difference in assisting the Organization to rectify its current financial distress.

5.      **Engagement of Restructuring Professionals and Implementation of Sale and Marketing Process for CCSP's Assets.**

46.     As noted above, CCSP initially engaged my firm to assist in certain financial advisory services in March 2020, including helping CCSP with respect to its reporting to WSFS. CCSP subsequently engaged my firm to address its aging accounts receivable, including making increased efforts to collect such receivables, and refine its billing system and processes to minimize collection delays or denials of invoices.

47.     In February 2021, CCSP engaged restructuring counsel, its proposed counsel in this bankruptcy case, to assist it in developing strategies for addressing its liquidity issues either in or out of court.  Thereafter, also in February 2021, CCSP hired SSG Advisors, LLC, its proposed investment banker in this bankruptcy case, to assist CCSP in obtaining alternative financing, if possible, selling some or all of the assets of CCSP, or otherwise restructuring CCSP's balance sheet.

48.     On or about March 12, 2021, the Debtor, with the assistance of its professionals, began soliciting the assets of the Debtor for sale.  The marketing process engaged in prior to the Petition Date resulted in CCSP's recent entry into an LOI with a potential purchaser for some of the operations of the Organization.  Moreover, after extended and arm's-length negotiations, CCSP has reached agreement with WSFS pursuant to which WSFS will permit CCSP's use of its cash collateral during this Chapter 11 Case, in accordance with the Budget and the terms of an agreed order.

**II.**        **EVIDENTIARY SUPPORT FOR FIRST DAY PLEADINGS[2]**

49.        Through the sale process in the Chapter 11 Case, CCSP hopes to effectuate a going concern sale of its operations thereby preserving the drug treatment and mental health services to a decidedly undeserved segment of the population of Delaware and the surrounding area.  CCSP hopes that such a going concern sale will preserve as many of the jobs of the Organization's approximately 1100 employees as possible in a manner that ensures the Debtor realizes as much value as possible for its assets.

50.        Contemporaneously herewith, the Debtor has filed a number of First Day Pleadings in this Chapter 11 Case seeking orders granting various forms of relief intended to facilitate the efficient administration of this Chapter 11 Case and pursue and consummate a going concern of its assets.

51.        I have reviewed each of the First Day Pleadings listed on **Exhibit A**, and the facts set forth therein are true and correct to the best of my knowledge, information, and belief.

52.        I believe that the relief requested in the First Day Pleadings is necessary to avoid immediate and irreparable harm and provides the best opportunity to allow the Debtor to operate with minimal disruption during the pendency of this Chapter 11 Case.

53.        Accordingly, for the reasons stated herein and in each of the First Day Pleadings, I respectfully request that each of the First Day Pleadings be granted in its entirety.

**CONCLUSION**

54.        For all of these reasons, I respectfully request that this Court grant the relief requested in each of the First Day Motions filed concurrently herewith.

---

2    Any capitalized terms used but not defined in this section shall have the meaning ascribed to it in the underlying applicable motion or application.

- 19 -

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 19, 2021

*Robert D. Katz* /S/

Robert D. Katz
Chief Restructuring Officer

# EXHIBIT A

## LIST OF FIRST DAY PLEADINGS

(1)     Debtor's Application for Appointment of Omni Agent Solutions as Claims and Noticing Agent *nunc pro tunc* to the Petition Date

(2)     Debtor's Motion to File under Seal Portions of its Creditor Matrix Containing Certain Individual Creditor Information

(3)     Debtor's Motion for Entry of Interim and Final Orders (a) Authorizing the Continued Use of the Debtor's Cash Management System and (b) Extending the Time to Comply with the Requirements of Section 345(b) of the Bankruptcy Code

(4)     Debtor's Motion for Entry of Interim and Final Orders (i) Authorizing the Debtor to (a) Pay Certain Prepetition Wages, Salaries, Benefits, and Other Compensation and (b) Maintain Employee Benefits Programs and Pay Related Obligations, and (ii) Granting Related Relief

(5)     Motion of the Debtor for Entry of Interim and Final Orders Authorizing the Debtor to (i) Continue Insurance Coverage Entered into Prepetition and Satisfy Prepetition Obligations Related Thereto; (ii) Renew, Amend Supplement, Extend, or Purchase Insurance Policies; (iii) Honor the Terms of the Premium Financing Agreement and Pay Premiums Thereunder; and (iv) Enter into New Premium Financing Agreements in the Ordinary Course of Business

(6)     Debtor's Motion for Interim and Final Orders Authorizing the Debtor to Pay Certain Prepetition Taxes and Fees

(7)     Debtor's Motion for the Entry of Interim and Final Orders (i) Authorizing the Debtor's Proposed Form of Adequate Assurance of Payment, (ii) Establishing Procedures for Resolving Objections by Utility Companies, and (iii) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Service

(8)     Debtor's Motion for Entry of an Order Authorizing the Implementation of Procedures to Maintain and Protect Confidential Patient Information

(9)     Motion of the Debtor for Approval of Interim Order (i) Authorizing Debtor to Use Cash Collateral on a Limited Basis, (ii) Granting Adequate Protection to Prepetition Secured Creditor, (iii) Modifying the Automatic Stay, (iv) Granting Related Relief, and (v) Scheduling a Final Hearing