### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| CONNECTIONS COMMUNITY SUPPORT PROGRAMS, INC., | Case No. 21-10723 (MFW) |
| Debtor.[1] | *Requested* Hearing Date: May 17, 2021 at 11:30 a.m. (ET)<br>*Requested* Objection Deadline: May 11, 2021 at 4:00 p.m. (ET) |

**MOTION OF DEBTOR FOR ENTRY OF ORDERS (I)(A) ESTABLISHING BIDDING PROCEDURES; (B) APPROVING BID PROTECTIONS; (C) ESTABLISHING PROCEDURES RELATING TO ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, INCLUDING NOTICE OF PROPOSED CURE AMOUNTS; (D) APPROVING FORM AND MANNER OF NOTICE; (E) SCHEDULING A HEARING TO CONSIDER ANY PROPOSED SALE; AND (F) GRANTING CERTAIN RELATED RELIEF; AND (II)(A) APPROVING A SALE OF SOME OR ALL OF THE ASSETS OF THE DEBTOR; (B) AUTHORIZING ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES IN CONNECTION WITH THE SALE; AND (C) GRANTING RELATED RELIEF**

Connections Community Support Programs, Inc. (the "**Debtor**", the "**Company**", or "CCSP"), by and through its *proposed* undersigned counsel, hereby moves (the "**Motion**") for entry of an order (the "**Bidding Procedures Order**"), substantially in the form attached hereto as **Exhibit A**, (i) authorizing and approving (a) certain proposed bidding, auction, and sale procedures, substantially in the form attached to the proposed Bidding Procedures Order as Exhibit 1 (the "**Bidding Procedures**"),[2] in connection with one or more transactions involving a sale of certain or substantially all of the Debtor's assets pursuant to section 363 of the Bankruptcy Code (each a "**Sale**"), (b) the proposed Bid Protections (*as defined herein*), including a Break-Up Fee

---

[1]   The Debtor in this chapter 11 case, along with the last four digits of its tax identification number, is as follows: Connections Community Support Programs, Inc. (3030).  The address of the Debtor's corporate headquarters is 3812 Lancaster Pike, Wilmington, Delaware 19805.

[2]   Capitalized terms used but not otherwise defined in this Motion shall have the meanings ascribed to them in the Bidding Procedures and in the First Day Declaration (as defined herein), unless stated otherwise herein.

and Expense Reimbursement (*each as defined herein*) and the opportunity of the Debtor to seek other and further break-up fees and expense reimbursements, as necessary or appropriate, (c) certain proposed assumption procedures in connection with the sale (the "**Assumption Procedures**"), and (d) the form and manner of notice of all procedures, protections, schedules, and agreements; (ii) (a) scheduling a hearing (the "**Sale Hearing**") to consider final approval of the Sale, (b) following the Sale Hearing, entry of an order (a "**Sale Order**"), a copy of the proposed form of which is attached as Exhibit C to the Stalking Horse APA (as defined herein), (x) approving the sale to one or more Successful Bidders (*as defined below*) (or, if the Successful Bidder(s) fails to consummate a sale, to one or more of the Back-Up Bidders (*as defined below*)), which sale shall be free and clear of all liens, claims, encumbrances, and other interests, (y) authorizing the assumption and assignment of certain executory contracts and unexpired leases (collectively, the "**Designated Contracts**" or the "**Assumed Contracts**" or the "**Assumed Executory Contracts**"), and (z) granting related relief.  In support of this Motion, the Debtor relies upon, and incorporates by reference, the *Declaration of Robert D. Katz in Support of Chapter 11 Petitions and First Day Pleadings* (Docket No. 4) (the "**First Day Declaration**") filed on the Petition Date (as defined herein).  In further support of this Motion, the Debtor respectfully states as follows:

## PRELIMINARY STATEMENT

Prior to the Petition Date, the Debtor's operations were materially and adversely impacted by the coronavirus disease 2019 ("**COVID-19**") pandemic sweeping the nation.  As set forth in the First Day Declaration the decline in revenue and increase in expenses caused by the COVID-19 pandemic only exacerbated what was the already dire financial position of CCSP caused by (i)

the absence of any additional ability to borrow from its existing secured lender WSFS due to the Debtor's maturity default; (ii) the loss of the Delaware DOC Contracts and approximately $60 million in annual revenue in connection therewith; and (iii) the litigation expenses borne by CCSP for several years in connection with services provided under the DOC Contracts and an ongoing investigation by the DOJ.

The Debtor commenced this Chapter 11 Case with the goal of attempting to effectuate an expeditious sale of its operations, as a going concern, to (i) allow the mission of CCSP to continue and (ii) to preserve as many of the 1100 jobs CCSP provides as possible.

As set forth in the First Day Declaration and herein, CCSP and its advisors engaged in a robust marketing process with the goal of finding one or more buyers for all or substantially all of the assets of CCSP as a going concern.  Immediately prior to the filing of the Chapter 11 Case, CCSP executed an LOI with Conexio Care, Inc. (the "**Stalking Horse Bidder**"), a non-profit affiliate of Inperium, Inc., for the sale of certain assets (the "**Acquired Assets**"), excluding those assets associated with CCSP's Medication Assisted Treatment ("**MAT**") services and those assets not designated expressly as Acquired Assets (such excluded assets, collectively, the "**Excluded Assets**" and with the Acquired Assets, the "**CCSP Assets**" or the "**Assets**"), and the assumption of certain liabilities (collectively, the "**Assumed Liabilities**") in connection therewith.  Promptly thereafter, CCSP filed the Chapter 11 Case with the goal of selling the Acquired Assets, and the Excluded Assets (with the Acquired Assets, collectively, if possible, as promptly as possible in order to (i) continue to provide services to its patients, who otherwise have few or no options for treatment, (ii) preserve the jobs of as many as possible of CCSP's almost 1100 dedicated employees, and (iii) maximize the value of the Debtor's Assets.

On April 21, 2021, CCSP and the Stalking Horse Bidder entered into that certain Asset Purchase Agreement (the "**Stalking Horse APA**" or the "**Stalking Horse Purchase Agreement**"), a true and correct copy of which is attached hereto as **Exhibit B**, for the sale of the Acquired Assets, subject to higher or better offers in accordance with the Bidding Procedures and approval by this Court.

The Debtor and its advisors designed the Bidding Procedures to be transparent and competitive in order to attain the highest or otherwise best price for their business, while remaining focused on preserving the mission of CCSP to "ensure everyone has 24/7 access to quality health care and treatment for substance use and mental health disorders, while simultaneously aiding them in lifelong recovery, providing support services that will allow them to return to a stable and productive lifestyle." Under the Bidding Procedures, qualified parties may submit bids that will be analyzed by the Debtor, the Consultation Parties (as defined below), and each of their respective professionals and will culminate in the Debtor's designating either or both the Stalking Horse Bidder and one or more other Successful Bidders (as defined below) to purchase the CCSP Assets, collectively, or in one or more separate sales.

The Debtor believes that the Bidding Procedures, in connection with the Stalking Horse APA, will provide the best opportunity to consummate a value-maximizing transaction that will allow those in need of receiving services from CCSP to do so, while also preserving as many jobs as possible in these unprecedented times.

By this Motion, the Debtor is seeking entry of the Bidding Procedures Order and a separate Sale Order approving the sale of the Acquired Assets to the Stalking Horse Bidder or the sale of

the CCSP Assets in one or more lots to one or more other Successful Bidders in one or more separate sales.

**RELIEF REQUESTED**

1.      By this Motion, the Debtor requests entry of the following:

A.      The Bidding Procedures Order, substantially in the form attached hereto as **<u>Exhibit A</u>**:

   i.    authorizing and approving the Bidding Procedures, substantially in the form attached to the Bidding Procedures Order as <u>Exhibit 1</u>, in connection with one or more sales of the CCSP Assets (the "**Sale**");

   ii.   approving the Bid Protections for the Stalking Horse Bidder;

   iii.  scheduling one or more auctions for the Assets (the "**Auction**") to be held, if necessary, on June 10, 2021, at 10:00 a.m. (Eastern);

   iv.   Scheduling a Sale Hearing for no later than June 15, 2021;

   v.    approving the Assumption Procedures in respect of the Designated Contracts and approving the form and manner of service of the Contract Assumption Notice;

   vi.   approving the form and manner of service of the Sale Notices (*as defined herein*); and

   vii.  granting related relief.

B.      Following the Sale Hearing, entry of the Sale Order:

   i.    if an Auction is conducted, authorizing and approving the sale of some or all of the CCSP Assets to one or more of the Qualified Bidders (*as defined below*) whom the Debtor determines, after consultation with the Consultation Parties (*as defined below*), has made the highest or otherwise best Qualified Bids (*as defined below*) for the Assets (each a "**Successful Bidder**" and, collectively, the "**Successful Bidders**") (or, if any of the Successful Bidders fails to consummate the specific Sale for which it was the Successful Bidder, to the Qualified Bidder with the next-highest or otherwise second-best Qualified Bid at the Auction with respect to each such Sale (each a "**Backup Bidder**" and, collectively, the "**Backup Bidders**"), free and clear of all liens, claims, encumbrances, and other interests;

ii.  if an Auction is not conducted, authorizing and approving the sale of the Acquired Assets to the Stalking Horse Bidder, free and clear of all liens, claims, encumbrances, and other interests;

iii.  authorizing and approving the assumption and assignment of the Designated Contracts; and

iv.  granting related relief.

## JURISDICTION AND VENUE

2.  The United States Bankruptcy Court for the District of Delaware (this "**Court**") has jurisdiction over this Chapter 11 Case, the Debtor, property of the Debtor's estate, and this matter under 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference from the United States District Court for the District of Delaware, dated February 29, 2012. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

3.  Pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"), the Debtor consents to the entry of a final judgment or order with respect to this Motion if it is determined that this Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

4.  Venue of this Chapter 11 Case in this District is proper under 28 U.S.C. §§ 1408 and 1409.

5.  The statutory bases for the relief requested in this Motion are sections 105(a), 363, and 365 of title 11 of the United States Code (the "**Bankruptcy Code**").  The relief is also appropriate under Rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Local Rule 6004-1.

## BACKGROUND

**A.    GENERAL BACKGROUND.**

6.      On April 19, 2021 (the "**Petition Date**"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in this Court thereby commencing this case (the "**Chapter 11 Case**").

7.      The Debtor is authorized to continue to operate its businesses and manage its properties as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

8.      No trustee, examiner, or official committee of unsecured creditors has been appointed in this Chapter 11 Case.

9.      Additional factual background regarding the Debtor, including its operations, its capital and debt structures, and the events leading to the filing of this Chapter 11 Case, is set forth in the First Day Declaration, which is fully incorporated herein by reference.

**B.    THE DEBTOR'S PREPETITION MARKETING EFFORTS.**

10.     As set forth in the First Day Declaration, the Company initiated efforts to sell the CCSP Assets as a going concern with the retention of SSG in late February 2021, after struggling for well over a year in response to the loss of liquidity, loss of the DOC Contracts, further reduction in revenue due to COVID-19, and the staggering legacy litigation costs with which it was saddled. Those efforts included: (i) establishing a dataroom (the "**Dataroom**", (ii) developing (a) a list of potentially interested strategic bidders, (b) a "teaser" advertising the opportunity to participate in the purchase and sale process, and (c) a confidential information memorandum (the "**CIM**").

