# EXHIBIT 1

**BIDDING PROCEDURES**

On April 19, 2021, Connections Community Support Programs, Inc. (the "**Debtor**"), filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"). The Debtor is operating its businesses and managing its properties as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

On April 21, 2021, the Debtor entered into an Asset Purchase Agreement (the "**Non-MAT Stalking Horse APA**") with Conexio Care, Inc. (the "**Non-MAT Stalking Horse Bidder**"), by which the Non-MAT Stalking Horse Bidder or a designee of the Stalking Horse Bidder, as permitted pursuant to the Stalking Horse APA, will acquire certain of the Debtor's assets (the "**Acquired Non-MAT Assets**").

On April 27, 2021, in connection with a proposed sale or sales (collectively, the "**Non-MAT Sale**") of the Acquired Assets, and all other assets of the Debtor that are not Acquired Assets (such assets, the "**Excluded Non-MAT Assets**" and with the Acquired Non-MAT Assets, collectively, the ("**CCSP Assets**") pursuant to section 363 of the Bankruptcy Code to the successful bidder or bidders (each a "**Successful Bidder**"), free and clear of all liens, claims, encumbrances and other interests at one or more auctions (each, an "**Auction**"), the Debtor filed a motion (the "**Non-MAT Sale Motion**") (Docket No. 54), seeking, among other things, entry of an order (i) approving certain bidding procedures governing the solicitation of higher or better bids; (ii) establishing procedures for the assumption or assignment and assumption of executory contracts; (iii) scheduling a sale hearing (the "**Sale Hearing**"); and (iv) granting related relief.

On April 30, 2021, the Debtor entered into an Asset Purchase Agreement (the "**MAT Stalking Horse APA**"), a copy of which is attached hereto as **Exhibit A**, with Conexio Care, Inc. (the "**MAT Stalking Horse Bidder**"), by which the MAT Stalking Horse Bidder or a designee of the MAT Stalking Horse Bidder, as permitted pursuant to the MAT Stalking Horse APA, will acquire certain of the Debtor's assets (the "**Acquired MAT Assets**"). On that same date, the Debtor filed its motion (the "**MAT Sale Motion**") (Docket No. 71), in connection with a sale or sales (collectively the "**MAT Sale**" and with the Non-MAT Sale, collectively, the "**Sale**") for entry of an order approving certain bidding procedures governing the solicitation of higher or better bids; (ii) establishing procedures for the assumption or assignment and assumption of executory contracts; (iii) scheduling the Sale Hearing; and (iv) granting related relief.

On May ☐, 2021, the Bankruptcy Court entered two orders (Docket Nos. ☐ and ☐) (collectively, the "**Bidding Procedures Order**") that, among other things, authorized the Debtor to solicit bids and approved the bidding procedures to be employed by the Debtor in connection with the sale of substantially all of the Debtor's assets and operations, including both the Acquired Non-MAT Assets and the Acquired MAT Assets.

The proposed sale transactions pursuant to the Non-MAT Stalking Horse APA and the MAT Stalking Horse APA are subject to competitive bidding as set forth herein. Capitalized terms used herein but not otherwise defined shall have the meanings set forth in the Non-MAT Stalking Horse APA, the MAT Stalking Horse APA, and the Bidding Procedures Order, as applicable.

Set forth below are the Bidding Procedures in connection with the Sale.

## ASSETS TO BE SOLD

The Debtor seeks to consummate a sale of some or all of the CCSP Assets, which include the Acquired Non-MAT Assets and the Acquired MAT Assets, and any other assets of the Debtor available for sale. The sale of the CCSP Assets is on an "as is, where is" basis and without representations or warranties of any kind, nature or description by the Debtor, its agents, or estate, except to the extent set forth in any Asset Purchase Agreement (as defined below) of the Successful Bidder (as defined below) as approved by the Bankruptcy Court. Except as otherwise provided in such approved Asset Purchase Agreement, all of the Debtor's rights, title, and interest in and to each asset to be acquired shall be sold free and clear of all interests, liens, claims, and encumbrances (collectively, the "**Encumbrances**"), with such Encumbrances to attach solely to the net proceeds of the Sale.

## THE BID PROCEDURES

In order to ensure that the Debtor receives the maximum value for the CCSP Assets, the Non-MAT and MAT Stalking Horse APAs are subject to higher or better offers, and, as such, the Non-MAT and MAT Stalking Horse APAs will serve as the "stalking-horse" bid for the Acquired Assets described in the Stalking Horse APA. The Debtor seeks to sell all of the CCSP Assets through one or more Sales.

**ANY PARTY INTERESTED IN BIDDING ON THE ASSETS SHOULD CONTACT THE DEBTOR'S PROPOSED INVESTMENT BANKER: SSG Advisors, LLC, 300 Barr Harbor Drive, Suite 420, West Conshohocken, PA 19428 (Attn: J. Scott Victor (jsvictor@ssgca.com)).**

### SUMMARY OF IMPORTANT DATES

| Milestone | Date |
|---|---|
| Deadline to Serve Sale Notice | May 19, 2021 |
| Deadline to Serve Assumption Notice | May 19, 2021 |
| Deadline to Object to Sale (other than with respect to the conduct of the Auction and designation of a Successful Bidder), including adequate assurance of future performance of Stalking Horse Bidder and Cure Objection | June 2, 2021 @ 4:00 p.m. (Eastern) |
| Bid Deadline | June 3, 2021 @ 5:00 p.m. (Eastern) |
| Auction Date | June 4, 2021 @ 10:00 a.m. (Eastern) |
| Deadline to Serve Auction Results Notice | June 5, 2021 |
| Deadline to Object to Designation of Successful Bidder, and Assumption Notice | June 7, 2021 @ 10:00 a.m. (Eastern) |
| Deadline to Object to Conduct of Auction, Adequate Assurance and | June 7, 2021 @ 10:00 a.m. |

| Assumption/Assignment to Successful Bidder (if other than Stalking Horse Bidder) | |
|---|---|
| Sale Hearing | June 8, 2021 @ 2:00 p.m. (Eastern) |
| Outside Closing Date | June 15, 2021 |

## PARTICIPATION REQUIREMENTS

Any person or entity that wishes to conduct due diligence and gain access to the Debtor's confidential electronic data room concerning the Assets (the "**Data Room**" and such person or entity, a "**Potential Bidder**") must submit to the Debtor and its advisors an executed confidentiality agreement (a "**Confidentiality Agreement**") in form and substance reasonably satisfactory to the Debtor.

Any Potential Bidder that wishes to participate in the bidding process for the Assets must first become a "**Qualified Bidder**". Potential Bidders may be qualified as a Qualified Bidder up to the Bid Deadline (*i.e.*, **June 3, 2021, at 5:00 p.m. (Eastern)**), but **parties interested in submitting a bid for any of the CCSP Assets are encouraged to qualify as soon as possible because the Bidding Procedures do not permit any due diligence or financing conditions in Qualified Bids**.

To become a Qualified Bidder, Potential Bidders must submit, in addition to the requirements for a Qualified Bid as set forth below, sufficient information, as determined by the Debtor, to allow the Debtor, after consultation with the Consultation Parties,[1] to determine that the Potential Bidder (i) has, or can obtain, the financial wherewithal and any required internal corporate, legal or other authorizations to close a sale transaction, including, but not limited to, current audited financial statements of the Potential Bidder (or such other form of financial disclosure acceptable to the Debtor in its discretion) and (ii) can provide adequate assurance of future performance under any executory contracts and unexpired leases to be assumed by the Debtor and assigned to such Potential Bidder pursuant to section 365 of the Bankruptcy Code in connection with the Sale.

Each Potential Bidder shall comply with all reasonable requests for information and due diligence access by the Debtor or its advisors regarding the ability of such Potential Bidder to consummate its contemplated transaction.

Notwithstanding anything to the contrary herein, and for the avoidance of doubt, for all purposes under the Bidding Procedures: (a) the Stalking Horse Bidder shall be considered a Qualified Bidder and (b) the Stalking Horse Purchase Agreement shall be a Qualified Bid (as defined below).

To the extent that a bid is proposed by a group or committee to which Bankruptcy Rule 2019 applies, such parties must promptly file the statement required by such rule as a condition to becoming a Qualified Bidder.

---

[1] The term "**Consultation Parties**" shall mean, collectively, the Committee appointed in the Debtor's bankruptcy case and its counsel and (ii) WSFS and its counsel.

Notwithstanding anything to the contrary herein, for purposes of the Auction, Wilmington Savings Fund Society, FSB, a federal savings bank ("**WSFS**"), will be deemed a Qualified Bidder without the need to meet any of the above or below requirements (or any modification to any of the above or below requirements), provided, however, that WSFS shall be required to indicate whether it intends to bind on any of the CCSP Assets on or before the Bid Deadline.

## BANKRUPTCY COURT JURISDICTION

In conjunction with any actions or proceedings arising from or relating to the Bidding Procedures, the  Sale or Sales concerning the CCSP Assets, any Auction, the acts or omissions of the Debtor, the Investment Banker, and their respective representatives and/or the construction and enforcement of the contemplated transaction documents of such parties, any Potential Bidders and Qualified Bidders shall:  (a) be deemed to have waived any right to a jury trial and consented and submitted to the exclusive jurisdiction of the Bankruptcy Court, (b) bring any such action or proceeding in the Bankruptcy Court, and (c) be deemed to have consented to the Bankruptcy Court entering a final judgment determining any such action or proceeding and that such final judgment in any such action or proceeding, including all appeals, shall be conclusive and may be enforced in other jurisdictions (including any foreign jurisdictions) by suit on the judgment or in any other manner provided by applicable law.

## FORM OF AGREEMENT

Each Qualified Bidder, must include with its bid an executed asset purchase agreement for the applicable Sale (each a "**Transaction Agreement**"), clean and marked against the Stalking Horse APA, which must include the following:

(a)     identification of the specific assets to be acquired either in the Transaction Agreement itself or as a schedule to the Transaction Agreement;

(b)     full disclosure of the identity of the bidder and whether such party is an insider (as defined in section 101 of the Bankruptcy Code) of the Debtor, along with the contact information of the specific person(s) whom the Debtor or its advisors should contact in the event that the Debtor wishes to discuss the bid submitted by the Qualified Bidder;

(c)     the Purchase Price to be paid by such Qualified Bidder, including what amount is being paid as cash and what amount constitutes a credit bid, if any, and subject to the terms of the Second Interim Cash Collateral Order, as well as any liabilities proposed to be paid or assumed by such Qualified Bidder;

(d)     identify whether the Qualified Bidder or the Debtor shall be responsible for (a) any transfer or similar taxes that arise from the Sale and (b) any cure costs required to be paid to assume and assign executory contracts and unexpired leases that are included in the bid;

(e)     (i) a commitment to close the transaction contemplated by the Transaction Agreement promptly upon entry of the order approving the Sale, within two (2) business days after all closing conditions are met, and, in any event, no later than June 15, 2021, and

(ii) a representation that the Qualified Bidder will use its reasonable best efforts to satisfy all applicable regulatory conditions;

(f)    a written acknowledgement and representation that the Qualified Bidder (i) has had an opportunity to conduct any and all due diligence regarding the Assets, (ii) has relied solely upon its own independent review, investigation and/or inspection of any documents and other information in making its Qualified Bid, (iii) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the CCSP Assets, or the completeness of any documents or other information provided in connection with the Bidding Procedures and the Sale, and (iv) has not entered into any agreement with any other Potential Bidder or Qualified Bidder concerning the Auction or the Sale or discloses any agreement with any other Potential Bidder or Qualified Bidder concerning the Auction or the Sale;

(g)    a statement that the Transaction Agreement is not subject to contingencies of any kind, including, including, without limitation, contingencies related to financing, due diligence or third party, regulatory or internal approval; and

(h)    a statement that the Qualified Bidder has obtained any required internal corporate, legal or other authorizations to close a sale transaction and to provide adequate assurance of future performance as required under section 365 of the Bankruptcy Code.

## **DUE DILIGENCE**

Only Qualified Bidders shall be eligible to receive due diligence information and access to the Debtor's Data Room and to additional non-public information regarding the Debtor that the Debtor believes to be reasonable and appropriate under the circumstances. All additional due diligence requests shall be directed to the Debtor's proposed Investment Banker, as directed on the first page of these Bidding Procedures. The due diligence period shall extend through and include the Bid Deadline. The Debtor may, but shall not be obligated to, in its sole discretion, furnish any due diligence information after the Bid Deadline.

The Debtor reserves the right, in its sole discretion, and after consultation with the Consultation Parties, to withhold or limit access to any due diligence information that the Debtor determines is business-sensitive or otherwise not appropriate for disclosure to a Qualified Bidder. The Debtor and its advisors will coordinate all reasonable requests from Bidders for additional information and due diligence access. The Debtor, in consultation with the Consultation Parties, may decline to provide information to Bidders who, in the Debtor's business judgment, in consultation with the Consultation Parties, have not established, or who have raised doubt, that such Bidder intends in good faith or has the capacity to consummate a sale transaction of any, all, or substantially all of the Debtor's Assets.

The Debtor and its estate are not responsible for, and shall have no liability with respect to, any information obtained by, or provided to, any Qualified Bidders in connection with the Bidding Procedures and the Sale.

All due diligence materials provided to Potential Bidders and Qualified Bidders shall be subject to the limitations on use and disclosure included in any Confidentiality Agreement entered into pursuant to the Bidding Procedures.

Notwithstanding any limitations provided for in any due diligence materials in the Debtor's possession, including, without limitation, any non-disclosure, confidentiality, or similar provisions, the Debtor and its estate shall be authorized to provide due diligence information to Potential Bidders that have executed a Confidentiality Agreement in form and substance acceptable to the Debtor.

## BID REQUIREMENTS

To be deemed a "**Qualified Bid**", a bid must be received from a Qualified Bidder on or before the Bid Deadline and must satisfy each of the following requirements (each, a "**Bid Requirement**"), as determined by the Debtor in its business judgment, after consultation with the Consultation Parties. The Bid Requirements are as follows:

(a)      **Writing**.  Each bid must be in writing. **Identity of the Bidder**.  Each bid must fully disclose the identity of the Qualified Bidder and whether such party is an "insider" (as defined in section 101 of the Bankruptcy Code) of the Debtor, and provide the contact information of the specific person(s) whom the Debtor or its advisors should contact in the event that the Debtor wishes to discuss the bid submitted by the Qualified Bidder.

(b)      **Assets**. Each Bid must clearly specify the CCSP Assets that are included in the bid.

(c)      **Purchase Price**.  Each bid must set forth the purchase price (the "**Purchase Price**") to be paid by such Qualified Bidder, identify separately any cash and non-cash components of the Purchase Price, and identify the liabilities proposed to be paid or assumed by such Qualified Bidder.

(d)      **Identification of Executory Contracts.**  Each bid must identify with particularity each executory contract, unexpired lease, and unexpired sublease the assumption and assignment of which is a condition to close the transaction contemplated by the proposed Transaction Agreement.

(e)      **Deposit**. In connection with each bid, a Qualified Bidder must submit by wire transfer of immediately available funds, a cash deposit in the amount not less than the lesser of (i) $500,000 and (ii) ten percent (10%) of the aggregate cash Purchase Price set forth in the Transaction Agreement, to be held in a noninterest-bearing escrow account to be identified and established by the Debtor (the "**Deposit**").

(f)      **Bid Terms/Other Stalking Horse Bids**. Each bid must be accompanied by a clean and marked Transaction Agreement that reflects any variations from the Stalking Horse APA.  In the event that the Qualified Bidder wishes to bid on the same Assets that are included in the Stalking Horse APA, the aggregate consideration proposed by the Qualified Bidder must equal or exceed the sum of the amount of (i) the purchase price

under the Stalking Horse APA, plus (ii) any break-up fee, expense reimbursement, or other bid protection provided under the Stalking Horse APA or otherwise, plus (iii) an overbid of $50,000 of the purchase price under the Stalking Horse APA.

(g)     **Contingencies; No Financing or Diligence Outs**. A bid shall not be conditioned on (i) obtaining financing, (ii) shareholder, board of directors, or other internal approval, or (iii) the outcome or completion of a due diligence review by the Potential Bidder, or (iv) third-party regulatory approval.

(h)     **Demonstrated Financial Capacity**. A bid must state that such Qualified Bidder is financially capable of consummating the transactions contemplated by the Transaction Agreement and provide written evidence in support thereof. Such evidence may include materials sufficient for counterparties to any executory contract(s) proposed to be assumed and assigned to determine the bidder's ability to provides adequate assurance of future performance under such executory contracts, including: (i) three years of audited financials; (ii) a detailed description of the bidder's experience providing similar services; (iii) number and location of the bidder's related operations and any trade names used; (iv) business plan for 2021 and 2022; (v) any financial projections, projections, calculations, and/or financial pro forma prepared in contemplation of the bid; and (vi) evidence of the bidder's possession of all necessary licenses, permits, or similar governmental authority, or efforts to date to obtain the same. The Debtor may also request the name and position of any proposed management, including the bidder's intention with regard to the offer of employment to any of debtor' current employees and/or management.

(i)     **Committed Financing**. Each bid must contain such financial and other information to allow the Debtor to make a reasonable determination as to the Qualified Bidder's financial and other capabilities to close the transaction contemplated by its proposed Transaction Agreement, including, without limitation, such financial and other information supporting the Qualified Bidder's ability to comply with the requirements of adequate assurance of future performance under section 365(f)(2)(B) of the Bankruptcy Code, including the Qualified Bidder's financial wherewithal and willingness to perform under any contracts that are assumed and assigned to the Qualified Bidder, in a form that allows the Debtor to make available, within one (1) business day after such receipt, such information to any counterparties to any contracts or leases being assumed and assigned in connection with the Sale that have requested, in writing, such information ("**Counterparties**").

(j)     **Binding and Irrevocable**. A bid must include a signed writing stating that: (i) the Qualified Bidder's offer is irrevocable until the conclusion of the Sale Hearing, unless such party is the Successful Bidder or Backup Bidder (both as defined below) in which case such offer is binding, unconditional, and irrevocable until two (2) business days after the closing of the Sale of the subject assets, and (ii) the Qualified Bidder agrees to serve as a backup bidder ("**Backup Bidder**") upon the terms and conditions set forth in the Bidding Procedures, if such Qualified Bidder's bid is the next highest and best bid (the "**Backup Bid**") after the Successful Bid in any Auction.

(k)     **Firm Commitment**.  Each bid must include a commitment to close the transaction contemplated by the Transaction Agreement promptly upon entry of the Sale Order and, in any event, by no later than June 15, 2021.

(l)     **Expenses; Disclaimer of Fees**.  Each Qualified Bidder other than the Non-MAT Stalking Horse Bidder and the MAT Stalking Horse Bidder must disclaim any right to receive a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation or bid protection.  For the avoidance of doubt, no Potential Bidder or Qualified Bidder (other than the Non-MAT Stalking Horse Bidder and the MAT Stalking Horse Bidder) will be permitted to request, or be granted by the Debtor, at any time, whether before or as part of the Auction or otherwise, a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation or bid protection, unless expressly agreed by the Debtor, after consultation with the Consultation Parties, and approved by the Bankruptcy Court on motion and notice.  Absent such agreement by the Debtor and approval by the Bankruptcy Court, by submitting its Bid each Potential Bidder and Qualified Bidder is agreeing to refrain from and waive any assertion or request for reimbursement on any basis, including under section 503(b) of the Bankruptcy Code.

(m)     **As-Is, Where-Is**.  Each bid must contain a written acknowledgement and representation that the Qualified Bidder (i) has had an opportunity to conduct any and all due diligence regarding the CCSP Assets, (ii) has relied solely upon its own independent review, investigation and/or inspection of any documents and other information in making its Qualified Bid, and (iii) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Assets, or the completeness of any documents or other information provided in connection with the Bidding Procedures and the Sale, and (iv) has not entered into any agreement with any other Potential Bidder or Qualified Bidder concerning the Auction or the Sale or discloses any agreement with any other Potential Bidder or Qualified Bidder concerning the Auction or Sale.

(n)     **Authorization**.  Each bid must contain evidence that the Qualified Bidder has obtained authorization or approval from its board of directors (or a comparable governing body acceptable to the Debtor in consultation with the Consultation Parties) with respect to the submission, execution, and delivery of the Transaction Agreement and the consummation of the transaction contemplated in such Transaction Agreement.

(o)     **Liquidated Damages**.  Each bid must provide for liquidated damages in the event of the Qualified Bidder's breach of, or failure to perform under, the Transaction Agreement equal to the amount of the Deposit.

(p)     **Documents Evidencing Financing**.  Each bid must contain written evidence satisfactory to the Debtor, in consultation with the Consultation Parties, that the Qualified Bidder has a commitment for financing or other evidence (which may include copies of any documents evidencing any financing commitments) of the ability to close the transactions contemplated by the Transaction Agreement.

(q)    **Consent to Jurisdiction**.  Each Qualified Bidder must submit to the jurisdiction of the Bankruptcy Court and waive any right to a jury trial in connection with any disputes relating to Debtor's qualification of bids, the Auction, the construction and enforcement of these Bidding Procedures, the Transaction Agreement, and the closing of the Sale, as applicable.

