## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------x

In re:

CONNECTIONS COMMUNITY SUPPORT
PROGRAMS, INC.,

Debtor.[1]

Chapter 11

Case No. 21-10723-MFW

---------------------------------------------------------x

CONNECTIONS COMMUNITY SUPPORT
PROGRAMS, INC.,

Plaintiff,

-against-

UNITED STATES OF AMERICA,

Defendant.

Adv. Proc. No. _____

---------------------------------------------------------x

## VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF

Pursuant to Rules 7001 and 7065 of the of the Federal Rules of Bankruptcy Procedure (the **"Bankruptcy Rules"**) and section 105(a) of title 11 of the United States Code 11 U.S.C. §§ 101-1532 (as amended, the **"Bankruptcy Code"**), the above-captioned debtor and debtor-in-possession, Connections Community Support Programs, Inc. (**"Connections"** or the **"Debtor"**), brings this Adversary Proceeding seeking an order to enjoin, for a period of 120 days, an action commenced by Defendant, the United States of America (the **"United States"** or **"Government"**), entitled *United States of America v. Connections Community Support Programs, Inc., Catherine Devaney McKay, William Northey, and Steven Davis*, 1:21-cv-00514-UNA (D. Del.) (the **"Action"**). In support of this Adversary Complaint, the Debtor avers as follows:

---

[1] The Debtor in this chapter 11 case, along with the last four digits of its tax identification number, is as follows: Connections Community Support Programs, Inc. (3030). The address of the Debtor's corporate headquarters is 3812 Lancaster Pike, Wilmington, Delaware 19805.

## NATURE OF THE ACTION AND THE NEED FOR RELIEF

1.      This is an Adversary Proceeding brought pursuant to Rules 7001(7) and 7065 of the Bankruptcy Rules and Section 105(a) of the Bankruptcy Code seeking an order granting injunctive relief staying the Action for a period of 120 days during which the Debtor will pursue its scheduled asset sale, transition of assets and reorganization.

2.      The relief requested in this Adversary Proceeding is being sought (i) to safeguard the Debtor's assets including certain insurance policies and their proceeds, (ii) to avoid irreparable harm to the Debtor's estate, (iii) to enable the Debtors to achieve a successful reorganization through a sale of substantially all of its assets as a going concern and a transition to a buyer, (iv) to ensure a seamless continuation of critical healthcare services the Debtor provides to over 10,000 residents of Delaware, including some or most of those critical healthcare services being provided to the underserved and most vulnerable population of the State as well as a significant number of veterans, and (v) to preserve as many of the 1100 essential jobs that the Debtor's employees perform every day to provide critical healthcare services to Delaware residents.

3.      Continued prosecution of the Action over the next 120 days will significantly impair the Debtor's sale, transition and reorganization efforts, potentially stall or halt the reorganization and transition process to the new buyer, interfere with the Debtor's continued services to Delaware residents and will cause the Debtor to incur additional legal expense. Furthermore, representatives of the State of Delaware have indicated to the Debtor that this transition and non-interruption of services is critical to their constituencies and as outlined would interfere with the process.

4.      By contrast, the Government will suffer little, if any, prejudice by virtue of the limited stay for 120 days. Most importantly, the Government claims involve the Debtor's alleged

negligence associated with (i) certain required documentation for transfers of controlled substances, methadone and buprenorphine (both used by the Debtor to treat clients suffering from opioid addiction), and (ii) certain controlled substances that were unaccounted for.

5.      The Debtor has since remediated its document processes, has accounted for all controlled substances, and has implemented procedures and training to ensure that all required records going forward are properly created and maintained.  The core public safety concern to which the Government's Complaint points has, therefore, been ameliorated.  Indeed, nothing in the Government's Complaint suggests that the Debtor's continued operations are marred by the allegations of purported past impropriety set forth in the Complaint.  Therefore, there is no urgency associated with Government liquidating its claims immediately.

6.      Moreover, (i) the Government's claims will be preserved, not lost, during the period, (ii) a delay in the Government's prosecution of the Action does not constitute "particularized harm" sufficient to contest injunctive relief, and (iii) even if the Government were permitted to proceed and obtained a judgment in the next 120 days, enforcement of any such judgment would nevertheless be automatically stayed 11 U.S.C. §§ 362(a)(1) and (b)(4) and would be resolved, along with other creditor claims, as part of the bankruptcy claims process.

