**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>CONNECTIONS COMMUNITY<br>SUPPORT PROGRAMS, INC.,<br><br>Debtor.[1] | Chapter 11<br><br>Case No. 21-10723 (MFW)<br><br>**Hrg. Date: 9/17/2021 @ 10:30 a.m. (Eastern) (Requested)**<br>**Obj.: 9/15/2021 @ 10:00 a.m. (Eastern) (Requested)** |

**MOTION TO CONVERT DEBTOR'S CHAPTER 11 CASE TO A CASE
UNDER CHAPTER 7 OF THE BANKRUPTCY CODE**

The above-captioned debtor and debtor in possession (the **"Debtor"**) hereby moves (the

"**Motion**") pursuant to sections 105(a), 1112(b), and 1112(c) of title 11 of the United States Code

(the "**Bankruptcy Code**"), for entry of an order substantially in the form attached hereto as

**Exhibit B** (the "**Proposed Order**") converting the Debtor's chapter 11 case into one under chapter

7 of the Bankruptcy Code.  In support of this Motion, the Debtor respectfully states as follows:

**PRELIMINARY STATEMENT[2]**

1.      The Debtor consummated a Sale of the Debtor's assets, yielding $12.725 million

in Proceeds, ensuring, without interruption, the continuation of critical healthcare services to over

10,000 of Delaware's most needy and underserved residents, preserving in excess of 800 essential

jobs, and resolving certain claims raised by governmental entities and secured creditors enabling

the distribution of the Proceeds.  Had this sale not been achieved, it is hard to imagine the negative

impact that could have occurred, significantly beyond the discussion of financial considerations.

---

[1] The Debtor in this chapter 11 case, along with the last four digits of its tax identification number, is as follows: Connections Community Support Programs, Inc. (3030).  The address of the Debtor's corporate headquarters is 3812 Lancaster Pike, Wilmington, Delaware 19805.

[2] Capitalized terms used in this Preliminary Statement not otherwise defined herein shall have the meanings ascribed to them below.

2.      At the outset of this case, a number of constituencies including but not limited to the State of Delaware and the United States Department of Justice, on behalf of a number of federal agencies, made clear that their most important concern was that the Debtor's services were not interrupted.  With support of these constituencies and the Committee, the Debtor was able to accomplish this goal.

3.      Moreover, in accordance with the terms of a settlement with WSFS embodied in the Third Amendment to the Final Cash Collateral Order, the Debtor and the Committee drafted a plan that would potentially allow a distribution to unsecured creditors.  Although counsel for WSFS assured that they would only propose minor comments to the Plan so that the Debtor would be able to file such Plan in sufficient time to have the disclosure statement considered by the Court at the next omnibus hearing, almost immediately after WSFS received its share of the Proceeds, WSFS informed counsel for the Debtor and counsel for the Committee that WSFS (i) would not support the liquidating plan and (ii) would not permit any use of cash collateral after August 31, 2021 unless this motion to convert was on file.

4.      On September 1, 2021, WSFS sent a Notice of Termination Declaration (the **"Carve-Out Trigger Notice"**) to the Debtor and the Committee, declaring that an Event of Default had occurred and was continuing under the Final Cash Collateral Order by failing to file the very Plan WSFS supported but then abruptly changed its mind.  A copy of the Carve-Out Trigger Notice is attached hereto as **Exhibit A**.  In essence, WSFS created the very default it has caused to force the Debtor to convert the case.  The Debtor and the Committee reserve all rights with respect to the Carve-Out Trigger Notice.

5.      Absent access to cash collateral, the estate lacks funding to cover the costs of administrative expenses.  Accordingly, the Debtor has determined that the Chapter 11 Case (as

defined herein) must be converted to a case under chapter 7 to avoid additional losses and prevent the ongoing accrual of unnecessary additional costs to the detriment of all parties-in-interest.

6.      As set forth in the Carve-Out Trigger Notice, the Prepetition Secured Lender will not agree to any additional consensual use of its cash collateral after August 31, 2021.  As reflected in the Budget attached as Exhibit A to the *Notice of Filing of Third Amendment to Final Order (I) Authorizing Debtor to Use Cash Collateral On a Limited Basis, (II) Granting Adequate Protection to Prepetition Secured Creditor, (III) Modifying the Automatic Stay, and (IV) Granting Related Relief* [Docket No. 371] (the "**Third Amendment**"), as of August 31, 2021, the estate will have no revenue generating operations and limited remaining funds, other than certain accounts receivable that remain to be collected.  Aside from the collection of these accounts receivable, there are no ongoing business operations, no cash flow, no hope for rehabilitation (in light of the recent decision by WSFS not to support the plan), and no hope for consensual liquidation via a confirmable chapter 11 plan.  Notwithstanding the estate's dim prospects, the costs of administering the Chapter 11 Case continue mounting and U.S. Trustee fees continue to accrue. Without the promised support of WSFS for a liquidating plan, the Debtor is left with no alternative but to move to convert this case as promptly as possible.

7.      Accordingly, by this Motion, the Debtor seeks to convert the Debtor's chapter 11 case into a chapter 7 case under the Bankruptcy Code, effective as of the date of entry of an order of this Court.

