**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>CONNECTIONS COMMUNITY<br>SUPPORT PROGRAMS, INC.,<br><br>Debtor[1]. | Chapter 11<br><br>Case No. 21-10723 (MFW) |

**RESPONSE OF WILMINGTON SAVINGS FUND SOCIETY, FSB TO
MOTION TO CONVERT DEBTOR'S CHAPTER 11 CASE TO A CASE
UNDER CHAPTER 7 OF THE BANKRUPTCY CODE**

Wilmington Savings Fund Society, FSB ("WSFS"), by and through its undersigned counsel, files this response to Connections Community Support Programs, Inc.'s (the "Debtor") Motion to Convert Debtor's Chapter 11 Case to a Case Under Chapter 7 of the Bankruptcy Code [D.I. 442] (the "Motion") and respectfully states as follows:

**PRELIMINARY STATEMENT**

1.      WSFS' relationship with the Debtor dates back as far as 1997.  WSFS has long supported the Debtor's not-for-profit efforts to provide critical healthcare services to thousands of patients in Delaware every year for substance use and mental health disorders, aid them in lifelong recovery, and provide support services to allow them to return to stable and productive lifestyles. When the Debtor's prepetition loan matured on March 20, 2020, WSFS continued to support the Debtor by entering into forbearance agreements through December 31, 2020.  After the Debtor's chapter 11 bankruptcy filing, WSFS continued to support the Debtor by consenting to the Debtor's

---

[1] The Debtor in this chapter 11 case, along with the last four digits of its tax identification number, is as follows: Connections Community Support Programs, Inc. (3030).  The address of the Debtor's corporate headquarters is 3812 Lancaster Pike, Wilmington, Delaware 19805.

use of cash collateral.  In doing so, WSFS supported the continuity of the critical healthcare services being provided to the citizens of Delaware.  Without WSFS' support, the asset sales that allowed these critical services to continue to be available to the citizens of Delaware would not have occurred.

2.      WSFS does not oppose the relief being sought by the Debtor in the proposed Order attached to the Motion.  However, WSFS is compelled to respond to the Motion because of the Debtor's mischaracterizations in the Motion of WSFS' actions in this case.  In the Motion, the Debtor wrongly attempts to blame WSFS for the fact that conversion of the Debtor's bankruptcy case to Chapter 7 is necessary.  In reality, post-sale conversion appears to have always been necessary, but WSFS did not come to understand that reality until only recently.

I.    **Prepetition Collateral; Stalking Horse Bids; and Initial Cash Collateral Orders**

3.      As set forth in WSFS' limited objection to the sale motions [D.I. 214], WSFS' focus in this case has been, primarily, the continuity of the critical healthcare services being provided to the citizens of Delaware and, secondarily, the collection of accounts receivable that were not included in the stalking horse bids for, or the ultimate sales of, the Debtor's assets.

4.      Generally, these accounts receivable consist of claims for reimbursement from primarily Medicaid, the Delaware Division of Substance Abuse and Mental Health, and third party health insurance providers.  They are predominately made up of claims not yet submitted, claims submitted but rejected which require correction and resubmission, claims submitted and awaiting payment, and claims maintained on the Debtor's books and records but likely not eligible for reimbursement.

5.      The Debtor's book balance for these reimbursement claims, as reflected on the certified borrowing base certificates delivered monthly to WSFS, is approximately $22 million.

6.       Starting in January 2021, if not earlier, the Debtor routinely provided WSFS with written statements of the projected collectable amount of these reimbursement claims.  The Debtor consistently stated that the collectible amount was approximately $8 million.  Indeed, on Schedule A/B [D.I. 169], the Debtor estimated the value of these reimbursement claims to be $8,301,534.85 as of the petition date of April 19, 2021 (the "Petition Date").  Notably, when the Debtor requested WSFS' consent to the inclusion of reimbursement claims in the sale to the stalking horse bidder, the Debtor stated the collectible amount to be approximately $9.8 million.  On that basis, WSFS did not consent to such inclusion.