11.     In the first week of March, SSG sent the teaser to approximately 285 entities.  As of the date of the filings of this motion, SSG has sent (i) the teaser to 332 entities, (ii) non-

disclosure agreements (each an "**NDA**") to 33 entities that responded to the initial solicitation, and (iii) the CIM to 28 of those 33 entities that executed NDAs.  Of these 28 entities receiving the CIM, 7 entities have accessed the Dataroom.  Thus, although to date only the Stalking Horse Bidder has signed a purchase agreement, several entities remain interested in acquiring some or all of the CCSP Assets, including the assets associated with the MAT programs.

12.     Against this backdrop, the Company and its advisors developed the Bidding Procedures to enable the Debtor to pursue the Stalking Horse Transaction (*as defined below*) and continue to seek any alternative sale transactions, all with the goal of ensuring that (i) CCSP's mission and services survive, (ii) as many of CCSP's Employees as possible remain employed of furtherance of that mission, and (iii) CCSP obtains the maximum value possible for the CCSP Assets as a going concern.

## C.    THE BIDDING PROCEDURES.

13.     The Bidding Procedures are designed to promote participation and active bidding and ensure an orderly marketing, auction, and sale process.  The Bidding Procedures describe, among other things, the procedures for interested parties to perform due diligence, the process for written, irrevocable offers ("**Bids**"), the manner in which bidders and bids become "qualified," the receipt and negotiation of bids received, the conduct of any Auction, the selection and approval of any ultimately successful bidders, and the deadlines with respect to the foregoing.  The Bidding Procedures will allow the Debtor to conduct the Sale in a fair, orderly, and open manner that will maximize value for all stakeholders, including, especially the patients and CCSP Employees, and will further the public interest in continuing the essential services provided by CCSP to those of Delaware's most desperately in need.

14.    In accordance with Local Rule 6004-1, below is a summary of the Bidding Procedures and the procedures for conducting the Auction:[3]

| Participation Requirements | To receive due diligence information, including full access to the Dataroom and to additional non-public information regarding the Debtor, a Potential Bidder, other than the Stalking Horse Bidder, must deliver the following documents (collectively, the "**Preliminary Bid Documents**") by email to the proposed investment banker for the Debtors, SSG, 300 Barr Harbor Drive, Suite 420, West Conshohocken, PA 19428 (Attn: J. Scott Victor (jsvictor@ssgca.com)); with a copy to (i) proposed counsel to the Debtor, Chipman Brown Cicero & Cole, LLP, 1313 North Market Street, Suite 5400, Wilmington, Delaware 19801 (Attn: William E. Chipman, Jr., Esquire (chipman@chipmanbrown.com) and  Mark L. Desgrosseilliers, Esquire (desgross@chipmanbrown.com)); (ii) counsel to the official committee of unsecured creditors, if any (the "**Committee**"); and (iii)  (collectively, the "**Bid Recipients**"): |
|---|---|
| |        (a)  an executed NDA on terms acceptable to the Debtor, to the extent not already executed; and |
| |        (b)  evidence by the Potential Bidder of its financial capacity to close a proposed transaction, which may include financial statements of, or verified financial commitments obtained by, the Potential Bidder (or, if the Potential Bidder is an entity formed for the purpose of acquiring a breach). |
| | Promptly after a Potential Bidder delivers Preliminary Bid Documents to the Bid Recipients, the Debtor, in consultation with the Consultation Parties, will assess the adequacy of the evidence of its financial capacity and notify the Potential Bidder whether such Potential Bidder has submitted acceptable Preliminary Bid Documents so that the Potential Bidder may proceed to conduct due diligence and ultimately submit a Bid and participate in the Auction, as applicable.  Only those Potential Bidders that have submitted acceptable Preliminary Bid Documents (each, a "**Bidder**") may submit Bids. |
| | As soon as reasonably practicable after the Debtor, in consultation with the Consultation Parties, determine that a Potential Bidder is a Qualified Bidder, the Debtor will provide such Bidder with access to an electronic data room and reasonable due diligence information as requested by such Bidder (to the extent such Bidder has not already been provided such access and information). All due |

---

[3]    The following summary is qualified in its entirety by reference to the provisions of the Bidding Procedures. In the event of any inconsistencies between the provisions of the Bidding Procedures and the terms herein, the terms of the Bidding Procedures shall govern.  Unless otherwise defined in the summary set forth in the accompanying text, capitalized terms have the meaning ascribed to them in the Bidding Procedures.

| | |
|---|---|
| | diligence requests must be directed to the Financial Advisor. The Financial Advisor will work to facilitate meetings between any interested Bidder and the Debtor's management team. For all Potential Bidders (except for the Stalking Horse Bidder), the due diligence period will end on the Bid Deadline, and after the Bid Deadline, the Debtor will have no obligation to furnish any due diligence information.<br><br>The Debtor and its advisors will coordinate all reasonable requests from Bidders for additional information and due diligence access. The Debtor, in consultation with the Consultation Parties, may decline to provide such information to Bidders who, in the Debtor's business judgment, in consultation with the Consultation Parties, have not established, or who have raised doubt, that such Bidder intends in good faith or has the capacity to consummate a sale transaction of any, all, or substantially all of the CCSP Assets (a "**Transaction**").<br><br>Each Bidder shall comply with all reasonable requests for additional information and due diligence access by the Debtor or its advisors regarding such Bidder and its contemplated Transaction. |
| **Deposit (Del. Bankr. L.R. 6004-1(b)(iv)(F))** | The Stalking Horse Bidder shall be deemed to be a Qualified Bidder at all times. Likewise, the Stalking Horse APA shall at all times be deemed a Qualified Bid. The Stalking Horse Bidder is required to provide a Deposit (*as defined below*) as set forth in the Stalking Horse APA. *See* Bidding Procedures Order ¶ 7.<br><br>Otherwise, each Bid must be accompanied by a cash deposit in an amount equal to the lesser of $500,000 or 10% of the aggregate value of the cash consideration of the Bid, to be held in an escrow account to be identified and established by the Debtor (the "**Deposit**"). *See* Bidding Procedures Order Ex. 1 at p.6 (c).¶ |
| **Other Highlighted Terms Under Del. Bankr. L.R. 6004-1(b)(iv)** | <u>**Private Sale/No Competitive Bidding**</u>: The Sale is being conducted pursuant to the competitive bidding process detailed in the Motion.<br><br><u>**Relief from Bankruptcy Rule 6004(h)**</u>: As noted in the Motion, the Debtor is requesting relief from the 14-day stay imposed by Rules 6004(h) and 6006(d). *See* Bidding Procedures Order ¶ 36; *see also* Sale Order ¶ 32. |
| **Provisions Governing Qualification of Bidders; Provisions Governing Qualified Bids. (Del. Bankr. L.R. 6004-1(c)(i)(A), (B))** | <u>**Bid Requirements**</u>:<br><br>*Purpose*: Each Bid must state which CCSP Assets the Bidder intends to purchase or if the Bidder intends to purchase substantially all of the CCSP Assets.<br><br>*Purchase Price*: Each Bid must clearly set forth the terms of any proposed Transaction, including and identifying separately any cash and non-cash components of the proposed Transaction consideration, such as certain liabilities to be assumed by the Bidder as part of the Transaction, for example (the "**Purchase Price**").<br><br>*Deposit*: Each Bid must be accompanied by a cash deposit in an amount equal to the lesser of $500,000 or 10% of the aggregate value of the cash consideration of |

the Bid to be held in an escrow account to be identified and established by the Debtor (the "**Deposit**").

*Identification of Executory Contracts*:  Each Bid must identify with particularity each executory contract, unexpired lease, and unexpired sublease the assumption and assignment of which is a condition to close the transactions contemplated by the proposed Transaction Agreement.

*Marked Agreement*:  Each Bid must include, at a minimum, a draft asset purchase agreement (the "**APA**"), together with a redline version of the revised APA against the Stalking Horse APA, including the exhibits and schedules related thereto and any related Transaction documents or other material documents integral to such Bid, pursuant to which the Bidder proposes to effectuate the Transaction (collectively, the "**Transaction Documents**").  Each Bidder's APA must provide (i) a commitment to close the Transaction within two (2) business days after all closing conditions are met and, in any event no later than June 30, 2021, and (ii) a representation that the Bidder will use its reasonable best efforts to satisfy all applicable regulatory conditions.

*Committed Financing*:  To the extent that a Bid is not accompanied by evidence of the Bidder's capacity to consummate the Transaction set forth in its Bid with cash on hand, each Bid must include evidence of committed financing that demonstrates that the Bidder has received sufficient debt and/or equity funding commitments to satisfy the Bidder's Purchase Price and other obligations under its Bid.  Such funding commitments or other financing acceptable to the Debtor (in consultation with the Consultation Parties) must be unconditional and must not be subject to any internal approvals, syndication requirements, diligence, or credit committee approvals, and shall have covenants and conditions acceptable to the Debtor (in consultation with the Consultation Parties).

*Contingencies*; *No Financing or Diligence Outs*:  A Bid shall not be conditioned on a Bidder's obtaining, or the sufficiency of, financing or any internal approval, or on the outcome or review of due diligence, but may be subject to the accuracy at the closing of specified representations and warranties or the satisfaction at the closing of specified conditions.

*Identity:*  Each Bid must fully disclose the identity of each entity that will be bidding or otherwise participating in connection with such Bid (including each equity holder or other financial backer of the Bidder if such Bidder is an entity formed specifically/specially for the purpose of consummating the proposed Transaction contemplated by such Bid), and the complete terms of any such participation.  Under no circumstances shall any undisclosed principals, equity holders, or financial backers be associated with any Bid.  Each Bid must also include contact information for the specific person(s) and counsel the Debtor's advisors should contact regarding such Bid.

*Authorization*:  Each Bid must contain evidence that the Bidder has obtained authorization or approval from its board of directors (or a comparable governing

body acceptable to the Debtor) with respect to the submission of its Bid and the consummation of the Transactions contemplated in such Bid.

*Substantial Contribution Waiver*.  Each Bid must contain an express waiver, effective upon submission of the Bid, of any substantial contribution claims by the Bidder.  If the Bidder seeks any break-up fee, expense reimbursement, termination fee, or any other similar form of compensation through the Bid, the Bid must so indicate.  The Debtor may refuse to seek approval of any request for any break-up fee, expense reimbursement, termination fee, or any other similar form of compensation and insist that any Bidder expressly disclaim any request for such payment in the Bid.

*As-Is, Where-Is*:  Each Bid must include a written acknowledgement and representation that the Bidder: (i) has had an opportunity to conduct any and all due diligence regarding the Assets prior to making its offer; (ii) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Assets in making its Bid; and (iii) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied by operation of law, or otherwise, regarding the Assets or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Bidder's Transaction Documents.

*Same or Better Terms*.  Each Bid shall be based on the Stalking Horse Bid and must be on terms that are not more burdensome than the terms of the Stalking Horse Bid, as determined by the Debtor, in consultation with the Consultation Parties, and considering, among other factors, the scope and manner of the proposed transaction, including the proposed Bid Protections.  Each Bid must include duly executed, non-contingent transaction documents necessary to effectuate the Sale and shall include a schedule of assumed contracts to the extent applicable to the Bid, and a copy of the Stalking Horse APA clearly marked to show all changes requested by the Potential Bidder, including those related to the respective Purchase Price and Assets to be acquired by such Potential Bidder, as well as all other material documents integral to such Bid.