As stated above and subject to the next sentence, a bid from a Qualified Bidder satisfying all of the above requirements, as determined by the Debtor, in consultation with the Consultation Parties, shall constitute a Qualified Bid.  The Debtor both reserves the right and is authorized to work with any Qualified Bidder in advance of the Auction to cure any deficiencies in a bid that is not initially deemed a Qualified Bid.

Each Qualified Bidder submitting a bid shall be deemed to: (a) acknowledge and represent that it is bound by all of the terms and conditions of the Bidding Procedures; and (b) have waived the right to pursue a substantial contribution claim under section 503 of the Bankruptcy Code related in any way to the submission of its bid, the Bidding Procedures, and the Sale.

## BID PROTECTIONS.

In the event the Non-MAT Stalking Horse Purchaser is not the Successful Bidder for all of the Acquired Non-MAT Assets (or otherwise does not purchase all of the Acquired Assets as a Backup Bidder), the Stalking Horse Purchaser will be provided a break-up fee (the "**Non-MAT Break-Up Fee**") of three percent (3%) of the $10,000,000 Purchase Price as set forth in the Non-MAT Stalking Horse APA (as in effect as of the date of the filing and not as amended from time to time) and expense reimbursement for reasonable, documented, and out-of-pocket costs, fees, and expenses incurred in connection with the Non-MAT Sale in an amount not to exceed $350,000 (the "**Non-MAT Expense Reimbursement**" and together with the Break-Up Fee, the "**Non-MAT Bid Protections**").

In the event the MAT Stalking Horse Purchaser is not the Successful Bidder for all of the Acquired MAT Assets (or otherwise does not purchase all of the Acquired MAT Assets as a Backup Bidder), the MAT Stalking Horse Purchaser will be provided a break-up fee (the "**MAT Break-Up Fee**") of three percent (3%) of the $2,500,000 Purchase Price as set forth in the MAT Stalking Horse APA (as in effect as of the date of the filing and not as amended from time to time) and expense reimbursement for reasonable, documented, and out-of-pocket costs, fees, and expenses incurred in connection with the MAT Sale in an amount not to exceed $50,000 (the "**MAT Expense Reimbursement**" and together with the Break-Up Fee, the "**MAT Bid Protections**").

## CREDIT BIDDING

Any party that wishes to submit a credit bid either as a component, or as the entirety, of the consideration for its bid shall identify the amount of the claim and the nature, extent, and priority of the lien upon which its credit bid is premised.  Except where the Debtor has stipulated to the amount of a Senior Secured Claim (as defined below) in a "cash collateral" order entered by the Bankruptcy Court, any party submitting a credit bid agrees to provide the Debtor with documentation to evidence the amount, nature, extent, validity and perfection of such claim and

lien to the extent it has not already done so and agrees that any such credit bid shall be subject to the terms of the Second Interim Cash Collateral Order.

Any party submitting a credit bid must include in its bid either (i) provisions for the satisfaction of any secured claims that are senior to the secured claim that forms the basis of the credit bid (a "**Senior Secured Claim**") or (ii) evidence that the holder of any such Senior Secured Claim has affirmatively consented to any other treatment of its Senior Secured Claim.

## BID DEADLINE

A Qualified Bidder, other than the Non-MAT Stalking Horse Bidder and the MAT Stalking Horse Bidder, that desires to make a bid shall deliver a written and electronic copy of its bid in both PDF and MS-WORD format to the Debtor so as to be **actually received** on or before **June 2, 2021, at 5:00 p.m. (Eastern)** (the "**Bid Deadline**"); provided that the Debtor may extend the Bid Deadline without further order of the Court, after consulting with the Consultation Parties. All parties wishing to submit a Qualified Bid shall submit the bid materials required by these Bidding Procedures (including the **executed** Transaction Agreement and a certified check or wire transfer for the Deposit amount) to the Debtor's proposed Investment Banker at the contact information provided above with a copy to counsel to the Debtor, Chipman Brown Cicero & Cole, LLP, 1313 N. Market St., Suite 5400, Wilmington, Delaware 19801 (Attn:  William E. Chipman, Jr., Esq. (chipman@chipmanbrown.com)    and    Mark    L.    Desgrosseilliers,    Esq. (desgross@chipmanbrown.com)).

**Any party that does not submit a bid by the Bid Deadline will not be allowed to (a) submit any offer after the Bid Deadline, or (b) participate in the Auction. Consistent with the terms of any Confidentiality Agreements executed by them, all Potential Bidders and Qualified Bidders shall maintain as confidential, up until the Auction, the fact that they have submitted a bid and the terms and conditions of such bid.**

## EVALUATION OF QUALIFIED BIDS AND BASELINE BID

The Debtor will deliver, within two (2) hours after receipt thereof, copies of all bids from Qualified Bidders to the Consultation Parties. The Debtor, in the exercise of its business judgment and in consultation with the Consultation Parties, shall make a determination regarding whether a timely submitted bid from a Qualified Bidder is a Qualified Bid, and shall notify each Qualified Bidder as to whether its bid has been determined to be a Qualified Bid by no later than 11:59 p.m. (Eastern) on the Bid Deadline. In the event that a bid is determined not to be a Qualified Bid, the Qualified Bidder shall be notified by the Debtor and shall have until the Auction to modify its Bid so as to become a Qualified Bid; provided that any Qualified Bid may be improved at the Auction as set forth herein.

Prior to the commencement of each Auction, the Debtor shall determine, in consultation with the Consultation Parties, which of the Qualified Bids, at such time, is the highest and best bid for purposes of constituting the opening bid of each Auction (the "**Baseline Bid**" and the Qualified Bidder submitting the Baseline Bid, the "**Baseline Bidder**"), and shall promptly notify the Non-MAT Stalking Horse Bidder (and MAT Stalking Horse Bidder) and all Qualified Bidders with Qualified Bids of the Baseline Bid. The Baseline Bid may be comprised of any combination of

the CCSP Assets, and the Debtor may determine, in consultation with the Consultation Parties, that different Baseline Bids exist for different groupings of the CCSP Assets. The Debtor, in consultation with the Consultation Parties, shall have the discretion to determine how to proceed when auctioning the CCSP Assets in groupings that do not include all of the CCSP Assets so as to maximize the value of the CCSP Assets., including, without limitation, grouping the CCSP Assets into one or more lots.

### ONE QUALIFIED BID

If no Qualified Bids, other than the Stalking Horse Bidder's Qualified Bid(s) for the Non-MAT Acquired Assets and the MAT Acquired Assets, are submitted on or before the Bid Deadline, the Debtor shall not hold an Auction, shall declare the Non-MAT Stalking Horse Bidder the Successful Bidder, and/or the MAT Staling Horse Bidder the Successful Bidder, as the case may be, and shall request at the Sale Hearing (as defined in the Bidding Procedures Orders) that the Court approve the Non-MAT Stalking Horse APA and/or the MAT Stalking Horse APA and the transactions contemplated thereunder.

### AUCTION

In the event that the Debtor timely receives one or more Qualified Bids other than the Non-MAT and MAT Stalking Horse Bidder's Qualified Bids, the Debtor shall conduct an auction (the "**Auction**"). The Auction shall be held on **June 4, 2021, at 10:00 a.m. (Eastern)** (the "**Auction Date**") by Zoom videoconference, as determined by the Debtor. Following each Auction, the Debtor will determine, in consultation with the Consultation Parties, which Qualified Bid is the highest and best bid for the assets subject to such Auction, which will be determined by considering, among other things, the following non-binding factors: (i) the transaction structure and execution risk, including conditions to, timing of, and certainty of closing, termination provisions, availability of financing and financial wherewithal to meet all commitments, and required governmental or other approval; (ii) variations between competing bids and any incremental execution risk that the Debtor reasonably determines, in consultation with the Consultation Parties, exist as a result of those variations; (iii) the time needed to close a Sale or other transaction compared with other Qualified Bids and the cost to the Debtor and its estate of any incremental delay; (iv) the total consideration to be received by the Debtor and its estate; (v) the ability to obtain a higher or better offer for any of the CCSP Assets when sold individually or in combination with one or more of the other CCSP Assets; (vi) existing funding available or proposed to be provided by the Qualified Bidder during the period necessary to close the Sale or other transaction; (vii) the net benefit to the Debtor's estate, taking into account the Stalking Horse Purchaser's rights to the Bid Protections; (viii) the proposed treatment of existing secured indebtedness, including any Senior Secured Claim in the case of a credit bid; (ix) the impact on patients, employees, Counterparties (including claims that may be asserted related to rejection and objections to adequate assurance), and other creditors; and (x) any other factors the Debtor may reasonably deem relevant, in consultation with the Consultation Parties.

The Auction shall be governed by the following procedures:

(a)    **Participation**. Only the Non-MAT Stalking Horse Bidder, the MAT Stalking Horse Bidder, WSFS (should it decide to bid on some or all of the CCSP Assets

prior to the Bid Deadline), and any other Qualified Bidders with Qualified Bids (together, the "**Auction Bidders**") for the assets subject to such Auction shall be entitled to make any subsequent bids at such Auction.

(b)    **Attendance at the Auction**.  The Auction Bidders shall appear at the Auction themselves, or through a duly authorized representative.  All participants in the Auction shall appear telephonically or by Zoom videoconference, as the Debtor shall determine.  Only the Debtor, the Auction Bidders, the Consultation Parties, the Delaware Department of Health and Social Services ("**DHSS**") and the Delaware Department of Services for Children, Youth and Their Families ("**DSCYF**"), the U.S. Trustee, the Patient Care Ombudsman, and all creditors of the Debtor, together with the professional advisors to each of the foregoing parties, may attend the Auction; provided that any of the Debtor's creditors must provide one (1) business day's written notice to counsel to the Debtor of their intent to attend the Auction.

(c)    **Direction of the Auction**.  The Debtor and its professional advisors shall direct and preside over the Auction, which shall be transcribed or otherwise recorded verbatim by any means as they shall determine.

(d)    **No Collusion**.  The Auction Bidders shall confirm that they have not engaged in any collusion with respect to the Bidding Procedures, the Auction or the Sale.

(e)    **Minimum Bid Increments.**  Bidding on any lot of the CCSP Assets shall commence at the amount of the Baseline Bid, and the Auction Bidders may submit successive bids in increments of at least $50,000 above, initially,  the Baseline Bid, and, thereafter, each successive Bid, provided that:  (i) each such successive bid must be a Qualified Bid; (ii) with respect to a lot that includes the Acquired Assets, if the then-highest and best bid was made by the Non-MAT Stalking Horse Purchaser or the MAT Stalling Horse Purchaser, as applicable, such bid shall be deemed to include the sum of the amount of any Break-Up Fee, Expense Reimbursement, or other Bid Protections available to such Stalking Horse Bidder; (iii) any bid made by such Stalking Horse Bidder, including in each and every round of bidding, shall be deemed to include the sum of the amount of any Break-Up Fee, Expense Reimbursement, or other Bid Protection available to such Stalking Horse Bidder in addition to the cash and other consideration provided for in its bid; and (iv) the Debtor shall retain the right to modify the bid increment requirements at any Auction, after consultation with the Consultation Parties.

(f)    **Bidding and Negotiations**.   The Auction may include individual negotiations by the Debtor and its professional advisors with any of the Auction Bidders, but all bids shall be made on the record and in the presence of all of the Auction Bidders.  All material terms of the bid that is deemed to be the highest and best bid for each round of bidding shall be fully disclosed to the Auction Bidders, and the Debtor shall use reasonable efforts to clarify any and all questions that the Auction Bidders may have regarding the Debtor's announcement of the then-current highest and best bid.

(g)    **Modification to the Auction Procedures**.  The Debtor and its professional advisors, in consultation with the Consultation Parties, may employ and announce at the

Auction additional procedural rules that are reasonable under the circumstances (*e.g.,* the amount of time allotted to make subsequent bids) for conducting the Auction; provided that such rules are (i) not inconsistent with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, or any applicable order of the Bankruptcy Court entered in connection with this chapter 11 case, including, without limitation, the Bidding Procedures Order, and (ii) disclosed to the Auction Bidders.

(h)     **Consent to Jurisdiction**.  Each Auction Bidder shall (i) be deemed to have waived any right to a jury trial in connection with, and consented and submitted to the exclusive jurisdiction of the Bankruptcy Court over, any actions or proceedings arising from or relating to the Bidding Procedures, the Sale, the Auction and the construction and enforcement of the contemplated transaction documents of the Auction Bidders, (ii) bring any such action or proceeding in the Bankruptcy Court, and (iii) be deemed to have consented to the Bankruptcy Court entering a final judgment determining any such action or proceeding and that such final judgment in any such action or proceeding, including all appeals, shall be conclusive and may be enforced in other jurisdictions (including any foreign jurisdictions) by suit on the judgment or in any other manner provided by applicable law.

(i)     **Bid Modifications**.  The Auction Bidders shall have the right to make additional modifications to their Transaction Agreement or respective Non-MAT or MAT Stalking Horse APA, as applicable, in conjunction with each Qualified Bid submitted in each round of bidding during the Auction, provided that (i) any such modifications on an aggregate basis and viewed in whole, shall not, in the Debtor's discretion, in consultation with the Consultation Parties, be less favorable to the Debtor and its estate than the terms of the applicable Non-MAT or MAT Stalking Horse APA for the assets that are the subject of the bids, and (ii) each Qualified Bid shall constitute an irrevocable offer and shall be binding on the Auction Bidder submitting such bid until such party shall have submitted a subsequent Qualified Bid at the Auction or the conclusion of the Sale Hearing, whichever occurs sooner, unless such bid is selected as the Successful Bid or the Backup Bid, which shall remain binding as provided for in the Bidding Procedures.

(j)     **Additional Financial Information**.  The Debtor shall have the right to request any additional financial information that will allow the Debtor to make a reasonable determination, in consultation with the Consultation Parties, as to an Auction Bidder's financial and other capabilities to consummate the transactions contemplated by the Transaction Agreement or the Non-MAT or MAT Stalking Horse APA, as applicable, as may be amended during the Auction, and any further information that the Debtor may believe is reasonably necessary to clarify and evaluate any bid made by an Auction Bidder during the Auction.

(k)     **Selection of the Successful Bid**.  Upon the conclusion of the Auction, the Debtor shall determine, in consultation with the Consultation Parties, and subject to Bankruptcy Court approval, the offer or offers for the Debtor's assets that is or are the highest and best from among the Qualified Bids submitted at each Auction (individually and collectively, the "**Successful Bid**").  The bidder submitting such Successful Bid shall become the "**Successful Bidder**" and shall have such rights and responsibilities of the

purchaser as set forth in the Transaction Agreement or the Non-MAT or MAT Stalking Horse APA, as applicable, as may be amended during the Auction.  The Debtor may, in its sole discretion, designate a Backup Bid(s) (and the corresponding Backup Bidder(s)) to purchase the specific assets of the Debtor in a Sale in the event that a Successful Bidder does not close such Sale.  Prior to the Sale Hearing, the Successful Bidder shall complete and execute all agreements, contracts, instruments, and other documents evidencing and containing the terms and conditions upon which the Successful Bid was made.

**EACH SUCCESSFUL BID AND ANY BACKUP BID SHALL CONSTITUTE AN IRREVOCABLE OFFER AND BE BINDING ON THE APPLICABLE SUCCESSFUL BIDDER AND BACKUP BIDDER, RESPECTIVELY, FROM THE TIME THE BID IS SUBMITTED UNTIL THE TIME PERIOD SPECIFIED IN THESE BIDDING PROCEDURES.  EACH QUALIFIED BID THAT IS NOT A SUCCESSFUL BID OR BACKUP BID SHALL BE IRREVOCABLE UNTIL THE CONCLUSION OF THE SALE HEARING, AT WHICH POINT THEY SHALL BE DEEMED WITHDRAWN AND TERMINATED.**

## SALE HEARING

The Successful Bid (which, if no Auction is held, may be the Stalking Horse APA) and any Backup Bid will be subject to approval by the Bankruptcy Court.  The Sale Hearing to approve the Successful Bid(s) and any Backup Bid(s) shall take place on **June 8, 2021, at 2:00 p.m. (Eastern)**.  The Sale Hearing may be adjourned by the Debtor, in consultation with the Consultation Parties, from time to time without further notice to creditors or other parties in interest other than by announcement of the adjournment in open court on the date scheduled for the Sale Hearing or by filing a notice on the docket of the Debtor's chapter 11 case.

## BACKUP BIDDER

Notwithstanding any of the foregoing, in the event that a Successful Bidder fails to close within two (2) business days after the Court enters a Sale Order (or such date as may be extended by the Debtor in consultation with the Consultation Parties to a date not later than June 15, 2021), the Backup Bid for that Sale shall become the Successful Bid, the Backup Bidder shall become the Successful Bidder, and the Debtor will be authorized, but not directed, to close immediately that Sale to the Backup Bidder subject to the terms of the Backup Bid without the need for further order of the Court and without the need for further notice to any interested parties.

## RETURN OF DEPOSITS

All Deposits shall be returned to each bidder not selected by the Debtor as a Successful Bidder or Backup Bidder for any Sale no later than two (2) business days following the conclusion of the Sale Hearing.  The deposit of a Backup Bidder shall be returned within three (3) business days of the closing of the applicable Sale to the Successful Bidder; the deposit of the Successful Bidder or, if the Sale is closed with the Backup Bidder, the deposit of the Backup Bidder, shall be applied to the purchase price for the Sale.  If the Successful Bidder (or, if the Sale is to be closed with the Backup Bidder, then the Backup Bidder) fails to consummate the Sale because of a breach or failure to perform on the part of the Successful Bidder (or, if the Sale is to be closed with the

Backup Bidder, then the Backup Bidder), then the Debtor and its estate shall be entitled to retain the Deposit of the Successful Bidder (or, if the Sale is to be closed with the Backup Bidder, then the Backup Bidder) as liquidated damages resulting to the Debtor and its estate for such breach or failure to perform.

## CONSULTATION PARTIES

The term "**Consultation Parties**" as used in these Bidding Procedures shall mean (i) the Committee appointed in this chapter 11 case and its counsel and (ii) WSFS and its counsel (but only to the extent that WSFS does not decide to bid on some or all of the CCSP Assets).

In the event that any Consultation Party, any member of the Committee, or an affiliate of any of the foregoing participates as a bidder in the Sales process, any obligation of the Debtor to consult with the bidding party established under these Bidding Procedures will be waived, discharged, and released without further action, until such party advises the Debtor that they are irrevocably withdrawing as a bidder in the Sales process at which time such party's consultation rights will be reinstated; provided that the bidding party will have the same rights as any other Qualified Bidder set forth above.

If a member of the Committee submits a bid in connection with the Sales process, the Committee will continue to have consultation rights as set forth in these Bidding Procedures; provided that the committee shall exclude such member from any discussions or deliberations regarding the Sales of the Debtor's assets in question and shall not provide any information regarding the sale of any of the CCSP Assets to such member.

## RESERVATION OF RIGHTS

Notwithstanding any of the foregoing, the Debtor and its estate reserve the right, after consultation with the Consultation Parties, to modify these Bidding Procedures at or prior to the Auction, including, without limitation, to extend the deadlines set forth herein, to allow for bidding on only a portion of the CCSP Assets and not all of them, to modify bidding increments, to waive terms and conditions set forth herein with respect to any or all potential bidders (including, without limitation, the Bid Requirements), to impose additional terms and conditions with respect to any or all Potential Bidders, to adjourn or cancel the Auction at or prior to the Auction, and to adjourn or cancel the Sale Hearing. Any such modifications shall comply with the Bankruptcy Code, the Rules, and the Local Rules, and the Bidding Procedures Order, to the extent applicable.

Additionally, the Debtor, in consultation with the Consultation Parties, has the right to terminate the sale and auction process with respect to any or all of the Assets at any time.

## DISCLAIMER

By submitting a bid, each Potential Bidder and Qualified Bidder agrees to and acknowledges the following terms and conditions with respect to any information received from the Debtor related to any of the CCSP Assets ("**Information**"):

(a)    The Assets are being offered AS-IS, WHERE-IS, with ALL FAULTS.

(b)     The Information has been prepared:

        i.      for informational purposes only;

        ii.     from materials supplied by the Debtor, government offices and agencies, and other sources commonly accepted as reliable sources for such types of Information; and

        iii.    to assist Potential Bidders and Qualified Bidders in making their own evaluation of the offering and does not purport to be all-inclusive or to contain all of the information that interested parties may desire. The Debtor, and the Investment Banker, and their respective officers, directors, employees, affiliates, agents, advisors and representatives (such parties, collectively, "**Representatives**") have not assumed responsibility for independent verification of any of the information contained herein and have not in fact in any way audited such Information. In all cases, Potential Bidders and Qualified Bidders should conduct their own investigation and analysis of the offering, conduct site inspections, and scrutinize the Information. Potential Bidders and Qualified Bidders should engage legal counsel, accountants, engineers, and/or such other professional advisors as Potential Bidders and Qualified Bidders deem appropriate for evaluating the CCSP Assets.

(c)     None of Potential Bidders, Qualified Bidders, or their respective Representatives is entitled to rely on the accuracy or completeness of the Information except as provided for in a Transaction Agreement that is authorized and approved by the Court.