7.      Furthermore, a brief stay in the Defendant's prosecution of the Action will advance public policy because (i) a stay is necessary to enable the Debtor to complete its sale,  transition, and reorganization process, (ii) a stay will help ensure that the Debtor will be able to continue providing its critical healthcare services to Delaware residents during its Chapter 11 Case, and (iii) a stay will allow for the Debtor to continue employing as many of its 1,100 employees as possible and permit its successor to make its own employment decisions as part of its purchase and further pursuit of the services it will provide.

3

## JURISDICTION AND VENUE

8.      The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference from the United States District Court for the District of Delaware, dated February 29, 2012.

9.      This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (O).  Pursuant to Rules 7008-1 and 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware, the Debtors consent to the entry of a final order by the Court in connection with this adversary proceeding to the extent it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

10.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

## THE PARTIES

11.      The Plaintiff Debtor is a non-profit corporation duly organized and existing under the laws of the State of Delaware.  The Debtor's principal place of business is located at 3821 Lancaster Pike, Wilmington, DE, 19805.

12.      Defendant United States commenced the Action by complaint (the **"CSA Complaint"**) against the Debtor and the Debtor's Officers (as defined below) on April 9, 2021. The Action was commenced on behalf of the United States Drug Enforcement Administration (the **"DEA"**), an agency within the United States Department of Justice (the **"DOJ"**) responsible for enforcing provisions of the Comprehensive Drug Abuse Prevention Control Act of 1970, 21 U.S.C. §§ 801, *et seq*. (the **"CSA"**).  A copy of the CSA Complaint is Attached hereto as Exhibit "A".

13.      Non-party Catherine Devaney McKay (**"McKay"**) served as the Debtor's Chief Executive Officer (**"CEO"**) from its founding in 1985 until September 30, 2019.

14. Non-Party William Northey (**"Northey"**) is the Debtor's current CEO. Prior to becoming the Debtor's CEO on October 1, 2019, Northey served as the Debtor's Chief Operating Officer ("COO").

15. Non-Party and Steven Davis (**"Davis"**) is the Debtor's General Counsel.

16. McKay, Northey and Davis are co-defendants with the Debtor in the Action and are collectively referred to herein as the **"Debtor's Officers"**.

## FACTUAL BACKGROUND

### The Debtor Provides Necessary Services to Delaware Residents

17. The Debtor is a not-for-profit 501(c)(3) health and human services organization that operates over 100 service locations throughout the State of Delaware and employs more than 1,100 employees. The Debtor exists to pursue its mission of providing therapy and other treatment services to its patients for addiction, mental health, and intellectual disabilities issues. Most of the services the Debtor provides are to the underserved residents of the State of Delaware.

18. To provide its services, the Debtor's management and employees are closely involved in servicing and managing the Debtor's day-to-day business and operations on behalf of Delaware residents with limited resources and roadblocks attributable to the Covid-19 pandemic.

19. Moreover, the Debtor maintains licenses and agreements as are necessary that the Debtor's management and employees manage. Without relevant licenses and agreements, and performance thereunder, the Debtor, and any successor of the Debtor, would not be able to provide the critical services the Debtor provides to thousands of Delaware residents on a day-to-day basis.

20. On April 19, 2021 (the **"Petition Date"**), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware, thereby commencing this case (the **"Chapter 11 Case"**).

21.     The factual background regarding the Debtor, including its business operations, its capital and debt structure, and the events leading to the filing of this Chapter 11 Case, is set forth in the *Declaration of Robert D. Katz in Support of the Debtor's Chapter 11 Petition and First Day Pleadings* (the "**First Day Declaration**"), which is fully incorporated herein by reference.

22.     As explained in the First Day Declaration and as detailed in further proceedings in this Chapter 11 Case, the Debtor commenced this Chapter 11 Case with the goal of attempting to effectuate an expeditious sale of its operations, as a going concern, to (i) allow its mission to provide critical healthcare services to over 10,000 residents of Delaware every year to proceed with little or no interruption and (ii) to preserve as many of its approximately 1,100 employees' jobs as is possible.