## JURISDICTION AND VENUE

8.      The United States Bankruptcy Court for the District of Delaware (the "**Court**") has jurisdiction over this Motion under 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order*

*of Reference from the United States District Court for the District of Delaware*, dated as of February 29, 2012.  This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A).

9.      Pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"), the Debtor consents to the entry of a final judgment or order with respect to this Motion, if it is determined the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

10.     Venue of this case in this District is proper under 28 U.S.C. §§ 1408 and 1409.

## RELIEF REQUESTED

11.     The Debtor respectfully requests the Court enter an order substantially in the form of the Proposed Order converting the Chapter 11 Case into a case under chapter 7 of the Bankruptcy Code.  The predicates for the relief requested herein are sections 105(a), 1112(b), and 1112(c) of the Bankruptcy Code and Rules 1017 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

## BACKGROUND

**A.      Procedural Background**

12.     On April 19, 2021 (the "**Petition Date**"), the Debtor commenced a case by filing a petition for relief under chapter 11 of the Bankruptcy Code (the "**Chapter 11 Case**").

13.     Additional factual background regarding the Debtor, including its business operations, its capital and debt structure, and the events leading to the filing of this Chapter 11 Case, is set forth in the *Declaration of Robert D. Katz in Support of Chapter 11 Petition and First Day Pleadings* [Docket No. 4] (the "**First Day Declaration**") and was filed on the Petition Date.

14. The Debtor continues to operate its business and manage its properties as debtor and debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

15. On May 3, 2021, the Office of the United States Trustee for the District of Delaware (the "**U.S. Trustee**") appointed five creditors to serve on the Committee; they include Christiana Care Health Services, Inc.; Bayshore Ford; Drummond Plaza Associates LLC; First State Surgery Center, LLC; and Medline Industries Inc. *See* Docket No. 79. The Committee selected Polsinelli PC as its counsel. *See* Docket No. 92.

B. **Debtor's Corporate History and Capital Structure**

16. The Debtor was a non-profit organization who provided critical healthcare services to thousands of underserved Delawareans every year and who employed more than one thousand employees. *See generally* First Day Declaration.

17. The Debtor has two loans with Wilmington Savings Fund Society, FSB (the "**Prepetition Secured Lender**" or "**WSFS**"), which totaled approximately $9.8 million as of the Petition Date. *See* First Day Declaration, ¶¶ 20-24, 34-36.  As discussed in greater detail below, the Debtor's Prepetition Secured Lender consented to the Debtor's use of its cash collateral during the initial phase of the Chapter 11 Case. *See generally* First Day Declaration, ¶¶ 25-26.

18. The Debtor also owned real property encumbered by liens and/or mortgages held by the National Council on Agricultural Life & Labor Research Fund, Inc. ("**NCALL**"), the Delaware State Housing Authority ("**DSHA**"), and the United States of America, acting through the Rural Housing Services and the United States Department of Agriculture ("**USDA**"). *See* First Day Declaration, ¶ 27.

C. **The Bankruptcy Case**

19.     The Debtor faced numerous and significant challenges throughout the Chapter 11 Case, which compounded and materially increased the cost of its administration and negatively impacted the Debtor's ability to collect accounts receivable and generate cash.  These challenges included, but were not limited to: on-going litigation expenses, years of government-led investigations, over 2,000 unprocessed billings/claims that had built up over years, secured lender disputes, accounts receivable posting inaccuracies that had been in place for years, the ongoing refusal by 3rd party payors/managed care organizations to make payments owing to the Debtor, and the failure of key stakeholders to negotiate with the Debtor and Committee in good faith to pave a smooth exit path for the benefit of all parties in interest.  *See* First Day Declaration, ¶¶ 37-45 (describing expenses related to on-going litigation and governmental regulation).  Although the Debtor and its professionals were able to resolve all of the significant disputes remaining in the Chapter 11 Case, and both the Debtor and the Committee believed that they had laid a foundation for a liquidating plan that would potentially permit some recovery for unsecured creditors, WSFS has indicated that it will not support any such plan.  Moreover, WSFS has demanded that the Debtor convert its Chapter 11 Case to a case under Chapter 7.  Without the support of WSFS, and the inability to pay WSFS in full, the Debtor had no choice but to file this motion.

I.      **The Cash Collateral Motion**

20.     On April 20, 2021, the Debtor filed a *Motion of the Debtor for Approval of Interim Order (I) Authorizing Debtor to Use Cash Collateral on a Limited Basis, (II) Granting Adequate Protection to Prepetition Secured Creditor, (III) Modifying the Automatic Stay, (IV) Granting Related Relief, and (V) Scheduling a Final Hearing* [Docket No. 12] (the "**Cash Collateral Motion**").

21.     On April 22, 2021, the Court entered the *Interim Order (I) Authorizing Debtor to Use Cash Collateral on a Limited Basis, (II) Granting Adequate Protection to Prepetition Secured Creditor, (III) Modifying the Automatic Stay, (IV) Granting Related Relief, and (V) Scheduling a Final Hearing* [Docket No. 40] (the "**Interim Cash Collateral Order**").