7.       As a result, on the Petition Date, WSFS reasonably believed that it had pre-petition collateral with a value of $8 million that was not being sold and, if used by the Debtor as cash collateral, would be replaced with post-petition adequate protection liens on equivalent amounts of post-petition reimbursement claims.

8.       Similarly, WSFS reasonably believed that, after the closings of the sales of the Debtor's other assets on June 15, 2021, there would still be reimbursement claims to process, submit, correct, re-submit, and collect with a value of $8 million.

9.       On that basis, and in support of the sales allowing for continuity of the Debtor's services, WSFS consented to the use of its cash collateral pursuant to the first and second interim cash collateral orders [D.I. 40, 147] and the final cash collateral order [D.I. 199].  Those cash collateral orders had a scheduled termination date of the earlier to occur of the closing of the sales of the Debtor's other assets and June 30, 2021.  The orders also provided for the expiration of the challenge period on July 6, 2021.

**II.    Asset Sales and Amendments to Final Cash Collateral Order**

10.    As the closings of the sales approached, which also meant the termination of the Debtor's authority to use cash collateral, WSFS raised concerns regarding the lack of any post-sale wind-down budget. At that time, the only wind-down budget that existed was a skeletal draft that the Debtor presented to WSFS on May 20, 2021.

11.    That skeletal wind-down budget covered the period from June 15, 2021 to October 31, 2021, projected approximately $8 million of collections and showed only approximately $800K of expenses. Notably, such projection was supported by a certified borrowing base certificate delivered to WSFS on or about June 1, 2021, indicating collectable reimbursement claims of approximately $8 million.

12.    The sales of the Debtor's other assets then closed on June 15, 2021.

13.    The next day, on June 16, 2021, the first amendment to the final cash collateral order was filed [D.I. 257-1], which provided for a short-term extension to the Debtor's authority to use cash collateral. It had a scheduled termination date of July 6, 2021, commensurate with the expiration of the challenge period.

14.    On June 29, 2021, for the first time, the Debtor presented WSFS with a detailed wind-down budget for the period from June 15, 2021 to November 30, 2021.

15.    That detailed wind-down budget projected approximately $8 million of collections of reimbursement claims and indicated that collection efforts would need to continue through the entirety of the wind-down period.

16.    That detailed wind-down budget showed that, after payment of all administrative expenses, there would be a net cash balance of approximately $3 million that could be paid to WSFS.

17.     WSFS, the Debtor, and the Unsecured Creditors Committee were unable to reach agreement on the wind-down budget, an accounts receivable collection agreement, or a resolution of the case before July 6, 2021.

18.     On July 6, 2021, the Debtor's authority to use cash collateral terminated and the challenge period expired under terms of the final cash collateral order.  No challenge was filed against WSFS prior to the expiration of the challenge period.

19.     Two days later, on July 8, 2021, the second amendment to the final cash collateral order was filed [D.I. 292-1], which provided for a short-term extension to the Debtor's authority to use cash collateral.  It did not extend the challenge period.  It had a scheduled termination date of July 31, 2021.

20.     WSFS consented to these short-term cash collateral extensions based on its reasonable belief that (a) EisnerAmper LLP was best positioned to process, collect, and maximize the value of the reimbursement claims and not a Chapter 7 Trustee; (b) the budgeted claims collections were substantial and sufficient to pay all administrative expenses while still providing a material return to WSFS; and (c) therefore, a plan of liquidation should be considered, rather than conversion to Chapter 7.

21.     Notably, as part of these short-term cash collateral extensions, WSFS authorized the payment of substantial stop-loss insurance premiums to The Benecon Group in an effort to limit administrative claims related to the Debtor's self-funded group health insurance plan and preserve the possibility of confirming a liquidating plan in this case.

22.     Thus, contrary to the Debtor's counsel's assertions in the Motion, WSFS is the interested party that advocated for and supported pursuing a liquidating plan in this case.

III.    **Distribution of Sale Proceeds**

23.    In the meantime, the sale proceeds remained undistributed.

24.    On June 30, 2021, the Debtor filed its motion to surcharge the sale proceeds [D.I. 287].

25.    On July 6, 2021, WSFS filed its motion regarding allocation of the sale proceeds [D.I. 290].

26.    By reason of these motions, the sale proceeds could not be distributed under the sale orders without a further order of this Court.