*Expenses; Disclaimer of Fees*.  Unless the Debtor expressly agrees to seek approval of a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation, each Bid (other than that set forth in the Stalking Horse APA) must disclaim any right to receive a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation.  For the avoidance of doubt, no Potential Bidder (other than the Stalking Horse Bidder), unless the Debtor expressly agrees otherwise, will be permitted to request, nor be granted by the Debtor, at any time, whether as part of the Auction or otherwise, a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation, and by submitting a Bid any Potential Bidder is waiving any assertion or request for reimbursement on any basis, including under section 503(b) of the Bankruptcy Code.

By submitting its Bid, each Bidder is agreeing, and shall be deemed to have agreed, to be bound by and honor the terms of the Bidding Procedures Order and to refrain from submitting a Bid or seeking to reopen the Auction after conclusion of the Auction. **The submission of a Bid shall constitute a binding and irrevocable offer to acquire the specific CCSP Assets reflected in such Bid.**

**Designation of Qualified Bidders.**

A Bid will be considered a "**Qualified Bid**", and each Bidder that submits a Qualified Bid will be considered a "**Qualified Bidder**", if the Debtor, in consultation with the Consultation Parties, determine that such Bid:

> (a) is reasonably likely (based on availability of financing, antitrust, or other regulatory issues, experience, and other considerations) to be consummated, if selected as the Successful Bid within a time frame acceptable to the Debtor (in consultation with the Consultation Parties); and
>
> (b) On or before 11:59 p.m. on the Bid Deadline, the Debtor (after consultation with the Consultation Parties) will notify each Bidder whether such party is a Qualified Bidder and shall provide the Notice Parties, as well as the Stalking Horse Bidder with a copy of each Qualified Bid.

If any Bid is determined not to be a Qualified Bid, the Debtor will refund such Bidder's Deposit promptly after the Bid Deadline in accordance with the Bidding Procedures.

Between the date that the Debtor notifies a Bidder that it is a Qualified Bidder and the Auction Date, the Debtor may (in consultation with the Consultation Parties) discuss, negotiate, or seek clarification of any Qualified Bid from a Qualified Bidder. Without the prior written consent of the Debtor (in consultation with the Consultation Parties), a Qualified Bidder may not modify, amend, or withdraw its Qualified Bid, except for proposed amendments to increase its Purchase Price, or otherwise improve the terms of, the Qualified Bid, during the period that such Qualified Bid remains binding as specified in these Bidding Procedures; provided that any Qualified Bid may be improved at the Auction as set forth in the Bidding Procedures. Any improved Qualified Bid must continue to comply with the requirements for Qualified Bids set forth in the Bidding Procedures. The Stalking Horse shall be deemed a Qualified Bidder at all times, and the Stalking Horse APA shall be a Qualified Bid.

Notwithstanding anything to the contrary herein, for purposes of the Auction, Wilmington Savings Fund Society, FSB, a federal savings bank ("**WSFS**"), shall be deemed a Qualified Bidder without the need to meet any of the requirements

| | |
|---|---|
| | therefor (or any modification to any of the requirement therefors), including, without limitation, the requirement of having to submit a Qualified Bid by the Bid Deadline. |
| **Bid Deadline (Del. Bankr. L.R. 6004-1(c)(i)(B)(1))** | June 9, 2021, at 5:00 p.m. (Eastern) |
| **Provisions Providing Bid Protections to "Stalking Horse" or Initial Bidder (Del. Bankr. L.R. 6004-1(c)(i)(C))** | In recognition of the considerable time, energy, and resources that the Stalking Horse Bidder has expended in connection with the Stalking Horse Bidder's proposal to acquire the Debtor's Assets in accordance with the Stalking Horse APA (the "**Stalking Horse Transaction**"), the Debtor has agreed that if the Stalking Horse Bidder is not the Successful Bidder for the Acquired Assets (or if the Debtor consummates the  sale of all or substantially all of the Debtor's Assets other than the Stalking Horse Transaction), the Stalking Horse Bidder shall be entitled to the following Bid Protections set forth in the Stalking Horse APA: (1) a Break-Up Fee of three percent (3%) of the Purchase Price as set forth in the Stalking Horse APA (as in effect as of the date of the filing of this Motion and not as amended from time to time), and (2) Expense Reimbursement of up to $350,000. <br><br> The Bid Protections are payable pursuant to the terms and conditions of, and under certain circumstances as set forth in, the Stalking Horse APA. Payment of the Bid Protections shall be governed by the Stalking Horse APA and the Bidding Procedures Order. |
| **Bidding Increments (Del. Bankr. L.R. 6004-1(c)(i)(C)(3))** | "**Overbid**" means any bid made at the Auction by a Qualified Bidder after the Debtor's announcement of the Baseline Bid. Each Overbid must comply with the following conditions: <br><br> (a) <u>Minimum Initial Overbid</u>. Any Overbid following the Baseline Bid shall be no less than the value of the Bid Protections, plus a value equal to $50,000. <br><br> (b) <u>Minimum Overbid Increment</u>. Any Overbid to a Prevailing Highest Bid shall be in increments of no less than $50,000. <br><br> (c) <u>Conclusion of Each Overbid Round</u>. Upon the solicitation of each round of Overbids, the Debtor may announce a deadline (the "**Overbid Round Deadline**"), subject to extension by the Debtor, by which time any Overbids must be submitted to the Debtor. <br><br> (d) <u>Overbid Alterations</u>. An Overbid may contain alterations, modifications, additions, or deletions of any terms of the Bid no less favorable to the Debtor's estates than any prior Qualified Bid or Overbid and shall otherwise comply with the terms of these Bidding Procedures. <br><br> **Announcing Highest Bid**. After each Overbid Round Deadline, the Debtor shall determine, in consultation with the Consultation Parties, whether an Overbid is |

| | |
|---|---|
| | higher or otherwise better than the Baseline Bid in the initial Overbid round or, in subsequent rounds, the Overbid previously designated by the Debtor as the prevailing highest or otherwise best Bid (the "**Prevailing Highest Bid**"). The Debtor shall announce and describe to all Qualified Bidders present at the Auction the material terms of any new Overbid designated by the Debtor as the Prevailing Highest Bid, as well as the value attributable by the Debtor to such Prevailing Highest Bid. |
| | Any Overbid to a Prevailing Highest Bid by any party other than the Stalking Horse Bidder must provide more value for the Debtor's estates than any prior bid after taking into account the Bid Protections in each round of bidding. |
| **Modification of Bidding and Auction Procedures (Del. Bankr. L.R. 6004-1(c)(i)(D))** | Without prejudice to the rights of the Stalking Horse Bidder under the terms of the Stalking Horse APA, the Debtor reserves its rights to modify these Bidding Procedures, in any manner that it reasonably determines will best promote the goals of the Bidding Procedures, or impose, at or prior to the Auction, additional customary terms and conditions in connection with a Sale, including, without limitation: (a) extending the deadlines set forth in these Bidding Procedures; (b) adjourning the Auction at the Auction; (c) adding procedural rules that are reasonably necessary or advisable under the circumstances for conducting the Auction; (d) canceling the Auction; and (e) rejecting any or all Bids or Qualified Bids, other than the Stalking Horse Bidder's. |
| | For the avoidance of doubt, nothing in the Bidding Procedures shall prevent the Debtor from exercising its fiduciary duties under applicable law. |
| | The Bidding Procedures may not be modified except with the express prior written consent of the Debtor. |
| **Closing with Alternative Backup Bidders (Del. Bankr. L.R. 6004-1(c)(i)(E))** | Notwithstanding anything in the Bidding Procedures to the contrary, if an Auction is conducted, the Qualified Bidder with the next-highest or otherwise second-best Qualified Bid at the Auction for the Assets is required to serve as a Backup Bidder until such time that the Transaction with the Successful Bidder is consummated, and each Qualified Bidder shall agree and be deemed to agree to be the Backup Bidder if so designated by the Debtor. |
| | The identity of the Backup Bidder and the amount and material terms of the Qualified Bid of the Backup Bidder shall be announced by the Debtor, at the conclusion of the Auction at the same time the Debtor announces the identity of the Successful Bidder. The Backup Bidder shall be required to keep its Qualified Bid (or if the Backup Bidder submits one or more Overbids at the Auction, its final Overbid) open and irrevocable until such time as the Transaction is consummated. The Backup Bidder's Deposit shall be held in escrow pending consummation of the Sale to the Successful Bidder. |
| | If a Successful Bidder fails to consummate the approved Transaction contemplated by its Successful Bid, the Debtor may select the Backup Bidder as the Successful Bidder, and such Backup Bidder shall be deemed a Successful Bidder for all |

| | |
|---|---|
| | purposes. The Debtor will be authorized, but not required, to consummate all Transactions contemplated by the Bid of such Backup Bidder without further order of the Court or notice to any party. In such case, the defaulting Successful Bidder's Deposit shall be forfeited to the Debtor, and the Debtor specifically reserves the right to seek all available remedies against the defaulting Successful Bidder, including with respect to specific performance. |
| **Provisions Governing the Auction (Del. Bankr. L.R. 6004-1(c)(ii))** | If an auction is necessary, the Auction shall take place on June 10, 2021, at 10:00 a.m. (Eastern) by telephone or videoconference, in the Debtor's sole discretion, or such other date and time as the Debtor shall notify all Qualified Bidders that have submitted Qualified Bids (including the Stalking Horse Bidder).<br><br>Prior to the commencement of the Auction, the Debtor shall determine, in consultation with the Consultation Parties, which of the Qualified Bids, at such time, is the highest and best bid for purposes of constituting the opening bid of the Auction (the "**Baseline Bid**" and the Qualified Bidder submitting the Baseline Bid, the "**Baseline Bidder**"), and shall promptly notify the Stalking Horse Bidder and all other Qualified Bidders with Qualified Bids of the Baseline Bid. The Baseline Bid may be comprised of any combination of the CCSP Assets, and the Debtor may determine that different Baseline Bids exist for different groupings of the CCSP Assets. The Debtor, in consultation with the Consultation Parties, shall have the discretion to determine how to proceed when auctioning the CCSP Assets to (i) further the mission of CCSP and (ii) maximize the value of the Assets.<br><br>The Auction shall be conducted in a timely fashion according to the following procedures:<br><br>**Auction Participation and Governance**:<br><br>(a) The Debtor and its professional advisors shall preside over and have the proceedings of the Auction transcribed by a qualified court reporter or other accepted means of providing a verbatim record of the proceedings.<br><br>(b) The Debtor and its professionals shall direct and preside over each Auction of the CCSP Assets. At the start of each Auction, the Debtor shall describe the terms of the Baseline Bid. All incremental Bids made thereafter shall be Overbids (as defined herein) and shall be made and received on an open basis, and all material terms of each Overbid shall be fully disclosed to all other Qualified Bidders. The Debtor shall maintain a written transcript of all Bids made and announced at each of the Auctions, including the Baseline Bid, all Overbids, and the Successful Bid.<br><br>(c) Only the Stalking Horse Purchaser, WSFS, and any other Qualified Bidders with Qualified Bids (together, the "**Auction Bidders**") shall be entitled to make any subsequent bids at the Auction, subject to the terms of these Bidding Procedures and other limitations as may |

reasonably be imposed by the Debtor. Auction Bidders, or their respective duly authorized representatives, must appear at the Auction by telephone or by such other means as the Debtor may approve in its sole discretion.