(d)     Although the Debtor and its Investment Banker have endeavored for the Information to contain data that they believe to be relevant for the purpose of any Potential Bidder's or Qualified Bidder's investigation, except as expressly set forth in a Transaction Agreement accepted by the Debtor and approved by the Court, none of the Debtor, Investment Banker, or any of their respective Representatives:

        i.      has made or make and expressly disclaim making any written or oral statements, representations, warranties, promises or guarantees, whether express or implied or by operation of law or otherwise, with respect to the CCSP Assets or with respect to the accuracy, reliability, or completeness of the Information;

        ii.     to the fullest extent permitted by law, shall have any liability whatsoever to Potential Bidders, Qualified Bidders or their Representatives on any basis (including, without limitation, in contract, tort, under federal, foreign or state securities laws or otherwise) as a result of, relating or pertaining to, or resulting or arising from (i) any Potential Bidder's, any Qualified Bidder's, or any of their Representative's reliance on the Information, (ii) Potential Bidder's, Qualified Bidder's, or their Representatives' use or non-use of the Information, or (iii) any alleged acts or omissions of Debtor, Investment Banker or any of their respective Representatives, or any errors or omissions in the Information;

iii.    to the extent allowed by applicable law, shall have any liability or responsibility for any decisions made by any Potential Bidder, Qualified Bidder, or any of their Representatives in reliance on any Information;

iv.    will be under any obligation or duty (express or implied) to make available any Information to any Potential Bidders, any Qualified Bidders, or any of their Representatives; and

v.    will be under any duty or obligation (express or implied) to update, supplement, revise, or correct any Information disclosed under these Bidding Procedures, regardless of the circumstances.

(e)    No contract or agreement providing for any transaction shall be deemed to exist between a Potential Bidder or Qualified Bidder and the Debtor unless and until a Qualified Bidder and the Debtor execute and deliver a Transaction Agreement that is authorized and approved by the Bankruptcy Court, and Potential Bidders and Qualified Bidders hereby waive, in advance, any claims (including, without limitation, breach of contract) in connection with any transaction unless and until a Potential Bidder or Qualified Bidder and the Debtor shall have executed and delivered a Transaction Agreement that has been authorized and approved by the Bankruptcy Court.  The Debtor reserves the right, in its discretion, and after consultation with the Consultation Parties, to reject any and all proposals made by any Potential Bidder or Qualified Bidder with regard to a transaction, other than the Stalking Horse Bidder's, and to terminate discussions and negotiations with a Potential Bidder or Qualified Bidder at any time.  Subject to the terms of these Bidding Procedures, the Debtor shall be free to establish and change any process or procedure with respect to a transaction as the Debtor in its sole discretion shall determine (including, without limitation, negotiating with any other interested party and entering into a final definitive agreement relating to a transaction with any other party without prior notice to any Potential Bidder, Qualified Bidder, or any other person).

(f)    The Debtor, the Investment Banker, and the Debtor's other advisors, individually and collectively, have not made any representations or warranties except as expressly set forth in any Transaction Agreement executed by the Debtor that has been authorized and approved by the Bankruptcy Court.  Potential Bidders and Qualified Bidders may rely only on the representations and warranties expressly set forth in a Transaction Agreement executed by the Debtor that has been authorized and approved by the Bankruptcy Court.

# Exhibit A to Exhibit 1

**ASSET PURCHASE AGREEMENT**

**CONEXIO CARE, INC.**

**AND**

**CONNECTIONS COMMUNITY SUPPORT PROGRAMS, INC.**

**APRIL 30, 2021**

Table of Contents

Page

1.   Definitions and References. ..................................................................................................2
     1.1.   Definitions ..............................................................................................................2
     1.2.   Certain References ..................................................................................................7

2.   Sale of Acquired Assets and Related Matters. .....................................................................8
     2.1.   Sale of Acquired Assets .........................................................................................8
     2.2.   Excluded Assets .....................................................................................................9
     2.3.   Assumed Liabilities ................................................................................................9
     2.4.   Excluded Liabilities .............................................................................................10
     2.5.   Purchase Price ......................................................................................................11
     2.6.   Certain Adjustments to the Purchase Price ..........................................................11
     2.7.   Prorations .............................................................................................................11
     2.8.   Designation and Assignment of Assumed Contracts, and Cure Payments ...........11
     2.9.   Non-Assignment of Assets ...................................................................................12
     2.10.  Further Conveyance of Acquired Assets ..............................................................12

3.   Representations and Warranties of the Seller. ....................................................................13
     3.1.   Organization .........................................................................................................13
     3.2.   Powers; Consents; Absence of Conflicts .............................................................13
     3.3.   Binding Agreement ...............................................................................................13
     3.4.   Financial Statements and Undisclosed Liabilities ................................................13
     3.5.   Equipment .............................................................................................................13
     3.6.   Real Property ........................................................................................................14
     3.7.   Environmental Matters ..........................................................................................15
     3.8.   Insurance ...............................................................................................................16
     3.9.   Permits and Licenses ............................................................................................16
     3.10.  Employees and Employee Benefits ......................................................................16
     3.11.  Litigation and Proceedings ...................................................................................17
     3.12.  Brokers and Finders ..............................................................................................17
     3.13.  Participation in Medicare and Medicaid ...............................................................17
     3.14.  Title ......................................................................................................................17
     3.15.  List of Properties, Contracts, etc .........................................................................18
     3.16.  Relationships with Affiliated Persons ..................................................................18

4.   Representations and Warranties of the Buyer. ....................................................................18
     4.1.   Organization .........................................................................................................18
     4.2.   Corporate Powers; Consents; Absence of Conflicts, Etc .....................................18
     4.3.   Binding Agreement ...............................................................................................19
     4.4.   Brokers and Finders ..............................................................................................19

5.   Covenants and Agreements of the Parties. .........................................................................19
     5.1.   Operation by the Seller Pending Closing ..............................................................19
     5.2.   Negative Covenants of the Seller ..........................................................................19

Table of Contents
(continued)

| 5.3. | Affirmative Covenants of the Seller | 19 |
| 5.4. | Employee Matters | 20 |
| 5.5. | Access to and Provision of Additional Information; Due Diligence | 21 |
| 5.6. | Post-Closing Maintenance of and Access to Information and Billing | 22 |
| 5.7. | Governmental Authority Approvals; Consents to Assignment | 23 |
| 5.8. | Allocation of Purchase Price | 23 |
| 5.9. | Further Acts and Assurances | 23 |
| 5.10. | Accounts Receivable | 24 |
| 5.11. | Costs and Expenses | 24 |
| 5.12. | Fulfillment of Conditions | 24 |
| 5.13. | Payments Received or to be Received | 24 |
| 5.14. | Adequate Assurance | 25 |
| 5.15. | Tail Coverage | 25 |
| 6. | Conditions Precedent To Obligations Of the Seller | 25 |
| 6.1. | Representations and Warranties; Covenants; Required Actions | 25 |
| 6.2. | Adverse Action or Proceeding | 25 |
| 6.3. | Entry of Sale Order | 26 |
| 7. | Conditions Precedent to Obligations Of the Buyer | 26 |
| 7.1. | Representations and Warranties; Covenants | 26 |
| 7.2. | Pre-Closing Confirmations and Contractual Consents | 26 |
| 7.3. | Adverse Action or Proceeding | 26 |
| 7.4. | Entry of Order/Approvals | 26 |
| 7.5. | Payor Contracting | 26 |
| 7.6. | Resolution of Claims; Successor Liability | 27 |
| 7.7. | Title Insurance | 27 |
| 8. | Closing; Termination of Agreement. | 27 |
| 8.1. | Closing | 27 |
| 8.2. | Action of the Seller at Closing | 28 |
| 8.3. | Action of the Buyer at Closing | 28 |
| 8.4. | Termination Prior to Closing; Liquidated Damages | 29 |
| 9. | General. | 32 |
| 9.1. | Survival of Representation and Warranties | 32 |
| 9.2. | Headings and Captions | 32 |
| 9.3. | Consents, Approvals and Discretion | 32 |
| 9.4. | Choice of Law/Venue | 32 |
| 9.5. | Benefit; Assignment | 32 |
| 9.6. | Third Party Beneficiary | 32 |
| 9.7. | Waiver of Breach, Right or Remedy | 33 |
| 9.8. | Notices | 33 |
| 9.9. | Severability | 34 |

Table of Contents
(continued)

Page

9.10. Entire Agreement; Amendment ...........................................................................34
9.11. Schedules and Exhibits ......................................................................................34
9.12. Counterparts .......................................................................................................35

SL1 1691053v3 007562.00162

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (the "Agreement") is made and entered into as of April 30, 2021 by and between Conexio Care, Inc., a Delaware nonstock corporation ("Buyer") and Connections Community Support Programs, Inc., a Delaware nonstock corporation (the "Seller" and with the Buyer, the "Parties").

## RECITALS

WHEREAS, the Seller provides a comprehensive array of healthcare services, including treatment for substance use and mental health disorders, as well as housing, and employment opportunities to individuals and families at its locations throughout Delaware; and

WHEREAS, Buyer is an affiliate of Inperium, Inc. ("Inperium"), the parent company of a constellation of Section 501(c)(3) human service companies that provide, among other services, behavioral health, intellectual disability, and other health-related support and services on a charitable basis; and

WHEREAS, upon the terms and subject to the conditions contained in this Agreement, the Seller desires to sell to the Buyer and the Buyer desires to purchase (presumably through a designated Affiliate) from the Seller substantially all of the Seller's assets used in the operation of the Assumed Programs, as hereinafter defined, in exchange for the payment of the Purchase Price to the Seller and the assumption of the Assumed Liabilities by a Buyer as set forth in more detail herein; and

WHEREAS, Seller has filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code (the "Bankruptcy Case") with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"); and

WHEREAS, the transactions contemplated by this Agreement (the "Transactions") are subject to the approval of the Bankruptcy Court and will be consummated only pursuant to a Sale Order to be entered in the Bankruptcy Case.

NOW, THEREFORE, for and in consideration of the premises, and the agreements, covenants, representations and warranties set forth below, and for other consideration, the receipt and adequacy of which hereby are acknowledged, the Parties, intending to be legally bound hereby, agree as follows:

**AGREEMENT**

1.      <u>Definitions and References</u>.

    1.1.      <u>Definitions</u>.  As used in this Agreement, and unless the context requires a different meaning, the following terms have the meanings given:

"<u>Accounts Receivable</u>" means all accounts receivable of the Seller, including all amounts due to the Seller from Medicare, Medicaid, and any other payor on account of the provision of medical or related ancillary services.

"<u>Acquired Assets</u>" is defined in Section 2.1.

"<u>Affiliate</u>" means Person that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with another Person and includes the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of securities, election or appointment of directors, by contract or otherwise.

"<u>Affiliated Persons</u>" is defined in Section 3.16.

"<u>Agreement</u>" means this Asset Purchase Agreement and all Exhibits and Schedules attached hereto, as amended, supplemented or replaced by the parties from time to time, and all instruments, agreements, certificates or other documents executed and delivered by any party at Closing.

"<u>Assumed Contracts</u>" is defined in Section 2.8.

"<u>Assumed Liabilities</u>" is defined in Section 2.3.

"<u>Assumed Program A/R</u>" is defined in Section 5.10.

"<u>Assumed Programs</u>" means the programs or operations of Seller listed on <u>Exhibit A</u> attached hereto to be acquired or otherwise assumed by Buyer pursuant hereto.

"<u>Audited Financial Statements</u>" means the audited consolidated balance sheet of the Seller and its  Affiliates as of June 30, 2020, and the audited consolidated statement of operations, and audited consolidated statement of net assets for the fiscal year then ended, together with the notes thereto and the report thereon of Whisman Giordano.

"<u>Bankruptcy Case</u>" is defined in the Recitals.

"<u>Bankruptcy Code</u>" means Title 11 of the United States Code, 11 U.S.C. §§ 101 – 1532, as amended.

"<u>Bankruptcy Court</u>" is defined in the Recitals.

"<u>Bidding Procedures</u>" means the bidding procedures approved pursuant to the Bidding Procedures Order.

SL1 1691053v3 007562.00162

"Bidding Procedures Order" means the Order (I) Scheduling a Hearing to Consider Approval of the Sale of Substantially all of the Debtor's Assets, and the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (II) Approving Certain Bidding Procedures, Assumption and Assignment Procedures, and the Form and Manner of Notice Thereof, and (III) Granting Related Relief [Docket No. _____] entered by the Bankruptcy Court in the Bankruptcy Case.

"Closing" is defined in Section 8.1.

"Closing Date" means the date on or as of which the Closing occurs.

"Closing Date Liquidated Cure Payments" is defined in Section 2.8.

"CMS" the Centers for Medicare and Medicaid Services.

"Code" means the Internal Revenue Code of 1986, as amended.

"Competing Bid" is defined in Section 5.3(f)

"Contracts" means all commitments, contracts, leases, licenses, agreements and understandings, written or oral, to which the Seller is a party, including all management, employment, retention and severance agreements, vendor agreements, real and personal property leases and schedules, maintenance agreements and schedules, agreements with municipalities and labor organizations, and bonds, mortgages and other loan agreements.

"Cure Payments" means the amounts necessary to cure all defaults, if any, under the Assumed Contracts, as required by Section 365(b) of the Bankruptcy Code.

"Deposit" is defined in Section 2.5(c).

"Employee Benefit Plan" means pension, benefit, retirement, compensation, employment, consulting, profit-sharing, deferred compensation, incentive, bonus, performance award, change in control, retention, severance, vacation, paid time off, sick leave, welfare, fringe-benefit and other similar agreement, plan, policy, program or arrangement (and any amendment thereto), in each case whether or not reduced to writing and whether funded or unfunded, including each "cafeteria plan" under Section 125 of the Code and each "employee benefit plan" within the meaning of Section 3(3) of ERISA, whether or not tax-qualified and whether or not subject to ERISA, which is or has been maintained, sponsored, contributed to, or required to be contributed to by the Seller or any ERISA Affiliates for the benefit of any current or former employee, officer, director, retiree, independent contractor or consultant or any spouse or dependent of any such individual, or under which the Seller or any of its ERISA Affiliates has or may have any liability, or with respect to which the Buyer could reasonably be expected to have any liability.

"Employee Pension Benefit Plan" is defined in Section 3(2) of ERISA.

"Employee Welfare Benefit Plan" is defined in Section 3(1) of ERISA.

3

"Environmental Claim" means any written notice (or oral notice reduced to writing by the Seller) by a Person alleging potential liability (including potential liability for investigatory costs, cleanup costs, Governmental Authority response costs, natural resource damages, property damages, personal injuries, or penalties) arising out of, based on or resulting from (a) the presence, or release into the environment by the Seller, of any Materials of Environmental Concern at any location, whether or not owned by the Seller, (b) circumstances forming the basis of any violation, or alleged violation, of any Environmental Laws by the Seller; or (c) circumstances forming the basis of any liability, or alleged liability, of the Seller under any Environmental Laws.

"Environmental Laws" means any and all Legal Requirements relating to pollution or protection of human health or the environment (including air, surface water, groundwater, land surface or subsurface strata), including Legal Requirements of any permits, licenses, registrations or other authorizations of Governmental Authorities relating to pollution or protection of human health or the environment, Legal Requirements relating to emissions, discharges, releases or threatened releases of Materials of Environmental Concern, or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport, recycling, reporting or handling of Materials of Environmental Concern.

"ERISA" means the Employment Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" means any entity (whether or not incorporated) that would be treated together with the Seller or any of its Affiliates as a "single employer" within the meaning of Section 414 of the Code.

"Excluded Assets" is defined in Section 2.2.

"Excluded Liabilities" means any and all liabilities of the Seller other than the Assumed Liabilities, whether known or unknown, fixed or contingent, recorded or unrecorded.

"Execution Date" means April 30, 2021.

"Final Order" means an order, judgment or other decree of any Governmental Authority as to which (a) the operation or effect has not been reversed, stayed, modified, or amended, (b) no appeals or motions for reconsideration are pending, and (c) any and all appeal periods have expired.

"GAAP" means the generally accepted accounting principles in the United States.

"Governmental Authorities" means all agencies, authorities, bodies, boards, commissions, courts, instrumentalities, legislatures and offices of any nature whatsoever of any federal, state, county, district, municipal, city, foreign or other government or quasi-government unit or political subdivision, and private arbitration panels or dispute resolution makers.

"Government Reimbursement Programs" means federal and state Medicare, Medicaid and CHAMPUS programs, and similar or successor programs with or for the benefit of Governmental Authorities.

"Hired Employees" means those employees of the Seller who accept a Buyer's offer of employment before, on, or as of the Closing Date.

"Included Patient Records" is defined in Section 2.1(g).

"Intellectual Properties" means all marks, names, trademarks, service marks, patents, patent rights, assumed names, logos, copyrights, trade secrets and similar intangibles (including variants thereof and applications therefor).

"Interests" means any and all mortgages, security interests, conditional sale or other title retention agreements, pledges, liens, rights of offset, judgments, demands, encumbrances and claims (as that term is defined in the Bankruptcy Code), (ii) rights or options to effect any forfeiture, modification, repurchase, or termination of the Seller's or any Buyer's interest in the Assigned Contracts and/or Acquired Assets, regardless whether such are "claims" as that term is defined in the Bankruptcy Code, (iii) claims of the PBGC, (iv) claims in respect of Taxes (including taxes as to which applicable returns have not yet been filed, whether or not overdue), and (v) easements, restrictions, rights of first refusal or charges of any kind or nature, if any, including, but not limited to, any restriction on the use, voting, transfer, receipt of income or other exercise of any attributes of ownership, regardless whether such are "claims" as that term is defined in the Bankruptcy Code.

"Inventory" is defined in Section 2.1(c).

"IRS" means the United States Internal Revenue Service.

"Legal Requirements" means with respect to any Person, all statutes, ordinances, codes, rules, regulations, restrictions, orders, judgments, orders, writs, injunctions, decrees, licenses, permits, registrations, determinations, awards or other approvals or authorizations of any Governmental Authority having jurisdiction over such Person or any of such Person's assets or businesses in effect as of the Closing Date.

"Material Adverse Effect" means any event, change, circumstance, effect, or state of facts that is materially adverse to (a) the business, financial condition or results of operations of the Assumed Programs and/or Acquired Assets, taken as a whole, or (b) the ability of the Buyer or the Seller to perform its obligations under the Agreement or any documents required hereunder or to consummate the Transactions; provided, however, that "Material Adverse Effect" shall not include the effect of any event, change, circumstance, or state of facts primarily arising out of or primarily attributable to any of the following, either alone or in combination, (i) the filing of the Bankruptcy Case, (ii) the markets in which the Seller operates generally, (iii) general economic or political conditions (including those affecting the securities markets), (iv) the public announcement of the Agreement or of the consummation of the Transactions, (v) acts of war (whether or not declared), sabotage or terrorism, military actions or the escalation thereof or other force majeure events occurring after the date hereof, (vi) the effects of the Covid-19 pandemic, or (vii) any changes in applicable laws, regulations or accounting rules.

"Material Payors" is defined in Section 7.5.

"Materials of Environmental Concern" means chemicals, pollutants, contaminants, wastes (including medical waste, infectious and chemotherapeutic waste), toxic substances, radioactive materials and radioactive sources, petroleum and petroleum products, including hazardous wastes under the Resource, Conservation and Recovery Act, 42 U.S.C. § 6903 *et seq.*, hazardous substances under the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. § 9601 *et seq.*, hazardous air pollutants under the Clean Air Act, 42 U.S.C. § 7401 *et seq.*, regulated substances under the Land Recycling and Environmental Remediation Standards Act of 1995, 35 P.S. § 6026.101 *et seq.*, each as amended, and asbestos, polychlorinated biphenyls and urea formaldehyde.

"Multiemployer Plan" is defined in Section 3(37) of ERISA.

"Necessary Consent" is defined in Section 2.9.

"Outside Closing Date" is defined in Section 8.4(a)(i).

"PBGC" is defined in Section 3.10(d).

"Permitted Real Property Encumbrances" means (a) liens for real estate Taxes, water and sewer rents and other lienable services that are apportioned as provided in Section 2.7, including special assessments; (b) the standard or printed exceptions contained in the form of owner's policy issued by the Buyer's title insurance company; (c) an exception for any state of facts or other matters which would be shown by a survey; (d) any and all present and future laws, ordinances, restrictions, requirements, resolutions, orders, rules and regulations of any Governmental Authority, as now or hereafter existing or enforced (including, without limitation, those related to zoning and land use); (e) possible additional tax assessments for new construction and/or major improvements; (f) any exceptions caused by the Buyer or any of its agents, employees or contractors; (g) any recorded or unrecorded covenants, conditions, restrictions, rights of way and easements which would not materially interfere with the use of the Real Property in the manner in which it is presently being used.

"Person" means any individual, company, body corporate, association, partnership, limited liability company, firm, joint venture, trust, trustee or Governmental Authority;

"Procedures Order" means the order of the Bankruptcy Court, described in Section 5.3(f) and attached to this Agreement as Exhibit B, with such modifications to which the Buyer may agree.

"Purchase Price" is defined in Section 2.5(a).