23.     Northey and Davis are crucial to the Debtor's asset sale and reorganization.  Both spend their valuable and limited time managing the Debtor's day-to-day business, thereby preserving the Debtor's material assets to complete the sale and the Debtor's reorganization. Staying the Action as against Northey and Davis for 120 days will enable the Debtor and its CEO and General Counsel to focus on the sale and the Debtor's transition efforts pursuant to such sale free from the burden of extraneous litigation.

24.     As also explained in the First Day Declaration, a DOJ investigation and a flood of litigation against the Debtor were among the principal reasons the Debtor was forced to seek relief under chapter 11 of the Bankruptcy Code.  Among the litigation that forced the Debtor into Bankruptcy is the Action.

**The Action**

25.     On April 9, 2021, the Government commenced the Action.  By the Action, as alleged in the CSA Complaint, the Government seeks civil penalties for alleged failures to

6

complete properly certain required documentation for transfers of controlled substances, methadone and buprenorphine (both used by the Debtor to treat clients suffering from opioid addiction).

26.    The purported failures were first brought to the Debtor's attention as a result of a DEA audit conducted on March 4, 2019, and a subsequent review of the Debtor's records by the DEA and the DOJ.

27.    The allegations set forth in the CSA Complaint concern improper documentation that occurred in 2019 and before.  The CSA Complaint in the Action does not allege that the record keeping oversights continued thereafter or are continuing presently.

28.    The CSA Complaint also alleges the period during which certain controlled substances were unaccounted for but, in fact, the Debtor (i) has accounted for all such controlled substances and (ii) has implemented procedures and training to ensure that all required records going forward are properly created and maintained.  Transfers of controlled substances are now properly documented, and the records are now properly maintained.

29.    The CSA Complaint alleges that the Debtor and Debtor's Officers acted "negligently" and are personally responsible for allegedly failing to supervise the Debtor's employees and allegedly failing to ensure that recordkeeping and reporting requirements of the CSA and its enabling regulations were followed.

30.    The Debtor's employees are now properly supervised, and recordkeeping and reporting requirements of the CSA and its enabling regulations are being followed.

31.    The CSA Complaint asserts that the Debtor's and the Debtor's Officers' allegedly "negligent" actions constitute violations of Sections 842(a)(5), 842(a)(10) and 842(c)(1)(B)(i) of

the CSA and seeks to hold the Debtor and each of the Debtor's Officers jointly and severally liable for a civil penalty for each violation in an amount not to exceed $15,040.

**The Debtor's Continuing Obligations and Burdens**

32.     Given the serious state of its financial condition, as set forth in the First Day Declaration, the Debtor engaged in a robust marketing process to find one or more potential purchasers for all or substantially all its assets as a going concern.

33.     The Debtor's efforts were successful in locating a Stalking Horse Bidder to purchase certain of the Debtor's assets (the **"Acquired Assets"**) and assume certain of its liabilities.

34.     On April 21, 2021 and April 30, 2021, the Debtor entered into Asset Purchase Agreements to sell the Acquired Assets, subject to higher or better offers, in accordance with approved bidding procedures and approval of this Court.

35.     In accordance with bidding procedures approved by this Court on May 18, 2021, the Debtor conducted an auction of its material assets and operations on June 4, 2021.  The Stalking Horse Bidder was the successful bidder at the auction.  The Debtor's intent is to close on the sale to the Stalking Horse Bidder (also referred to as the **"Purchaser"**) on or before June 15, 2021.

36.     A crucial component of the Debtor's sale, as reflected in the Asset Purchase Agreement between the Debtor and the Purchaser, is the Debtor's covenant to maintain and to continue operating the Debtor's business during the period between the auction and the closing of the sale.  The continued operation of the Debtor's business during the interim period will require almost in its entirety the ongoing and significant focus and time of the Debtor's management and employees.

37.     Another crucial component of the Debtor's sale was the Debtor's and the Purchaser's entry into a Transition Services Agreement (the **"TSA"**).

38.     In particular, the Debtor and the Purchaser recognize, that pursuant to the purchase agreement and TSA, a transition period into August 2021 is necessary for a successful transition of the purchased operations to the Purchaser.  The focus of the Debtor's management is necessary and required unconditionally to ensure a successful transition.