22.     On May 17, 2021, the Court entered the *Second Interim Order (I) Authorizing Debtor to Use Cash Collateral on a Limited Basis, (II) Granting Adequate Protection to Prepetition Secured Creditor, (III) Modifying the Automatic Stay, (IV) Granting Related Relief, and (V) Scheduling a Final Hearing* [Docket No. 147] (the "**Second Interim Cash Collateral Order**").

23.     On June 2, 2021, the Court entered the *Final Order (I) Authorizing Debtor to Use Cash Collateral on a Limited Basis, (II) Granting Adequate Protection to Prepetition Secured Creditor, (III) Modifying the Automatic Stay, and (IV) Granting Related Relief* [Docket No. 199] ("**Final Cash Collateral Order**").  The Final Cash Collateral Order authorized the Debtor's use of Cash Collateral, "to pay only the Approved Expenses set forth in the Budget, subject to the Permitted Variances, from the Petition Date until the 'Termination Date' which shall be the earliest to occur of: (a) 5:00 p.m. (Eastern Time) on June 30, 2021; (b) the date on which an Event of Default (as hereinafter defined) occurs; (c) the date of the consummation of any sale of all,

substantially all, or any material portion of the Debtor's property and assets; and (d) the effective date of a chapter 11 plan for the Debtor." Final Cash Collateral Order ¶ 1.

24.     Paragraph L.1.p., further provides that the following shall constitute an Event of Default under the Final Cash Collateral Order:

> a hearing being held on a motion or any plan or disclosure statement attendant thereto to obtain or allow, or the entry of an order in the Bankruptcy Case authorizing, … (ii) any person or entity to recover from all or any portions of the Prepetition Collateral and/or the Post-Petition Collateral any costs or expenses of preserving or disposing of such collateral under § 506(c) of the Bankruptcy Code without the prior written consent of the Prepetition Secured Creditor, which consent may be conditioned or withheld in its sole and absolute discretion….

25.     On June 15, 2021, the Sale to the purchaser closed (the "**Sale Closing Date**").

26.     On June 16, 2021, the Debtor and WSFS agreed to the *First Amendment to Final Order (I) Authorizing Debtor to Use Cash Collateral on a Limited Basis, (II) Granting Adequate Protection to Prepetition Secured Creditor, (III) Modifying the Automatic Stay, and (IV) Granting Related Relief* [Docket No. 257] ("**First Amendment**").

27.     Pursuant to the First Amendment, Paragraph I(1) of the Final Cash Collateral Order was amended and restated in its entirety as follows:

> Limited Use and Termination Date.  Subject to the terms and conditions set forth herein (and contingent on the Debtor's compliance herewith), and on the condition precedent that this Final Order is approved by this Court, the Prepetition Secured Creditor hereby consents to the Debtor's use of Cash Collateral, and the Debtor is hereby authorized to use Cash Collateral, to pay only the Approved Expenses set forth in the Budget, subject to the Permitted Variances, from the Petition Date until the "Termination Date" which shall be the earliest to occur of: (a) 5:00 p.m. (Eastern Time) on July 6, 2021; (b) the date on which an Event of Default (as hereinafter defined) occurs; and (c) the effective date of a chapter 11 plan for the Debtor. Notwithstanding anything to the contrary herein, the Prepetition Secured Creditor and the Debtor expressly reserve all rights relating to the payment of accrued and unpaid

administrative expenses incurred in connection with the administration of the Debtor's estate leading to the sales of substantially all of the Debtor's assets.

28.     The portion of the Budget from the Sale Closing Date to July 6, 2021, was also replaced with the Budget attached to the First Amendment as Exhibit A.

29.     The Second Amendment provided the Debtor and its estate with additional financial respite.  First, the Second Amendment amended and restated the amendment and restatement of Paragraph I(1) of the Final Cash Collateral Order contained within the First Amendment in its entirety as follows:

> Limited Use and Termination Date.  Subject to the terms and conditions set forth herein (and contingent on the Debtor's compliance herewith), and on the condition precedent that this Final Order is approved by this Court, the Prepetition Secured Creditor hereby consents to the Debtor's use of Cash Collateral, and the Debtor is hereby authorized to use Cash Collateral, to pay only the Approved Expenses set forth in the Budget, subject to the Permitted Variances, from the Petition Date until the "Termination Date" which shall be the earliest to occur of: (a) 5:00 p.m. (Eastern Time) on July 31, 2021; (b) the date on which an Event of Default (as hereinafter defined) occurs; and (c) the effective date of a chapter 11 plan for the Debtor. Notwithstanding anything to the contrary herein, the Prepetition Secured Creditor and the Debtor expressly reserve all rights relating to the payment of accrued and unpaid administrative expenses incurred in connection with the administration of the Debtor's estate leading to the sales of substantially all of the Debtor's assets.

Second, the Second Amendment replaced the portion of the Budget, attached as Exhibit A to the Second Amendment, from July 6, 2021, to July 31, 2021.