27.    On July 23, 2021, all interested parties agreed to settlement terms, fully resolving the surcharge and allocation motions and the distribution of the sale proceeds, subject only to the United States of America, acting through Rural Housing Service, United States Department of Agriculture (the "USDA"), obtaining final approval.

28.    The parties proceeded on the assumption that the same would be obtained and drafted an agreed upon form of proposed Order.

29.    The USDA approved the settlement on August 20, 2021 – a month after the agreement on settlement terms.  On the next business day, the Consent Order resolving the distribution of the sale proceeds was entered [D.I. 420].

30.    Despite being fully aware of these facts, and participating in the process, the Debtor nevertheless wrongly suggests in the Motion that the timing of the distribution of the sale proceeds was the reason WSFS concluded that confirming a liquidating plan in this case is not feasible.

31.    To the contrary, the agreement on the distribution of sale proceeds reached on July 23, 2021 paved the way for the parties to pursue a liquidating plan, and the parties proceeded on the assumption that the USDA would obtain final approval.

**IV.    Events Leading to Third Amendment to Final Cash Collateral**

32.    On July 24, 2021, WSFS recommenced negotiations of the contemplated accounts receivable collection agreement between EisnerAmper LLP and the Debtor – a heavily negotiated document, now on its fourth version.

33.    On the same day, notwithstanding that the challenge period had expired with no challenge being filed, but understanding that a plan could not be confirmed without the support of unsecured creditors, WSFS sent a draft Global Settlement Term Sheet to the Unsecured Creditors Committee, copying the Debtor.

34.    On the same day, WSFS circulated a draft third amendment to the final cash collateral order to which the Global Settlement Term Sheet and a wind-down budget would be attached.  The wind-down budget would cover July 31, 2021 to October 31, 2021, during which it was anticipated that a liquidating plan could be confirmed.

35.    On July 28, 2021, the Debtor circulated a revised wind-down budget that both reduced projected collections of reimbursement claims and increased costs, notwithstanding that it covered a shorter time period than the previously circulated wind-down budget.

36.    The revised wind-down budget showed that there would be a net cash balance of approximately $2.7 million that could be paid to WSFS.

37.    Two days later, on July 30, 2021, the Debtor circulated a further revised wind-down budget that both reduced projected collections of reimbursement claims and increased costs, resulting in a net cash balance of approximately $1.7 million that could be paid to WSFS.

38.    Later that afternoon, the Debtor circulated yet another wind-down budget that further reduced the net cash balance that could be paid to WSFS to $1.4 million.

39.     Thus, only one month later, the net cash balance that could be paid to WSFS reduced from $3 million to $1.4 million.

40.     Nonetheless, WSFS authorized the filing of the third amendment to the final cash collateral order [D.I. 371-1].

41.     WSFS consented to this cash collateral extension based on its reasonable belief that (a) EisnerAmper LLP was best positioned to process, collect, and maximize the value of the reimbursement claims and not a Chapter 7 Trustee; (b) the budgeted claims collections were substantial and sufficient to pay all administrative expenses while still providing a material return to WSFS; and (c) therefore, a plan of liquidation should be considered, rather than a conversion to Chapter 7.

**V.     Third Amendment to Final Cash Collateral Order**

42.     The third amendment to the final cash collateral order contained several material terms that are necessary to discuss to correct misleading statements made by the Debtor in the Motion.

43.     First, the third amendment expressly and intentionally deleted the reservation of rights language regarding accrued and unpaid administrative claims that the Debtor repeated twice in the Motion without noting that the reservation of rights was deleted in the third amendment.  It was deleted because of the agreed upon settlement terms regarding the distribution of the sale proceeds, the inclusion of a 506(c) waiver in favor of WSFS in the third amendment, and the fact that the Global Settlement Term Sheet attached to the third amendment unequivocally provided that the wind-down budget was to include all accrued and unpaid administrative claims.