(d) The Auction shall be held telephonically or by video, and all participants in the Auction, including the Auction Bidders **shall** appear telephonically or by video at the Auction, or through a duly authorized representative, who also **shall** appear telephonically or by video at the Auction. Only the Debtor, the Auction Bidders, the Consultation Parties, and all creditors of the Debtor, together with the professional advisors to each of the foregoing parties, may attend the Auction, also telephonically or by video; provided that any of the Debtor's creditors must provide one (1) business day's written notice to counsel to the Debtor of their intent to attend the Auction.

**<u>Reservation of Rights</u>**: The Debtor reserves the right to adjourn any Auction as necessary to (i) facilitate discussions between the Debtor and Qualified Bidders, (ii) provide Qualified Bidders with additional time to consider how they wish to proceed, and (iii) provide Qualified Bidders the opportunity to offer such additional evidence as the Debtor may require, such as with respect to financial capacity or sufficient funding or financing, in order to consummate the proposed Transaction at the prevailing Overbid amount.

Following the conclusion of each Auction, the Debtor will determine, in consultation with the Consultation Parties, which Qualified Bid is the highest and best bid for those of the CCSP Assets subject to such Auction, which will be determined by considering, among other things, the following non-binding factors: (i) the transaction structure and execution risk, including conditions to, timing of and certainty of closing, termination provisions, availability of financing and financial wherewithal to meet all commitments, and required governmental or other approval; (ii) variations between competing bids and any incremental execution risk that the Debtor reasonably determines, in consultation with the Consultation Parties, exist as a result of those variations; (iii) the time needed to close a Sale or other transaction compared with other Qualified Bids and the cost to the Debtor and its estate of any incremental delay; (iv) the total consideration to be received by the Debtor and its estates; (v) the ability to obtain a higher or better offer for CCSP Assets when sold individually or in combination with one or more of the Debtor's other Assets; (vi) existing funding available or proposed to be provided by the Qualified Bidder during the period necessary to close any Sale or other transaction; (vii) the net benefit to the Debtor's estate, taking into account the Stalking Horse Purchaser's rights to any Bid Protections; (viii) the proposed treatment of existing secured indebtedness (ix) the impact on patients, employees, Counterparties (including claims that may be asserted related to rejection and objections to adequate assurance), and other creditors; and (x) any other factors the Debtor may reasonably deem relevant, including the public interest.

| | |
|---|---|
| | **Closing the Auction**: Each Auction shall continue until there is only one Qualified Bid that the Debtor determines to be the highest or otherwise best Qualified Bid for the CCSP Assets subject to such Auction. Such Qualified Bid shall be declared the "**Successful Bid**," and such Qualified Bidder, the "**Successful Bidder**," and the Auction will be closed. The Debtor shall also at that time designate the Backup Bidder. The Debtor may, thereafter, reopen one or more Auctions, in light of the Sale of other Assets of the Debtor, as necessary to ensure that the Debtor receives the highest possible value for the CCSP Assets and that the Debtor's mission is furthered as and to the extent practicable. Such acceptance by the Debtor of the Successful Bid is conditioned upon approval by the Court of the Successful Bid. <br><br> **No Collusion; Good-Faith Bona Fide Offer**: Each Qualified Bidder participating at each Auction shall be required to confirm on the record at the Auction that (i) it has not engaged in any collusion with respect to the bidding, (ii) its Qualified Bid is a good-faith bona fide offer, and (iii) it intends to consummate the proposed Transaction if selected as the Successful Bidder. |
| **Notice and Consultation Parties** | Information that must be provided to the "**Notice Parties**" under these Bidding Procedures must be provided to counsel to the Committee, if any. <br><br> The term "**Consultation Parties**" shall mean, collectively, the Committee, if any, and its advisors and WSFS and its counsel. |

## D.   OVERVIEW OF THE STALKING HORSE APA.

15.    In accordance with Local Rule 6004-1, below is a summary of the Stalking Horse APA, which may be modified by a Successful Bidder in accordance with the Bidding Procedures and the Bidding Procedures Order:[4]

| | |
|---|---|
| **Seller/Debtor** | Connections Community Support Programs, Inc. |
| **Purchaser** | Conexio Care, Inc. |
| **Purchased Assets** | Those assets identified as Acquired Assets in Section 2.1 of the Stalking Horse APA. |

---

[4]    The following summary is qualified in its entirety by reference to the provisions of the Stalking Horse APA. In the event of any inconsistencies between the provisions of the Stalking Horse APA and the terms herein, the terms of the Stalking Horse APA shall govern

| Purchase Price | Cash consideration of ten million dollars ($10,000,000), plus the payment of all Cure Costs for executory contracts being assumed and assigned to the Stalking Horse, plus Transfer and other related taxes, all in accordance with the terms of the Stalking Horse APA, |
|---|---|
| **Closing and Other Deadlines (Del. Bankr. L.R. 6004-1(b)(iv)(E))** | **Sale Hearing**: The Sale Hearing is proposed to take place on or before June 15, 2021, and at a time to be determined by the Court. At the Sale Hearing, the Debtor will present such Successful Bid to the Court for approval.<br><br>**Closing**: No later than June 30, 2021. *See* Stalking Horse APA § 8.1.<br><br>**Conditions to Closing**:<br><br>**Conditions Required by the Purchaser and Sellers**.<br><br>(a) The Bankruptcy Court shall have entered the Sale Order, which shall have become a Final Order, provided, however, that if the Buyer waives the requirement that the Sale Order has become a Final Order, the Seller shall be deemed to have also waived such requirement. *See* Stalking Horse APA §§ 6.3, 7.4.<br><br>(b) The Seller and the Buyer have received all consents, permits, approvals, authorizations and clearances of Governmental Authorities and other Persons required to consummate the Transaction including, without limitation, consents or approvals (if any exist) from counter parties to the Assumed Contracts necessary to assign such Assumed Contracts to the Buyer and from any patients, Governmental Authorities or other third parties necessary to transfer the patient records to the Buyer. *See* Stalking Horse APA § 7.2(a).<br><br>(c) Payor Contracting. The Buyer and the Seller shall, to the extent necessary (i) to transition services after the Closing to the Buyer and permit the Buyer sufficient time to obtain provider agreements, provider numbers or such other reasonable assurances, as applicable, with respect to all material payors ("Material Payors") listed on Schedule 7.5 and (ii) to permit the Buyer to bill and collect for services provided by the Buyer to enrollees and beneficiaries of such Material Payors as of and after the Closing, all to the extent agreements with such Material Payors are not included in the Assumed Contracts, enter into the interim transition services agreement (the "TSA"), in substantially the form attached to the Stalking Horse APA as Exhibit D, pursuant to which the Buyer shall, among other things, assume all costs and expenses incurred by the Seller and retain all revenues in connection with the continued operations of the Acquired Assets and Assumed Programs for the period during which the Seller and the Buyer operate under the terms of the TSA. *See* Stalking Horse APA § 7.5.<br><br>**Conditions Required by the Seller (numbers below are references to sections in the Stalking Horse APA)**.<br><br>6.1 Representations and Warranties; Covenants; Required Actions.<br><br>(a) Each of the representations and warranties of the Buyer contained in the Stalking Horse APA that are qualified as to materiality shall be true and correct on and as of the Closing Date; and each of the other representations and warranties of the Buyer contained in this Agreement shall be true and correct in all material respects on and as of the Closing Date. |

(b) Each and all of the terms, covenants and agreements to be complied with or performed by the Buyer on or before the Closing Date shall have been complied with and performed in all material respects, including the obligations of the Buyer in Section 8.3 of the Stalking Horse APA.

6.2 <u>Adverse Action or Proceeding</u>.  There shall not be in effect any order restraining, enjoining or otherwise preventing consummation of the sale of the Acquired Assets and the Transactions

**<u>Conditions Required by the Purchaser (numbers below are references to sections in the Stalking Horse APA</u>.**

7.1 <u>Representations and Warranties; Covenants</u>.

(a) Each and all of the terms, covenants and agreements to be complied with or performed by the Seller on or before the Closing Date shall have been complied with and performed, including, without limitation, the obligations of the Seller in Sections 5.3 and 8.2 of the Stalking Horse APA.

(b) Since the Execution Date, there shall not have occurred any event, change or occurrence that has or could reasonably be expected to have a Material Adverse Effect on the Seller or the Acquired Assets.

7.2 <u>Pre Closing Confirmations and Contractual Consents</u>.  The Buyer shall have obtained documentation or other evidence reasonably satisfactory to the Buyer that:

(b) Each and all of the terms, covenants and agreements to be complied with or performed by the Seller on or before the Closing Date shall have been complied with and performed, including the obligations of the Seller in Section 8.2 of the Stalking Horse APA.

7.3 <u>Adverse Action or Proceeding</u>.  No action or proceeding before any Governmental Authority shall have been instituted or threatened to restrain or prohibit the Transactions, and there shall not be in effect any order restraining, enjoining or otherwise preventing consummation of the sale of the Acquired Assets and the Transactions.

7.6 <u>Licensure and Provider Agreements</u>.  Buyer shall have been given sufficient time to ensure that Buyer will be able to continue each of the Assumed Programs after the Closing Date and/or termination of the TSA, as applicable, and Buyer and Seller shall have entered into the TSA whereby Buyer will be permitted, for an interim period after the Closing Date, to operate as an agent of the Seller to continue the Assumed Programs within the terms of the TSA, all as approved by the Bankruptcy Court, and with respect to each of the following regulatory agencies:

(a) Delaware Department of Health and Social Services, Division of Substance Abuse and Mental Health;

(b) Delaware Department of Health and Social Services, Division of Developmental Disabilities Services;

(c) Delaware Department of Health and Social Services, Division of Public Health;

(d) Delaware Department of Health and Social Services, Division of Health Care Quality (Long Term Care licensure);

(e) Delaware Department of Services for Children, Youth and Their Families, Division of Prevention and Behavioral Health Services;

(f) Delaware Department of Services for Children, Youth and Their Families, Division of Youth Rehabilitative Services; and

(g) U.S. Department of Veterans Affairs.

| | |
|---|---|
| | 7.7 <u>Title Insurance</u>.  The Buyer shall have received either (a) an ALTA (or the local equivalent thereof) extended coverage owner's policy of title insurance issued by the Buyer's title company insuring title to the Real Property in an amount equal to the portion of the Purchase Price allocated to the Real Property pursuant to Section 5.8, containing such endorsements as the Buyer may request and showing good and marketable title to the Real Property vested in the Buyer free and clear of all liens except (i) Permitted Real Property Encumbrances, and (ii) any other matter approved by the Buyer before the Closing Date (collectively "Title Policy"), or (b) the written commitments or binders of the Buyer's title company to issue the Title Policy in the aforementioned condition within a reasonable time after the Closing Date.  The Buyer agrees to waive the foregoing condition with respect to one or more parcels of Real Property, and to exclude such parcels from the Acquired Assets, if the Buyer cannot convey good and marketable title to such parcels of Real Property and the Purchase Price shall be reduced proportionally based on such exclusion using the portion of the Purchase Price allocated to such Real Property under Section 5.8, all provided that the exclusion of such parcels of Real Property from the Acquired Assets would not result in a Material Adverse Effect. |
| **Other Highlighted Terms Under Del. Bankr. L.R. 6004-1(b)(iv)** | <u>**Sale to an Insider**</u>: The Stalking Horse Bidder is not an insider (as defined in the Bankruptcy Code) of the Debtor.