"Real Property" means the real property owned by the Seller as more particularly described on Schedule 2.1(a), together with all buildings, improvements and fixtures thereon and all appurtenances and rights thereto;

"Sale Hearing" is defined in Section 5.3(f).

"Sale Motion" is defined in Section 5.3(f).

6

"<u>Sale Order</u>" means the Order issued by the Bankruptcy Court described in Section 5.3(f) and substantially in the form of <u>Exhibit C</u>, attached to this Agreement, with such modifications to which the Buyer may agree.

"<u>Tax</u>" means any income, unrelated business income, excess benefits, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental (including taxes under Section 59A of the Code), customs duties, capital stock, franchise, profits, withholding, social security, unemployment, disability, real property, personal property, stamp, sales, use, transfer, registration, unclaimed property, value added, alternative or add-on minimum, estimated or other tax, assessment, charge, levy or fee of any kind whatsoever, including payments or services in lieu of Taxes, interest and penalties on and additions to all of the foregoing, which are due or alleged to be due to any Taxing Authority or Governmental Authority, whether disputed or not.

"<u>Tax Return</u>" means any return, declaration, report, claim for refund, information return or other document (including any related or supporting schedule, statement or information or amended return) filed or required to be filed in connection with the determination, assessment or collection of any Tax of any party or the administration of any laws, regulations, or administrative requirements relating to any Tax.

"<u>Taxing Authority</u>" means any appropriate federal, state, local and foreign governmental entity or other authority responsible for the administration of any Tax.

"<u>Tenant Leases</u>" is defined in Section 3.6(i).

"<u>Title Policy</u>" is defined in Section 7.7.

"<u>Transactions</u>" is defined in the Recitals.

"<u>TSA</u>" is defined in Section 7.5.

"<u>Unaudited Financial Statements</u>" is defined in Section 3.4(b).

1.2.    <u>Certain References</u>.  As used in this Agreement, and unless the context requires otherwise:

(a)    references to "include" or "including" mean including without limitation; and

(b)    references in this Agreement to the "knowledge" of the Seller or variants thereof (including "best knowledge") mean the actual knowledge, after reasonable inquiry, of each of the Persons whose names or positions are set forth in <u>Schedule 1.2</u>.  The phrase "reasonable inquiry," as used in this definition, may include communication in connection with the operation of the Seller and shall not be confined to matters contemplated by this Agreement.

2.    <u>Sale of Acquired Assets and Related Matters</u>.

2.1.    <u>Sale of Acquired Assets</u>.  Subject to the terms and conditions of this Agreement, at Closing the Seller shall sell, assign, convey, transfer and deliver to the Buyer the Seller's interest in the Acquired Assets and the Buyer shall purchase the Seller's interest in the Acquired Assets, free and clear of all Interests other than the Assumed Liabilities of such Buyer and Permitted Real Property Encumbrances.  As used herein, the term "Acquired Assets" means all of Seller's right, title and interest in any property used by the Seller in the operation of the Assumed Programs other than Excluded Assets, including without limitation, the following:

(a)    the Real Property, together with all fixtures and improvements thereon, including, without limitation, described on <u>Schedule 2.1(a)</u>;

(b)    all vehicles and equipment owned or leased by Seller, including that listed in <u>Schedule 2.1(b)</u>; provided that leased equipment or vehicles shall be transferred only upon  and to the extent that Seller satisfies all Cure Payments associated therewith in accordance with Section 2.8;

(c)    all janitorial, maintenance, shop, office and other supplies, drugs, food and other disposables owned by the Seller as of the Closing Date relating to the Assumed Programs ("<u>Inventory</u>"), to the extent transferable;

(d)    the Seller's interests in the Assumed Contracts;

(e)    licenses, permits, provider numbers, registrations and other approvals or authorizations (including pending approvals or authorizations) of Governmental Authorities, to the extent assignable, relating to the Seller's operations, but limited to those licenses, permits, registrations and other approvals or authorizations listed on <u>Schedule 2.1(e)</u>;

(f)    all Intellectual Properties used in connection with the ownership and operation of the Assumed Programs, and all computer software, programs and similar systems licensed for use in conjunction with the operation of the Assumed Programs, limited to those described on <u>Schedule 2.1(f)</u>, to the extent assignable;

(g)    all original patient records located at, in the custody of, or electronically maintained by the Seller which, as of the Closing Date, the Seller is required by applicable law to retain (the "<u>Included Patient Records</u>") and personnel records for Hired Employees, and all policies and procedures manuals and quality assurance records of the Seller, all to the extent related to or otherwise associated with the Assumed Programs;

(h)    all other books, records, files, papers and other documents (in whatever form, including computer files and software), including all inventory, sales and marketing records and all patient, customer and supplier lists, and literature related to or otherwise associated with the Assumed Programs;

(i)    all deposits, prepaid expenses and claims for refunds, advances, prepaid lease expenses, and security deposits arising under or related to the Assumed Contracts, and rights to offset in respect thereof;

8

(j)    all insurance claims and proceeds thereof arising in connection with property damage to the Acquired Assets occurring prior to the Closing Date except to the extent, in the case of proceeds, received by the Seller prior to the Closing Date and expended on the repair or restoration of the Acquired Assets prior to the Closing Date; and

(k)    general intangibles pertaining to the operations of the Seller, including goodwill to the extent related to or otherwise associated with the Assumed Programs.

Notwithstanding the foregoing or anything to the contrary herein, the Buyer shall have the right, upon written notice given to the Seller before Closing, to exclude any or all of the Acquired Assets listed above, deeming such Acquired Assets to be Excluded Assets. No election to revise the Acquired Assets hereunder by the Buyer shall alter the Purchase Price.

2.2.    <u>Excluded Assets</u>.  Notwithstanding the generality of Section 2.1, the following assets (the "<u>Excluded Assets</u>") are not a part of the sale and purchase contemplated by this Agreement and are excluded from the Acquired Assets:

(a)    all cash and cash equivalents;

(b)    all Accounts Receivable;

(c)    any Inventory disposed of or exhausted after the Execution Date and prior to the Closing Date in the ordinary course of the Seller's operations of its programs;

(d)    any of the Seller's interests in Contracts other than Assumed Contracts;

(e)    any Employee Benefit Plans;

(f)    all right, title and interest of the Seller in and to all current insurance policies, if any, and all insurance policies providing Tail Coverage, except as otherwise set forth herein;

(g)    any and all claims and causes of action of Seller, whether arising under the Bankruptcy Code or otherwise;

(h)    all personnel records, other than personnel records relating to Hired Employees, and all patient records other than Included Patient Records;

(i)    all tradenames that are not described in <u>Schedule 2.1(f)</u> or are described therein but are not assignable;

(j)    all Seller's Permits that are not assignable pursuant to applicable law and pending applications therefore; and

(k)    all Documents relating exclusively to an Excluded Asset.

2.3.    <u>Assumed Liabilities</u>.  Effective upon Closing, the Buyer shall assume (a) all obligations of the Seller arising on or after the Closing Date under the Assumed Contracts,

(b) vacation, holiday and sick leave accumulations of the Hired Employees, but only to the extent listed on <u>Schedule 5.4(a)</u>, to be attached to this Agreement pursuant to Section 5.4(a) hereof, and related Taxes thereon, and subject to the limitations and conditions set forth in Section 5.4, and (c) the Seller's obligations, if any, described on <u>Schedule 2.3</u> to this Agreement.  The foregoing are collectively referred to as the "<u>Assumed Liabilities</u>".  At least ten (10) days prior to the Sale Hearing, the Buyer will provide the Seller with a completed form of <u>Schedule 2.3</u>, which schedule will list all liabilities of the Seller that the Buyer, in its sole and absolute discretion, shall have agreed to assume at Closing in addition to the Seller's liabilities identified in subsections (a), (b) and (c) above.

2.4.    <u>Excluded Liabilities</u>.    Under no circumstance shall the Buyer assume or be obligated to pay, and none of the Acquired Assets shall be or become liable for or subject to any of the Excluded Liabilities, including the following, which shall be and remain liabilities of the Seller:

(a)    liabilities or obligations of the Seller for Taxes in respect of any periods, including periods ending on or prior to the Closing Date or resulting from the consummation of the Transactions, but excluding Taxes for which Buyer is expressly liable pursuant to Section 5.11(b) hereof;

(b)    liabilities or obligations associated with any Excluded Assets;

(c)    liabilities or obligations associated with any and all indebtedness of the Seller for borrowed money;

(d)    liabilities or obligations arising out of any Contract that is not an Assumed Contract;

(e)    liabilities or obligations arising out of or in connection with claims, litigation or proceedings described in <u>Schedule 3.11</u>, Environmental Claims, litigation or proceedings described in <u>Schedule 3.7(b)</u>, and claims, litigation and proceedings (whether instituted prior to or after Closing) for acts or omissions which allegedly occurred or accrued prior to the Closing Date;

(f)    any liability of the Seller, or any of Seller's agents or employees, or with respect to any transactions entered into or any facts existing with respect to the Seller's programs prior to the Closing Date, relating to any overpayment from a Governmental Authority (except to the extent related to an Assumed Contract) or any violation of any law, regulation or ordinance at any time, including, but not limited to, the federal Anti-Kickback Statute (42 U.S.C. § 1320(a) *et seq.*), the Ethics in Patient Referrals Act (42 U.S.C. § 1395nn *et seq.*), and the False Claims Act (31 U.S.C. § 3729 *et seq.*);

(g)    all liabilities relating to any oral agreements or understandings with referral sources, unless reduced to writing and expressly assumed by the Buyer as an Assumed Contract;

(h)    except to the extent they are Assumed Liabilities, liabilities or obligations to the Seller's employees relating to periods prior to Closing, including liabilities or obligations arising under or with respect to any Employee Benefit Plan, severance pay program or

10

arrangement, EEOC claim, unfair labor practice, and wage and hour practice, and liabilities or obligations arising under the Worker Adjustment and Retraining Act, 29 U.S.C. §§2101-2109 as a result of acts or omissions of the Seller prior to Closing and obligations of the Seller under the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended, with respect to current or former employees of the Seller who do not become Hired Employees; and

(i)    any other liability relating to the Seller's operations that accrued or occurred prior to Closing, unless expressly assumed hereby.

2.5.    <u>Purchase Price</u>.

(a)    The purchase price of the Acquired Assets shall be Two Million Five Hundred Thousand Dollars ($2,500,000.00), subject to the terms and conditions in this Agreement (the "<u>Purchase Price</u>").

(b)    The Purchase Price (reflecting the adjustments, prorations, and cost and expense allocations provided in Sections 2.6, 2.7 and 5.11) shall be paid by the Buyer to the Seller at the Closing in cash or by wire transfer of immediately available funds, after application of the Deposit, as set forth herein.

(c)    Upon execution of this Agreement, Buyer shall deposit with Seller the sum of Two Hundred Fifty Thousand Dollars ($250,000.00) (the "Deposit"), which shall be held by Seller in a segregated attorney escrow account. Upon Closing of the transactions contemplated under this Agreement, the Deposit shall be applied against the Purchase Price.

2.6.    <u>Certain Adjustments to the Purchase Price</u>.  The amount of the Purchase Price payable at the Closing shall be reduced by the amount, if any, of the net prorated amounts attributed to the Seller but to be paid by Buyer under Section 2.7.

2.7.    <u>Prorations</u>.  At Closing, the Buyer and the Seller shall prorate real estate and personal property lease payments, real estate and personal property Taxes and other assessments, plus all other income and expenses (including utilities) with respect to the Seller's operations which are normally prorated upon a sale of assets of a going concern.  Proration shall be calculated on a per diem basis with the Seller responsible for all the above Taxes, payments and other assessments which accrue on and prior to the Closing Date, and the Buyer responsible for all the above Taxes, payments and assessments which accrue after the Closing Date.  The Buyer shall timely pay both the Buyer's and the Seller's portion of the above Taxes, payments and other assessments to the Taxing Authority or other Person to which payment is due.

2.8.    <u>Designation and Assignment of Assumed Contracts, and Cure Payments</u>.  At least ten (10) days prior to the Sale Hearing, the Buyer shall provide Seller with a completed form of <u>Schedule 2.8</u>. <u>Schedule 2.8</u> will list all Contracts of the Seller, which the Buyer, in its sole and absolute discretion, shall have designated for assignment by the Seller to the Buyer at Closing. Prior to the Closing, the Buyer shall have the right, in its sole and absolute discretion, to add and delete Contracts from <u>Schedule 2.8</u>.  At Closing, the Seller shall assign to the Buyer those Contracts on <u>Schedule 2.8</u> as of the Closing Date (the "<u>Assumed Contracts</u>").  To the extent the amount of the required Cure Payments for Assumed Contracts have been allowed by Final Order prior to the Closing Date (the "<u>Closing Date Liquidated Cure Payments</u>"), such amounts shall be

11

paid to the counter-party to such Assumed Contracts on the Closing Date, except as may otherwise be agreed upon with such counter-party. The Closing Date Liquidated Cure Payments shall be paid by the Buyer. To the extent the amount of the required Cure Payment for any Assumed Contract is in dispute and has not been allowed by Final Order prior to the Closing Date, unless waived by Buyer, Buyer shall control the defense and settlement of all such disputed Cure Payments. Seller shall provide reasonable cooperation to Buyer in providing such defense. Buyer shall be responsible for all Cure Payments.

2.9.    <u>Non-Assignment of Assets</u>.    Notwithstanding any other provision of this Agreement to the contrary, this Agreement shall not constitute an agreement to assign or transfer and shall not effect the assignment or transfer of any asset if, and to the extent, such asset is not assignable or transferable under the Bankruptcy Code or other Legal Requirement. To the extent any asset is not assignable or transferrable under the Bankruptcy Code or other Legal Requirement, the Seller and the Buyer will use their commercially reasonable efforts to obtain the approval, authorization or consent of, or the granting or issuance of any license or permit by, any third party (each such action, a "<u>Necessary Consent</u>") as the Buyer may reasonably request; <u>provided</u>, <u>however</u>, that the Seller shall not be obligated to pay any consideration therefor to any third party from whom consent or approval is requested or to initiate any litigation or legal proceedings to obtain any such consent or approval. If a Necessary Consent is not obtained, or if an attempted assignment of such asset would be ineffective or would adversely affect the rights of the Buyer or if the Buyer would not in fact receive all rights, the Seller and the Buyer will cooperate in a mutually agreeable arrangement, to the extent feasible and at no expense to the Seller, so that the Buyer can obtain the benefits and assume the obligations thereunder in accordance with this Agreement.

2.10.    <u>Further Conveyance of Acquired Assets</u>.

(a)    From time to time following the Closing, the Seller and the Buyer shall, and shall cause their respective Affiliates to, execute, acknowledge and deliver all such further conveyances, notices, assumptions, releases and other instruments, and shall take such further actions, as may be reasonably necessary or appropriate to assure fully to the Buyer and its respective successors or assigns, all of the properties, rights, titles, interests, estates, remedies, powers and privileges intended to be conveyed to the Buyer under this Agreement and to assure fully to the Seller and its Affiliates and their successors and assigns, the assumption of the liabilities and obligations intended to be assumed by the Buyer under this Agreement, and to otherwise make effective the Transactions.

(b)    From time to time following the Closing, and subject to Legal Requirements, the Seller shall cause its Affiliates to make available to the Buyer any personnel records that were not transferred to the Buyer pursuant to Section 2.1(f), as reasonably necessary for the Buyer to transition Hired Employees into the Buyer's records.

(c)    Following the Closing, and subject to Legal Requirements, the Buyer shall make available to Seller all of the Seller's records acquired by the Buyer that Seller believes, in its sole and absolute discretion, are necessary to collect any Accounts Receivable, to the extent requested to do so pursuant to Section 5.10 of this Agreement hereof, for any continued operations

of the Seller, any wind-down by the Seller (or any successor thereto or assignee thereof), or otherwise, at no cost to the Seller.

3.      Representations and Warranties of the Seller.

The Seller makes the following representations and warranties to the Buyer on and as of the Execution Date and shall be deemed to make them again at and as of the Closing, to the best of the Seller's knowledge, irrespective of whether such knowledge qualifier is so indicated in each subsection of this Section 3 below.  The Seller represents and warrants to the Buyer as follows:

3.1.      Organization.  The Seller is duly organized and subsisting under the laws of the State of Delaware and is duly authorized, qualified to do business, and in good standing under all applicable laws of any Governmental Authorities having jurisdiction over its business and operations.

3.2.      Powers; Consents; Absence of Conflicts.  Except as described in Schedule 3.2, the execution, delivery and performance by the Seller of this Agreement and the consummation of the Transactions, (a) is not in contravention of any Legal Requirement  or the terms of its certificate of incorporation, bylaws and other governing documents, if any, as amended to date, (b) does not conflict with or result in any breach or contravention of any material agreement to which the Seller is a party or by which it is bound, and (c) has been duly authorized by all appropriate corporate and member action.  Further, subject to entry of the Sale Order and such other authorization as is required by the Bankruptcy Court, the Seller has the requisite power and authority to perform its obligations hereunder and such performance will not be in contravention of any Legal Requirement.

3.3.      Binding Agreement.  Subject to entry of the Sale Order, this Agreement and all instruments and agreements hereunder to which the Seller is or becomes a party are (or upon execution will be) valid and legally binding obligations of the Seller, enforceable against the Seller in accordance with the respective terms hereof or thereof.

3.4.      Financial Statements and Undisclosed Liabilities.

(a)      The Seller has delivered the Audited Financial Statements to the Buyer.  The Audited Financial Statements (including any notes thereto) were certified by the Seller's auditors at the time of issuance as true, complete and accurate and fairly presented, with a going concern opinion, the financial condition and results of operations of the Seller as of the respective dates thereof and for the periods therein referred to, all in accordance with GAAP.

(b)      The Seller has delivered all unaudited balance sheets, income statements, statements of cash flow, statements of operations, and all other financial statements of the Seller for the year-to-date period ended February 28, 2021 (the "Unaudited Financial Statements") to the Buyer, all of which are consistent with as presented Unaudited Financial Statements with respect to previous periods.  The Seller shall thereafter deliver to the Buyer current Unaudited Financial Statements within thirty-five (35) days of the end of each month until the Closing.

3.5.      Equipment.  Schedule 3.5 sets forth to the best of Seller's knowledge, all the equipment associated with, or constituting any part of, the Acquired Assets.

13

3.6.    <u>Real Property</u>.  Except as disclosed in <u>Schedule 3.6</u>:

(a)    Set forth on <u>Schedule 3.6(a)</u> is a true, correct, and complete list of each parcel of real property owned, leased, occupied or otherwise used by the Seller, together with a brief description of each building, structure, fixture or improvement located thereon or appurtenant thereto and all interests of the Seller in any of the foregoing. The Seller has good, indefeasible and marketable title to the Real Property owned by it, free and clear of all Interests except for (i) Permitted Real Property Encumbrances, and (ii) the additional Encumbrances set forth on <u>Schedule 3.6(a)</u> hereto, each of which will be satisfied on the Closing Date and/or divested by operation of the Sale Order.

(b)    Except as set forth on <u>Schedule 3.6(b)</u>, the Seller has not received any notice from the holder of any mortgage presently encumbering any Real Property, any insurance company which has issued a policy currently in effect with respect to the Seller or from any board of fire underwriters (or other body exercising similar functions) claiming and the Seller has no knowledge of, any defects or deficiencies in the Real Property requiring the performance of any repairs, alterations or other work to the Real Property which has not been accomplished.

(c)    No municipal or other governmental improvements located on the Real Property are in the course of construction or installation or have been ordered to be made. All assessments affecting the Real Property for street paving, curbing, sanitary sewers, storm sewers and other municipal or other governmental improvements which have been constructed or installed have been paid for and will not hereafter be assessed. There are no private contractual obligations relating to the installation of, or connection to, any sanitary sewers or storm sewers.

(d)    Except as set forth on <u>Schedule 3.6(d)</u>, each parcel of Real Property is exempt from real property taxes or from any requirements to make payments in lieu of such taxes, constitutes a separate tax parcel and is separately assessed for real estate tax purposes.  To the best of Seller's knowledge, except as set forth on <u>Schedule 3.6(d)</u>, there is no proceeding to revoke the tax exemption, to require a payment in lieu of taxes or to adjust the assessed valuation of all or any portion of the Real Property.

(e)    To the best of the Seller's knowledge, the Real Property is free and clear of any mechanic's or materialmen's liens for work or materials furnished or contracted for.

(f)    Except as set forth on <u>Schedule 3.6(f)</u>, no portion of the Real Property is located within an area designated as a flood hazard area.  Except as set forth on <u>Schedule 3.6(f)</u>, no portion of the Real Property is located in any area constituting a "wetland" or "other water of the United States" or "waters of the United States" or "waters of the State of Delaware," or in a "coastal zone" as defined under federal, state or local Law. Except as set forth on <u>Schedule 3.6(f)</u>, no portion of the Real Property is located in any conservation or historic district.

(g)    To the best of Seller's knowledge, no condemnation proceeding or other proceedings in the nature of eminent domain ("<u>Taking</u>") is pending in connection with the Real Property and no Taking has been threatened by any governmental agency, authority or instrumentality.