39.     Among many other things, the Purchaser has or will need to apply for certain of its own provider numbers, licenses and agreements as may be necessary to continue the operations of the programs sold by the Debtor.  The necessary provider numbers, licenses and agreements relate to services provided to, among others: the Delaware Department of Health and Social Services, Division of Substance Abuse and Mental Health; the Delaware Department of Health and Social Services, Division of Developmental Disabilities Services; the Delaware Department of Health and Social Services, Division of Public Health; the Delaware Department of Health and Social Services, Division of Health Care Quality (Long Term Care licensure); the Delaware Department of Services for Children, Youth and Their Families, Division of Prevention and Behavioral Health Services; the Delaware Department of Services for Children, Youth and Their Families, Division of Youth Rehabilitative Services; and the U.S. Department of Veterans Affairs.

40.     As stated in the TSA, the Purchaser may not receive certain licenses and agreements as may be necessary to continue the operations of the programs sold by the Debtor by the closing date.  During the period that the Purchaser remains without such necessary agreements and documents, the Debtor has agreed under the TSA to enable the Purchaser to operate, as the Debtor's agent.  The continued services in this regard will require the focus of the Debtor's

management and employees during a transition period to ensure critical services continue to be provided until the Purchaser can obtain the necessary licenses, agreements and other documents.

41.    Moreover, the Debtor and the Purchaser recognize the importance of the sale to the thousands of Delaware residents that receive services and that, therefore, an orderly transition of the Debtor's operations to the Purchaser is necessary.  Thus, under the TSA, the Debtor agreed to continue providing, among other items and resources, numbers, billing codes, usernames, account information, authorization information, and other information the Purchaser reasonably needs to operate, have authorized, bill for and timely collect payments for services rendered and products provided by the Debtor in connection with the continued services after the closing date for an extended period.  The Debtor's current management and employees will be consumed with assisting the purchaser during the transition period to continue providing services and ensure a smooth transition.

42.    More specifically, the Debtor currently provides services to adults and children at various levels along the continuum of care, from long- and short-term residential programs, community- and home-based programs, outpatient programs, medication assisted treatment (MAT), peer support programs, recovery residences and now telehealth services.  The Debtor's patients come from a variety of contexts in the community, including individuals living independently, group homes, recovery residences, supportive housing, intact families, justice involved, and returning from incarceration, residential, and out-of-home placements.  These services are provided throughout the entire state and geography of Delaware.

43.    The Debtor has five primary lines of business - (i) psychiatric/behavioral health services, (ii) substance use disorder treatment, (iii) housing and veterans' services, (iv) intellectual disabilities services, and (v) operation support services.  The debtor leases four hundred and eight

(408) properties (including 389 leased facilities associated with housing and veterans' services) and owns forty-eight (48) properties.

44.     To fulfill its mission and provide a full array of support services for some of Delaware's most vulnerable citizens, the Debtor also owns or manages certain active non-debtor affiliates that either, in turn, own property housing patients of the Debtor or that are currently developing affordable housing options in Delaware.

45.     During the transition period under the TSA, the Debtor's management team and employees will be consumed with continuing to assist the Purchaser in providing the critical services set forth above while also facilitating the transition of all the Debtor's programs, employees, assets and properties to the Purchaser.

46.     In addition, while the transition to the Purchaser is proceeding, the Debtor's management team and employees will also be working with the Committee and lender to formulate a plan of liquidation and wind down of its remaining operations.  The formulation of a plan and the continued wind-down of operations will require the additional focus of the Debtor's management and remaining employees.

47.     Forcing the Debtor, its management team, and employees to defend the Government's claims in the Action while the sale, transition and plan process are ongoing would violate to the spirit and very purpose of the automatic stay and will be untenable and irreparably harm the Debtor's estate also potentially jeopardizing the completion and transition to the new Purchaser.

48.     At this critical time, the Debtor must have its management team and employees focused on providing critical client services and transitioning the Debtor's complex operations for

the benefit of all parties in interest. Actively litigating with a small group of creditors would be a huge and unnecessary distraction to the detriment of all other parties in interest in this case.

49.    Given their day-to-day roles, the Debtor's current management – including Northey (the Debtor's CEO) and Davis (the Debtor's General Counsel) will be unavailable to assist in litigation challenging the very heart of the Debtor's past business practices.    The necessary involvement of current management in defending the Action would certainly shift their attention away from the Debtor's reorganization process for the benefit of all stakeholders.