30.     Thereafter, on July 30, 2021, the Debtor filed the Third Amendment to Final Order (I) Authorizing Debtor to Use Cash Collateral on A Limited Basis, (II) Granting Adequate Protection to Prepetition Secured Creditor, (III) Modifying the Automatic Stay, and (IV) Granting Related Relief [Docket No. 371] (the "**Third Amendment**").  The Third Amendment, among other

things, extended the time during which the Debtor could continue to use WSFS's cash collateral through and including October 31, 2021. Critically, the Third Amendment also set a reasonable path for confirming a liquidating plan in the Chapter 11 Case. As noted herein, the Debtor and the Committee had already drafted and sent to counsel for WSFS an acceptable liquidating plan that conformed to the terms set forth in the Third Amendment and were informed by counsel for WSFS that WSFS would have minor comments to such plan. Instead of such minor comments, upon payment to WSFS of its agreed portion of the Proceeds, counsel for WSFS informed counsel for the Committee and counsel for the Debtor that it would not support any liquidating plan, demanded the prompt filing of a motion to convert, and stated that WSFS would not permit any use of cash collateral after August 31, 2021, absent filing of this motion. On September 1, 2021, the Debtor received the Carve-Out Trigger Notice.

31.     Notwithstanding the reprieve afforded by the Second Amendment and the Third Amendment, the revised Budget reflects the rapid emptying of estate coffers. The recent change of heart of WSFS not to support a plan, immediately after receiving its share of the Proceeds, has left the Debtor with no viable option but to seek to convert this Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code.

**II.     The Asset Sales**

32.     The Debtor and other estate professionals did their utmost to preserve and maximize the value of estate assets. The Sale generated approximately $12.75 million in Proceeds. As previously noted, through the Sale, the Debtor was able to preserve jobs and continue the critical services of the Debtor. If called on to testify, the Debtor's Chief Restructuring Officer will outline how without the successful Sale it is unlikely that the secured parties who recovered a significant amount through the Chapter 11 Case, would have recovered a mere fraction.

33.     On April 27, 2021, the Debtor filed the *Motion of Debtor for Entry of Orders (I)(A) Establishing Bidding Procedures; (B) Approving Bid Protections; (C) Establishing Procedures Relating to Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, Including Notice of Proposed Cure Amounts; (D) Approving Form and Manner of Notice; (E) Scheduling a Hearing to Consider Any Proposed Sale; and (F) Granting Certain Related Relief; and (II)(A) Approving a Sale of Some or All of the Assets of the Debtor; (B) Authorizing Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection with the Sale; and (C) Granting Related Relief* [Docket No. 54] (the "**Non-MAT Sale Motion**").

34.     On April 30, 2021, the Debtor filed the *Motion of Debtor for Entry of Orders (I)(A) Approving Bidding Protections in Connection With Sale of MAT Assets and Services; (B) Establishing Procedures Relating to Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, Including Notice of Proposed Cure Amounts in Connection with Sale of MAT Assets; and (C) Granting Certain Related Relief; and (II)(A) Approving a Sale of the MAT Assets; (B) Authorizing Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection with the MAT Asset and Services Sale; and (C) Granting Related Relief* [Docket No. 71] (the "**MAT Sale Motion**," and with the Non-MAT Sale Motion, the "**Sale Motions**")[3].

35.     On May 18, 2021, the Court entered the *Order (I) Scheduling a Hearing to Consider Approval of the Sale of Substantially All of the Debtor's Assets, and the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (II) Approving Certain Bidding Procedures, Assumption and Assignment Procedures, and the Form and Manner of Notice Thereof, and (III) Granting Related Relief* [Docket No. 151] (the "**Non-MAT Procedures Order**") and the

---

[3] Capitalized terms used but not defined herein have the meanings ascribed to them in the Sale Motions.

*Order (I) Approving Certain Bidding Protections in Connection with the Sale of the Debtor's MAT Assets, and (II) Granting Related Relief* [Docket No. 152] (the "**MAT Procedures Order**") (collectively the, "**Bid Procedure Orders**").

36.     By the Sale Motions, the Debtor sought, among other things, (i) to sell the Acquired Assets and the Acquired MAT Assets and operations, including critical programs operated by the Debtor (collectively, the "**CCSP Assets**") and (ii) to assume and assign executory contracts and leases (collectively, the "**Assumed CCSP Contracts**") for any or all of the CCSP Assets designated as contracts and leases to be assumed and assigned in connection with any Sale.  The Debtor used approximately $2 million of the Cash Collateral to fund the costs and expenses of administering the Chapter 11 Case, which included running the Sale process.

37.     On June 4, 2021, the Debtor held an auction for the CCSP Assets, by Zoom, in accordance with the terms of the Bid Procedures Orders (the "**Auction**").  After the Auction, the Debtor filed two Notices of Auction Results identifying Conexio Care, Inc., the Non-MAT and MAT Stalking Horse Bidder (collectively, the "**Purchaser**") as the Successful Bidder for the Non-MAT Assets and the MAT Assets. *See* Docket Nos. 218 and 219, respectively.