44.     Second, the Global Settlement Term Sheet contained the agreed upon settlement terms regarding the distribution of the sale proceeds and used them to example how unsecured

creditors could receive a distribution under a liquidating plan. Indeed, one of those settlement terms was that WSFS would set aside $350,000 of the sale proceeds to serve as a reserve for such plan distributions. All of which belies the notion that WSFS did not intend to pursue a liquidating plan following the settlement of the distribution of the sale proceeds.

45.     Third, the Global Settlement Term Sheet expressly reserved WSFS' right to withdraw support for a liquidating plan to the extent there was insufficient funds in the wind-down budget to fund it.

46.     Finally, the third amendment contained a milestone of August 31, 2021 on which an acceptable liquidating plan was to be filed. That date was not supplied by WSFS. Rather, it was supplied by the Unsecured Creditors Committee and dovetailed with the last day of the Debtor's transition services agreements with its buyer.

**VI.     Events Leading up to the August 31, 2021 Milestone**

47.     On August 5, 2021 – not even a week after the third amendment was filed – the Debtor informed WSFS that the projected gross collections on the wind-down budget attached to the third amendment were overstated and that the gross collectible amount of remaining reimbursement claims was only approximately $1-1.5 million. With gross collections of only $1-1.5 million, after payment of budgeted administrative expenses, the net cash balance that could be paid to WSFS of $1.4 million reflected on the wind-down budget would not be achieved and would be materially less, perhaps even $0.00.

48.     In the weeks that followed, WSFS spent considerable time with the Debtor trying to understand that revised projection.

49.     On August 16, 2021, the Unsecured Creditors Committee provided WSFS with an initial draft of a liquidating plan.

50.    The liquidating plan was well drafted, and counsel to WSFS informed counsel to the Unsecured Creditors Committee and the Debtor that they could anticipate minor legal comments on the draft, except that the parties would need to address WSFS' treatment under the plan on the effective date, which was left blank.

51.    On August 20, 2021, counsel to WSFS and counsel to the Unsecured Creditors Committee had a call to discuss the same.  During that call, counsel to WSFS made clear that WSFS expected to be paid the net cash balance of $1.4 million reflected on the wind-down budget on the effective date.  Counsel to the Unsecured Creditors Committee took no issue with that position, as that was their expectation as well, but did ask whether the Debtor had provided its draft hypothetical chapter 7 liquidation analysis to WSFS, which the Committee had already received.

52.    Counsel for WSFS then informed counsel to the Debtor that it was not moving forward with a liquidating plan unless it provided for a minimum effective date cash payment to WSFS consistent with net cash balance reflected on the wind-down budget and requested a copy of the draft hypothetical chapter 7 liquidation analysis.

53.    The Debtor's counsel refused to provide the draft hypothetical chapter 7 liquidation analysis to WSFS and said that a minimum effective date cash payment to WSFS was impossible because the wind-down budget did not include all accrued and unpaid administrative claims.

54.    WSFS then obtained a copy of the draft hypothetical chapter 7 liquidation analysis from counsel to the Unsecured Creditors Committee.  It showed projected gross collections consistent with the Debtor's statements earlier that month that the gross collectible amount of remaining reimbursement claims was only approximately $1-1.5 million.  With gross collections

of only $1-1.5 million, after payment of budgeted administrative expenses, there would be little to no net cash that could be paid to WSFS under a liquidating plan.

55.     WSFS also pressed the Debtor for additional information regarding the statement that the wind-down budget did not include all accrued and unpaid administrative claims.

56.     On August 23, 2021, the Debtor informed WSFS that over $1 million of accrued and unpaid professional fees and costs were not included in the wind-down budget and that an additional $1 million of professional fees and costs would need to be incurred from August 2021 to October 2021 – the same time period over which now only $1-1.5 million was projected to be collected.

57.     On August 25, 2021, counsel for WSFS scheduled calls with both counsel to the Debtor and counsel for the Unsecured Creditors Committee to inform them that, in light of this new information, WSFS was withdrawing support for a liquidating plan because there were not sufficient funds to fund a liquidating plan.  Both agreed that conversion of the case was necessary.