<u>**Agreements with Management**</u>: No agreements with management of the Seller have been entered into in connection with the Sale.

<u>**Releases**</u>: None.

<u>**Private Sale/No Competitive Bidding**</u>: The Sale is being conducted pursuant to the competitive bidding process detailed in the Motion.

<u>**Interim Arrangements with Proposed Buyer**</u>: None.

<u>**Use of Proceeds**</u>: Any cash proceeds of the Sale shall: (a) be used to pay the Bid Protections, if applicable; (b) the Debtor's costs of the Closing, including the fees of SSG; and (c) otherwise be paid over to the Debtor for distribution in accordance with the priorities set forth in the Bankruptcy Code.

<u>**Tax Exemption**</u>: No tax exemptions under section 1146(a) of the Bankruptcy Code are contemplated in connection with the Sale.

<u>**Record Retention**</u>: The Sellers have the right to access copies of the books and records. *See* Sale Order ¶ 34

<u>**Sale of Avoidance Actions**</u>: The Acquired Assets do not include avoidance claims.

<u>**Requested Findings as to Successor Liability**</u>: The Acquired Assets shall be sold free and clear of successor liability claims.  *See* Sale Order ¶¶ X, Z, CC, 23.

<u>**Relief from Bankruptcy Rule 6004(h)**</u>: As noted in the Motion, the Debtor is requesting relief from the 14-day stay imposed by Rules 6004(h) and 6006(d).  *See* Bidding Procedures Order ¶ 36 ; *see also* Sale Order ¶ 32. |

E.    **BID PROTECTIONS.**

16.    In recognition of the considerable time, energy, and resources that the Stalking Horse Bidder has expended in connection with the Stalking Horse Transaction, if the Stalking Horse Bidder is not the Successful Bidder (or if the Debtor consummates any transaction other than the Stalking Horse Transaction), the Debtor seeks authority to grant the Stalking Horse Bidder a cash break-up fee equal to three percent (3%) of the Purchase Price (the "**Break-Up Fee**") and to reimburse the reasonable expenses of the Stalking Horse Bidder in an amount up to $350,000 (the "**Expense Reimbursement**" and, together with the Break-Up Fee, the "**Bid Protections**"), in accordance with the Stalking Horse APA.  Once approved, the Bid Protections shall constitute allowed administrative expense claims arising in the Debtor's Chapter 11 Case under sections 503(b), 507(a)(2), and 507(b) of the Bankruptcy Code.  The Bid Protections were heavily negotiated by the parties, and the Stalking Horse Bidder would not have agreed to serve as the stalking horse and would not have entered into the Stalking Horse APA without the proposed Bid Protections.

17.    Other than with respect to the Bid Protections for the Stalking Horse Bidder, if approved, the Debtor is currently making no request for the payment of any additional protections to other bidders.  In light of the nature of the Stalking Horse APA, *i.e.*, for less than all of the CCSP Assets, the Debtor expressly reserves its right to seek such additional bidding protections in its business judgment if one or more other potential stalking horse bidders for assets of CCSP other than the Acquired Assets emerges.  The Debtor further seeks authority to request such additional bidding protections on shortened notice.  Unless the Debtor specifically requests approval of additional stalking horse protections for some or all of the Excluded Assets, no party submitting a

Bid shall be entitled to a break-up fee or expense reimbursement.  In addition, the Debtor requires

that all substantial contribution claims by any bidder are deemed waived upon submission of a

Qualified Bid.

**F.     KEY DATES AND DEADLINES.**

18.     The table below summarizes the proposed key dates and deadlines with respect to

the Sale process:

| | |
|---|---|
| May 17, 2021, at 11:30 a.m. (Eastern) | Proposed Hearing to Consider Entry of the Bidding Procedures Order |
| May 19, 2021, at 4:00 p.m. (Eastern) | Deadline for Debtor to provide non-debtor parties with (i) a list of Designated Contracts, and (ii) notice of the proposed Cure Amounts for the Designated Contracts (the "**Assumption and Assignment Service Deadline**") |
| June 8, 2021, at 4:00 p.m. (Eastern) | Deadline to object to the Debtor's proposed assumption and assignment of Designated Contracts and related Cure Amounts |
| June 8, 2021, at 4:00 p.m. (Eastern) | Deadline to object ("**Sale Objection Deadline**")[5] to Section 363 Asset Sale ("**Sale Objections**") |
| June 9, 2021, at 5:00 p.m. (Eastern) | Bid Deadline |
| June 9, 2021, at 11:59 p.m. (Eastern) | Deadline for Debtor to notify bidders of whether their Bids are Qualified Bids |
| June 10, 2021, at 10:00 a.m. (Eastern) | Auction to be held (if necessary) |
| June 11, 2021, at 12:00 p.m. (noon) (Eastern) | Deadline for Debtor to (i) file with the Court the Notice of Successful Bidder and (ii) provide notice to non-Debtor parties of any Designated Contracts |
| June 11, 2021, at 4:00 p.m. (Eastern) | Deadline to object to (i) conduct of the Auction, (ii) the proposed Sale to the Successful Bidder, and (iii) the ability of the Successful Bidder to provide adequate assurance of future performance, or the proposed form of adequate assurance of future performance, with respect to the assumption and assignment of any Designated Contracts |

---

[5]     The Sale Objection Deadline applies to all objections to this Motion and the sale of any of the CCSP Assets to a Successful Bidder, with the exception of objections solely related to the identity of the Successful Bidder and adequate assurance of future performance by the Successful Bidder.

| June 14, 2021, at 4:00 p.m. (Eastern) | Deadline for Debtor and other parties to file responses to Sale Objections |
| No later than June 15, 2021, at a time to be determined by the Court | Date of a proposed Sale Hearing to consider entry of the Sale Order |
| No later than June 30, 2021 | Closing |

G.    **ASSUMPTION PROCEDURES.**

19.    The Debtor is also seeking approval of the Assumption Procedures, attached to the Bidding Procedures Order as Exhibit 4, including a notice to all counterparties to all contracts expected to be Designated Contracts (the "**Contract Assumption Notice**"), in the form attached as Exhibit 3 to the Bidding Procedures Order, to facilitate the fair and orderly assumption and assignment of certain executory contracts and/or unexpired leases in connection with the Transaction.  The key provisions of the Assumption Procedures are summarized[6] as follows:

- *Contract Assumption Notice*.  No later than the Assumption and Assignment Service Deadline, the Debtor shall serve a Contract Assumption Notice on all counterparties to all contracts expected to be Designated Contracts.  The Contract Assumption Notice will inform the counterparties of the timing and procedures relating to such assumption, and, to the extent applicable, (i) the title of the executory contract or unexpired lease, as applicable, (ii) the name of the counterparty to the executory contract or unexpired lease, (iii) the Debtor's good-faith estimates of the amount of the required cure payments, if any (the "**Cure Amounts**") related to the applicable executory contract, or unexpired lease, as applicable, and (iv) the Sale Objection Deadline.  The inclusion of a contract or unexpired lease on the Contract Assumption Notice is not a guarantee that such contract or unexpired lease will ultimately be assumed and assigned.

- *Cure Amounts and Adequate Assurance of Future Performance*.  The payment of the applicable Cure Amounts by the Successful Bidder or the Debtor as applicable, shall (i) constitute a cure of all defaults existing under executory

---

[6]    The following summary is qualified in its entirety by reference to the provisions of the Assumption Procedures.  In the event of any inconsistencies between the provisions of the Assumption Procedures and the terms herein, the terms of the Assumption Procedures shall govern.  Unless otherwise defined in the summary set forth in the accompanying text, capitalized terms have the meaning ascribed to them in the Assumption Procedures.

contract(s) or expired lease(s), as applicable, and (ii) compensate for any actual pecuniary loss to such counterparty resulting from such default.

- *Additions*. The Debtor may designate, up to and including at the Sale Hearing (the "**Designation Deadline**"), additional executory contracts and/or unexpired leases as agreements to be assumed by the Debtor and assigned to the Successful Bidder (the "**Additional Designated Contracts**"). As soon as practicable, the Debtor shall serve a Contract Assumption Notice on each of the counterparties to such Additional Designated Contracts and their counsel of record, if any, indicating (i) that the Debtor intends to assume and assign the counterparty's executory contract or unexpired lease to the Successful Bidder, (ii) any assignee, and (iii) the corresponding estimated Cure Amount.

- *Eliminations*. The Debtor may remove any executory contract or unexpired lease, as applicable, to be assumed by the Debtor and assigned to the Successful Bidder (the "**Eliminated Agreements**") through and including the Designation Deadline. The Debtor shall, as soon as reasonably practicable after identifying an Eliminated Agreement, serve a notice on each of the affected counterparties and their counsel of record, if any, indicating that the Debtor no longer intend to assume and assign the counterparty's executory contract or unexpired lease to the Successful Bidder in connection with the Sale.

- *Supplemental Contract Assumption Notice*. Although the Debtor intends to make a good-faith effort to identify all Designated Contracts that may be assumed and assigned in connection with a Sale, the Debtor may discover that certain executory contracts were inadvertently omitted from the Designated Contracts list, or the Successful Bidder may identify other executory contracts that they desire to assume and assign in connection with the Sale. Accordingly, the Debtor reserves the right at any time after the Assumption and Assignment Service Deadline and before the closing of a Sale, to file and serve a Supplemental Assumption Notice on each of the counterparties to such Designated Contracts and their counsel of record, if any.

- *Objections*. Objections, if any, to any proposed assumption and assignment or the Cure Amount proposed with respect thereto must conform with the requirements set forth in the Assumption Procedures **and be filed with the Court and served upon counsel to the Debtor, counsel to the Consultation Parties, and counsel to the Stalking Horse Bidder so as to be actually received by June 8, 2021, at 4:00 p.m. (Eastern),** or such other deadline set forth in the applicable Supplemental Assumption Notice. If a Successful Bidder that is not the Stalking Horse Bidder prevails at the Auction, then the deadline to object to assumption and assignment solely with respect to the adequate assurance of future payment from the Successful

Bidder shall be extended to June 11, 2021, at 4:00 p.m. (Eastern);[7] <u>provided,</u> <u>however,</u> that the deadline to object to the Cure Amount or other matters unrelated to the identity of the Successful Bidder shall not be extended.