(h)      To the best of Seller's knowledge, all buildings, plants, and structures constituting Acquired Assets are wholly within the boundaries of the Real Property and do not encroach upon the property of, or otherwise conflict with the property rights of, any other Person and the improvements on the adjoining land do not encroach onto the Real Property or any part thereof.

(i)      To the best of Seller's knowledge, Schedule 3.6(i) contains a complete and correct list of all of the leases, tenancies, licenses and other agreements, as amended to date, for the use or occupancy of any portion of the Real Property in effect on the date hereof (the "Tenant Leases"), setting forth, with respect to each, (i) the name of the tenant; (ii) the date of the Tenant Leases and the date of all written amendments or modifications thereof in the Seller's possession or otherwise known to the Seller; and (iii) any claims asserted by any tenant of a default by the landlord or of termination of any Tenant Lease.

(j)      No tenant under any of the Tenant Leases has any right or option to acquire the Real Property or any portion thereof, and there are no outstanding agreements with any other party granting any right or creating any obligation to acquire the Real Property or any portion thereof or any interest therein.

(k)      A copy of each such Tenant Lease and written amendments or modifications thereof in the Seller's possession or otherwise known to the Seller has been made available to the Buyer.

(l)      To the best of Seller's knowledge, except as set forth on Schedule 3.6(l), all of the buildings on the Real Property are free of material defects of any kind.  To the best of Seller's knowledge, except as set forth on Schedule 3.6(l), all of the Real Property (including, without limitation, the appliances, the plumbing, heating and electric systems, the cesspools and septic systems, and the elevators, if any) is in good order, condition and repair, all in accordance with applicable Legal Requirements, including, without limitation, Delaware licensing standards and requirements associated with the Assumed Programs.

3.7.    Environmental Matters.

(a)      To the best of Seller's knowledge: (i) Except as described on Schedule 3.7(a)(i) , the Seller is in compliance, in all material respects, with all Environmental Laws relating to or otherwise affecting its programs, including the ownership or operation of the Acquired Assets and, to the Seller's knowledge, there are no circumstances in existence that may prevent or interfere with compliance in all material respects with Environmental Laws or that may prevent or interfere with the ownership or operation of the Acquired Assets; (ii) Except as described on Schedule 3.7(a)(ii), the Seller has not received any written or oral communication from any Person alleging that, with respect to the ownership or operation of the Seller's programs or the Acquired Assets, the Seller is not in full compliance with Environmental Laws or alleging that the Seller has any unresolved obligations or liabilities under Environmental Laws; (iii) The Seller has all material permits, licenses and approvals or other authorizations required under applicable Environmental Laws to own and operate the Real Properties and the Acquired Assets; (iv) All licenses, permits, registrations and other authorizations of Governmental Authorities currently held by the Seller pursuant to Environmental Laws are identified on Schedule 3.7(a)(iv).

15

(b)     Except as described on Schedule 3.7(b), there is no Environmental Claim pending or to the best of Seller's knowledge threatened against the Seller or the Acquired Assets.

(c)     No actions, activities, circumstances, conditions, events or incidents, including the release, emission, discharge or disposal of any Materials of Environmental Concern, have occurred at the Real Property or in connection with transportation or disposal of Materials of Environmental Concern from the Acquired Assets that could form the basis of any Environmental Claim against the Seller or the Acquired Assets.

(d)     To the best of Seller's knowledge, except as described on Schedule 3.7(d), there are not now nor any underground or aboveground storage tanks containing Materials of Environmental Concern at, on or beneath the Real Property.

(e)     Except as described on Schedule 3.7(e), to the best of Seller's knowledge: (i) There are no asbestos containing materials at the Real Property; (ii) Any asbestos containing materials at the Real Property have been managed and are being managed in compliance, in all material respects, with all applicable Environmental Laws; and (iii) All asbestos inspection reports, asbestos abatement closeout documentation, asbestos abatement monitoring reports, asbestos management plans or other documentation concerning or related to asbestos containing materials or the inspection, management or abatement thereof at the Real Property are identified on Schedule 3.7(e)(iii) and have been provided to the Buyer.

(f)     All environmental reports, assessments or compliance audits in the Seller's possession or control that refer or relate to the ownership or operation of the Real Property or the Acquired Assets are identified on Schedule 3.7(f).

(g)     To the best of Seller's knowledge, the Seller has provided the Buyer with any written information in its possession or control pertaining to the matters set forth in this Section 3.7, including complete copies of all environmental permits, licenses, registrations or other approvals or authorizations described in any Schedule to this Section, if any.

3.8.    Insurance.  To the best of Seller's knowledge, Schedule 3.8 contains a complete and accurate list of all policies and binders of insurance (including, without limitation, property, casualty, liability, professional liability, life, health, accident, workers' compensation and disability insurance and bonding arrangements) owned by or maintained for the benefit of the Seller or under which the Seller or any member, shareholder, director, trustee, officer or employee thereof is a party or is covered.

3.9.    Permits and Licenses.  To the best of Seller's knowledge, Schedule 3.9 contains an accurate list and summary description of all material licenses, permits, registrations and other approvals or authorizations (including pending approvals or authorizations) of Governmental Authorities owned or held by the Seller relating to the ownership, development or operation of the Assumed Programs, all of which are current and in good standing.

3.10.    Employees and Employee Benefits.

(a)     The Seller has provided to the Buyer a complete list (as of the date set forth therein) of the names, positions, current annual salaries or wage rates, and bonus and other

16

compensation arrangements, including accrued vacation, sick leave or paid time off of all employees of the Seller associated with the Assumed Programs or otherwise providing centralized administrative, management or similar services in connection with such Assumed Programs (indicating whether each employee is part-time or full-time, their exempt status classification, visa status, if any, and, if such employee is not actively at work, the reason therefor).

(b)    There is no pending or, to the Seller's knowledge, threatened employee strike, work stoppage or labor dispute.

(c)    To the best of Seller's knowledge, Schedule 3.10(c) contains a complete and correct list of all Employee Benefit Plans.

(d)    Neither the Seller nor any of its ERISA Affiliates has (i) incurred or reasonably expects to incur, either directly or indirectly, any liability under Title I or Title IV of ERISA or related provisions of the Code relating to an Employee Benefit Plan; (ii) failed to timely pay premiums to the Pension Benefit Guaranty Corporation ("PBGC"); (iii) withdrawn from any Employee Benefit Plan which is a multiemployer plan under Section 3(37) of ERISA or a "multiple employer plan" as defined in Section 413(c) of the Code; (iv) engaged in any transaction which would give rise to liability under Section 4069 or Section 4212(c), respectively, of ERISA; or (v) engaged in any transaction described in Section 4204 of ERISA which may give rise to potential withdrawal liability.

(e)    No Employee Benefit Plans are maintained for the benefit of employees who primarily render services outside the United States of America.

3.11.    <u>Litigation and Proceedings</u>.    To the best of Seller's knowledge, Schedule 3.11 contains an accurate list and summary description of all actions, suits, litigation, arbitration, mediations, investigations and other proceedings pending against or otherwise affecting the Seller, the Seller's programs or the Acquired Assets.    Except as described in Schedule 3.11, To the best of Seller's knowledge, there are no actions, suits, litigation, arbitration, mediations, investigations or other proceedings (including *qui tam* actions) pending, affecting or threatened against the Seller, the Seller's programs or the Acquired Assets.

3.12.    <u>Brokers and Finders</u>.    Except for the Seller's engagement of SSG Advisors, LLC, neither Seller, nor any officer, trustee, director, employee or agent of Seller, has engaged any finder or broker in connection with the Transactions.

3.13.    <u>Participation in Medicare and Medicaid</u>.    The Seller is qualified for participation in the Medicare and Medicaid programs, has a current and valid provider contract with such programs, is in compliance in all material respects with the conditions for participation in such programs, and has received all approvals or qualifications necessary for capital reimbursement under such programs. A listing of the Seller's NPI numbers and Medicare and Medicaid provider numbers and all physicians and physician extenders employed by Seller is set forth on Schedule 3.13.

3.14.    <u>Title</u>.    Upon transfer of the Acquired Assets to the Buyer at the Closing as contemplated by this Agreement, and subject to the entry of the Sale Order, the Buyer shall acquire

good and valid title thereto, free and clear of all interests except those specifically provided for in this Agreement (such as Permitted Real Property Encumbrances).

3.15.   <u>List of Properties, Contracts, etc.</u>   <u>Schedule 3.15</u> contains a complete and accurate list of the following, to the extent, in whole or in part, directly or indirectly, associated with any of the Assumed Programs: (i) each Contract to which the Seller is a party or by which the Seller or any of the Seller's assets is bound; (ii) all vehicles, items of machinery, equipment and other tangible real and personal assets (other than Real Property owned in fee by the Seller) with an original book or fair market value in excess of $10,000 or requiring annual rental payments in excess of $10,000, in each case owned, leased, used or held by the Seller, and the location thereof (together, if applicable, with the identity of the lessor and lessee, the annual rental and unexpired term of the lease); (iii) Intellectual Properties owned by the Seller; (iv) all outstanding loans and advances by the Seller to any director, trustee, officer, employee or member; (v) all material notes, debt instruments, other evidences of indebtedness, letters of credit and guaranties (whether written or oral) issued by or for the benefit of the Seller, and all loans and other agreements relating thereto; and (vi) all leases, rental and occupancy agreements, licenses, installment and conditional sale agreements, and any other Contracts (in each case, whether written or oral) affecting the ownership of, leasing of, title to, use of, or any leasehold or other interest in, any Acquired Asset.  A complete and accurate copy of each Contract listed on <u>Schedule 3.15</u> has been made available to the Buyer.

3.16.   <u>Relationships with Affiliated Persons</u>.  Except as disclosed in <u>Schedule 3.16</u>, no current or former individual Affiliate, nor any member of the immediate family of any current or former individual Affiliate (collectively "Affiliated Persons") has, or has had, any interest in any property (whether real, personal or mixed and whether tangible or intangible) used in or pertaining to any businesses of the Seller.

4.   <u>Representations and Warranties of the Buyer</u>.

The Buyer makes the following representations and warranties to the Seller on and as of the Execution Date and shall be deemed to make them again at and as of the Closing.  The Buyer represents and warrants to the Seller as follows:

4.1.   <u>Organization</u>.  The Buyer is a nonstock corporation duly organized and validly existing in good standing under the laws of the State of Delaware.

4.2.   <u>Corporate Powers; Consents; Absence of Conflicts, Etc.</u>   The Buyer has the requisite power and authority to conduct its business as now being conducted, to enter into this Agreement, and to perform its obligations hereunder.  The execution, delivery and performance by the Buyer of this Agreement and the consummation of the Transactions:

(a)   are within its corporate powers and are not in contravention of the terms of its certificate of incorporation and bylaws, as amended to date, and, by Closing, will have been approved by all requisite corporate action;

(b)   except as otherwise expressly herein provided, do not require any approval or consent of, or filing with, any Governmental Authority bearing on the validity of this Agreement;

(c)     do not conflict with or result in any breach or contravention of any material agreement to which the Buyer is a party or by which the Buyer is bound; and

(d)     do not violate any Legal Requirement to which the Buyer may be subject.

4.3.    <u>Binding Agreement</u>.    This Agreement and all instruments and agreements hereunder to which the Buyer is or becomes a party are (or upon execution will be) valid and legally binding obligations of the Buyer, enforceable against it in accordance with the respective terms hereof and thereof, except as enforceability against them may be restricted, limited or delayed by applicable bankruptcy or other laws affecting creditors' rights generally and except as enforceability may be subject to general principles of equity.

4.4.    <u>Brokers and Finders</u>.    Except for the Seller's engagement of Angler West Consultants, Inc., neither the Buyer, nor any Affiliate of the Buyer, nor any officer, director, employee or agent thereof, has engaged any finder or broker in connection with the Transactions.

5.    <u>Covenants and Agreements of the Parties</u>.

5.1.    <u>Operation by the Seller Pending Closing</u>.    From the Execution Date until the Closing Date, and except as otherwise expressly provided in this Agreement, and except as may otherwise be required by applicable laws, the Bankruptcy Code or Bankruptcy Court, the Seller agrees to operate in substantially the same manner as it has heretofore and not make any material change in its personnel, operations, finances, accounting policies, or real or personal property or other operations of the Seller.    The Buyer agrees and acknowledges that, from and after the Execution Date, the Seller, including through its representatives, may solicit inquiries, proposals, or offers from third parties for all or any part of the Acquired Assets, and the Seller may discuss and negotiate such inquiries, proposals or offers and provide information to Third Parties in connection therewith, all as contemplated by the Procedures Order.

5.2.    <u>Negative Covenants of the Seller</u>.    Without the prior written approval of the Buyer, which shall not be unreasonably withheld, the Seller shall not, between the Execution Date and the Closing Date: (a) dissolve or merge with any other entity; (b) enter into any Contract or modify or terminate any existing Contract that would have a Material Adverse Effect; or (c) create, assume or permit to exist any encumbrance upon any of the Acquired Assets; (d) dispose of Inventory other than through use in the ordinary course of business; or (e) take any other action outside the ordinary course of business.

5.3.    <u>Affirmative Covenants of the Seller</u>.    Between the Execution Date and the Closing Date, the Seller shall:

(a)     maintain its operations, including the grounds and physical plant, in substantially the state of repair, order and condition as on the date hereof, reasonable wear and tear excepted;

(b)     maintain in full force and effect all Licenses, currently in effect with respect to its operations;

19

(c)     maintain in full force and effect the insurance policies and binders currently in effect with respect to its operations;

(d)     utilize commercially reasonable efforts to preserve intact the present business organization of its operations; keep available the services of present employees and agents, and any other employees and agents employed in connection its operations; and maintain the Seller's relations and goodwill with the suppliers, patients, employees, affiliated personnel and anyone having business relating to its operations;

(e)     maintain all of the books and records relating to its operations in accordance with its past practices; and

(f)     within five (5) business days after the Execution Date, file a motion with the Bankruptcy Court, in form and substance satisfactory to the Buyer, (the "Sale Motion") seeking an order (the "Procedures Order") in the form attached hereto as Exhibit B (together with such modifications to which the Buyer may agree) (i) establishing procedures for potential competing offers to purchase Acquired Assets (each a "Competing Bid") (ii) designating the Buyer as the "stalking horse" bidder for the Acquired Assets and entitling the Buyer to (1) reimbursement of documented costs, expenses and fees incurred by Inperium, Buyer and/or their affiliates associated with their evaluation and/or pursuit of the Transactions in an amount not to exceed fifty thousand dollars ($50,000.00) *plus* (2) an amount equal to three percent (3%) of the Purchase Price if the Seller sells a material portion of the Acquired Assets in a transaction or a series of transactions with one or more persons other than the Buyer in accordance with the Procedures Order, with such amounts being payable upon the closing or consummation of such alternate transaction(s), and (ii) following the entry by the Bankruptcy Court of the Procedures Order, setting a further hearing (the "Sale Hearing") seeking an order (the "Sale Order") in the form attached hereto as Exhibit C (together with such modifications to which the Buyer may agree) approving the Transactions.

5.4.    Employee Matters.

(a)     The Buyer will offer to employ as of the Closing Date substantially all active employees of the Seller on the day before the Closing Date to the extent such active employees are employed in connection with the operation of the Assumed Programs or in connection with the provision of centralized administrative, management or related services to one or more Assumed Programs, such offer of employment to be (i) on terms and conditions comparable to similarly-situated employees in the market, but in no event on terms and conditions more favorable than the terms and conditions applicable to the then current comparable employees of the Buyer and its Affiliates, and (ii) contingent upon the results of the Buyer's hiring practices, including, without limitation, customary background checks and employee interviews. The Seller shall permit the Buyer to have access to the Seller's personnel files in order to assist the Buyer in determining those employees to whom such offer of employment will be made.  At least five (5) days prior to the date of the Sale Hearing, the Buyer shall provide the Seller with Schedule 5.4(a) which schedule shall list all of the Seller's employees to whom the Buyer will offer employment and, subject to usage between the date of delivery of such schedule and the Closing Date, the vacation, holiday and sick pay to which each such employee shall be entitled if such offer is accepted.

(b)      In accordance with, and subject to the terms, conditions and limitations of Buyer's policies and procedures, as may be updated from time to time, Buyer will allow Hired Employees to carry over and/or cash out accrued but unused vacation, holiday and sick days remaining as of the Closing Date in such proportions and amounts, and subject to such limits, as determined by Buyer.

(c)      With respect to Employee Pension Benefit Plans, Hired Employees shall receive, for purposes of eligibility to participate only (and specifically not for purposes of vesting or benefit accrual) under Buyer's Employee Pension Benefit Plans, credit for all service with Seller credited to each such Hired Employee under Seller's Employee Pension Benefit Plans and shall be eligible for, and commence participation in, Buyer's Employee Pension Benefit Plans in accordance with their terms as of the first (1st) day they are otherwise eligible under the terms of the applicable plan following the Closing Date.

(d)      With respect to Employee Welfare Benefit Plans which provide medical, dental or eye care coverages, Hired Employees shall receive, for purposes of eligibility to participate in any such Buyer Employee Welfare Benefit Plan, credit for all service with the Seller and the Buyer shall waive, to the extent it may do so under any of Buyer's Employee Welfare Benefit Plans, any preexisting condition exclusions and permit Hired Employees to commence participation in such applicable Buyer Employee Welfare Benefit Plan in accordance with its terms and conditions.

(e)      With respect to Employee Welfare Benefit Plans or applicable payroll plans of Buyer which provide for vacation pay, holiday pay and sick pay, Hired Employees shall receive credit for all service with Seller for purposes of determining eligibility for, and levels of participation in, such applicable Buyer Employee Welfare Benefit Plan or applicable payroll plans in accordance with its terms and conditions.

(f)      As of and after the Execution Date, the Seller agrees not to communicate to any employees of the Seller any information regarding the Buyer's intention with respect to continuation of employment under the Buyer and the terms and conditions of such continued employment, except as requested or approved by the Buyer, which approval shall not be unreasonably withheld.

5.5.     Access to and Provision of Additional Information; Due Diligence.

(a)      From the Execution Date until the Closing Date, the Seller shall take reasonably commercial steps to provide to the Buyer full and complete access to and the right to inspect the Acquired Assets, books and records of the Seller relating to the Seller's operations, and will furnish to the Buyer all material information concerning the Seller's operations not otherwise disclosed pursuant to this Agreement, and such additional financial, operating and other data and information regarding the Seller's operations as the Buyer may from time to time reasonably request, provided such data and information are in the possession and/or control of the Seller. The Seller shall take reasonably commercial steps to permit the Buyer to inspect the Inventory upon the Buyer's request.

(b)     From the Execution Date until the Closing Date, promptly after becoming known to the Seller, the Seller shall notify the Buyer in writing of any material changes in the operations, financial condition or prospects of the Assumed Programs and/or Acquired Assets and of any complaints, investigations, hearings or adjudicatory proceedings (or communications indicating that the same may be contemplated) of any Person and shall keep the Buyer reasonably informed of such matters.

(c)     Without limiting the generality of the foregoing, the Buyer will proceed with all due diligence to conduct such investigations with respect to the Seller's operations as it deems to be reasonably necessary in connection with its purchase thereof, including, but not limited to, zoning investigations, soil studies, environmental assessments, asbestos inspections, seismic assessments, wetlands reports, investigations of the Seller's books and records and structural inspections (the "Due Diligence Review"); provided, however, that the Buyer shall, except as otherwise required by Legal Requirements, maintain the confidentiality of any documents or information obtained by it during the course of its Due Diligence Review.  To be clear, the obligation of the Buyer to close on this Agreement, purchase the Acquired Assets and assume the Assumed Liabilities is in no way subject to any such Due Diligence Review or any conditions, other than those expressly set forth in section 7 of this Agreement.

5.6.    <u>Post-Closing Maintenance of and Access to Information and Billing</u>.

(a)     The Parties acknowledge that after Closing each party may need access to information or documents in the control or possession of another party for the purposes of concluding the Transactions, Tax Returns or audits, compliance with the Government Reimbursement Programs and other Legal Requirements, and the prosecution or defense of third party claims.  Accordingly, each party shall keep, preserve and maintain in the ordinary course of business, and as required by Legal Requirements and relevant insurance carriers, all books, records (including patient medical records), documents and other information in the possession or control of such party and relevant to the foregoing purposes until at least the earlier of (i) expiration of any applicable statute of limitations or extensions thereof, and (ii) entry of an order of the Bankruptcy Court closing or otherwise dismissing the Bankruptcy Case.

(b)     Each party shall cooperate fully with, and make available for inspection and copying by, the other Party, its employees, agents, counsel and accountants and/or Governmental Authorities, upon written request and at the expense of the requesting Party, such books, records documents and other information to the extent reasonably necessary to facilitate the foregoing purposes.  In addition, each party shall cooperate with, and shall permit and use its commercially reasonable efforts to cause its respective former and present directors, officers and employees to cooperate with, the other Party on and after Closing in furnishing information, evidence, testimony and other assistance in connection with any action, proceeding, arrangement or dispute of any nature with respect to the subject matters of this Agreement and pertaining to periods prior to the Closing Date.