50.    Moreover, defending the Action would continue to impose a significant financial burden on the Debtor, including, but not limited to, continued uninsured attorneys' fees and other substantial litigation expenses incurred as part of discovery and motion practice. These resources are currently needed to complete the Debtor's successful sale and consummation process on behalf of all stakeholders, including the Government Defendants.

**The Debtor's Insurance Policies**

51.    The Debtor maintains two insurance policies that, upon information and belief, are applicable to the Action.

52.    The first policy is a $3,000,000 Directors and Officers liability policy (the **"D&O Policy"**) that provides the Debtor and the Debtor's Officers coverage for errors and omissions arising in their capacities as the Debtor's Officers. The D&O policy has a $1,000,000 excess coverage component for officers and directors.

53.    Upon information and belief, the D&O Policy provides coverage for up to $2,000,000 in defense costs in the Action, among other things. Payment of defense costs are credited against the policy coverage amount thereby rendering the D&O Policy depleting in nature.

54.     The D&O Policy contains a waterfall that requires payment of individual director and officer coverage prior to covering the Debtor and subjects the Debtor to a minimum $35,000 self-insured retention before coverage is triggered.

55.     The D&O Policy and its proceeds are, in whole or part, property of the Debtor's estate.

56.     The Debtor has submitted a claim under the D&O Policy relating to the Action as well as other actions and proceedings in which the Debtor is named or implicated as a party.

57.     The second insurance policy is a $1,000,000 Employed Lawyers Policy (the **"Lawyers Policy"**) that provides Mr. Davis, as the Debtor's General Counsel, coverage for negligence in rendering professional legal services.

58.     The Lawyers Policy is property of the Debtor's estate.

59.     The Debtor has submitted a claim under the Lawyers Policy relating to the Action.

60.     Other actions and proceedings have been commenced against the Debtor that, upon information and belief, trigger coverage under the D&O Policy, including *United States of America, and the State of Delaware, ex rel. Malika Spruill and Douglas Spruill v. Connections Community Support Programs, Inc.*, Civil Action No. 19-475-CFC, pending in the United States District Court for the District of Delaware.

61.     Given the amounts claimed in the Action and other actions against the Debtor in which the insurance policies are implicated, the insurance policies and their proceeds are finite estate assets that are at risk of depleting.  And given the risk to the Debtor's insurance assets, the Action would ordinarily fall within the automatic stay of 11 U.S.C. § 362(a).

62.     As a defendant in the Action, the Debtor will be forced to incur substantial legal fees and expenses in defending itself, including its self-insured retention under the D&O Policy,

should a stay not be implemented.  Moreover, all factual and legal issues as they relate to the Debtor are the same as those upon which liability may be based against the Debtor's Officers.

63.    The Debtor's potential liability may not only be direct, but is also alleged to be joint and several, and secondary and dependent upon the primary liability and responsibility of the Debtor's Officers.

64.    Accordingly, there is an identity between the Debtor and the Debtor's Officers such that the Debtor may be said to be the real party and that a judgment against the Debtor's Officers will in effect be a judgment or finding against the Debtor.

65.    If the Action is stayed only as to the Debtor, the Debtor could potentially face collateral estoppel arguments seeking to prevent the Debtor from re-litigating the critical factual and legal issues decided in the Action against the Debtor's Officers.

66.    In addition, the Debtor is subject to potential indemnification obligations to the Debtor's Officers.  Section 4 of the Debtor's Bylaws, entitled "Liability of Individual Members, Employees, Agents," provides that:

> Neither the Officers, the Board of Directors, any committee member nor agent nor employee of this Corporation shall have the authority to contract indebtedness or incur any obligation on behalf of any other member of the Corporation.  No member, officer, director or agent of the Corporation shall ever be personally liable for any debt, contract, obligation or tort of the Corporation nor of any other member, officer, director or agent.

Given the Debtor's potential responsibility to hold the Debtor's Officers harmless, the Debtor has incurred, and will continue to incur, substantial legal expense in defending the Action, including on behalf of the Debtor's Officers.

67.    The Debtor is also in control of most, if not all, of the records from that are relevant to the Action and from which the Debtor's Officers would seek to defend their actions.  Therefore,

even if the Action is stayed as to the Debtor, the Debtor would still be required to direct its efforts to responding to discovery and providing the Debtor's Officers with records and documents from which the Debtor's Officers may mount a defense.