38.     On June 14, 2021, this Court entered an: (i) *Order (I) Authorizing the Assumption, Assignment, and Sale of Certain Assets to Conexio Care, Inc., Free and Clear of All Liens, Claims, Encumbrances, and Interests; and (II) Granting Related Relief* [Docket No. 247] (the "**Non-MAT Sale Order**") and (ii) *Order (I) Authorizing the Assumption, Assignment, and Sale of Certain Assets to Conexio Care, Inc., Free and Clear of All Liens, Claims, Encumbrances, and Interests; and (II) Granting Related Relief* [Docket No. 245]  (the "**MAT Sale Order**", and together with the Non-MAT Sale Order, the "**Sale Orders**" or "**Sale**").  The Debtor's covenant to maintain and continue operating during the period between the auction and the Sale Closing Date was a crucial

component of the Debtor's Sale required the ongoing and significant focus and time of the Debtor's professionals, management, and employees.

IV.    **The Debtor's Administrative Expenses**

39.    Notwithstanding the requirements of the Bankruptcy Code, the estate lacks sufficient funding to continue to pay administrative expenses and pursue a liquidating plan with the support of WSFS.  After August 31, 2021, WSFS has indicated it will refuse to consent to the continued use of its cash collateral, even with the global resolution that the Debtor and the Committee have obtained that WSFS is a party to.

40.    Specifically, on June 30, 2021, the Debtor filed the *Motion of Debtor for Entry of an Order (I) Authorizing the Debtor to Surcharge Certain Collateral, Proceeds of Sale of Substantially All of the Debtor's Assets, and (II) Granting Related Relief* [Docket No. 287] (the "**Surcharge Motion**").

41.    Thereafter, on July 6, 2021, the Prepetition Secured Creditor filed the *Motion Pursuant to the Sale Orders, for Entry of an Order Regarding Distribution of Sale Proceeds* [Docket No. 290] (the "**WSFS Proceeds Distribution Motion**").

42.    After extensive, arm's length negotiation, the various secured parties, the Committee, and the Debtor resolved the disputes in the Surcharge Motion and the WSFS Proceeds Distribution Motion.  That resolution was approved by this Court on August 23, 2021, by entry of the Consent Order (I) Pursuant to Paragraphs 35 of the Sale Orders, Authorizing the Debtor to Distribute the Sale Proceeds, (II) Resolving Related Motions of the Debtor and Wilmington Savings Fund Society, FSB, and (III) Granting Related Relief [Docket No. 420].

43.    Despite the best efforts of the Debtor, the Committee, and all estate professionals to maximize value, ensure continuity of service and employment, build consensus between

secured, administrative, priority, and general unsecured creditors, and then oversee the equitable and efficient liquidation and administration of the estate, for the reasons set forth herein, it has become clear that WSFS will not agree to the terms of a liquidating plan.  The impossibility of confirming a plan without the agreement of WSFS and the lack of any estate resources to fund any challenge to the recent change of heart exhibited by WSFS, weigh heavily in favor of converting the Debtor's Chapter 11 Case to a chapter 7 case – where a disinterested trustee will take the reins, hire the trustee's own professionals, investigate potential causes of action, liquidate estate assets, make distributions, and windup the estate.   In the absence of the relief requested herein, administrative expenses, professional fees, and U.S. Trustee fees will quickly whittle away the Debtor's remaining assets while little to no progress is made on developing a confirmable chapter 11 plan of liquidation.

44.     WSFS, by its recent actions, has demonstrated all too clearly that notwithstanding its professed eagerness to avoid a conversion of this case, a position that led the Debtor to seek approval of a bar date and the Committee and the Debtor to spend valuable time and resources developing a liquidating plan in accordance with the terms set by WSFS and acceptable to the Debtor and the Committee, WSFS was only interested in obtaining as much of the Proceeds as possible.

## ARGUMENT

45.     Section 1112(b)(1) provides a court should either convert a chapter 11 case to chapter 7 or dismiss the case when cause is demonstrated, whichever is in the best interests of creditors and the estate. 11 U.S.C. § 1112(b)(1). The Third Circuit holds that section 1112(b) "requires a two-step process in which the court first determines whether there is 'cause' to convert or dismiss, and next chooses between conversion and dismissal based on the best interests of creditors and the estate." *In re Am. Capital Equip., LLC*, 688 F.3d 145, 161 (3d Cir. 2012) (citing

*In re SGL Carbon Corp.,* 200 F.3d 154, 159 n. 8 (3d Cir. 1999)).

46.     Although section 1112(b) does not define "cause," section 1112(b)(4) provides sixteen factors that constitute "cause" to convert or dismiss a case. *See* 11 U.S.C. § 1112(b)(4). The factors, however, are "not exhaustive" and courts are free to consider other factors. *Gateway Access Solutions*, 374 B.R. 556, 561 (Bankr. M.D. Pa. 2007) (noting "such lists are viewed as illustrative rather than exhaustive, and the Court should 'consider other factors as they arise'") (citing *In re Brown*, 951 F.2d 564, 572 (3d Cir. 1991)); *Quarles v. U.S. Trustee*, 194 B.R. 94, 96 (W.D. Va. 1996) (acknowledging courts may consider additional grounds in determining whether cause exists). The application of the factors is partly dependent on where the debtor is in the bankruptcy reorganization process. *Gateway Access Solutions*, 374 B.R. at 561.