VII.    **Termination of Authorization of Use of Cash Collateral**

58.     On August 31, 2021 – the last day of the Debtor's transition services period – the Debtor sent WSFS a draft cash collateral budget contemplating that WSFS would agree to continue to authorize the use of cash collateral beyond August 31, 2021.

59.     The budget contemplated that the Debtor would use all of the cash in the debtor's bank accounts (roughly $900,000), and the $350,000 set aside from the sale proceeds as a reserve for funding distributions to unsecured creditors under a liquidating plan, and the proceeds of an additional $278,000 of reimbursement claims collections to pay not just the professional fees and costs subject to the carve-out but also other accrued and unpaid administrative claims.

60.     On September 1, 2021, WSFS sent a notice terminating the Debtor's authority to use cash collateral by reason of, *among other things*, the event of default caused by the Debtor's failure to satisfy the August 31, 2021 milestone to file an acceptable liquidating plan.[2]

61.     In so wording the notice of termination, WSFS attempted to allow the Debtor to convert this case without the need to delve into any of these issues.  However, the Debtor opted to file a motion attempting to place blame squarely on WSFS.

62.     Obviously, if the wind-down budget presented to WSFS on July 30, 2021, which showed a net cash balance that could be paid to WSFS of $1.4 million, had not overstated gross collections and had included the omitted $1 million of accrued and unpaid professional fees and costs[3], WSFS would not have consented to the continued use of WSFS' cash collateral during the last month of the Debtor's transition services agreements with the buyer.

63.     Instead, the issue of converting the case would have been before the Court in early August.

---

[2] Additional events of default under the final cash collateral order include multiple variance defaults.  For example, the Debtor's actual collections for August 2021 were only $1,357,467.98 (versus a $1,675,000 budgeted amount).  Similarly, the administrative claim made by Highmark BCBSD Inc. exceeded budgeted expenses.

[3] After WSFS terminated the Debtor's authority to use cash collateral, the Debtor attempted to explain away such omission by relying on a footnote in the wind-down budget that reads "the budget does not include all accrued and unpaid professional fees and expenses that were set forth in the original budget and that those fees and expenses will also become due and payable in the ordinary course – or something similar." This footnote first appeared in the cash collateral budgets submitted to the Court with the first and second amendments to the final cash collateral order, when the parties were reserving rights with respect to accrued and unpaid administrative claims. In light of the fact that the third amendment removed such reservation of rights and the Global Settlement Term Sheet attached to the third amendment unequivocally provided that the wind-down budget was to include all accrued and unpaid administrative claims, this footnote should have been removed when the wind-down budget was submitted with the third amendment. In any event, in the context of a wind-down budget, WSFS understood this footnote to cover nothing more than immaterial omissions.

## VIII.    Conclusion

64.    WSFS is far from the villain in this case.  Instead, WSFS authorized the use of its cash collateral to fund this case[4], including the entirety of the Debtor's post-sale transition services period on the basis of poor information and communication, only to now find such use not adequately protected by its replacement liens.[5]

Dated:  September 15, 2021                    Respectfully submitted,
Wilmington, Delaware

                                              **REED SMITH LLP**

                                              By:  */s/ Mark W. Eckard*
                                                   Mark W. Eckard (No. 4542)
                                                   1201 Market Street, Suite 1500
                                                   Wilmington, DE 19801
                                                   Telephone: (302) 778-7500
                                                   Facsimile: (302) 778-7575
                                                   E-mail: meckard@reedsmith.com

                                                        -and-

                                                   Brian M. Schenker, Esquire (*admitted pro hac vice*)
                                                   Three Logan Square, Suite 3100
                                                   1717 Arch Street
                                                   Philadelphia, PA 19103
                                                   Telephone: (215) 815-8100
                                                   E-mail: bschenker@reedsmith.com

                                                   *Counsel for Wilmington Savings Fund
                                                   Society, FSB*

---

[4] WSFS disputes the Debtor's assertion that only $2 million of WSFS' cash collateral was used during the course of the chapter 11 case.

[5] Notably, as a result, WSFS has an administrative claim with superpriority status pursuant to Section 507(b) of the Bankruptcy Code entitled to be paid ahead of all other costs and expenses of administration of this case, subject only to the carve-out.