20.     Any party that does not timely object to the Cure Amount, the proposed assumption and assignment of a Designated Contract or Additional Designated Contract listed on the Contract Assumption Notice or Supplemental Assumption Notice, or any Sale shall be deemed to have consented to (a) such Cure Amount, (b) the assumption and assignment of such Designated Contract or Additional Designated Contract (including the adequate assurance of future payment), (c) the related relief requested in the Motion, and (d) the Sale.  Such party shall be forever barred and estopped from objecting to the Cure Amount, the assumption and assignment of the Designated Contract, or Additional Designated Contract, adequate assurance of future performance, the relief requested herein, whether applicable law excuses such counterparty from accepting performance by, or rendering performance to, the Successful Bidder and/or the Debtor for purposes of section 365(c)(1) of the Bankruptcy Code and from asserting any additional cure or other amounts against the Debtor or the Successful Bidder, as applicable, with respect to such party's Designated Contract or Additional Designated Contract.

**H.     NOTICE PROCEDURES.**

21.     **<u>Notice of Sale Hearing</u>**. Within two business (2) days after entry of the Bidding Procedures Order, or as soon thereafter as practicable (the "**Service Date**"), the Debtor (or its agents) shall serve the Bidding Procedures Order, together with the Bidding Procedures, by first-

---

[7]     The Debtor will file, as promptly as possible after the close of the Auction, but, in any event by June 11, 2021, at 12:00 p.m. (noon) (Eastern), a Notice of Successful Bidder (as defined herein).  The Debtor will also transmit the Notice of Successful Bidder via email and fax to the counterparties to the Designated Contracts and have the Notice of Successful Bidder posted on the Debtor's claims and noticing agent's website located at https://omniagentsolutions.com/connectionsCSP.

class mail, postage prepaid, and by electronic mail (if available and known to the Debtor) or facsimile (if available and known to the Debtor) upon (a) all entities reasonably known by the Debtor to have expressed a *bona fide* interest in a potential transaction during the two years preceding the date hereof; (b) all entities known to have asserted any claim, liens, interests, or encumbrances in or upon any of the Assets; (c) all federal, state, and local regulatory or taxing authorities or recording offices that have a reasonably known interest in the relief requested by this Motion; (d) the Office of the United States Trustee for Region 3 (the "**U.S. Trustee**"); (e) the Internal Revenue Service; (f) the parties included on the Debtor's consolidated list of their 30 largest unsecured creditors or any official committee of unsecured creditors (as applicable); (g) the Office of the Attorney General of the State of Delaware; (h) the United States Attorney for the District of Delaware; and (i) all parties entitled to notice pursuant to Local Rule 2002-1(b).

22.    **Sale Notice**. In addition, by the Service Date or as soon as reasonably practicable thereafter, the Debtor shall serve a sale notice, substantially in the form annexed as **Exhibit 2** to the Bidding Procedures Order (the "**Sale Notice**") by first-class mail, postage prepaid or, for those parties who have consented to receive notice by the ECF system, by ECF, with a courtesy copy via email, upon all parties entitled to notice pursuant to Local Rule 2002-1(b) and all other known creditors of the Debtor.  The Debtor shall also have the Sale Notice and the Order posted on the website of the Debtor's claims and noticing agent located at https://omniagentsolutions.com/connectionsCSP.  Such notice shall be sufficient and proper notice of the Sale with respect to known interested parties.

23.    **Publication Notice**. On the Service Date or as soon as practicable thereafter, the Debtor may, but shall not be required to, publish notice of the proposed Sale, substantially in the

form of the Sale Notice (the "**Publication Notice**"), once in The News Journal.  The Debtor submits that such Publication Notice shall be sufficient and proper notice of any Sale to any other interested parties whose identities are unknown to the Debtor.

24.     **Notice of Successful Bidder**. As soon as possible after the conclusion of the Auction, the Debtor shall file, but not serve (except for service on counterparties to Designated Contracts), a notice identifying any Successful Bidder (the "**Post-Auction Notice**" and, collectively with the Sale Notice and Publication Notice, the "**Sale Notices**").

## BASIS FOR RELIEF

**A.     AMPLE AUTHORITY EXISTS FOR APPROVAL OF THE BIDDING PROCEDURES AND ANY SALE.**

25.     Ample authority exists for approval of the Bidding Procedures and any Sale. Section 363(b) of the Bankruptcy Code provides, in relevant part: "The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  This Court's power under section 363 of the Bankruptcy Code is supplemented by section 105(a) of the Bankruptcy Code, which provides in relevant part: "The Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  *Id*. § 105(a).

26.     Courts review a debtor's decision to use proper use, sell, or lease out of the ordinary course under the business judgment rule.  *In re Culp*, 550 B.R. 683, 697 (D. Del. 2015) ("'In determining whether to authorize use, sale or lease of property of the estate under Section 363, courts require the [Debtor] to show that a sound business purpose justifies such actions.'  If the [Debtor's] decision evidences a sound business purpose, then the Bankruptcy Court should

approve the sale." (quoting *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999)).

27.    "Under Delaware law, the business-judgment rule operates as a presumption 'that directors making a business decision, not involving self-interest, act on an informed basis, in good faith and in the honest belief that their actions are in the corporation's best interest.'" *Continuing Creditors' Comm. of Star Telecomms., Inc. v. Edgecomb*, 385 F. Supp. 2d 449, 462 (D. Del. 2004) (quoting *Grobow v. Perot*, 539 A.2d 180, 187 (Del. 1988)); *accord Ad Hoc Comm. of Equity Holders of Tectonic Network, Inc. v. Wolford*, 554 F. Supp. 2d 538, 555 n.111 (D. Del. 2008).  As set forth below, this Court should approve the Bidding Procedures and the Sale because the Debtor has demonstrated a sound business justification therefor.  *See In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 179 (D. Del. 1991).

> **i.    The Bidding Procedures Are Fair and Are Designed to Elicit the Highest or Otherwise Best Transaction Value**.

28.    The purpose of sale and bidding procedures is to promote competition in order to maximize the value of the Debtor's Assets.  *See Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 537 (3d Cir. 1999); *see also Official Comm. Of Subordinated Bondholders v. Integrated Res. Inc. (In re Integrated Res. Inc.)*, 147 B.R. 650, 659 (S.D.N.Y. 1992).

29.    The Bidding Procedures are appropriate in this context.  The Debtor designed the Bidding Procedures to ensure a fair and reasonable process that will yield the maximum value for the Debtor's Assets, while preserving as much as possible the mission of CCSP.  The proposed Bidding Procedures will facilitate a competitive process in which all Potential Bidders are encouraged to participate and submit bids (while affording Potential Bidders flexibility in

structuring their Bids).  The Bidding Procedures provide Potential Bidders with sufficient notice and opportunity to acquire information necessary to submit timely and informed bids at each stage of the sale process.  Thus, the Debtor and all parties in interest can be assured that the Debtor will have the opportunity to consider all competing bids in a fair process and that the consideration received will be the highest and best available in light of the circumstances, including the vital services that CCSP provides to the Delaware community.

       **ii.**       **The Sale Represents a Sound Exercise of the Debtor's Business Judgment.**

30.      The section 363(b) standard for sales outside of the ordinary course of a debtor's business is met here.

31.      The Debtor has demonstrated ample business justifications for the Sale.  The Debtor and its investment banker aggressively marketed the CCSP Assets extensively prior to the Petition Date.  The Debtor intends to continue such efforts post-petition, including by providing notice to those entities that previously expressed interest in the CCSP Assets, in accordance with the Bidding Procedures.  The Bidding Procedures provide for a fair and organized process that is designed to encourage competitive bidding in order to maximize the value of the Debtor's operations.  As part of the Bidding Procedures, the Debtor has required each Potential Bidder to mark up the Stalking Horse APA and submit it as part of their Bid (along with a redline to the form), which will allow the Debtor to determine and select the qualifying bids and bidders for the CCSP Assets.  The Debtor and its professionals have further included sufficient flexibility in the Bidding Procedures to allow the Debtor to auction the CCSP Assets as a whole or separately to preserve as much as possible the existing operations of the Debtor.  The Debtor has further requested authority to seek additional bidding protections if necessary, in the reasonable business

judgment of the Debtor, to maximize the value of the CCSP Assets and ensure the continued operations of CCSP.

32.    In short, the Debtor believes that a sale of the CCSP Assets pursuant to and in accordance with the Bidding Procedures will afford Potential Bidders the flexibility to structure their Bids in a manner that best suits their goals, while ensuring that Qualified Bids generate the greatest possible value for the Assets.  To this end, if a Bid is submitted that (a) contemplates a Sale, and (b) is higher or otherwise better than the Stalking Horse Transaction, this Court should approve the Sale to that Bidder.  Similarly, if a combination of Bids, or a Bid for all of the CCSP Assets is submitted that the Debtor and its professional advisors, after consultation with the Consultation Parties, determines is or are higher and better than the Stalking Horse Bid, the Debtor will request that the Court approve such Sale.

**B.    THE PROPOSED BID PROTECTIONS SHOULD BE AUTHORIZED.**

33.    The Debtor seeks authorization to pay the Bid Protections, including a Break-Up Fee of three percent (3%) of the Purchase Price and an Expense Reimbursement of up to $350,000, to the Stalking Horse Bidder in the event that the Stalking Horse Bidder is not the Successful Bidder (or if the Debtor consummates any transaction that includes the Acquired Assets other than the Stalking Horse Transaction).  Approval of bidding protections in connection with the sale of significant assets pursuant to section 363 of the Bankruptcy Code has become established practice in chapter 11 cases.  Such bidding protections enable a debtor to ensure a sale to a contractually committed bidder at a price the debtor believes is fair, while setting a floor to encourage an active process to generate additional value for the estate.

34.     The United States Court of Appeals for the Third Circuit has established standards for determining the propriety of bidding incentives in the bankruptcy context.  *See O'Brien Envtl. Energy, Inc.*, 181 F.3d at 533–38; *see also In re Reliant Energy Channelview LP*, 594 F.3d 200, 205 (3d Cir. 2010) (noting that *O'Brien* "set forth the controlling legal principles" applicable to bidding incentives).  The Court has held that even though bidding incentives, including break-up fees, are measured against a business judgment standard in nonbankruptcy transactions, the administrative expense provisions of section 503(b) of the Bankruptcy Code govern in the bankruptcy context.  *See O'Brien Envtl. Energy*, 181 F.3d at 535.  Accordingly, bidding incentives must provide some post-petition benefit to the debtor's estate in order to be approved.  *See In re Energy Future Holdings Corp.*, 904 F.3d 298, 314 (3rd Cir. 2018); *O'Brien Envtl. Energy*, 181 F.3d at 533.  With respect to break-up fees, the standard is generally satisfied if the bid protections promote a more competitive process, for example.  *O'Brien Envtl. Energy*, 181 F.3d at 537.

35.     A break-up fee of around three percent (3%) can promote such competitive bidding. *See In re Celadon Grp., Inc.*, Case No. 19–12606 (KBO) (Bankr. D. Del. Jan. 6, 2020) (Docket No. 219) (authorizing a break-up fee of up to 3% of the purchase price); *In re Bumblebee Parent Inc., et al.*, Case No. 19-12502 (LSS) (Bankr. D. Del. Dec. 19, 2019) (Docket No. 171) (approving a break-up fee of approximately 2.5% of the purchase price); *In re Fred's, Inc., et al.*, Case No. 19-11984 (CSS) (Bankr. D. Del. Sept. 27, 2019) (Docket No. 204) (approving break-up fee and expense reimbursement of up to 1.5% of the purchase price); *In re Nanomech, Inc.*, Case No. 19-10851 (JTD) (Bankr. D. Del. May 13, 2019) (Docket No. 93) (approving a break-up fee of approximately 2.2% of the purchase price); *In re Things Remembered, Inc., et al*, Case No. 19-

10234 (KG) (Docket No. 150) (approving a break-up fee of 2.4% of the purchase price).[8]  In smaller cases such as this one, amounts that may represent percentages of the transaction size or price greater than those approved in larger cases are approved if they are nonetheless reasonable.