(c)     Upon the Buyer's receipt of appropriate consents and authorizations, the Seller shall be entitled to remove, at the Seller's sole risk and expense, any patient or other records that relate to events or periods prior to Closing for purposes of pending litigation involving matters to which such records refer, as certified in writing prior to removal by counsel retained by the

Seller in connection with such litigation.  Any records so removed shall be promptly returned to the Buyer following their use by the Seller.

(d)     The exercise by the Seller of any right of access granted herein shall not materially interfere with the business operations of the Buyer.

(e)     To the extent that the Seller may be obligated or required by law to retain any records, including patient records, in its possession and being transferred to the Buyer hereunder, the Seller hereby appoints the Buyer as the Seller's records custodian, which appointment the Buyer hereby accepts, to retain such records for the Seller in accordance with applicable Law and this Section.

5.7.    <u>Governmental Authority Approvals; Consents to Assignment</u>.  From the Execution Date until the Closing Date, the Seller will make commercially reasonable efforts to:

(a)     cooperate and assist the Buyer's efforts, which efforts by the Buyer shall be commercially reasonable, to obtain prior to Closing all consents, approvals, authorizations and clearances of Governmental Authorities required of it to consummate the Transactions;

(b)     provide such information and communications to Governmental Authorities as the other party or such Persons may reasonably request; and

(c)     assist and cooperate with the Buyer and other parties to obtain all consents, licenses, permits, approvals, authorizations and clearances of Governmental Authorities that the Buyer and the other parties reasonably deem necessary or appropriate, and to prepare any document or other information reasonably required of it by any such Persons to consummate the Transactions.

5.8.    <u>Allocation of Purchase Price</u>.  The Purchase Price shall be allocated among the Acquired Assets in accordance with Treasury Regulation Section 1.1060-1(c) and IRS Form 8594, Asset Acquisition Statement Under Section 960, as completed and attached hereto as <u>Schedule 5.8</u>. In the event of an adjustment to the Purchase Price, the Seller hereby agrees to amend the allocation set forth in <u>Schedule 5.8</u> in accordance with any written request, notice or other determination given by the Buyer to the Seller, unless the Seller reasonably determines (and notifies the Buyer) that the allocation requested by the Buyer is contrary to law.  The allocation set forth in <u>Schedule 5.8</u>, as the same may be amended in accordance with this Section, shall, for federal and state income tax purposes, be binding on the Seller and the Buyer.  The Seller and the Buyer shall file their respective Tax Returns in accordance with such allocation and shall not take any position inconsistent with such allocation, unless the Seller or the Buyer, as the case may be, reasonably determines (and notify the other parties to this Agreement) that such allocation is contrary to applicable Legal Requirements.

5.9.    <u>Further Acts and Assurances</u>.  At any time and from time to time at and after the Closing, upon request of the Buyer, the Seller shall do, execute, acknowledge and deliver, or cause to be done, executed, acknowledged and delivered, such further acts, deeds, assignments, transfers, conveyances, powers of attorney, confirmations and assurances as the Buyer may reasonably request to more effectively convey, assign and transfer to and vest in the Buyer and their successors and assigns, full legal right, title and interest in and actual possession of the Acquired Assets, to

23

confirm the Seller's capacity and ability to perform its post-Closing covenants and agreements under this Agreement, and to generally carry out the purposes and intent of this Agreement, provided, however, any such actions as the Buyer may reasonably request of the Seller after the Closing Date in this regard shall be done at the sole cost and expense of the Buyer. The Seller shall also furnish the Buyer with such information and documents in its possession or under its control, or which the Seller can execute or cause to be executed, as will enable the Buyer to prosecute any and all petitions, applications, claims and demands relating to or constituting a part of the Acquired Assets, at the sole cost and expense of the Seller.

5.10.    Accounts Receivable.  After the Closing, if requested by the Seller, Buyer shall use reasonable efforts to promptly collect, on behalf of and for the benefit of the Buyer, any remaining Accounts Receivable pertaining to the operation of the Assumed Programs ("Assumed Program A/R"). Seller agrees to provide Buyer with any and all necessary or appropriate, information, documentation and/or support to allow Buyer to collect such Assumed Program A/R.  On at least a monthly basis after the Closing Date, Buyer shall remit to Seller any Assumed Program A/R amounts collected less a collection fee of five percent (5%), which fee shall be retained by Buyer as consideration for its collection services.  Notwithstanding the foregoing, Buyer shall no longer be obligated to collect any Assumed Program A/R on behalf of the Buyer after the date that is six (6) months after the Closing Date.

5.11.    Costs and Expenses.

(a)    Except as otherwise expressly set forth in this Agreement, all expenses of the preparation of this Agreement and of the purchase of the Acquired Assets set forth herein, including counsel, accounting, brokerage and investment advisor fees and disbursements, shall be borne by the respective Party incurring such expense, whether or not such transactions are consummated.

(b)    The Buyer shall pay all Taxes, including all real estate transfer Taxes arising out of the transfer of the Acquired Assets, the cost of the Buyer's and any lender's title insurance policies, if any, the cost of recording the deeds and any mortgages created by the Buyer at Closing, the cost of the Buyer's land title survey of the Real Property, and the cost of all appraisals and environmental, engineering and other professional studies undertaken by the Buyer.

5.12.    Fulfillment of Conditions.  Each Party will execute and deliver at Closing each agreement, instrument or other document that such party is required by this Agreement to execute and deliver as a condition to Closing, and will take all commercially reasonable steps necessary or desirable and proceed diligently and in good faith to satisfy each other condition to the obligations of the parties contained in this Agreement, to the extent that satisfaction of such condition is within the control of such party.

5.13.    Payments Received or to be Received.

(a)    After the Closing Date, the Buyer will promptly transfer and deliver to the Seller, from time to time as and when received by the Buyer, or their Affiliates, and in the currency received by the Buyer, or their Affiliates, any cash, checks with appropriate endorsements, or other

property that the Buyer, or their Affiliates, may receive on or after the Closing Date which properly belongs to the Seller.

(b)     After the Closing Date, the Seller will promptly transfer and deliver to the Buyer, from time to time as and when received by the Seller, or its Affiliates, and in the currency received by the Buyer, or their Affiliates, any cash, checks with appropriate endorsements, or other property that the Seller, or their Affiliates, may receive on or after the Closing Date which properly belongs to the Buyer.

5.14.   <u>Adequate Assurance</u>.  The Buyer agrees that it will promptly take such actions, including without limitation providing testimony, furnishing affidavits or other documents or information for filing with the Bankruptcy Court, as are reasonably requested by the Seller to assist in obtaining, with respect to all Assumed Contracts, a finding by the Bankruptcy Court of adequate assurance of future performance, as such term is used in section 365 of the Bankruptcy Code; provided, however, (a) the Buyer shall not be required to provide any confidential or proprietary information absent appropriate protections including confidentiality agreements and, if requested by the Buyer, the filing of such information under seal, and (b) the Buyer does not warrant or represent that the Bankruptcy Court will find that adequate assurance of future performance has been provided.

5.15.   <u>Tail Coverage</u>.  The Buyer shall be permitted, to the extent available and at its own expense and for its own benefit, to purchase one or more extended claims reporting endorsements to Seller's professional liability, directors & officers, general liability or other insurance policies for which coverage is provided and written on a claims made basis.  Seller shall provide reasonable cooperation to Buyer if Buyer elects to purchase such coverage and such purchase is permitted under the terms of the applicable insurance policies.

6.      <u>Conditions Precedent To Obligations Of the Seller</u>.

The obligations of the Seller to consummate the Transactions are subject to the satisfaction on or prior to the Closing Date of the following conditions unless waived in writing by the Seller:

6.1.   <u>Representations and Warranties; Covenants; Required Actions</u>.

(a)     Each of the representations and warranties of the Buyer contained in this Agreement that are qualified as to materiality shall be true and correct on and as of the Closing Date; and each of the other representations and warranties of the Buyer contained in this Agreement shall be true and correct in all material respects on and as of the Closing Date.

(b)     Each and all of the terms, covenants and agreements to be complied with or performed by the Buyer on or before the Closing Date shall have been complied with and performed in all material respects, including the obligations of the Buyer in Section 8.3.

6.2.   <u>Adverse Action or Proceeding</u>.  There shall not be in effect any order restraining, enjoining or otherwise preventing consummation of the sale of the Acquired Assets and the Transactions.

6.3.    <u>Entry of Sale Order</u>.  The Bankruptcy Court shall have entered the Sale Order, which shall have become a Final Order, <u>provided</u>, <u>however,</u> that if the Buyer waives the requirement that the Sale Order has become a Final Order, the Seller shall be deemed to have also waived such requirement.

7.    <u>Conditions Precedent to Obligations Of the Buyer</u>.

The obligations of the Buyer to consummate the Transactions are subject to the satisfaction on or prior to the Closing Date of the following conditions, unless waived in writing by the Buyer:

7.1.    <u>Representations and Warranties; Covenants</u>.

(a)    Each and all of the terms, covenants and agreements to be complied with or performed by the Seller on or before the Closing Date shall have been complied with and performed, including, without limitation, the obligations of the Seller in Sections 5.3 and 8.2.

(b)    Since the Execution Date, there shall not have occurred any event, change or occurrence that has or could reasonably be expected to have a Material Adverse Effect on the Seller or the Acquired Assets.

7.2.    <u>Pre-Closing Confirmations and Contractual Consents</u>.  The Buyer shall have obtained documentation or other evidence reasonably satisfactory to the Buyer that:

(a)    The Seller and the Buyer have received all consents, permits, approvals, authorizations and clearances of Governmental Authorities and other Persons required to consummate the Transaction including, without limitation, consents or approvals (if any exist) from counter-parties to the Assumed Contracts necessary to assign such Assumed Contracts to the Buyer and from any patients, Governmental Authorities or other third parties necessary to transfer the patient records to the Buyer.

(b)    Each and all of the terms, covenants and agreements to be complied with or performed by the Seller on or before the Closing Date shall have been complied with and performed, including the obligations of the Seller in Section 8.2.

7.3.    <u>Adverse Action or Proceeding</u>.  No action or proceeding before any Governmental Authority shall have been instituted or threatened to restrain or prohibit the Transactions, and there shall not be in effect any order restraining, enjoining or otherwise preventing consummation of the sale of the Acquired Assets and the Transactions.

7.4.    <u>Entry of Order/Approvals</u>.  The Bankruptcy Court shall have entered the Sale Order which shall have become a Final Order.

7.5.    <u>Payor Contracting</u>.  The Buyer and the Seller shall, to the extent necessary (i) to transition services after the Closing to the Buyer and permit the Buyer sufficient time to obtain licenses, provider agreements, provider numbers or such other reasonable assurances, as applicable, with respect to all material payors ("<u>Material Payors</u>") listed on <u>Schedule 7.5</u> and any regulatory agencies as necessary to operate the Assumed Programs and (ii) to permit the Buyer to perform services, bill and collect for services provided by the Buyer to enrollees and beneficiaries

26

of such Material Payors and regulatory agencies as of and after the Closing, all to the extent licenses and agreements, as applicable, with such Material Payors are not included in the Assumed Contracts, enter into the interim transition services agreement (the "TSA"), in substantially the form attached hereto as Exhibit D, pursuant to which the Buyer shall, among other things, assume all costs and expenses incurred by the Seller and retain all revenues in connection with the continued operations of the Acquired Assets and Assumed Programs for the period during which the Seller and the Buyer operate under the terms of the TSA, all as approved by the Bankruptcy Court .

7.6.    Resolution of Claims; Successor Liability.    The Sale Order entered by the Bankruptcy Court, which shall have become a Final Order pursuant to Section 7.4, shall expressly provide for the conveyance of the Acquired Assets to Buyer free and clear of, and released from, all Interests (other than those Interests expressly permitted herein), including, without limitation, any and all settlement obligations, fines, penalties, repayments, recoupments or other successor liabilities of Buyer or any of its Affiliates, officers, directors, employees or agents related to the claims by the United States Department of Justice and/or other applicable plaintiffs or parties, private or governmental, in current litigation or enforcement or regulatory proceedings, and provided that such releases shall be legally binding on all applicable parties including the United States Department of Justice and any other applicable state or federal Governmental Authorities.    The foregoing release and Sale Order shall impose no additional payments or other obligations on Buyer or its Affiliates unless approved by Buyer in its sole and absolute discretion.

7.7.    Title Insurance.    The Buyer shall have received either (a) an ALTA (or the local equivalent thereof) extended coverage owner's policy of title insurance issued by the Buyer's title company insuring title to the Real Property in an amount equal to the portion of the Purchase Price allocated to the Real Property pursuant to Section 5.8, containing such endorsements as the Buyer may request and showing good and marketable title to the Real Property vested in the Buyer free and clear of all liens except (i) Permitted Real Property Encumbrances, and (ii) any other matter approved by the Buyer before the Closing Date (collectively "Title Policy"), or (b) the written commitments or binders of the Buyer's title company to issue the Title Policy in the aforementioned condition within a reasonable time after the Closing Date.    The Buyer agrees to waive the foregoing condition with respect to one or more parcels of Real Property, and to exclude such parcels from the Acquired Assets, if the Buyer cannot convey good and marketable title to such parcels of Real Property and the Purchase Price shall be reduced proportionally based on such exclusion using the portion of the Purchase Price allocated to such Real Property under Section 5.8, all provided that the exclusion of such parcels of Real Property from the Acquired Assets would not result in a Material Adverse Effect.

8.    Closing; Termination of Agreement.

8.1.    Closing.    Subject to the satisfaction of the conditions set forth in Sections 6 and 7 hereof (or the waiver thereof by the party entitled to waive that condition), the closing of the Transactions (the "Closing") shall take place at such mutually agree upon location or electronically on the Closing Date.    The Closing Date shall be the third business day following the satisfaction of all conditions to the obligation of the Seller to Close, other than conditions which, by their nature, are to be satisfied at Closing, or such other date as may be agreed by the Buyer and the Seller, in any case to occur on or before June 30, 2021.

8.2.    <u>Action of the Seller at Closing</u>.  At the Closing and unless otherwise waived in writing by the Buyer, the Seller shall deliver:

(a)    to the Buyer, a certified copy of the Sale Order;

(b)    to the Buyer, special warranty deeds, fully executed by the Seller in recordable form, conveying to the Buyer good and marketable fee title to the Real Property, free and clear of all Interests other than the Permitted Real Property Encumbrances in accordance with the Sale Order;

(c)    to the Buyer, one or more bills of sale, in form acceptable to the Buyer, fully executed by the Seller conveying to the Buyer title to all Acquired Assets other than the Real Property on the terms and in accordance with the Sale Order;

(d)    to the Buyer, one or more assignment and assumption agreements, in form acceptable to the Buyer, fully executed by the Seller conveying to the Buyer the Seller's interests in the Assumed Contracts assumed by the Buyer and by which the Buyer assumes the future payment and performance of the Assumed Liabilities in accordance with the Sale Order;

(e)    to the Buyer, the TSA fully executed by Seller;

(f)    to the Buyer's title insurance company, an affidavit of the type customarily provided by the Sellers of real property to induce title companies to insure over certain "standard" or "preprinted" exceptions to title;

(g)    to the Buyer, an affidavit in accordance with the Foreign Investment in Real Property Tax Act, to the extent applicable or required by law;

(h)    to the Buyer, copies of resolutions duly adopted by the board of directors or trustees of the Seller, certified as true and in full force and effect as of the Closing Date by the appropriate officers of the Seller; and

(i)    to the Buyer, such other instruments, agreements, certificates and documents as the Buyer reasonably deem necessary to effect the Transactions.

8.3.    <u>Action of the Buyer at Closing</u>.  At the Closing, the Buyer shall deliver or cause to be delivered:

(a)    to the Seller, in cash or by wire transfer of immediately available funds to the accounts designated in writing by Seller (which designation shall be provided at least three Business Days prior to the Closing Date), the Purchase Price, less the Deposit (which shall be applied towards the Purchase Price at Closing);

(b)    to the Seller, one or more assignment and assumption agreements, fully executed by the Buyer, in form and substance acceptable to the Seller, pursuant to which the Buyer shall assume the Seller's interests in the Assumed Contracts and the future payment and performance of the Assumed Liabilities related thereto;

28

(c)     to the Seller, the TSA fully executed by Buyer;

(d)     to the Seller, copies of resolutions duly adopted by the board of directors of the Buyer authorizing and approving the Buyer's execution and delivery of this Agreement and the Transactions, certified as true and in full force and effect as of the Closing Date by an appropriate officer of the Buyer:

(e)     to the Seller, certificates of the duly authorized President or a Vice President (or equivalent officer) of the Buyer certifying that each of the representations and warranties of the Buyer contained in this Agreement that are qualified as to materiality is true and correct on and as of the Closing Date, that each of the other representations and warranties of the Buyer contained in this Agreement is true and correct in all material respects on and as of the Closing Date, and that each and all of the terms, covenants and agreements to be complied with or performed by the Buyer on or before the Closing Date have been complied with and performed; and

(f)     to the Seller, such other agreements, instruments and documents as the Seller reasonably deem necessary to effect the Transactions.

8.4.     Termination Prior to Closing; Liquidated Damages.

(a)     The Agreement may be terminated prior to the Closing as follows:

(i)     by the Buyer, if the Closing shall not have occurred by 2 P.M. Eastern Time on June 30, 2021, or such later date as the Seller and the Buyer may mutually agree upon (the "Outside Closing Date"); provided, however, that if the Closing shall not have occurred on or before the Outside Closing Date due to a material breach of any representations, warranties, covenants or agreements contained in this Agreement by the Buyer, then the Buyer may not terminate this Agreement pursuant to this Section 8.4(a)(i);

(ii)     by mutual written consent of the Buyer and the Seller;

(iii)     by the Buyer, if any condition to the obligations of the Buyer set forth in Section 7 shall have become incapable of fulfillment other than as a result of a breach by the Buyer of any covenant or agreement contained in this Agreement, and such condition is not waived by the Buyer;

(iv)     by the Seller, if any condition to the obligations of the Seller set forth in Section 6 shall have become incapable of fulfillment other than as a result of a breach by the Seller of any covenant or agreement contained in this Agreement, and such condition is not waived by the Seller;

(v)     by the Buyer, if there shall be a material breach by the Seller of any representation or warranty, or any covenant or agreement contained in this Agreement which would result in a failure of a condition set forth in Section 7 and which breach has not been cured by the earlier of (A) five (5) business days after the giving of written notice by the Buyer to the Seller of such breach and (B) the Outside Closing Date.  For purposes of determining whether a material breach by

29

the Seller of any representation or warranty has occurred for purposes of this Section 8.4(a)(v), all references to the knowledge of the Seller included in any such representation or warranty shall be deemed omitted;

(vi)     by the Seller, if there shall be a material breach by the Buyer of any representation or warranty, or any covenant or agreement contained in this Agreement which would result in a failure of a condition set forth in Section 6 and which material breach has not been cured by the earlier of (i) five (5) business days after the giving of written notice by the Seller to the Buyer of such breach and (ii) the Outside Closing Date;

(vii)    by the Seller or the Buyer if there shall be in effect a Final Order of a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the Transactions;

(viii)   by the Buyer, if (A) within five (5) business days after the Execution Date, the Sale Motion is not filed with the Bankruptcy Court, (B) within five (5) days after receipt from the Buyer of Schedule 2.8, the Seller does not deliver the Assumption and Assignment Notice (as defined in the Procedures Order) to all counter parties to all Contracts listed on Schedule 2.8, (C) the Bankruptcy Court does not enter the Procedures Order within fifteen (15) business days after the Execution Date, or (D) the Sale Order is not entered by June 30, 2021 or such later date as may be agreed by the Buyer;

(ix)     by the Buyer, if (A) the Sale Order does not approve the assumption by the Seller and assignment to the Buyer of all of the Contracts listed on Schedule 2.8, or (B) an order is entered by the Bankruptcy Court denying the Sale Motion or entry of the Sale Order or approving the sale of any of the Acquired Assets to a Person other than the Buyer; or

(x)      by the Buyer if, after the Buyer and Seller have agreed on the form of any schedule or exhibit, the Seller requests the Buyer's consent to amend such schedule or exhibit if such amendment would qualify, in any material way, a representation, warranty or covenant made by the Seller in this Agreement or otherwise affect, in any material way, the rights of the Buyer under this Agreement, in each case, regardless whether the Buyer's consent to such amendment would be required pursuant to Section 9.11 hereof.

(b)      Liquidated Damages in the Event of Termination.

(i)      If this Agreement is terminated pursuant to Section 8.4(a), except pursuant to Sections 8.4(a)(v) or (vi), neither the Seller nor the Buyer shall be entitled to any damages, losses, or payment from the other party, and the Seller and the Buyer shall have no further obligation or liability of any kind to the other party, any of their Affiliates, or any third party on account of this Agreement and Buyer shall be entitled to the return of the Deposit;

(ii)     If there shall be a material breach by the Seller of any representation or warranty, or any covenant or agreement contained in this Agreement which would result in a failure of a condition set forth in Section 7 and which breach has not been cured by the earlier of (A) five (5) business days after the giving of written notice by the Buyer to the Seller of such breach and (B) the Outside Closing Date, then the Buyer may elect to (1) terminate this Agreement pursuant to Section 8.4(a)(v) hereof, or (2) enforce specific performance of this Agreement against the Seller.