68.     Similarly, the Debtor would also need to participate to protect the record from damaging admissions and other "taint" that would infect the Debtor's later defense against the DOJ's claims.

69.     Finally, Northey and Davis are closely and heavily involved in the day-to-day management of the Debtor and will continue to be so involved through the conclusion of the Debtor's asset sale and final restructuring.  Continued prosecution of the Action during the next 120 days will interfere with Northey's and Davis' efforts in preserving value for all the Debtor's stakeholders.

## CAUSES OF ACTION

## COUNT I

## (INJUNCTION UNDER 11 U.S.C. § 105(A) AND FED R. BANKR P. 7065)
### (As to the Debtor)

70.     The Debtor incorporates by reference the allegations of paragraphs 1 through 69 inclusive, as though fully set forth herein.

71.     The Debtor seeks preliminary and final injunctive relief staying the Action against the Debtor for a period of 120 days under Section 105(a) of the Bankruptcy Code and Rule 7065 of the Bankruptcy Rules.

72.     Section 362(a)(1) of the Bankruptcy Code prohibits the commencement or continuation of any judicial proceeding against the Debtor to recover on claims that arose before the bankruptcy.

73.     Section 362(a)(3) of the Bankruptcy Code prohibits the commencement or continuation of any judicial proceeding to obtain possession of property of the estate.

74.     An exception to the automatic stay applies Section 362(b)(4) of the Bankruptcy Code in instances in which a governmental entity seeks to enforce its police power, to be sure.

75.     Regardless of whether Section 362(b)(4) applies and notwithstanding the exception, however, the Third Circuit recognizes that "in some individual situations, the exercise of State power, even for the protection of the public health and safety, may run so contrary to the policy of the Bankruptcy Code that it should not be permitted." *In re Penn Terra*, 733 F.2d 267, 273 (3d Cir. 1984).

76.     The Bankruptcy Code in Section 105(a) "provides for such exigencies" and empowers the Court, in its discretion, to "issue an appropriate injunction, even if the automatic stay is not operative." *Id.*; *see New Jersey v. W.R. Grace & Co. (In re W.R. Grace & Co.)*, 412 B.R. 657, 665 (D. Del. 2009) (same).

77.     Pursuant to Section 105(a) of the Bankruptcy Code, a bankruptcy court may "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).

78.     In determining whether to stay an action under Section 105(a), bankruptcy courts consider the (1) reasonable likelihood of success, (2) the Debtor's risk of irreparable harm, (3) any irreparable harm to be suffered by the defendant, and (4) the public interest. *See W.R. Grace,* 412 B.R. at 665.

79.     Relief under Section 105(a) of the Bankruptcy Code is particularly appropriate in chapter 11 cases, such as the instant case, in which a Debtor requires a respite from costly and time-consuming litigation to focus upon the going concern sale and transition of the Debtor's

16

complex operations to the Purchaser, and the formulation of a plan of liquidation for the benefit of all parties in interest.  As asserted in Paragraphs 41-71, if the Action is not stayed, the Debtor and its constituencies and stakeholders are at risk of irreparable harm.

80.     The reasonable likelihood of success factor evaluates the Debtor's ability to complete its sale and reorganization successfully. *Id.*

81.     The Debtor has a reasonable likelihood of success because it located a Stalking Horse Bidder, entered into Asset Purchase Agreements with the Stalking Horse Bidder to sell the Acquired Assets, subject to higher or better offers, conducted a successful an auction of the Debtor's material assets and operations on June 4, 2021, and is heading for a closing of that asset sale by June 15, 2021, with a transition period under the TSA occurring into August 2021 thereafter.

82.     With a sale of the Debtor's assets as a going concern and transition of the Debtor's complex operations to the Purchaser, followed by a negotiation of a plan of liquidation in the ensuing 60 to 90 days thereafter, there is a reasonable likelihood of success supporting injunctive relief within the confines of the Bankruptcy Code.

83.     If the Action continues, the Debtor will likely suffer severe and irreparable harm, including, without limitation, the diversion of time and attention of key officers critical to the Debtor's asset sale, the implementation of that sale and transition, including under the TSA, the Debtor's reorganization, and the potential further impairment of Debtors' assets through the expenditure of ongoing uninsured litigation expenses as well as potential harm to the clients that the Debtor serves, including some of the most vulnerable in the State of Delaware.