47.     The movant initially bears the burden of establishing cause under section 1112(b) of the Bankruptcy Code. *See* 11 U.S.C. § 1112(b)(2); *In re Reserves Resort, Spa & Country Club LLC*, 2013 WL 3523289, at *2 (Bankr. D. Del. July 12, 2013) (stating the burden is on the moving party to prove cause by a preponderance of the evidence); *see also Gateway Access Solutions*, 374 B.R. at 561.

48.     If the movant establishes cause, the burden shifts to the debtor to prove it falls within the "unusual circumstances" exception. 11 U.S.C. § 1112(b)(1); *Gateway Access Solutions*, 374 B.R. at 567 (noting in order to deny conversion, the court must be able to specifically identify factors to establish conversion is not in the best interests of the creditors and the estate). Congress explained the exception only applies if: (1) the debtor or a party in interest establishes that there is a reasonable likelihood that a plan will be confirmed within a reasonable time period; (2) the grounds for granting such relief include an act or omission for which there exists a reasonable justification; or (3) such act or omission will be cured within

a reasonable time period. *See* H.R. Rep. No. 109-31(I) at 94 (April 8, 2005), *reprinted in* 2005 U.S.C.C.A.N. 88, 2005 WL 832198.

49.     Section 1112(c) provides that the "court may not convert a case under [chapter 11] to a case under chapter 7 of [the Bankruptcy Code] if the debtor is… a corporation that is not a moneyed, business, or commercial corporation, unless the debtor requests such conversion." 11 U.S.C. § 1112(c). Here, the Debtor, a non-profit, is requesting conversion to a case under chapter 7.

50.     Section 105(a) of the Bankruptcy Code provides:

> The court may issue any order, process, or judgment that is necessary to carry out the provisions of this title.

11 U.S.C. § 105(a).

## A.     There is No Prospect for Rehabilitation

51.     Section 1112(b)(4)(A) provides that "cause" exists if there are substantial or continuing losses or diminution of the estate and there is the absence of a reasonable likelihood of rehabilitation. 11 U.S.C. § 1112(b)(4).  Although section 1112(b)(4)(A) is often analyzed in the context of a debtor attempting to reorganize, courts have found section 1112(b)(4)(A) applicable to debtors liquidating their assets in chapter 11 as well. *See e.g., In re Wen-Kev Mgmt.*, 2014 WL 7370050 (D. N.J. Dec. 29, 2014); *Loop Corp. v. U.S. Trustee*, 379 F.3d 511 (8th Cir. 2004); *In re BH S & B Holdings, LLC*, 439 B.R. 342 (Bankr. S.D.N.Y. 2010); *Canpartners Realty Holding Co. IV, L.L.C. v. Vallambrosa Holdings, L.L.C. (In re Vallambrosa Holdings, L.L.C.)*, 419 B.R. 81, 89 (Bankr. S.D. Ga. 2009).  The purpose of section 1112(b)(4)(A) is to prevent the debtor "from gambling on the enterprise at the creditors' expense when there is no hope of rehabilitation." *Reserves Resort*, 2013 WL 3523289, at *2 (quoting *In re Lizeric Realty Corp.*, 188 B.R. 499, 563 (Bankr. S.D.N.Y. 1995)).

52.    In *Loop Corp.,* the Eight Circuit affirmed the conversion of a chapter 11 bankruptcy case to chapter 7 on facts similar to those here — there, the debtor's assets were liquidated, the secured lender was paid off, and all that remained was cash and potential causes of action. *See generally, Loop Corp.*, 379 F.3d 511. The U.S. Trustee moved to convert the case because despite ongoing negotiations between the debtor and the committee on the terms of a consensual plan, an agreement could not be reached. *Id.*   The bankruptcy court found that the "ongoing expenses associated with the estate and attempting to negotiate a confirmable plan constituted 'continuing loss to or diminution of the estate.'" *Id*. at 514-15. In affirming conversion of the case to chapter 7, the Eight Circuit noted the following:

> In the context of a debtor who has ceased business operations and liquidated virtually all of its assets, any negative cash flow — including that resulting only from administrative expenses — effectively comes straight from the pockets of the creditors.  This is enough to satisfy the first element of § 1112(b)(1). ... Courts have consistently understood "rehabilitation" to refer to the debtor's ability to restore the viability of its business.  Because the debtors here intended to liquidate their assets rather than restore their business operations, they had no reasonable likelihood of rehabilitation.

*Id*. at 516 (internal citations omitted).  Such is the case here.