36.     The amount of the proposed Bid Protections is reasonable and appropriate in light of the size and nature of the Sale and the efforts that have been and will be expended by the Stalking Horse Bidder.  The Stalking Horse Bidder has performed and will continue to perform substantial incremental work to formulate, document, and close the Stalking Horse Transaction, and has conducted substantial due diligence concerning the Debtor's business, the CCSP Assets generally, and the Acquired Assets in particular.  These efforts have positioned the Debtor to pursue a process that will ensure the continuation, as much as reasonably possible under the circumstances of continuing at least certain of the current services of CCSP and both maximize the going concern value of CCSP's operations and the chance of preserving such operations for the benefit of all stakeholders.

37.     Moreover, the Bid Protections, including the Break-Up Fee, are necessary to preserve the value of the estate and were necessary to secure the Stalking Horse Bidder's commitment under the Stalking Horse Transaction.  As such, the Bid Protections provide the Debtor with a platform from which to ensure a value-maximizing transaction for the benefit of their estates, creditors, and stakeholders.  Moreover, payment of the Bid Protections is customary and will not diminish the Debtor's estates as the amount of the Bid Protections will be covered in the Minimum Initial Overbid amount.

---

[8]     In accordance with Local Rule 7007-2, the Debtor's proposed counsel has copies of each of the above-referenced orders and will make them available to this Court and to any party that requests them.  The orders are also available on this Court's CM/ECF PACER site at the cited docket numbers and on the dates specified above.

C.    A SALE WILL SATISFY THE REQUIREMENTS OF SECTION 363(F) OF THE BANKRUPTCY CODE FOR A SALE FREE AND CLEAR OF INTERESTS.

38.    The Debtor seeks authority to sell the Assets free and clear of any interest, pursuant to section 363(f) of the Bankruptcy Code.

39.    Section 363(f) of the Bankruptcy Code provides for a sale "free and clear" of an entity's interest in property of the estate if:

    i.    applicable non-bankruptcy law permits sale of such property free and clear of such interest;

    ii.    such entity consents;

    iii.    such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

    iv.    such interest is in bona fide dispute; or

    v.    such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

40.    Section 363(f) of the Bankruptcy Code is stated in the disjunctive; therefore, it is only necessary to meet one of the five conditions of section 363(f) in a sale under section 363(b) of the Bankruptcy Code.  The Debtor submits that one or more of the conditions set forth in section 363(f) of the Bankruptcy Code will be satisfied with respect to any Sale.

41.    To be clear, the sale proposed through the Stalking Horse Bid will not generate sufficient proceeds to pay off all of the face value of the liens on the real property that is part of the Acquired Assets.  However, to the extent that the lenders holding liens on such real property do not consent to such sale, and the Debtor believes that such lenders will consent because the current anticipated proceeds of such sale, after the payment of all closing costs and other fees and expenses, including those of SSG, the proceeds of such sale, although less than the full face amount of such liens, will exceed the actual value of such liens.

42.     The Debtor will send the Sale Notice to, among others, all parties who assert liens or claims against or interests in the Assets.  Any holder of a lien or claim against or interest in the Assets who has standing to but does not object to the Sale shall be deemed to have consented to the sale of the Assets free and clear of its lien, claim, or interest.  11 U.S.C. § 363(f)(2); *see In re Heritage Home Grp. LLC*, Case No. 18-11736 (KG), 2018 WL 4684802 (Bank. D. Del. Sept. 27, 2018); *Hargrave v. Twp. of Pemberton*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994).  Moreover, the Debtor believes that any parties who do object on the basis that they hold liens or claims against the Assets will either (a) be holders of liens or claims that are subject to a bona fide dispute or (b) would be compelled to accept cash in satisfaction of their interests.  *Cf.* 11 U.S.C. §§ 363(f)(3) & 363(f)(5).

43.     Any lienholder or interestholder also will be adequately protected by having its interest, if any, attach to the proceeds of the Sale, in the same order of priority, with the same validity, force, and effect, that such creditor had prior to the sale, subject to any claims and defenses that the Debtor and its estates may possess with respect thereto.  *Cf.* 11 U.S.C. § 363(f)(3).  Therefore, pursuant to section 363 of the Bankruptcy Code, the Debtor may sell the Assets free and clear of all liens, claims, and encumbrances.

44.     The Debtor also submits that it is appropriate to sell the Assets free and clear of any claim for successor liability relating to the Debtor's business.  Such a provision ensures that the Successful Bidder is protected from any claims or lawsuits premised on the theory that the Successful Bidder is a successor in interest to the Debtor.

45.     Courts have consistently held that a buyer of a debtor's assets pursuant to a section 363 sale takes free and clear from successor liability relating to the debtor's business.  *See, e.g., In*

*re Trans World Airlines, Inc.*, 322 F.3d 283, 288–93 (3d Cir. 2003) (sale of assets pursuant to section 363(f) barred successor liability claims for employment discrimination and rights under travel voucher program); *United Mine Workers of Am. 1992 Benefit Plan v. Leckie Smokeless Coal Co. (In re Leckie Smokeless Coal Co.)*, 99 F.3d 573, 585–87 (4th Cir. 1996) (affirming the sale of Debtor's assets free and clear of certain taxes); *Riverside Acquisition Grp. LLC v. Vertis Holdings, Inc. (In re Vertis Holdings, Inc.)*, 536 B.R. 589, 636–38 (Bankr. D. Del. 2015) (sale of assets pursuant to 363(f) barred successor liability claims for tortious acts); *Amphenol Corp. v. Shandler (In re Insilco Techs., Inc.)*, 351 B.R. 313, 322 (Bankr. D. Del. 2006) (stating that a 363 sale permits a buyer to take ownership of property without concern that a creditor will file suit based on a successor liability theory); *see also In re Gen. Motors Corp.*, 407 B.R. 463, 505–06 (Bankr. S.D.N.Y. 2009) (holding that "[t]he law in this Circuit and District is clear; the Court will permit GM's assets to pass to the purchaser free and clear of successor liability claims, and in that connection, will issue the requested findings and associated injunction"); *In re Chrysler LLC*, 405 B.R. 84, 111 (Bankr. S.D.N.Y. 2009) ("*[I]n personam* claims, including any potential state successor or transferee liability claims against New Chrysler, as well as *in rem* interests, are encompassed by section 363(f) and are therefore extinguished by the Sale.").

46.    The purpose of section 363 and any order authorizing the transfer of assets free and clear of all liens, claims, encumbrances, and all other interests would be frustrated if claimants could thereafter use the transfer as a basis to assert claims against a purchaser arising from a seller's pre-sale conduct.  Moreover, without such assurances, the Debtor would run the risk that potential bidders may not enter the Auction or, if they did, would do so with reduced bid amounts.  To that end, any Successful Bidder should not be liable under any theory of successor liability relating to

the Debtor's business but should acquire the particular CCSP Assets subject to such Successful Bidder's Sale free and clear.

D.     **ANY SUCCESSFUL BIDDER SHOULD BE ENTITLED TO THE PROTECTIONS OF SECTION 363(m) OF THE BANKRUPTCY CODE.**

47.     Section 363(m) of the Bankruptcy Code provides in relevant part that the reversal or modification on appeal of an authorization under section 363(b) of a sale or lease of property does not affect the validity of a sale or lease under such authorization to a buyer who bought or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.  *See* 11 U.S.C. § 363(m).  Pursuant to section 363(m) of the Bankruptcy Code, a good faith purchaser is one who purchases assets for value, in good faith, and without notice of adverse claims.  *See Mark Bell Furniture Warehouse, Inc. v. D.M. Reid Assocs., Ltd. (In re Mark Bell Furniture Warehouse, Inc.)*, 992 F.2d 7, 8 (1st Cir. 1993); *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 147 (3d Cir. 1986) (holding that section 363(m) "encompasses one who purchases in 'good faith' and for 'value'" under traditional equitable principles); *Willemain v. Kivitz*, 764 F.2d 1019, 1023 (4th Cir. 1985); *In re Tempo Tech. Corp.*, 202 B.R. 363, 367 (D. Del. 1996) ("[T]he concept of 'good faith' speaks to the integrity of a party's conduct in the course of the bankruptcy sale proceedings."); *In re Congoleum Corp.*, Case No. 03-51524, 2007 WL 1428477, at *2 (Bankr. D.N.J. May 11, 2007).

48.     The Debtor's marketing efforts and negotiations with Potential Bidders have been and will continue to be undertaken at arm's length and without collusion, with all parties being represented or at least having the opportunity to be represented by their own counsel and other professional advisors.  Accordingly, the Debtor requests, and will demonstrate at the Sale Hearing, that the Successful Bidder for the Assets should be deemed and is in fact a "good faith" buyer

within the meaning of section 363(m) of the Bankruptcy Code.  The Debtor believes that providing any Successful Bidder with such protection will ensure that the Debtor will have the best chance of preserving as much of the current operations of CCSP as possible and receiving the highest or otherwise best offer for the CCSP Assets and that the closing of the Sale will occur promptly.

49.     Additionally, the Bidding Procedures are designed to prevent the Debtor and/or any Successful Bidders (or any Backup Bidders) from engaging in any conduct that would cause any Sale to any Successful Bidder (or any Backup Bidder) to be avoided under section 363(n) of the Bankruptcy Code.

**E.     ASSUMPTION OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES SHOULD BE AUTHORIZED.**

50.     Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or [unexpired] lease of the debtor." 11 U.S.C. § 365(a).  Bankruptcy courts apply a reasonable business judgment standard when considering a debtor's decision to assume or reject an executory contract or unexpired lease.  *See, e.g., In re HQ Glob. Holdings, Inc.*, 290 B.R. 507, 511 (Bankr. D. Del. 2003) (a debtor's decision to assume or reject executory contract is governed by business judgment standard and can only be overturned if decision was "product of bad faith, whim, or caprice"); *cf. In re Market Square Inn, Inc.*, 978 F.2d 116, 121 (3d Cir. 1992) (assumption or rejection of lease "will be a matter of business judgment by the bankruptcy court"); *Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 39–40 (3d Cir. 1989) (same).  A debtor has exercised its reasonable business judgment if it can demonstrate that assumption or rejection of an executory contract will benefit the estate. *See Sharon Steel Corp.*, 872 F.2d at 36, 39–40; *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *In re HQ Global Holdings, Inc.*, 290 B.R.

507, 511 (Bankr. D. Del. 2003); *Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co. (In re Wheeling-Pittsburgh Steel Corp.)*, 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987).  "[M]ore exacting scrutiny would slow the administration of the debtor's estate and increase costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially."  *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).  Moreover, for a debtor to assume an executory contract under section 365(b)(1) of the Bankruptcy Code, it also must cure, or provide adequate assurance that it will promptly cure, any default, including compensation for any "actual pecuniary loss" relating to such default. 11 U.S.C. § 365(b)(1).  Here, because the sale proceeds will not even cover the face value of existing liens, the Stalking Horse Bidder has agreed to pay the cure claims associated with the executory contracts it determines to assume.