(iii)     If there shall be a material breach by the Buyer of any representation or warranty, or any covenant or agreement contained in this Agreement which would result in a failure of a condition set forth in Section 6 and which breach has not been cured by the earlier of (A) five (5) business days after the giving of written notice by the Seller to the Buyer of such breach and (B) the Outside Closing Date, then the Seller shall be entitled to (1) enforce specific performance against the Buyer, or (2) terminate this Agreement and retain the Deposit as liquidated damages for Buyer's default and as Seller's exclusive money damages remedy, except as otherwise set forth herein; provided, however, that such damages shall not be paid to Seller in the event it obtains specific performance.

(iv)     Notwithstanding anything contained herein to the contrary, under no circumstances shall either Party have the ability to exercise or enforce any remedy or terminate this Agreement as a result of a default by the other Party if such default was caused in whole or in part by any default, action or omission by the first Party or its Affiliates.

(v)     The Parties agree that irreparable damage would occur upon any failure to cure a curable breach of any provision of this Agreement and that the Parties shall be entitled to specific performance of any such provision, in addition to any other remedy to which they are entitled at law or in equity.

(vi)     This Section 8.4 shall survive the Closing or the earlier termination of this Agreement.

(c)     Procedure Upon Termination.  In the event of termination pursuant to this Section, the terminating Party must give written notice thereof to the other party, specifying the provision pursuant to which the Agreement is being terminated, and this Agreement will terminate and the purchase of the Acquired Assets hereunder will be abandoned without further action by the Buyer or the Seller.

(d)     Back-Up Bid.  This Agreement shall remain binding in accordance with the terms hereof until the Back-Up Bid Termination Date, as defined in the Bidding Procedures and the Bidding Procedures Order.  If this Agreement has not been selected by Seller as the Successful Bid prior to the Back-Up Bid Termination Date, then this Agreement shall terminate on the Back-Up Bid Termination Date or such other date as mutually agreed upon by the Parties, and the Deposit shall be returned to Buyer in accordance with this Section 8.4.  If this Agreement is selected by the Seller as the Successful Bid prior to the Back-Up Bid Termination Date, then this

31

Agreement shall remain in full force and effect until the Closing or the earlier termination in accordance with this Section 8.4.

9.      General.

9.1.    Survival of Representation and Warranties.    The Parties agree that the representations and warranties contained in this Agreement shall survive until the Closing and none of the Parties shall have any liability to each other after such time for any breach thereof except as relates to claims as to which notice has been given on or prior to the Closing.  The Parties agree that the covenants contained in this Agreement to be performed at or after the Closing shall survive the Closing hereunder, and each Party shall be liable to the other after the Closing for any breach thereof.

9.2.    Headings and Captions.  The headings and captions in this Agreement are included for convenience of reference only and shall not be construed to define or limit any of the provisions contained herein.

9.3.    Consents, Approvals and Discretion.  Except as herein expressly provided to the contrary, whenever this Agreement requires any consent or approval to be given by either party or either party must or may exercise discretion, such consent or approval shall not be unreasonably withheld or delayed and such discretion shall be reasonably exercised.

9.4.    Choice of Law/Venue.  This Agreement shall be governed by and construed in accordance with (i) the laws of the State of Delaware without regard to its conflicts of laws rules and (ii) the Bankruptcy Code, as applicable.  For so long as the Seller is subject to the jurisdiction of the Bankruptcy Court and provided the Bankruptcy Court does not decline to exercise jurisdiction, the Parties irrevocably elect, and consent to the jurisdiction of, the Bankruptcy Court as the sole judicial forum for the adjudication of any matters arising under or in connection with the Agreement.  The Parties hereby consent to the jurisdiction of such court and waive their right to challenge any proceeding involving or relating to this Agreement on the basis of lack of jurisdiction over the Person or forum non conveniens.

9.5.    Benefit; Assignment.  Subject to provisions herein to the contrary, this Agreement shall inure to the benefit of and be binding upon the Parties and their respective legal representatives, successors and assigns.  No party may assign this Agreement without the prior written consent of the other Party except that the Buyer may, in its sole and absolute discretion, assign the right to purchase some or all Acquired Assets, or any and all other rights and obligations of Buyer hereunder, to one or more current or future Affiliates of the Buyer.  Without limiting the generality of the foregoing, Seller acknowledges that Buyer presently intends to assign all of its rights and obligations hereunder to a to-be-formed subsidiary of Buyer.

9.6.    Third Party Beneficiary.  The terms and provisions of this Agreement (including provisions regarding employee and employee benefit matters) are intended solely for the benefit of (a) the Parties and their respective successors and permitted assigns, and are not intended to confer third-party beneficiary rights upon any other Person.  Any reference in this Agreement to one or more Employee Benefit Plans of the Buyer includes provisions, if any, in such plans permitting their termination or amendment and any covenant in this Agreement to provide any

Employee Benefit Plan shall not be deemed or construed to limit the Buyer's right to terminate or amend such plan of the Buyer in accordance with its terms.

9.7.    <u>Waiver of Breach, Right or Remedy</u>.  The waiver by any party of any breach or violation by another party of any provision this Agreement or of any right or remedy permitted the waiving party in this Agreement (a) shall not waive or be construed to waive any subsequent breach or violation of the same provision (b) shall not waive or be construed to waive a breach or violation of any other provision, and (c) shall be in writing and may not be presumed or inferred from any party's conduct.  Except as expressly provided otherwise in this Agreement, no remedy conferred by this Agreement is intended to be exclusive of any other remedy, and each and every remedy shall be in addition to every other remedy granted in this Agreement or now or hereafter existing at law or in equity, by statute or otherwise.  The election of any one or more remedies by a party shall not constitute a waiver of the right to pursue other available remedies.

9.8.    <u>Notices</u>.  Any notice, demand or communication required, permitted or desired to be given hereunder shall be deemed effectively given if given in writing (i) on the date tendered by personal delivery, (ii) on the date received by facsimile or other electronic means (including email or PDF), or (iii) on the date tendered for delivery by nationally recognized overnight courier, in any event addressed as follows:

| | |
|---|---|
| If to the Buyer: | c/o Inperium, Inc. |
| | 120 Prospect Street |
| | Reading, PA 19606 |
| | Attn: Ryan D. Smith, President and CEO |
| | Email:  rsmith@inperium.org |
| | |
| With a copy to: | Stevens & Lee, P.C. |
| | 111 N. Sixth Street |
| | Reading, PA 19603 |
| | Attn:  G. Thompson Bell, III, Esq. |
| | Email:  gtb@stevenslee.com |

33

| If to the Seller: | Connections Community Services, Inc. |
| | c/o EisnerAmper, LLP |
| | One Logan Square |
| | 130 North 18th Street |
| | Suite 3000 |
| | Philadelphia, PA 19103 |
| | Attn: Robert D. Katz, Chief Restructuring Officer |
| | Email: robert.katz@eisneramper.com |
| | |
| With a copy to: | Chipman, Brown, Cicero & Cole, LLP |
| | Hercules Plaza |
| | 1313 N. Market Street |
| | Suite 5400 |
| | Wilmington, DE 19801 |
| | Attn:   William E. Chipman, Jr. |
| | Mark L. Desgrosseilliers |
| | Email: chipman@chipmanbrown.com |
| | desgross@chipmanbrown.com |

or to such other address or number, and to the attention of such other Person, as any party may designate at any time in writing in conformity with this Section.

9.9.    <u>Severability</u>.  If any provision of this Agreement is held or determined to be illegal, invalid or unenforceable under any present or future law, and if the rights or obligations of any party under this Agreement will not be materially and adversely affected thereby: (a) such provision will be fully severable; (b) this Agreement will be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part hereof; (c) the remaining provisions of this Agreement will remain in full force and effect and will not be affected by the illegal, invalid or unenforceable provision or by its severance herefrom; and (d) in lieu of such illegal, invalid or unenforceable provision, there will be added automatically as a part of this Agreement a legal, valid and enforceable provision as similar in terms to such illegal, invalid or unenforceable provision as may be possible.

9.10.    <u>Entire Agreement; Amendment</u>.  This Agreement supersedes all previous contracts, agreements and understandings and constitutes the entire agreement of whatsoever kind or nature existing between or among the parties representing the within subject matter and no party shall be entitled to benefits other than those specified herein.  As between or among the parties, any oral or written representation, agreement or statement not expressly incorporated herein, whether given prior to or on the Execution Date, shall be of no force and effect unless and until made in writing and signed by the parties on or after the Execution Date.

9.11.    <u>Schedules and Exhibits</u>.  Any schedule (other than schedules which, by the express terms hereof, are to be delivered at a different date) or exhibit referenced herein but not attached as of the Execution Date, in the case of an exhibit, or completed, in the case of a schedule, shall be completed or attached, as applicable, on or before the fifteenth (15th) day following the Execution Date, or such later date as may be agreed by the Buyer and the Seller, each in the exercise of commercially reasonable discretion.  Unless otherwise expressly provided herein, the

form of any such exhibit and the content of any such schedule must be satisfactory to the Buyer and the Seller, each in the exercise of commercially reasonable discretion. Notwithstanding the foregoing, the Parties anticipate that the schedules and exhibits may require updates or other amendments prior to the Closing Date and the Parties may, subject to their respective termination rights, update or otherwise amend the schedules or exhibits for any reason upon the mutual agreement of the Parties, which agreement shall not be unreasonably withheld by either Party.

9.12.    <u>Counterparts</u>.  This Agreement may be executed and delivered in one or more counterparts, each of which shall be an original, but all of which together shall constitute one and the same instrument.  This Agreement may also be executed and delivered by facsimile or electronic transmission with the same force and effect as if originally executed copies of this Agreement had been delivered by the parties hereto.  If this Agreement is executed and delivered in counterparts or by a facsimile, any party may thereafter require that both parties originally execute and deliver a sufficient number of additional copies of this Agreement so that each party may have two fully executed originals of this Agreement.

*[signature page follows]*

SL1 1691053v3 007562.00162

IN WITNESS WHEREOF, and intending to be legally bound, the parties have caused this Agreement to be executed by their duly authorized officers as of the Execution Date.

**CONNECTIONS COMMUNITY SUPPORT PROGRAMS, INC.**

By: _Robert Katz_
43CBBA0A4845435

Robert D. Katz
Chief Restructuring Officer

**CONEXIO CARE, INC.**

By: _[signature]_
D7703A43C32B404

Ryan D. Smith
President

[Signature Page to Asset Purchase Agreement]

**EXHIBIT A**

**ASSUMED PROGRAMS**

1. Newark Clinic
2. Millsboro Clinic
3. Dover Clinic
4. 340B
5. Seaford Clinic
6. Claymont Clinic
7. Smyrna Clinic

**EXHIBIT B**

**PROCEDURES ORDER**

**EXHIBIT C**

**SALE ORDER**

**EXHIBIT D**

**TRANSITION SERVICES AGREEMENT**

**SCHEDULE 2.1(A)**

**INCLUDED REAL ESTATE**

1.  Millsboro Clinic, 315 Old Landing Road, Millsboro, DE 19966

# **<u>EXHIBIT 2</u>**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| CONNECTIONS COMMUNITY SUPPORT PROGRAMS, INC., | Case No. 21-10723 (MFW) |
| Debtor.[1] | **Related Docket No. ____** |

<u>**NOTICE OF AUCTION AND SALE OF ASSETS**</u>

**PLEASE TAKE NOTICE REGARDING THE FOLLOWING:**

1.      On April 19, 2021, Connections Community Support Programs, Inc. (the "**Debtor**"), filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**").  The Debtor is operating its businesses and managing its properties as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

2.      On April 21, 2021, the Debtor entered into an Asset Purchase Agreement (the "**Non-MAT Stalking Horse APA**") with Conexio Care, Inc. (the "**Non-MAT Stalking Horse Bidder**"), by which the Non-MAT Stalking Horse Bidder or a designee of the Stalking Horse Bidder, as permitted pursuant to the Stalking Horse APA, will acquire certain of the Debtor's assets (the "**Acquired Non-MAT Assets**").

3.      On April 27, 2021, in connection with a proposed sale or sales (collectively, the "**Non-MAT Sale**") of the Acquired Assets, and all other assets of the Debtor that are not Acquired Assets (such assets, the "**Excluded Non-MAT Assets**" and with the Acquired Non-MAT Assets, collectively, the ("**CCSP Assets**") pursuant to section 363 of the Bankruptcy Code to the successful bidder or bidders (each a  "**Successful Bidder**"), free and clear of all liens, claims, encumbrances and other interests at one or more auctions (each, an "Auction"), the Debtor filed a motion (the "**Non-MAT Sale Motion**") (Docket No. 54),  seeking, among other things, entry of an order (i) approving certain bidding procedures governing the solicitation of higher or better bids; (ii) establishing procedures for the assumption or assignment and assumption of executory contracts; (iii) scheduling a sale hearing (the "**Sale Hearing**"); and (iv) granting related relief.

4.      On April 30, 2021, the Debtor entered into an Asset Purchase Agreement (the "**MAT Stalking Horse APA**") with Conexio Care, Inc. (the "**MAT Stalking Horse Bidder**"), by which the MAT Stalking Horse Bidder or a designee of the MAT Stalking Horse Bidder, as permitted pursuant to the Stalking Horse APA, will acquire certain of the Debtor's

---

[1]   The Debtor in this chapter 11 case, along with the last four digits of its tax identification number, is as follows: Connections Community Support Programs, Inc. (3030).  The address of the Debtor's corporate headquarters is 3812 Lancaster Pike, Wilmington, Delaware 19805.

assets (the "**Acquired MAT Assets**"). On that same date, the Debtor filed its motion (Docket No. 71) (the "**MAT Sale Motion**" and with the Non-MAT Sale Motion, collectively, the "**Sale Motions**"), in connection with a sale or sales (collectively the "**MAT Sale**" and with the Non-MAT Sale, collectively, the "**Sale**") for entry of an order approving certain bidding procedures governing the solicitation of higher or better bids; (ii) establishing procedures for the assumption or assignment and assumption of executory contracts; (iii) scheduling the Sale Hearing; and (iv) granting related relief.

5.    On May ▨, 2021, the Bankruptcy Court entered two orders (Docket Nos. ▨ and ▨) (collectively, the "**Bidding Procedures Order**") that, among other things, authorized the Debtor to solicit bids and approved the bidding procedures to be employed by the Debtor in connection with the sale of substantially all of the Debtor's assets and operations, including both the Acquired Non-MAT Assets and the Acquired MAT Assets.

6.    The proposed sale transactions pursuant to the Non-MAT Stalking Horse APA and the MAT Stalking Horse APA are subject to competitive bidding as set forth herein. Capitalized terms used herein but not otherwise defined shall have the meanings set forth in the Non-MAT Stalking Horse APA, the MAT Stalking Horse APA, and the Bidding Procedures Order, as applicable.

7.    Pursuant to the Bidding Procedures Order, if one or more Qualified Bids are received before the Bid Deadline (as defined below), the Debtor will conduct one or more Auctions among such Qualified Bidders to determine the highest or otherwise best Qualified Bid, beginning on **June 4, 2021 at 10:00 a.m. (Eastern)** at the offices of Chipman, Brown, Cicero & Cole, LLP, Hercules Plaza, 1313 North Market Street, Suite 5400, Wilmington, Delaware 19801, but to be held by Zoom videoconference, or such other means, including telephone that the Debtor may choose, after consultation with the Consultation Parties, or such other place and time as the Debtor shall notify all bidders that have submitted Qualified Bids (including the Stalking Horse Bidder) and the Committee appointed in the Debtor's Chapter 11 Cases and its counsel.

8.    Only Qualified Bidders that have submitted Qualified Bids by **June 3, 2021, at 5:00 p.m. (Eastern)** (the "**Bid Deadline**") are eligible to participate in any Auction, subject to the terms of the Bidding Procedures and other limitations as may reasonably be imposed by the Debtor. All Qualified Bids, must be accompanied with a deposit in an amount equal to the lesser of $500,000 or ten percent (10%) of the total cash consideration provided under the proposed Transaction Agreement.

9.    Qualified Bidders participating in the Auction must appear by telephone or by such other means as the Debtor may approve in their sole discretion. Duly authorized representatives of such Qualified Bidders may also participate in the Auction by such means. Only the Debtor, the Auction Bidders, the Consultation Parties, the U.S. Trustee, the Patient Care Ombudsman, and all creditors of the Debtor, together with the professional advisors to each of the foregoing parties, may attend the Auction, also by telephone, videoconference, or by such other means as the Debtor may approve in their sole discretion. Only Qualified Bidders (including the Non-MAT and MAT Stalking Horse Bidders) will be entitled to make any Bids at the Auction. For the avoidance of doubt, the Consultation Parties may attend the Auction without sending prior written notice of their intention to do so. All other parties must provide prior written notice to undersigned counsel

for the Debtor of their intention to attend the Auction and will, thereafter, receive instructions from such counsel regarding how to attend the Auction.

10.    If the Debtor does not receive a Qualified Bid (other than that of the Non-MAT and/or MAT Stalking Horse Bidder), the Debtor will not conduct an Auction and shall designate the Non-MAT and/or MAT Stalking Horse Bidder as the Successful Bidder.

11.    A hearing to consider approval of the Successful Bid (or to approve the Non-MAT Stalking Horse APA and/or the MAT Stalking Horse APA, as applicable, if no Auction is held) (the "**Sale Hearing**") is proposed to take place on **June 8, 2021, at 2:00 p.m. (Eastern)**, at the United States Bankruptcy Court for the District of Delaware, 824 N. Market Street, Wilmington, Delaware 19801.  At the Sale Hearing, the Debtor will present such Successful Bid to the Court for approval.  In accordance with the Court's Fifth Amended Standing Order Governing the Conduct of Hearings due to Coronavirus Disease 2019 (COVID-19), the Sale Hearing may be held by video through Zoom, as set forth in the agenda with respect to such Sale Hearing.

12.    Objections, if any, to the Motion and the sale of some or all of the CCSP Assets to the Successful Bidder, must be filed with the Court and served upon counsel to the Debtor so as to be actually received by **June 2, 2021, at 4:00 p.m. (Eastern)**.  If a Successful Bidder that is not the Non-MAT Stalking Horse Bidder or the MAT Stalking Horse Bidder prevails at the Auction, then the deadline to object solely with respect to the conduct of the Auction, any changes to the revised APA, or the adequate assurance of future performance from the Successful Bidder, shall be extended to **June 7, 2021, at 10:00 a.m. (Eastern)**; provided, however, that the deadline to object to matters unrelated to the identity of the Successful Bidder or conduct of the Auction shall not be extended.  In each case, all objections must: (a) be in writing; (b) conform to the applicable provisions of the Bankruptcy Rules, the Local Rules, and any orders of the Court; (c) state with particularity the legal and factual bases for the objection and the specific grounds therefor; and (d) be filed with the Court no later than the applicable objection deadline and served on proposed counsel to the Debtor.  **Any party who fails to timely file an objection to entry of the Sale Order (i) shall be forever barred from objecting thereto and (ii) shall be deemed to consent to the sale of the Assets as approved by any Sale Order.**

13.    This notice is subject to the fuller terms and conditions of the Sale Motions, the Bidding Procedures, and the Bidding Procedures Order.  In the event of any conflict, the Bidding Procedures Order shall control, and the Debtor encourages parties in interest to review such documents in their entirety. Parties interested in receiving more information regarding the Sale and/or copies of any related document, including the Sale Motions or the Bidding Procedures Order, may make a written request to proposed counsel for the Debtor, Chipman, Brown, Cicero & Cole, LLP, Hercules Plaza 1313 North Market Street, Suite 5400, Wilmington, Delaware 19801 (Attn: William E. Chipman, Jr., and Mark L. Desgrosseilliers).  In addition, copies of the Sale Motions, the Bidding Procedures Order, and this notice can be found (i) at https://omniagentsolutions.com/connectionsCSP (free of charge); and (ii) through PACER on the

Court's website, https://ecf.deb.uscourts.gov (registration required), and are on file with the Clerk of the Court, 824 N. Market Street, Wilmington, Delaware 19801.

Dated: May ___, 2021
Wilmington, Delaware

CHIPMAN BROWN CICERO & COLE, LLP

_____

William E. Chipman, Jr. (No. 3818)
Mark L. Desgrosseilliers (No. 4083)
Mark D. Olivere (No. 4291)
Hercules Plaza
1313 North Market Street, Suite 5400
Wilmington, Delaware 19801
Telephone:    (302) 295-0191
Email:        chipman@chipmanbrown.com
              desgross@chipmanbrown.com
              olivere@chipmanbrown.com

Counsel for the Debtor and Debtor-in-Possession

- 4 -

# **EXHIBIT 3**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| CONNECTIONS COMMUNITY SUPPORT PROGRAMS, INC., | Case No. 21-10723 (MFW) |
| Debtor.[1] | **Related Docket No. ____** |

**NOTICE OF PROPOSED ASSUMPTION, ASSIGNMENT, AND CURE AMOUNTS**
**WITH RESPECT TO EXECUTORY CONTRACTS AND**
**UNEXPIRED LEASES OF THE DEBTOR**

**PLEASE TAKE NOTICE REGARDING THE FOLLOWING:**

       1.      On April 19, 2021, Connections Community Support Programs, Inc. (the "**Debtor**"), filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").  The Debtor is operating its businesses and managing its properties as debtor in possession pursuant to section 1107(a) and 1108 of the Bankruptcy Code.