84.     Indeed, Defending the Action would continue to impose a significant financial, operational and personnel burden on the Debtor, including, but not limited to, continued uninsured

attorneys' fees and other substantial litigation expenses incurred as part of discovery and motion practice. These resources should, instead, be directed towards the Debtor's successful sale and consummation process, all of which are anticipated to occur in short order and in the coming months.

85.     The balance of hardships also weighs decidedly in favor of staying the Action against the Debtor. The Government will in no way lose or forego its claims by virtue of the limited injunctive relief requested.

86.     The relief the Debtor requests will only delay resolution of the Action and the Government will either resolve its claims as part of the bankruptcy claims resolution process or in litigation after the completion of 120-day stay period.

87.     Indeed, the Government is unable to assert any "particularized harm" attributable to the delay in litigation the Debtor requests, other than the short delay itself. Delay is not a particularized harm that weighs against injunctive relief.

88.     Moreover, even if the Government obtained a money judgment in the next 120 days, enforcement of any such money judgment would be automatically stayed under Sections 362(a)(1) and (b)(4) of the Bankruptcy Code and would be resolved, along with other creditor claims, as part of the bankruptcy claims process. The Government, accordingly, will suffer no practical prejudice from a stay of the Action.

89.     Staying the Action against the Debtor for 120 days will also further the public interest by promoting the Debtor's sale and transition efforts, while permitting the Debtor and its successor to continue the mission to provide critical healthcare services to over 10,000 Delaware residents and to preserve as many of its 1,100 employees' jobs as is possible.

90.     Conversely, the Debtor's distraction in defending the Action and failure to complete the sale of its material assets or to transition its business successfully would likely result in a material interference with the critical healthcare services the Debtor provides and in a termination of or downsizing its remaining employees.

91.     Moreover, there is no need for immediate governmental police action.  The allegedly improper transfer documentation and supervisory concerns that form the basis for the CSA Complaint have been resolved, the Debtor has accounted for all misdirected controlled substances, has implemented procedures and training to ensure that all required records going forward are properly created and maintained and has implemented proper supervisory protocols.

92.     Accordingly, it is unlikely that a brief delay in the Action will result in the events that form the basis for the claims in the Action reoccurring.

93.     The limited requested injunction staying the Action against the Debtor for 120 days is therefore warranted.

## COUNT II

### (INJUNCTION UNDER 11 U.S.C. § 105(A) AND FED R. BANKR P. 7065)
### (As to the Debtor's Officers)

94.     The Debtor incorporates by reference the allegations of paragraphs 1 through 72 inclusive, as though fully set forth herein.

95.     The Debtor seeks preliminary and final injunctive relief staying the Action against the Debtor's Officers for a period of 120 days under Section 105(a) of the Bankruptcy Code and Rule 7065 of the Bankruptcy Rules.

96.     Relief under Section 105 is particularly appropriate in a chapter 11 case, such as the present, where it is necessary to protect the Debtor's ability to engage in the appropriate sale

process to obtain the most favorable sale price for assets and to maximize distributions each of its stakeholders, including Defendant.

97.     Relief under Section 105 as to the Debtor's Officers is also particularly appropriate in a chapter 11 case, such as the present, where it is necessary to protect the Debtor from the potential collateral estoppel and other impacts the Action would have if factual and legal determinations are made against the Debtor's Officers.

98.     In addition, relief under Section 105 as to the Debtor's Officers is also particularly appropriate where, as here, the Debtor is subject to potential indemnification obligations to the Debtor's Officers under Section 4 of the Debtor's Bylaws.

99.     Given the Debtor's insurance policies being triggered, combined with the potential indemnification and actual collateral estoppel risk, the Debtor and the Debtor's Officers share a common interest warranting a stay of the Action against the Debtor's Officers.

100.     Moreover, because the Debtor possesses most of the documents and information concerning the claims at issue in the Actions, litigation against the Debtor's Officers necessarily requires the Debtor to expend additional and substantial resources to participate in discovery even if a stay of the Action against the Debtor itself is imposed.

101.     In addition, Northey and Davis are closely and heavily involved in the day-to-day management of the Debtor and will continue to be so involved through the conclusion of the Debtor's asset sale and final restructuring.  Continued prosecution of the Action during the next 120 days will interfere with Northey's and Davis' efforts in preserving value for all the Debtor's stakeholders.