53.    The Debtor's continued participating in chapter 11 will increase the administrative costs associated with the case and erode value for the Debtor's creditors.  As of August 31, 2021, the Sale has closed (subject to the ongoing obligation of the Debtor to complete the transfer of the real property sold to the Purchaser through the Sale Orders), the Transition Services Agreements concluded by their terms, and the Proceeds have been distributed.  The Debtor has no business operations, and, therefore, will not be generating ongoing revenue.  Although, the Debtor projects accounts receivable may remain outstanding and owed to the estate, the dollar amount is unknown and difficult to calculate within any reasonable margin of error.  Further, the lack of continued

access to WSFS's cash collateral will make collecting accounts receivable next to impossible. WSFS has informed counsel for the Debtor and counsel for the Committee that it will not consent to the continued use of Cash Collateral after August 31, 2021, and will not support the plan, the terms of which appeared to be previously acceptable to WSFS.

54.     As set forth above, the ongoing administrative expense associated with remaining in chapter 11 will diminish the value of the Debtor's estate for all creditors and the first requirement of section 1112(b)(4)(A) is satisfied. *See Wen-Kev Mgmt.*, 2014 WL 7370050 at *3 (quoting *Loop Corp.,* 379 F.3d at 516 for the proposition "the ongoing expenses associated with administering the estate and attempting to negotiate confirmable plans ... can be deemed to be continued loss to ... the estate") (internal citations omitted); *BH S & B*, 439 B.R. at 348 (cause exists to convert the case where "the Debtors' financial statements reflecting continuing losses and the Debtors' intention to liquidate establish that there is no likelihood of rehabilitation"); *In re Citi-Toledo Partners*, 170 B.R. 602, 606 (Bankr. N.D. Ohio 1994) ("first requirement of § 1112(b)(1) satisfied because administrative expenses eroded the position of the estate's creditors and diminished the value of the estate"); *Vallambrosa Holdings*, 419 B.R. at 89 ("accumulating administrative expenses are eroding the position of the estate's creditors and further diminishing the value of the estate").

55.     The Debtor similarly does not have any prospect for reorganization. The Debtor sold substantially all of its assets to the Purchaser and is not attempting to reorganize its businesses.  As of the filing of this Motion, the Debtor closed the sale and concluded the Transition Services Agreements.  All that remains is to collect outstanding receivables that are the collateral of the Prepetition Secured Lender and pursue causes of action.  Accordingly, the second requirement of section 1112(b)(4)(A) is also satisfied because "the Debtors' intention to liquidate

(rather than rehabilitate) demonstrates that there is no likelihood of rehabilitation." *See BH S & B,* 439 B.R. at 347; *Loop Corp.,* 379 F.3d at 516 ("Because the debtors here intended to liquidate their assets rather than restore their business operations, they had no reasonable likelihood of rehabilitation"); *Wen-Kev Mgmt.,* 2014 WL 7370050 *4 (finding no likelihood of rehabilitation where the final act to be achieved was the distribution of the liquidated estate). Here, there is no business left to reorganize, there are no complicated on-going business operations, and there is no cash flow from which current obligations can be met. Therefore, cause to convert the Chapter 11 Case to a chapter 7 case exists.

### B. Absent Authority To Use Cash Collateral, The Debtor's Estate Will Be Administratively Insolvent

56. Although not specifically set forth in section 1112(b), courts consider whether an estate is administratively insolvent in determining whether "cause" exists to convert or dismiss a case. *See BH S & B,* 439 B.R. at 349 (noting even though "section 1112(b)(4) does not list administrative insolvency as cause to convert or dismiss a chapter 11 case, a court may still consider this factor"). As set forth above, notwithstanding that the case was run for the benefit of the Debtor's secured lenders (and the citizens of Delaware), the Prepetition Secured Lender is no longer willing to fund the continued and ongoing administrative costs associated with the Chapter 11 Case after August 31, 2021.

57. Additional administrative expenses have and will continue to accrue, including professional fees and U.S. Trustee fees. The Debtor must account for and pay these liabilities, in addition to all other administrative expense claims, to remain a chapter 11 debtor and debtor in possession. Accordingly, cause exists to convert this case to chapter 7 solely based on the administrative insolvency of this estate. *BH S & B,* 439 B.R. at 349-50 (converting cases to chapter 7 due to the administrative insolvency of the estates).

### C.     The Debtor Cannot Confirm a Chapter 11 Plan

58.     Section 1112(b)(4)(J) provides that "cause" may include the failure to file a disclosure statement, or the failure to file or confirm a plan, within the time fixed by the Bankruptcy Code or by order of the court. 11 U.S.C. § 1112(b)(4)(J).  The timely and accurate disclosure of financial information is the "life blood of the chapter 11 process." *Quarles*, 194 B.R. at 97 (quoting *In re Berryhill*, 127 B.R. 427, 433 (Bankr. N.D. Ind. 1991) and finding a debtor's failure to file a disclosure statement within the time period set by the court constitutes cause under section 1112(b)); *see also BH S & B,* 439 B.R. at 351 (cause exists to convert because debtor has failed file a plan and disclosure statement by the court-approved deadline).  Whether the period during which a debtor fails to file a plan or disclosure statement constitutes a reasonable period of time will depend upon the unique circumstances of each case. *Quarles,* 194 B.R. at 97 (appellant's failure to file a disclosure statement as requested by the bankruptcy court undermines the chapter 11 process). Although, the complexity and nature of the case will dictate its pace, "a debtor cannot wallow in chapter 11." *BH S & B,* 439 B.R. at 351.