51.    Once an executory contract is assumed, the trustee or debtor in possession may elect to assign such contract pursuant to section 365(f) of the Bankruptcy Code.  *See L.R.S.C. Co. v. Rickel Home Ctrs., Inc. (In re Rickel Home Ctrs., Inc.)*, 209 F.3d 291, 299 (3d Cir. 2000) (noting that the Bankruptcy Code "generally favors free assignability as a means to maximize the value of the debtor's estate"); *see also Leonard v. Gen. Motors Corp.( In re Headquarters Dodge, Inc.)*, 13 F.3d 674, 682 (3d Cir. 1994) (noting that the purpose of section 365(f) is to assist trustee in realizing the full value of the debtor's assets).  Section 365(f)(1) of the Bankruptcy Code permits a debtor to assign unexpired leases and contracts free from anti-assignment restrictions, providing, in relevant part:

> Notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease under paragraph (2) of this subsection.

11 U.S.C. § 365(f)(1). Furthermore, section 365(f)(3) of the Bankruptcy Code prohibits enforcement of any clause creating a right to modify or terminate the contract or lease upon a proposed assumption or assignment thereof. See 11 U.S.C. § 365(f)(3). *See, e.g., In re Jamesway Corp.*, 201 B.R. 73, 77–78 (Bankr. S.D.N.Y. 1996) (section 365(f)(3) of the Bankruptcy Code prohibits enforcement of any lease clause creating a right to terminate the lease because it is being assumed or assigned, thereby indirectly barring assignment by a debtor). Other courts have recognized that provisions that have the effect of restricting assignments cannot be enforced. *See In re Rickel Home Ctrs., Inc.*, 240 B.R. 826, 831 (D. Del. 1998) ("In interpreting Section [365(f)], courts and commentators alike have construed the terms to not only render unenforceable lease provisions which prohibit assignment outright, but also lease provisions that are so restrictive that they constitute de facto anti-assignment provisions.").

52.    Section 365(f) of the Bankruptcy Code requires the debtor and proposed purchaser to provide adequate assurance of the latter's future performance in order for debtor to assign an executory contract. 11 U.S.C. § 365(f)(2). The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given a "practical, pragmatic construction." *In re DBSI, Inc.*, 405 B.R. 698, 708 (Bankr. D. Del. 2009); *EBG Midtown S. Corp. v. McLaren/Hart Envtl. Eng'g Corp. (In re Sanshoe Worldwide Corp.)*, 139 B.R. 585, 592 (S.D.N.Y. 1992), aff'd, 993 F.2d 300 (2d Cir. 1993); *see also In re Decora Indus. Inc.*, Case No. 00-4459JJF, 2002 WL 32332749 at *8 (D. Del. May 20, 2002) ("adequate assurance falls short of an absolute guaranty of payment"); *Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1988) (adequate assurance "will fall

considerably short of an absolute guarantee of performance") (quoting *In re Luce Industries, Inc.*, 8 B.R. 100, 107 (Bankr. S.D.N.Y. 1980)).

53.    Adequate assurance may be provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See, e.g., In re ANC Rental Corp.*, 278 B.R. 714, 724 (Bankr. D. Del. 2002) (adequate assurance is present where prospective assignee hired personnel with experience running Debtor's business and presented evidence of its financial security); *In re Bygaph, Inc.*, 56 B.R. 596, 605–06 (Bankr. S.D.N.Y. 1986) (adequate assurance is present when prospective assignee of lease from debtor has financial resources and has expressed willingness to devote sufficient funding to business to give it strong likelihood of succeeding).

54.    To facilitate and effect the Sale, the Debtor requests approval under section 365 of the Bankruptcy Code of the Debtor's assumption and assignment (as applicable) of the Designated Contracts to any Successful Bidder.  The Debtor further requests that the Sale Order provide that the Designated Contracts will remain in full force and effect for the benefit of any such Successful Bidder (and be transferred to a Successful Bidder, to the extent applicable) notwithstanding any provisions in the Designated Contracts, including those described in sections 365(b)(2) and (f)(1) and (3) of the Bankruptcy Code, that prohibit such assumption and assignment.

55.    The Stalking Horse intends to take assignment of many of the Debtor's material contracts related to the Assumed Programs as part of the Stalking Horse Transaction.  The Debtor proposes to serve Contract Assumption Notices on all counterparties to Designated Contracts as set forth herein and in the Bidding Procedures Order and provide such counterparties with an opportunity to object to assumption and assignment and the Debtor's proposed Cure Amount.  The

Designated Contracts will be assumed and assigned at closing of the contemplated Sale or at the closing of any other Sales ultimately approved by the Court, as requested herein.

56.    The Debtor's assumption and assignment of the Designated Contracts to the Successful Bidder meets the business judgment standard and satisfies the requirements of section 365 of the Bankruptcy Code.  The assumption and assignment of key executory contracts and unexpired leases is necessary for the Successful Bidder to conduct operations going forward. Because no purchaser of the any of CCSP's operations as a going concern would acquire some or all of the CCSP Assets without certain key executory contracts and unexpired leases, the assumption and assignment of such agreements is essential to securing the highest or otherwise best offer for the CCSP Assets and attempting to ensure the continuation of the Debtor's services, as much as possible under the circumstances.  Further, upon consummation of any Sale, the Debtor will no longer continue to operate the Assets transferred in connection with such Sale and will, therefore, have no use for any of the executory contracts and unexpired leases previously used in the ordinary course of the operation of the CCSP Assets.

57.    To the extent that any defaults exist under any executory contract or unexpired lease that is to be assumed and assigned in connection with any sale of some or all of the CCSP Assets, the Successful Bidder or the Debtor, as applicable, will cure any such default prior to such assumption and assignment.  The Stalking Horse Bidder is obligated to pay cure costs for any executory contracts and unexpired leases it assumes.

58.    The Debtor contemplates that any Successful Bidder will be able to provide adequate assurance of future performance in connection with any assumed and assigned executory contracts and unexpired leases, because such Successful Bidder must submit evidence sufficient

to demonstrate its financial wherewithal and ability to consummate the transaction. In addition, under the Assumption Procedures, the non-Debtor party to any Designated Contract will have the opportunity to object to adequate assurance of future performance by any Successful Bidder proposing to assume such non-Debtor party's Designated Contract.

59.    The Debtor will present facts at the Sale Hearing establishing the financial credibility, willingness, and ability of any Successful Bidder to perform under the Designated Contracts.  The Sale Hearing, therefore, will afford the Court and other interested parties the opportunity to evaluate the ability of each such Successful Bidder to provide adequate assurance of future performance under the Designated Contracts, as required under section 365(b)(1)(C) of the Bankruptcy Code.  Further, as set forth above, the Debtor will give notice to all parties to the Designated Contracts of their intention to assume and assign the Designated Contracts, as the case may be, as well as the proposed Cure Amounts and the provision for their payment.

60.    Accordingly, the Debtor submits that implementation of the proposed Assumption Procedures is appropriate in this Chapter 11 Case, and the Court will have a sufficient basis to authorize the Debtor to reject or assume and assign contracts as will be set forth in the Successful Bidder's asset purchase agreement.

**F.    THE FORMS OF NOTICE AND NOTICE PROCEDURES FOR THE BIDDING PROCEDURES, THE AUCTION, AND THE SALE HEARING ARE REASONABLE AND APPROPRIATE.**

61.    Under Bankruptcy Rules 2002(a) and (c), the Debtor is required to notify creditors of the Sale, including disclosing the time and place of any auction, the terms and conditions of the Sale, and the deadline for filing any objections thereto.  *See* Fed. R. Bankr. P. 2002 (a), (c).

62.    The Debtor submits that the notice procedures described above fully comply with Bankruptcy Rule 2002 and are reasonably calculated to provide timely and adequate notice of the

Bidding Procedures, the Auction, and the Sale Hearing to the Debtor's creditors and all other interested parties that are entitled to notice, as well as to those parties that have expressed a bona fide interest in acquiring some or all of the CCSP Assets and some or all of the operations of CCSP as a going concern.

63.     Accordingly, the Debtor respectfully requests that the Court approve the notice procedures set forth herein, including the form and manner of service of the Sale Notice, the Publication Notice, and the Notice of Successful Bidder and that no other or further notice of the Bidding Procedures, the Auction, and the Sale Hearing is necessary or required.

## G.     RELIEF UNDER BANKRUPTCY RULE 6004(h) AND 6006(d) IS APPROPRIATE.

64.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h). Additionally, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6006(d). The Debtor requests that each of the Bidding Procedures Order and the Sale Order be effective immediately upon its entry by providing that the fourteen-day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

65.     The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to request a stay pending appeal before an order can be implemented. See Fed R. Bankr. P. 6004(d) advisory committee's note. The stay pursuant to Bankruptcy Rule 6004(h) may be waived to allow a sale to close immediately "where there has been no objection to the procedure." *See* 10 Collier on Bankruptcy ¶ 6004.11 (16th ed. 2016). Accordingly, the

Debtor hereby requests that the Court waive the fourteen-day stay period under Bankruptcy Rules 6004(h) and 6006(d).

## NOTICE

66.     Notice of this Motion shall be provided to: (a) the Office of the United States Trustee for the District of Delaware; (b) the Debtor's thirty (30) largest unsecured creditors as identified on the voluntary petitions; (c) the United States Attorney's Office for the District of Delaware; (d) counsel to WSFS; (e) all applicable federal, state, and local taxing and regulatory authorities having jurisdiction over the Assets; and (f) all parties known to the Debtor who hold any liens or security interests in the Debtor's Assets who have filed against the Debtor appropriate documents with the requisite public offices , or who, to the Debtor's knowledge, have asserted any liens on or security interests in the Debtor's Assets (collectively, the "**Notice Parties**").  As the Debtor is seeking expedited relief with respect to the Bidding Procedures, including the Bid Protections to be afforded the Stalking Horse Bidder, notice of this Motion and any order entered hereon will be served on all parties required by Local Rule 9013-1(m).  Due to the urgency of the circumstances surrounding this Motion and the nature of the relief herein, the Debtor respectfully submits that no further notice of this Motion is required.

## NO PRIOR REQUEST

13.     The Debtor has not previously sought the relief requested herein from this or any other Court.

## CONCLUSION

**WHEREFORE**, the Debtor respectfully requests entry of the Bidding Procedures Order granting the relief requested herein and such other and further relief as is just and proper.

Dated: April 27, 2021
     Wilmington, Delaware

**CHIPMAN BROWN CICERO & COLE, LLP**


     /s/ Mark L. Desgrosseilliers
William E. Chipman, Jr. (No. 3818)
Mark L. Desgrosseilliers (No. 4083)
Hercules Plaza
1313 North Market Street, Suite 5400
Wilmington, Delaware 19801
Telephone:    (302) 295-0191
Email:       chipman@chipmanbrown.com
               desgross@chipmanbrown.com


*Proposed Counsel for the Debtor and Debtor-in-Possession*