       2.      On April 30, 2021, the Debtor entered into an Asset Purchase Agreement (the "**MAT Stalking Horse APA**") with Conexio Care, Inc. (the "**MAT Stalking Horse Bidder**"), by which the MAT Stalking Horse Bidder or a designee of the MAT Stalking Horse Bidder, as permitted pursuant to the MAT Stalking Horse APA, will acquire certain of the Debtor's assets (the "**MAT Acquired Assets**").

       3.      On April 30, 2021, in connection with a proposed sale of the Acquired MAT Assets pursuant to section 363 of the Bankruptcy Code (the "**Sale**") to the successful bidder (the "**Successful Bidder**") at an auction (the "**Auction**"), the Debtor filed a motion (the "**MAT Sale Motion**"), seeking, among other things, entry of an order (i) establishing procedures for the assumption or assignment and assumption of executory contracts and (ii) granting related relief.

       4.      On May___, 2021, the Bankruptcy Court entered an order (Docket No. __) (the "**Bidding Procedures Order**") approving certain bidding procedures (the "**Bidding Procedures**").  Pursuant to the Sale and the MAT Stalking Horse APA, the Debtor will assume the Designated Contracts (as defined herein) pursuant to and upon the consummation of the MAT Sale, with the Successful Bidder continuing to perform under the applicable Designated Contracts. The Debtor will assume and assign the Designated Contracts to the applicable Successful Bidder, pursuant to the MAT Sale Order to be entered approving any MAT Sale following the Sale Hearing.

---

[1]    The Debtor in this chapter 11 case, along with the last four digits of its tax identification number, is as follows: Connections Community Support Programs, Inc. (3030).  The address of the Debtor's corporate headquarters is 3812 Lancaster Pike, Wilmington, Delaware 19805.

5.      Pursuant to the Bidding Procedures Order, and the MAT Bidding Protections Order (Docket No. ___ ), the Debtor hereby provides notice that they may seek to assume and assign to the Successful Bidder the executory contracts or unexpired leases (each, a "**Designated Contract**") listed on **Exhibit A** attached hereto.  On the closing date of any MAT Sale, or as soon thereafter as practicable, the Successful Bidder or the Debtor (as applicable), will pay the Debtor's good-faith estimates of the amount of the required cure payments, as set forth on **Exhibit A** (the "**Cure Amount**").  The payment of the Cure Amount by the Successful Bidder or the Debtor, as applicable, shall (i) constitute a cure of all defaults existing under the Designated Contracts, as applicable, and (ii) compensate the non-Debtor counterparties to such Designated Contracts for any actual pecuniary loss to such counterparty resulting from such default.  The Cure Amounts are the only amounts proposed to be paid upon any assumption or assumption and assignment of the Assumed Contracts, in full satisfaction of all amounts outstanding under the Assumed Contracts.

**YOU ARE RECEIVING THIS NOTICE BECAUSE YOU MAY BE A PARTY TO AN ASSUMED CONTRACT.  A LIST OF THE ASSUMED CONTRACTS IS ATTACHED HERETO AS <u>EXHIBIT A</u>.**

6.      The inclusion of an executory contract or unexpired lease as a Designated Contract on **Exhibit A** is not a guarantee that such contract or unexpired lease will ultimately be assumed and assigned.  Should it be determined that any Designated Contract will not be assumed and assigned, the non-Debtor counterparty to such Designated Contract will be notified in writing of such decision.

7.      The Debtor may designate, up to and including at the Sale Hearing (the "**Designation Deadline**"), additional executory contracts and/or unexpired leases as agreements to be assumed by the Debtor and assigned to the Successful Bidder (the "**Additional Designated Contracts**").  As soon as practicable, the Debtor shall serve a Contract Assumption Notice on each of the counterparties to such Additional Designated Contracts and their counsel of record, if any, and by email, where such information is available, indicating (i) that the Debtor intends to assume and assign the counterparty's executory contract or unexpired lease to the Successful Bidder, (ii) any assignee, and (iii) the corresponding estimated Cure Amount.

8.      The Debtor may remove any executory contract or unexpired lease, as applicable, to be assumed by the Debtor and assigned to the Successful Bidder (the "**Eliminated Agreements**") through and including the Designation Deadline.  The Debtor will, as soon as reasonably practicable after identifying an Eliminated Agreement, serve a notice on each of the impacted counterparties and their counsel of record, if any, and by email, where such information is available, indicating that the Debtor no longer intend to assume and assign the counterparty's executory contract or unexpired lease to the Successful Bidder in connection with the Sale.

9.      Although the Debtor intended to make a good-faith effort to identify all Designated Contracts that may be assumed and assigned in connection with the MAT Sale, the Debtor may discover that certain executory contracts were inadvertently omitted from the Designated Contracts list, or the Successful Bidder may identify other executory contracts that they desire to assume and assign in connection with the MAT Sale.  Accordingly, notwithstanding any provision herein to the contrary, the Debtor reserves the right at any time after the Designation Deadline and before the closing of the Sale, to (i) supplement the list of Designated Contracts with previously omitted

executory contracts, (ii) remove Designated Contracts from the list of executory contracts ultimately selected as Designated Contracts that a Successful Bidder proposes be assumed and assigned to it in connection with the MAT Sale, and/or (iii) modify the previously stated Cure Amount associated with any Designated Contracts.  In the event the Debtor exercises any of these reserved rights, the Debtor will promptly serve a supplemental notice of contract assumption and assignment (a "**Supplemental Assumption Notice**") on each of the counterparties to such Designated Contracts and their counsel of record, if any; provided, however, the Debtor may not add an executory contract to the list of Designated Contracts that has been previously rejected by the Debtor by order of the Court.  Each Supplemental Assumption Notice will include the same information with respect to listed Designated Contracts as was included in the Contract Assumption Notice.  The deadline to object to changes related to the Supplemental Assumption Notice is 4:00 p.m. (Eastern) on that date that is seven (7) calendar days after the service of any Supplemental Contract Assumption Notice in respect of such Assumed Executory Contract.  Any objection on this basis shall contain the same information indicated in paragraph 10 below.

10.     Objections, if any, to the proposed assumption and assignment or the Cure Amount proposed with respect thereto must (i) be in writing, (ii) comply with the applicable provisions of the Bankruptcy Rules and the Local Rules, (iii) state with specificity the nature of the objection and, if the objection pertains to the proposed Cure Amount, the correct cure amount alleged by the objecting counterparty, together with any applicable and appropriate documentation in support thereof, and (iv) be filed with the Court and served upon counsel to the Debtor and counsel to the MAT Stalking Horse Bidder so as to be actually received by **June 2, 2021, at 4:00 p.m. (Eastern)**, or such deadline set forth in the applicable Supplemental Assumption Notice.  If a Successful Bidder that is not the MAT Stalking Horse Bidder prevails at any Auction, then the deadline to object to assumption and assignment solely with respect to the adequate assurance of future payment from the Successful Bidder shall be extended to **June 7, 2011, at 4:00 p.m. (Eastern)**;[2] provided, however, that the deadline to object to the Cure Amount or other matters unrelated to the identity of the Successful Bidder shall not be extended.

11.     If an objection to the Cure Amount or assumption and assignment is timely filed and not resolved by the parties, a hearing with respect to the objection will take place before the Honorable Mary F. Walrath of the United States Bankruptcy Court for the District of Delaware, 824 Market St. N., 5th Floor, Courtroom #4, Wilmington, Delaware 19801 at the Sale Hearing to be held on **June 8, 2021, at 2:00 p.m. (Eastern)**.  A hearing regarding the Cure Amount, if any, may be continued at the discretion of the Debtor and the Successful Bidder until after the closing.

12.     Any party that does not timely object to the Cure Amount, the proposed assumption and assignment of a Designated Contract or Additional Designated Contract listed on the Contract Assumption Notice or Supplemental Assumption Notice, or any Sale is deemed to have consented to (a) such Cure Amount, (b) the assumption and assignment of such Designated Contract or Additional Designated Contract (including the adequate assurance of future payment), (c) the

---

[2]     The Debtor will file, as promptly as possible after the close of the Auction, but, in any event by **June 5, 2021, at 12:00 p. m. (Eastern)**, a Notice of Successful Bidder (as defined in the Motion). The Debtor will also transmit the Notice of Successful Bidder via email and fax, where available, to the counterparties to the Designated Contracts and post the Notice of Successful Bidder on the claims and noticing agent's case-dedicated website at https://omniagentsolutions.com/connectionsCSP.

related relief requested in the MAT Sale Motion, and (d) the MAT Sale. **Such party shall be forever barred and estopped from objecting to the Cure Amount, the assumption and assignment of the Designated Contract, or Additional Designated Contract, adequate assurance of future performance, the relief requested in the MAT Sale Motion, and the MAT Sale, whether applicable law excuses such counterparty from accepting performance by, or rendering performance to, the Successful Bidder and/or the Debtor, for purposes of section 365(c)(1) of the Bankruptcy Code and from asserting any additional cure or other amounts against the Debtor or the Successful Bidder, as applicable, with respect to such party's Designated Contract or Additional Designated Contract.**

13.    After the Auction (if any), the Debtor will file a notice that identifies the Successful Bidder. The Debtor and/or any Successful Bidder reserve all of their rights, claims, and causes of action with respect to the contracts and agreements listed on **Exhibit A** hereto.

14.    Notwithstanding anything to the contrary herein or in the MAT Sale Motion, the Bidding Procedures, the Bidding Procedures Order, or the MAT Bidding Protections Order service of this Contract Assumption Notice does not constitute an admission that any contract is an executory contract, that any lease is unexpired, or that the stated Cure Amount related to any executory contract or unexpired lease constitutes a claim against the Debtor or establishes any rights against any Successful Bidder (all rights with respect thereto being expressly reserved); provided further, that, following the Auction, the Successful Bidder or the Debtor, as applicable, reserve all rights to assert that any Cure Amount is lower than the Debtor's estimate, subject to each counterparty's opportunity to object.

**THE INCLUSION OF A CONTRACT OR UNEXPIRED LEASE ON THIS CONTRACT ASSUMPTION NOTICE IS NOT A GUARANTEE THAT SUCH CONTRACT OR UNEXPIRED LEASE WILL ULTIMATELY BE ASSUMED AND ASSIGNED.**

Dated: May ___, 2021
        Wilmington, Delaware                    **CHIPMAN BROWN CICERO & COLE, LLP**


                                                _____
                                                William E. Chipman, Jr. (No. 3818)
                                                Mark L. Desgrosseilliers (No. 4083)
                                                Mark D. Olivere (No. 4291)
                                                Hercules Plaza
                                                1313 North Market Street, Suite 5400
                                                Wilmington, Delaware 19801
                                                Telephone:    (302) 295-0191
                                                Email:    chipman@chipmanbrown.com
                                                          desgross@chipmanbrown.com
                                                          olivere@chipmanbrown.com

                                                *Counsel for the Debtor and Debtor-in-Possession*

# **EXHIBIT 4**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| CONNECTIONS COMMUNITY SUPPORT PROGRAMS, INC., | Case No. 21-10723 (MFW) |
| Debtor.[1] | **Related Docket No. ____** |

## ASSUMPTION PROCEDURES

On April 19, 2021, Connections Community Support Programs, Inc. (the "**Debtor**"), filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"). The Debtor is operating its businesses and managing its properties as debtor in possession pursuant to section 1107(a) and 1108 of the Bankruptcy Code.

On April 30, 2021, the Debtor entered into an Asset Purchase Agreement (the "**MAT Stalking Horse APA**") with Conexio Care, Inc. (the "**MAT Stalking Horse Bidder**"), by which the MAT Stalking Horse Bidder or a designee of the MAT Stalking Horse Bidder, as permitted pursuant to the MAT Stalking Horse APA, will acquire certain of the Debtor's assets (the "**Acquired MAT Assets**").

On April 30, 2021, in connection with a proposed sale of the Acquired MAT Assets pursuant to section 363 of the Bankruptcy Code (the "**MAT Sale**") to the successful bidder (the "**Successful Bidder**") at an auction (the "**Auction**"), the Debtor filed a motion (the "**MAT Sale Motion**"),[2] seeking, among other things, entry of an order (i) establishing procedures for the assumption or assignment and assumption of executory contracts; and (ii) granting related relief.

On May __, 2021, the Bankruptcy Court entered an order (Docket No. __) (the "**Bidding Procedures Order**") approving certain bidding procedures (the "**Bidding Procedures**"). On May __, 2021, the Bankruptcy Court also entered an order (Docket No. __) (the "**MAT Bidding Protections Order**") approving certain bidding protections in connection with the MAT Stalking Horse APA and also approving certain procedures for the assumption and assignment of certain contracts in connection with the MAT Sale. Specifically, in connection with the Bidding Procedures and associated sale process, the Debtor has developed the below assumption procedures (the "**Assumption Procedures**"). The Assumption Procedures will facilitate the fair

---

[1] The Debtor in this chapter 11 case, along with the last four digits of its tax identification number, is as follows: Connections Community Support Programs, Inc. (3030). The address of the Debtor's corporate headquarters is 3812 Lancaster Pike, Wilmington, Delaware 19805.

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the MAT Sale Motion.

and orderly assumption and assignment of certain executory contracts and unexpired leases in connection with the MAT Sale.

The Assumption Procedures are as follows:

## I.    CONTRACT ASSUMPTION NOTICE.

No later than May 19, 2021 (the **"Assumption and Assignment Service Deadline"**), the Debtor shall serve a notice of contract assumption in substantially the form attached to the MAT Bidding Protections Order as <u>**Exhibit 1**</u> (the **"Contract Assumption Notice"**) by first-class mail or by e-mail (where known) on all counterparties to all contracts expected to be assumed and assigned (**"Designated Contracts"**).    The Contract Assumption Notice will inform the counterparties of the timing and procedures relating to such assumption, and, to the extent applicable, (i) the title of the executory contract or unexpired lease, as applicable, (i) state the date, time, and place of the Sale Hearing, (ii) specify the date by which any objection to the assumption and assignment of the Assumed Contracts must be filed and served, (iii) include a description of each Assumed Executory Contract that may be assigned to the Successful Bidder, (iv) the title of the executory contract or unexpired lease, as applicable, (v) the name of the counterparty to the executory contract or unexpired lease, (vi) the Debtor's good-faith estimates of the amount of the required cure payments, if any (the **"Cure Amounts"**) related to the applicable executory contract or unexpired lease, as applicable, and (iv) the Sale Objection Deadline; provided, however, that service of a Contract Assumption Notice does not constitute an admission that any contract is an executory contract, that any lease is unexpired, or that the stated Cure Amount related to any executory contract or unexpired lease constitutes a claim against the Debtor or establishes any rights against any Successful Bidder (all rights with respect thereto being expressly reserved); provided further, that, following the Auction, any Successful Bidder or the Debtor, as applicable, reserve all rights to assert that any Cure Amount is lower than the Debtor's estimate, subject to each counterparty's opportunity to object.

**The inclusion of a contract or unexpired lease on the Contract Assumption Notice is not a guarantee that such contract or unexpired lease will ultimately be assumed and assigned.**

## II.    CURE AMOUNTS AND ADEQUATE ASSURANCE OF FUTURE PERFORMANCE.

The payment of your Cure Amount by any Successful Bidder, as applicable, shall (i) constitute a cure of all defaults existing under your executory contract(s) or expired lease(s), as applicable, and (ii) compensate you for any actual pecuniary loss to such counterparty resulting from such default.

## III.    ADDITIONS.

The Debtor may designate, until the earlier of (x) one Business Day prior to the Sale Hearing or (y) three Business Days prior to the MAT Sale Closing (the **"Designation Deadline"**), additional executory contracts and/or unexpired leases as agreements to be assumed by the Debtor and assigned to the Successful Bidder (the **"Additional Designated Contracts"**).    As soon as practicable, the Debtor shall serve a Contract Assumption Notice on each of the counterparties to

such Additional Designated Contracts and their counsel of record, if any, and by email, where such information is available, indicating (i) that the Debtor intends to assume and assign the counterparty's executory contract or unexpired lease to the Successful Bidder, (ii) any assignee, and (iii) the corresponding estimated Cure Amount.

## IV.    ELIMINATIONS.

The Debtor may remove any executory contract or unexpired lease, as applicable, to be assumed by the Debtor and assigned to the Successful Bidder (the **"Eliminated Agreements"**) through and including the Designation Deadline.  The Debtor shall, as soon as reasonably practicable after identifying an Eliminated Agreement, serve a notice on each of the impacted counterparties and their counsel of record, if any, indicating that the Debtor no longer intend to assume and assign the counterparty's executory contract or unexpired lease to the Successful Bidder in connection with the MAT Sale.

## V.    SUPPLEMENTAL CONTRACT ASSUMPTION NOTICE.

Although the Debtor intends to make a good-faith effort to identify all Designated Contracts that may be assumed and assigned in connection with a Sale, the Debtor may discover that certain executory contracts were inadvertently omitted from the Designated Contracts list, or a Successful Bidder may identify other executory contracts that they desire to assume and assign in connection with the Sale. Accordingly, the Debtor reserves the right at any time after the Assumption and Assignment Service Deadline and before the closing of the MAT Sale, to (i) supplement the list of Designated Contracts with previously omitted executory contracts, (ii) remove Designated Contracts from the list of executory contracts ultimately selected as Designated Contracts that a Successful Bidder proposes be assumed and assigned to it in connection with th MAT Sale, and/or (iii) modify the previously stated Cure Amount associated with any Designated Contracts.  In the event the Debtor exercises any of these reserved rights, the Debtor will promptly serve a supplemental notice of contract assumption and assignment (a **"Supplemental Assumption Notice"**) on each of the counterparties to such Designated Contracts and their counsel of record, if any, with such service to be made by e-mail where that information is available; provided, however, the Debtor may not add an executory contract to the list of Designated Contracts that has been previously rejected by the Debtor by order of the Court. Each Supplemental Assumption Notice will include the same information with respect to listed Designated Contracts as was included in the Contract Assumption Notice.  The deadline to object to changes related to the Supplemental Assumption Notice is 4:00 p.m. (Eastern) on that date that is seven (7) calendar days after the service of any Supplemental Contract Assumption Notice in respect of such Assumed Executory Contract.  Any objection on this basis shall contain the same information indicated in paragraph below.

## VI.    OBJECTIONS.

Objections, if any, to the proposed assumption and assignment or the Cure Amount proposed with respect thereto must (i) be in writing, (ii) comply with the applicable provisions of the Bankruptcy Rules and the Local Rules, (iii) state with specificity the nature of the objection and, if the objection pertains to the proposed Cure Amount, the correct cure amount alleged by the objecting counterparty, together with any applicable and appropriate documentation in support

thereof, and (iv) be filed with the Court and served upon counsel to the Debtor and counsel to the MAT Stalking Horse Bidder so as to be actually received by **June 2, 2021, at 4:00 p.m. (Eastern)**, or such deadline set forth in the applicable Supplemental Assumption Notice.  If any Successful Bidder that is not the MAT Stalking Horse Bidder prevails at the Auction, including with respect to an Auction for assets including the Excluded Assets, then the deadline to object to assumption and assignment solely with respect to the adequate assurance of future payment from such Successful Bidder shall be extended to **June 7, 2021, at 10:00 a.m. (Eastern)**; provided, however, that the deadline to object to the Cure Amount or other matters unrelated to the identity of the Successful Bidder shall not be extended.

If an objection to the Cure Amount or assumption and assignment is timely filed and not resolved by the parties, a hearing with respect to the objection will take place before the Honorable Mary F. Walrath of the United States Bankruptcy Court for the District of Delaware, 824 Market St. N., 5th Floor, Courtroom #4, Wilmington, Delaware 19801 at the Sale Hearing to be held on **June 8, 2021, at 2:00 p.m. (Eastern)**.  A hearing regarding the Cure Amount, if any, may be continued at the discretion of the Debtor and the Successful Bidder until after the closing.

Any party that does not timely object to the Cure Amount, the proposed assumption and assignment of a Designated Contract or Additional Designated Contract listed on the Contract Assumption Notice or Supplemental Assumption Notice, or the MAT Sale is deemed to have consented to (a) such Cure Amount, (b) the assumption and assignment of such Designated Contract or Additional Designated Contract (including the adequate assurance of future payment), (c) the related relief requested in the Motion, and (d) the Sale. **Such party shall be forever barred and estopped from objecting to the Cure Amount, the assumption and assignment of the Designated Contract, or Additional Designated Contract, adequate assurance of future performance, the relief requested in the MAT Sale Motion, and the MAT Sale, whether applicable law excuses such counterparty from accepting performance by, or rendering performance to, the Successful Bidder and/or the Debtor, for purposes of section 365(c)(1) of the Bankruptcy Code and from asserting any additional cure or other amounts against the Debtor or the Successful Bidder, as applicable, with respect to such party's Designated Contract or Additional Designated Contract.**