102.     Northey's and Davis' time, energy and commitment to the Debtor are necessary to preserve the Debtor's Assets, to compete the Debtor's sale of material assets and the completion

of the Debtor's reorganization, and thereby separately warrants a stay of the Action against the Debtor's Officers.

103.    In addition, the Debtor has a reasonable likelihood of success given that a Stalking Horse Bidder has entered into Asset Purchase Agreements with the Debtor, an auction has occurred there is every reason to believe that sale transaction will close on or before June 15, 2021, and the Debtor and its Debtor's Officers will be consumed with transitioning the Debtor's business to the purchaser.

104.    Short of a stay of the Actions against the Debtor's Officers, the Debtor will likely suffer severe and irreparable harm, including, without limitation, the depletion of insurance assets through the payment of defense costs, the diversion of the Debtor's Officers' time and attention from the Debtor's sale and reorganization, and the potential further impairment of Debtors' assets through the expenditure of ongoing litigation fees.

105.    The balance of hardships also weighs decidedly in favor of staying the Action against the Debtor's Officers.  The Government will in no way lose or forego its claims by virtue of the limited injunctive relief requested.  The relief the Debtor requests will only delay resolution of the Action and the Government will either resolve its claims as part of the bankruptcy claims resolution process or in litigation after the completion of 120-day stay period.

106.    Indeed, the Government is unable to assert any "particularized harm" attributable to the delay in litigation the Debtor requests, other than the short delay itself.  Delay itself is not a particularized harm that weighs against injunctive relief.

107.    Even if the Government obtained a money judgment in the next 120 days, enforcement of any such money judgment would be automatically stayed under Section 362(a) of

the Bankruptcy Code and would be resolved, along with other creditor claims, as part of the bankruptcy claims process.

108.    Staying the Action against the Debtor's Officers for 120 days will also further the public interest by promoting the Debtor's sale efforts, while permitting the Debtor and its ultimate successor to continue the mission to provide critical healthcare services to over 10,000 Delaware residents every year and to preserve as many of its 1,100 employees' jobs as is possible.

109.    Conversely, the Debtor's Officers' distraction in defending the Action rather than focusing on completing the sale of the Debtor's material assets would likely result in a material interference with the critical healthcare the Debtor provides and termination of or downsizing its remaining employees.

110.    Moreover, improper transfer documentation and supervisory concerns that form the basis for the Government's Complaint have been resolved, the Debtor has accounted for all misdirected controlled substances, has implemented procedures and training to ensure that all required records going forward are properly created and maintained and has implemented proper supervisory protocols.

111.    Accordingly, it is unlikely that a brief delay in the Action will result in the events that form the basis for the claims in the Action reoccurring.

112.    The limited requested injunction staying the Action against the Debtor's Officers for 120 days is therefore warranted.

## PRAYER FOR RELIEF

WHEREFORE, the Debtor respectfully requests that the Court:

A.  Enter an order granting the Debtor preliminary relief staying the Action against the Debtor and the Debtor's Officers pending a resolution of this Adversary Proceeding;

B.  Enter a judgment on Count I staying the Action as against the Debtor for 120 days;

C.  Enter a judgment on Count II staying the Action as against the Debtor's officers for 120 days; and

D.  Grant the Debtor such other and further relief as the Court deems warranted.

Dated: June 15, 2021
      Wilmington, Delaware            **CHIPMAN BROWN CICERO & COLE, LLP**

By: */s/ William E. Chipman, Jr.*
William E. Chipman, Jr. (No. 3818)
Mark L. Desgrosseilliers (No. 4083)
Hercules Plaza
1313 North Market Street, Suite 5400
Wilmington, Delaware 19801
Telephone:  (302) 295-0191
Email: chipman@chipmanbrown.com
       desgross@chipmanbrown.com

*Attorneys for the Debtor*

## **VERIFICATION**

Pursuant to 28 U.S.C. § 1746, I, Robert Katz, verify under penalty of perjury that the facts alleged in the foregoing Verified Complaint are true and correct, except as to matters therein stated to be alleged on information and belief and, as to those matters, I believe them to be true and correct.

Executed on June 15, 2021

*/s Robert Katz*
Robert Katz