59.     As set forth above, given the recent position of WSFS, the Debtor, is unable to negotiate, develop, propose, solicit, and confirm a chapter 11 plan.  No hope remains for rehabilitation, nor for the consensus building collaboration required to confirm a liquidating plan. The Debtor submits that "cause" exists to convert the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code.

### D.     Conversion Best Serves the Interests of Creditors and the Debtor's Estate

60.     Having established cause for conversion, a court must examine whether conversion or dismissal is in the best interests of the creditors and the estate.  Here, conversion, rather than dismissal, would best serve the interests of the Debtor's estate.  Although both

conversion and dismissal will end the administrative burn in fees and costs associated with chapter 11, conversion to chapter 7 is preferable.  The only remaining assets following the sale closing consist of the remaining Sale Proceeds, outstanding accounts receivable and potential estate causes of action (in addition to the sale or other disposal of certain real property and interests in non-Debtor subsidiaries that were not transferred through the Sale Orders).  Conversion will allow a chapter 7 trustee to investigate, and if appropriate, pursue such causes of actions for the benefit of all creditors.  A chapter 7 trustee can also direct account receivable collection efforts and determine who is entitled to amounts remaining in the Debtor's estate from the Sale Proceeds.

61.     For the foregoing reasons, conversion of the case to a case under chapter 7 of the Bankruptcy Code is warranted, necessary, and in the best interests of creditors and the estate.

### **RESERVATION OF RIGHTS**

62.     Nothing contained herein is intended or shall be construed as: (a) an admission as to the amount of, basis for, or validity of any claim against the Debtor/the estate under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtor's or any other party in interest's right to dispute any claim, (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtor's estate; or (g) a waiver of any claims or causes of action that may exist against any entity under the Bankruptcy Code or any other applicable law.

## CONCLUSION

63.     For the reasons stated herein, the conversion of the Chapter 11 Case to a chapter 7 case is warranted and justified. Accordingly, the Debtor respectfully requests the Court approve the Motion.

## NO PRIOR REQUEST

64.     The Debtor has not made a prior request seeking the relief requested by this Motion to this or any other Court.

## NOTICE

65.     Notice of this Motion will be given to: (a) counsel to the Official Committee of Unsecured Creditors, *Polsinelli PC,* 222 Delaware Avenue, Suite 1101, Wilmington, DE 19801, cward@polsinelli.com (*Attn*: Christopher A. Ward, Esquire); skatona@polsnielli.com (*Attn*: Shanti M. Katona); and bdolphin@polsinelli.com (*Attn*: Brenna A. Dolphin); (c) the Office of the United States Trustee for the District of Delaware, J. Caleb Boggs Federal Building, 844 King Street, Lockbox 35, Wilmington, De 19801 (Attn: Rosa Sierra, Esquire rosa.sierra@usdoj; (d) counsel to WSFS, Reed Smith, LLP, Three Logan Square, Suite 3100, 1717 Arch Street, Philadelphia, PA 19103 (Attn: Brian M. Schenker, Esquire bschenker@reedsmith.com and Derek M. Osei-Bonsu, Esquire dosei-bonsu@reedsmith.com) and 1201 N. Market Street, Suite 1500, Wilmington, DE 19801 (Attn: Jason D. Angelo, Esquire jangelo@reedsmith.com); (e) proposed counsel to the Ombudsman, Leech Tishman Fuscaldo & Lampl, LLC, 1007 N. Orange Street, 4th Floor, Wilmington, DE 19801 (Attn: Patrick W. Carothers, Esquire pcarothers@leechtishman.com, Gregory W. Hauswirth, Esquire ghauswirth@leechtishman.com, and Matthew Burn, Esquire mburne@leechtishman.com); (f) counsel to Conexio Care, In. and Imperium, Inc., Stevens & Lee, P.C. 919 North Market Street, Suite 1300, Wilmington, DE 19801

(Attn: Joseph H. Huston, Jr., Esquire jhh@stevenslee.com and David William Giattino, Esquire dwg@stevenslee.com); and (g) any party requesting notice pursuant to Bankruptcy Rule 2002 (collectively, the "**Notice Parties**"). In light of the nature of the relief requested herein, the Debtor submits no other or further notice is necessary.

**WHEREFORE**, the Debtor respectfully requests the Court enter an order converting the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code and granting such other and further relief as the Court may deem just and proper.

Dated: September 1, 2021
Wilmington, Delaware

CHIPMAN BROWN CICERO & COLE, LLP

*/s/ Mark L. Desgrosseilliers*

William E. Chipman, Jr. (No. 3818)
Mark L. Desgrosseilliers (No. 4083)
Hercules Plaza
1313 North Market Street, Suite 5400
Wilmington, Delaware 19801
Telephone:   (302) 295-0191
Facsimile:   (302) 295-0199
Email:       chipman@chipmanbrown.com
             desgross@chipmanbrown.com

*Counsel to the Debtor and*
*Debtor-In-Possession*