# Exhibit C

**(Agreement)**

# REAL ESTATE PURCHASE AGREEMENT

THIS REAL ESTATE PURCHASE AGREEMENT (this "Agreement") is effective as of _____, 2022 (the "Effective Date"), by and between DON A. BESKRONE, in his capacity as CHAPTER 7 TRUSTEE FOR THE ESTATE OF CONNECTIONS COMMUNITY SUPPORT PROGRAMS, INC. (collectively, "Seller"), and CORAS WELLNESS AND BEHAVIORAL HEALTH, LLC, a Delaware limited liability company ("Purchaser").

## RECITALS

WHEREAS, Connections Community Support Programs, Inc. ("CCSP") is a Delaware nonstock corporation that previously provided healthcare services, housing, and employment opportunities to individuals and families at its locations throughout Delaware; and

WHEREAS, Purchaser is an affiliate of Inperium, Inc. ("Inperium"), the parent company of a constellation of Section 501(c)(3) human service companies that provide, among other services, behavioral health, intellectual disability, and other health-related support and services on a charitable basis; and

WHEREAS, CCSP previously filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code (the "Bankruptcy Case") with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), which has now been converted to Chapter 7; and

WHEREAS, prior to the Chapter 7 conversion of the Bankruptcy Case, Purchaser and Purchaser's affiliate purchased substantially all of the assets of CCSP, but excluding, among other things, certain real property;

WHEREAS, Seller is the duly appointed Chapter 7 trustee in the Bankruptcy Case;

WHEREAS, Seller desires to sell to Purchaser and Purchaser desires to purchase from Seller the real property and improvements located at 1-11 East Street, Harrington, Delaware 19952, which is currently being leased by Purchaser on an interim basis (as may be amended and/or extended prior to Closing, the "Interim Lease");

WHEREAS, the transactions contemplated by this Agreement (the "Transactions") are subject to the approval of the Bankruptcy Court and will be consummated only pursuant to a Sale Order to be entered in the Bankruptcy Case; and

WHEREAS, the parties desire to enter into this Agreement for the purpose of setting forth their mutual understandings and agreements with respect to the sale and purchase of such property.

**NOW, THEREFORE**, for and in consideration of the mutual covenants set forth herein and other good and valuable consideration, the adequacy and receipt of which are hereby acknowledged, and intending to be legally bound, the parties hereto agree as follows:

## AGREEMENT

1. <u>Agreement to Purchase and Sell</u>. Subject to the terms and conditions hereinafter set forth, Seller agrees to sell, transfer, convey and assign to Purchaser or its designee, and Purchaser agrees to purchase, accept and assume from Seller, the following, free and clear of all Interests other than Permitted Encumbrances:

(a) all those certain parcels of real estate located at 1-11 East Street, Harrington, Delaware 19952, as more particularly described on <u>Exhibit A</u> attached hereto and made a part hereof, and all rights, privileges and appurtenances pertaining thereto, including, without limitation, all right, title and interest in and to all rights-of-way, open or proposed streets, alleys, easements, strips or gores of land adjacent thereto (collectively, the "Land");

(b) all buildings (the "Buildings"), improvements and fixtures located on the Land, including all heating and air conditioning, electrical systems, plumbing and lighting fixtures, water heaters and boilers and all facilities used to provide any utility services, refrigeration, ventilation or garbage disposal, and all doors, carpeting, other floor coverings, wall coverings and other interior improvements and built-in items owned by Seller and permanently affixed to the Buildings and all fixtures attached or appurtenant to the Buildings or the real property which are traditionally defined as part of real property including, without limiting the generality of the foregoing, all sprinkler, plumbing, heating, air-conditioning, electric power or lighting, incinerating, vacuum cleaning, ventilating and cooling systems, with each of their respective appurtenant furnaces, boilers, engines, motors, dynamos, radiators, pipes, wiring and other apparatus, equipment and fixtures, elevators, partitions, fire prevention and extinguishing systems and equipment, and all other fixtures and items considered a part of the real property (the "Improvements") (the Land, the Buildings and the Improvements, collectively hereinafter referred to as, the "Property").

For purposes hereof, "Interests" shall mean any and all (i) mortgages, security interests, conditional sale or other title retention agreements, pledges, liens, rights of offset, judgments, demands, encumbrances and claims (as that term is defined in the Bankruptcy Code), (ii) claims in respect of taxes (including taxes as to which applicable returns have not yet been filed, whether or not overdue), and (iii) easements, restrictions, rights of first refusal or charges of any kind or nature, if any, including, but not limited to, any restriction on the use, voting, transfer, receipt of income or other exercise of any attributes of ownership, regardless whether such are "claims" as that term is defined in the Bankruptcy Code or pertinent caselaw.

2. <u>Purchase Price; Assumed Liabilities</u>.

(a)  The purchase price for the Property shall be Two Million Five Hundred Thousand Dollars ($2,500,000) (the "Purchase Price") and shall be paid by Purchaser on the Closing Date (as defined in Section 3) in immediately available funds.

(b)  As additional consideration for the purchase of the Property, as of Closing, Purchaser shall assume financial and operational responsibility for conducting and completing such improvements, installations, remediation and repairs as specifically requested and required by the City of Harrington (the "Required Renovations") in order to, among other things, issue

new permits, approvals and certificates of occupancy for the Property, as applicable, all to the extent set forth in the September 21, 2021 letter from the City of Harrington, but expressly excluding any associated fines or penalties.  Excepting the foregoing and any other liability expressly assumed by Purchaser hereunder, Purchaser shall not assume, and shall not otherwise become legally or financially responsible for, any liability of Seller or CCSP relating to the Property or CCSP's operations to the extent arising, occurring or accruing prior to Closing. [NTD: need to address lease and Coras' obligations thereunder]

3.  Closing.

(a)  Subject to the satisfaction of the conditions set forth in Sections 10 and 11 hereof (or the waiver thereof by the party entitled to waive that condition), the closing of the Transactions (the "Closing") shall take place at such mutually agree upon location or electronically on the Closing Date.  The Closing Date shall be the third business day following the satisfaction of all conditions to the obligation of the Seller to Close, other than conditions which, by their nature, are to be satisfied at Closing, or such other date as may be agreed by the Purchaser and the Seller, in any case to occur on or before June 30, 2022 (the "Outside Closing Date").

4.  Action of the Seller at Closing.  At the Closing and unless otherwise waived in writing by the Purchaser, the Seller shall deliver:

(a)  to the Purchaser, a certified copy of the Sale Order;

(b)  to the Purchaser, the Deed, duly executed and acknowledged by the Seller in recordable form, conveying to the Purchaser good and marketable fee simple title to the Property, free and clear of all Interests other than the Permitted Encumbrances in accordance with the Sale Order;

(c)  to the Purchaser and the Title Company, all documents which Seller must execute under the terms of this Agreement to cause the Title Company to deliver to Purchaser the Title Policy, including, without limitation, an owner's affidavit to the Title Company in the form customarily used by title companies in the State of Delaware for commercial real estate transactions so as to enable the Title Company to issue Purchaser the Title Policy with all standard exceptions deleted, all endorsements reasonably requested by Purchaser and Purchaser's lender included, and subject only to Permitted Encumbrances;

(d)  to the Purchaser, the originals or copies of any real property tax bills for the Property and Buildings for the then current fiscal year and, if requested, the originals or copies of any current water, sewer and utility bills which are in Seller's custody or control;

(e)  to the Purchaser, all plans and specifications for the Buildings in the possession of Seller;

(f)  to the Purchaser, the closing statement to be executed by the parties in form and content acceptable to Purchaser (the "Closing Statement");

(g)     to the Purchaser, an affidavit in accordance with the Foreign Investment in Real Property Tax Act, to the extent applicable or required by law; and

(h)     to the Purchaser, such other instruments, agreements, transfers, assignments, certificates and documents as the Purchaser, its counsel or the Title Company reasonably deem necessary to effect the Transactions.

5.  <u>Action of the Purchaser at Closing</u>.  At the Closing, the Purchaser shall deliver or cause to be delivered:

(a)     to the Seller, in cash or by wire transfer of immediately available funds to the accounts designated in writing by Seller (which designation shall be provided at least three Business Days prior to the Closing Date), the Purchase Price;

(b)     to the Seller, the Closing Statement duly executed by the Purchaser;

(c)     to the Seller, copies of resolutions duly adopted by the governing body of the Purchaser authorizing and approving the Purchaser's execution and delivery of this Agreement and the Transactions, certified as true and in full force and effect as of the Closing Date; and

(d)     to the Seller, such other agreements, instruments and documents as the Seller reasonably deem necessary to effect the Transactions.

6.  <u>Seller's Warranties and Representations</u>. The matters set forth in this Section 6 constitute representations and warranties by Seller which shall, in all material respects, at Closing be true and correct to Seller's Knowldege. If Seller is or becomes aware of any reason to believe that any of the following representations and warranties are not true, have ceased to be true, or may cease to be true, Seller shall give prompt notice to Purchaser (which notice shall include copies of the instrument, correspondence, or document, if any, upon which Seller's notice is based). As used in this Section, the phrase "to Seller's Knowledge" shall mean the actual knowledge of Seller and CCSP, of (i) the inaccuracy, untruth or incorrectness of a representation or warranty or (ii) facts which would induce a reasonable, similarly situated property owner to conduct inquiry which would lead to discovery of such inaccuracy, untruth or incorrectness.

(a)  <u>Power and Authority</u>.  The execution, delivery and performance by the Seller of this Agreement and the consummation of the Transactions, (i) is not in contravention of any applicable law or the terms of CCSP's certificate of incorporation, bylaws and other governing documents, if any, as amended to date, (b) does not conflict with or result in any breach or contravention of any material agreement to which CCSP is a party or by which it is bound, and (c) has been duly authorized by all appropriate corporate and member action.  Further, subject to entry of the Sale Order and such other authorization as is required by the Bankruptcy Court, the Seller has the requisite power and authority to perform its obligations hereunder and such performance will not be in contravention of any applicable law.

(b)  <u>Compliance</u>. With the exception of the Required Renovations, the Property is in material compliance with all applicable laws, and neither Seller nor CCSP has received notice of,

nor has Seller any knowledge of: (i) any violations (collectively, "Violations", and individually, a "Violation") of any applicable local, state or federal law, municipal ordinances or regulations, orders, rules or requirements of any federal, state or municipal department or agency having jurisdiction over or affecting the Property or the construction, management, ownership, maintenance, operation, use, improvement, acquisition or sale thereof, including, without limitation, building, health and environmental laws, regulations and ordinances, and equal access opportunity laws, regulations and ordinances (collectively, "Legal Requirements") whether officially noted or issued, or (ii) any condition relating to the Property which to Seller's Knowledge would constitute a Violation, and, to Seller's knowledge, no such violations currently exist and no conditions that would give rise to any such Violation currently exists. Seller shall provide Purchaser with notice of any Violations of which Seller obtains notice or knowledge between the Effective Date and the Closing Date. With the exception of the Required Renovations, Seller shall be responsible for the removal or correction of all Violations, if any, issued with respect to the Property to and including the Closing Date, and on the Closing Date the Property will be in material compliance with all Legal Requirements, unless such removal or correction is cost prohibitive in Seller's reasonable discretion, in which case Purchaser may elect to waive such Violation or terminate this Agreement. [NTD: doesn't Coras have all this information – whether as a result of the sale/TSA or the lease?]

(c) Litigation. Other than the Bankruptcy Case, there is no pending or, to Seller's Knowledge, threatened litigation affecting the Property before any civil court of law or equity or any regulatory or arbitral forum.

(d) No Property Interests. No person, firm or entity has any rights to acquire or to lease all or any portion of the Property or otherwise to obtain any interest therein, and there are no outstanding options, rights of first refusal or negotiation, rights of reverter or rights of first offer relating to all or any portion of the Property or any interest therein.

(e) Environmental Compliance. In connection with the Property, to Seller's Knowledge, Seller has not generated, used, transported, treated, stored, released or disposed of, or has suffered or permitted anyone else to generate, use, transport, treat, store, release or dispose of any Hazardous Substances (as defined below) in violation of any Legal Requirements and, there has not been any generation, use, transportation, treatment, storage, release or disposal of any Hazardous Substances in connection with the ownership, operation, maintenance or occupancy of the Property, or with any nearby or adjacent properties or facilities, which has created or might reasonably be expected to create any liability under any Legal Requirements or which would require any reporting to or notification to any federal, state or local governmental entity. No asbestos or polychlorinated biphenyl or underground storage tank is contained in or located on the Property. To Seller's Knowledge, any Hazardous Substances, if any, handled or dealt with in any way in connection with the ownership, operation, maintenance or occupancy of the Property, during Seller's ownership thereof has been and is being handled or dealt with in all respects in compliance with applicable Legal Requirements. "Hazardous Substances" as used herein shall mean toxic or hazardous materials, substances, wastes or other environmentally regulated substances (including without limitation, asbestos, polychlorinated biphenyls ("PCBs"), petroleum products, radon gas, toxic or radioactive materials, ammonia, chlorine, pesticides, bulk chemicals, solvent mixtures, waste oils, substances listed in the United States Department of Transportation Table or by the Environmental Protection Agency (or any

successor agency) as hazardous substances, or which are classified as hazardous or toxic under local, state or federal laws, rules or regulations, including, but not limited to, the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, the Superfund Amendments and Reauthorization Act of 1986, as amended, the applicable requirements issued by the Occupational Safety and Health Administration ("OSHA"), including without limitation OSHA regulations set forth in 29 C.F.R. § 1910.1030 and OSHA's Bloodborne Pathogen Standard and revised Center for Disease Control recommendations relating to handling and disposal of infectious waste, 29 C.F.R. § 1910.1030, and any regulations promulgated thereunder and any State counterparts thereof.

(f) <u>Compliance with Zoning Ordinances and Restrictive Covenants</u>. To Seller's Knowledge, the operation and current use of the Property comply in all material respects with all applicable zoning statutes, ordinances, regulations and laws (collectively, the "Zoning Requirements") without variance or special exception, and with all valid and enforceable restrictive covenants of record which appear in the chain of title to the Property.

(g) <u>Condition of Property</u>. To Seller's Knowledge, the Buildings are structurally sound in condition and all of the Mechanical Systems (herein defined) are fully operational and in good working order with no known defects. "Mechanical Systems" means the Building's mechanical, electrical, sanitary, HVAC, plumbing, lighting or other systems.

7. <u>Purchaser's Warranties and Representations</u>. Purchaser represents and warrants to Seller as an inducement to enter into and consummate this Agreement, as of the Effective Date and as of the Closing Date, that:

(a) <u>Power and Authority</u>. Purchaser has the legal right, power and authority to enter into and deliver this Agreement to Seller, to perform its obligations hereunder, and to consummate the transaction contemplated by the terms and conditions of this Agreement.

(b) <u>Binding Obligations</u>. This Agreement has been, and all of the documents to be delivered by Purchaser on or prior to the Closing Date will be, authorized and properly executed and constitutes, or will constitute, as appropriate, the valid and binding obligation of Purchaser, enforceable in accordance with their terms.

(c) <u>No Conflicts</u>.  Neither the execution and delivery of this Agreement by Purchaser nor the consummation of this transaction contemplated hereby will violate or constitute a default under any contract, agreement, instrument, license or undertaking to which Purchaser is a party or by which Purchaser, or any of Purchaser's assets is subject.

8. <u>Review and Inspection</u>.

(a) Prior to the Closing Date, the Seller shall provide to the Purchaser full and complete access to and the right to inspect the Property, books and records relating to the Property, and will furnish to the Purchaser all material information concerning the Property that Purchaser may request, provided such data and information are in the possession and/or control of the Seller.  [NTD: Coras has this, and has had access to it.  What more is being sought?]

(b)  Without limiting the generality of the foregoing, the Purchaser will at its sole cost and expense proceed with all due diligence to conduct such investigations with respect to the Property and its operations as Purchaser deems to be reasonably necessary in connection with its purchase thereof, including, but not limited to, zoning investigations, soil studies, environmental assessments, asbestos inspections, seismic assessments, wetlands reports, surveys, investigations of the CCSP's books and records and structural inspections (the "Due Diligence Review").  To be clear, the obligation of the Purchaser to close on the Transactions hereunder is in no way subject to any such Due Diligence Review or any conditions, other than those expressly set forth in Section 10 of this Agreement.

(c)  Prior to the Closing Date, promptly after becoming known to the Seller, the Seller shall notify the Purchaser in writing of any material changes in the operations, financial condition or prospects of the Property and of any complaints, investigations, hearings or adjudicatory proceedings (or communications indicating that the same may be contemplated) of any person and shall keep the Purchaser reasonably informed of such matters.

9.  Bankruptcy Filings and Interim Covenants.

(a)  Within five (5) business days after the Effective Date, the Seller shall file a motion with the Bankruptcy Court, in form and substance satisfactory to the Purchaser (the "Sale Motion"), seeking an order (the "Procedures Order") in the form attached hereto as Exhibit B (together with such modifications to which the Purchaser may agree) (i) establishing procedures for soliciting potential competing offers to purchase the Property (each a "Competing Bid") (ii) designating the Purchaser as the "stalking horse" bidder for the Property and entitling the Purchaser to (1) reimbursement of documented costs, expenses and fees incurred by Purchaser and/or its affiliates associated with the Required Renovations, if any are undertaken prior to Closing (the "Expense Reimbursement"), *plus* (2) an amount equal to Fifty Thousand Dollars ($50,000.00) (the "Breakup Fee") [NTD: discuss amount], as well as the right to continue the Interim Lease for the duration of its remaining term in accordance with its terms and conditions, if the Seller sells a material portion of the Property in a transaction or a series of transactions with one or more persons other than the Purchaser or its affiliates in accordance with the Procedures Order, with such amounts being payable upon the closing or consummation of such alternate transaction(s), and (iii) following the entry by the Bankruptcy Court of the Procedures Order, setting a further hearing (the "Sale Hearing") seeking an order (the "Sale Order") in the form attached hereto as Exhibit C (together with such modifications to which the Purchaser may agree) approving the Transactions.

(b)  From and after the Effective Date, neither Seller nor CCSP shall grant or execute any deed, easement, restriction, covenant, license or other matter affecting title to the Property unless Purchaser has received a copy thereof and has approved the same in writing, which consent may be granted or withheld in the sole and absolute discretion of Purchaser. If Purchaser fails to object in writing to any such proposed instrument within ten (10) business days after receipt of the aforementioned notice, Purchaser shall be deemed to have approved the proposed instrument.

(c)  From and after the Effective Date, neither Seller nor CCSP shall, without the prior written approval of the Purchaser, which shall not be unreasonably withheld: (a) dissolve or

merge CCSP with any other entity; (b) enter into any agreement or arrangement or modify or terminate any existing agreement or arrangement that would have a material adverse effect on the Property or Transactions contemplated hereby (other than a sale of certain or all of the Property, as may be approved by the Bankruptcy Court); (c) create, assume or permit to exist any encumbrance upon the Property; or (d) take any other action outside the ordinary course of business affecting the Property.

(d)  The Purchaser agrees and acknowledges that, from and after the Effective Date, the Seller, including through its representatives, may solicit inquiries, proposals, or offers from third parties for the Property, and the Seller may discuss and negotiate such inquiries, proposals or offers and provide information to third parties in connection therewith, all subject to and in accordance with the Procedures Order.

10.  Conditions Precedent to Consummation by Purchaser. The obligations of the Purchaser to consummate the Transactions are subject to the satisfaction on or prior to the Closing Date of the following conditions, unless waived in writing by the Purchaser:

(a)  The Purchaser shall have received either: (a) an ALTA (or the local equivalent thereof) extended coverage owner's policy of title insurance issued by the Purchaser's title company insuring title to the Property in an amount equal to the portion of the Purchase Price, containing such endorsements as the Purchaser may request and showing good and marketable title to the Property vested in the Purchaser free and clear of all Interests except: (i) ordinances, easements of roads, or privileges or rights of public service companies, if any (collectively the "Permitted Encumbrances"); and (ii) any other matter approved by the Purchaser before the Closing Date (collectively "Title Policy"); or (b) the written commitments or binders of the Purchaser's title company to issue the Title Policy in the aforementioned condition within a reasonable time after the Closing Date.  Notwithstanding anything to the contrary contained in this Agreement, Permitted Encumbrances shall not include any secured indebtedness or liens shown in the Commitment which are removable by the payment of a liquidated amount of money, which Seller shall comply with, pay or have released by the Bankruptcy Court, as the case may be, on or before Closing.

(b)  All of the Seller's representations and warranties contained in this Agreement shall be true and correct, to Seller's Knowledge, in all materials respects as of the date hereof and as of the Closing Date as if made on the Closing Date.

(c)  All of the covenants of Seller contained in this Agreement to be performed by or on the Closing Date shall have been performed by or on the Closing Date in material compliance with the terms and provisions of this Agreement.

(d)  There shall not have occurred any event, change or occurrence that has or could reasonably be expected to have a material adverse effect on the Property.

(e)  The Seller and the Purchaser have received all consents, permits, approvals, authorizations and clearances of Governmental Authorities and other persons required to consummate the Transactions.  For purposes hereof, "Governmental Authorities" shall mean any and all agencies, authorities, bodies, boards, commissions, courts, instrumentalities, legislatures

and offices of any nature whatsoever of any federal, state, county, district, municipal, city, foreign or other government or quasi-government unit or political subdivision, and private arbitration panels or dispute resolution makers.

(f) No action or proceeding before any Governmental Authority shall have been instituted or threatened to restrain or prohibit the Transactions, and there shall not be in effect any order restraining, enjoining or otherwise preventing consummation of the sale of the Property and/or the Transactions.

(g) The Bankruptcy Court shall have entered the Sale Order which shall have become a final order.

(h) Seller shall have delivered to Purchaser (and/or the Title Company, as applicable) on or before the Closing Date, all of the deliverables set forth in Section 4 hereof.

11. <u>Conditions Precedent to Consummation by Seller</u>. The obligations of the Seller to consummate the Transactions are subject to the satisfaction on or prior to the Closing Date of the following conditions unless waived in writing by the Seller:

(a) All of the Purchaser's representations and warranties contained in this Agreement shall be true and correct in all materials respects as of the date hereof and as of the Closing Date as if made on the Closing Date.

(b) All of the covenants of Purchaser contained in this Agreement to be performed by or on the Closing Date shall have been performed by or on the Closing Date in material compliance with the terms and provisions of this Agreement.

(c) No action or proceeding before any Governmental Authority shall have been instituted or threatened to restrain or prohibit the Transactions, and there shall not be in effect any order restraining, enjoining or otherwise preventing consummation of the sale of the Property and/or the Transactions.

(d) Purchaser shall have delivered to Seller on or before the Closing Date, all of the deliverables set forth in Section 5 hereof.

(e) The Bankruptcy Court shall have entered the Sale Order which shall have become a final order.

12. <u>Costs and Expenses; Apportionment</u>.

(a) Except as otherwise expressly set forth in this Agreement, all expenses of the preparation of this Agreement and of the purchase of the Property set forth herein, including counsel, accounting, brokerage and investment advisor fees and disbursements, shall be borne by the respective party incurring such expense, whether or not such transactions are consummated.

(b) Notwithstanding the foregoing, the Purchaser shall pay all taxes, including all real estate transfer taxes arising out of the transfer of the Property, the cost of the Purchaser's and any lender's title insurance policies, if any, the cost of recording the deeds and any mortgages created

by the Purchaser at Closing, the cost of the Purchaser's land title survey of the Real Property, if applicable, and the cost of all appraisals and environmental, engineering and other professional studies undertaken by the Purchaser, as applicable.

(c) For clarification purposes, on account of the foregoing agreement on costs and expenses and in recognition of the fact that, as of the Effective Date, Purchaser is leasing the Property under the Interim Lease pursuant to which Purchaser is responsible for, other than the Required Renovations, any and all maintenance, repairs, landscaping, trash removal, utilities (including, without limitation, all water and sewer rentals and charges and all charges for gas, electricity, telephone and communication services and other utility services used, rendered or consumed upon the Property), property insurance, cleaning and custodial supplies, licenses and permits, and taxes associated with the Property during the term thereof, no proration or apportionment of such items at Closing is required hereunder.

13.  Termination.  This Agreement may be terminated prior to Closing as follows:

(a)  by the Purchaser, if the Closing shall not have occurred by 3 P.M. Eastern Time on the Outside Closing Date, provided, however, that if the Closing shall not have occurred on or before the Outside Closing Date due to a material breach of any representations, warranties, covenants or agreements contained in this Agreement by the Purchaser, then the Purchaser may not terminate this Agreement;

(b)  by mutual written consent of the Purchaser and the Seller;

(c)  by the Purchaser, if any condition to the obligations of the Purchaser set forth in Section 10 shall have become incapable of fulfillment other than as a result of a breach by the Purchaser of any covenant or agreement contained in this Agreement, and such condition is not waived by the Purchaser;

(d)  by the Seller, if any condition to the obligations of the Seller set forth in Section 11 shall have become incapable of fulfillment other than as a result of a breach by the Seller of any covenant or agreement contained in this Agreement, and such condition is not waived by the Seller;

(e)  by the Purchaser, if there shall be a material breach by the Seller of any representation or warranty, or any covenant or agreement contained in this Agreement which would result in a failure of a condition set forth in Section 10 and which breach has not been cured by the earlier of (A) five (5) business days after the giving of written notice by the Purchaser to the Seller of such breach and (B) the Outside Closing Date;

(f)  by the Seller, if there shall be a material breach by the Purchaser of any representation or warranty, or any covenant or agreement contained in this Agreement which would result in a failure of a condition set forth in Section 11 and which material breach has not been cured by the earlier of (i) five (5) business days after the giving of written notice by the Seller to the Purchaser of such breach and (ii) the Outside Closing Date;

(g) by the Seller or the Purchaser if there shall be in effect a final order of a Governmental Authority of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the Transactions;

(h) by the Purchaser, if (A) within five (5) business days after the Effective Date, the Sale Motion is not filed with the Bankruptcy Court, or (B) the Sale Order is not entered by the Outside Closing Date or such later date as may be agreed by the Purchaser; or

(i) by the Purchaser, if an order is entered by the Bankruptcy Court denying the Sale Motion or entry of the Sale Order or approving the sale of any of the Property to a person other than the Purchaser.

14. <u>Risk of Loss</u>.

(a) <u>Damage or Destruction</u>.

(i) If the Property is damaged or destroyed by fire or any other casualty prior to the Closing Date and the reasonable estimate obtained by Seller from a reputable, licensed Delaware general contractor (the "Estimate") of the cost to restore or repair is Ten Thousand and No/100 Dollars ($10,000.00) or more, Purchaser will have the option to either (i) proceed to close this transaction (the "Closing Option") in accordance with the terms of this Agreement in which event Purchaser will be entitled to all insurance proceeds received or receivable by Seller as a result of such damage or destruction, and provided that the amount of any deductible under any applicable property damage or casualty policy of insurance shall be credited against the Purchase Price at Closing or (ii) terminate this Agreement (the "Termination Option") in which event Seller will retain all insurance proceeds, and neither party shall have any further liability hereunder except for the obligations and liabilities that shall expressly survive termination or expiration of this Agreement. Seller agrees it will give notice to Purchaser of any such damage or destruction within two (2) business days after the occurrence thereof. Purchaser will then have ten (10) days after receipt of such notice and the Estimate to exercise either of the options granted in this Section 14(a)(i) by written notice to Seller. If Purchaser fails to exercise either option under this Section 14(a)(i) within said ten (10) day period, Purchaser will be deemed to have elected the Closing Option and the Closing Date, upon request of Purchaser or Seller, shall be extended to a date mutually agreed upon by the parties.

(ii) If the Property is damaged or destroyed prior to the Closing Date and the Estimate of the cost to restore or repair is less than Ten Thousand and No/100 Dollars ($10,000.00), Seller may elect to assign its rights to Purchaser under the existing insurance policies in full discharge of all of Seller's obligations with respect to such loss or damage, and Purchaser will proceed to close in accordance with the terms of this Agreement; provided that the amount of any deductible under any applicable property damage or casualty policy of insurance shall be credited against the Purchase Price at Closing. If Seller does not elect to assign its rights to Purchaser under the existing insurance policies, Purchaser shall have the right to terminate this Agreement in which event, except for any obligations which by their express terms survive the termination of this Agreement, both parties will be released from further liability hereunder.

15. <u>Broker</u>.

(a) Seller represents that there is no broker engaged by Seller in connection with the sale of the Property who may be entitled to a commission or fee as a result of the sale of the Property to Purchaser. Seller agrees to indemnify and hold Purchaser harmless from and against any loss, cost, damage, expense (including reasonable attorneys' fees and expenses) or liability resulting from any claims that may be made against Purchaser by any broker or other person claiming a fee or other compensation in connection with this transaction arising from the acts of Seller. [NTD: To fairly market the property, Trustee will require engagement of Broker. Need to clarify that in the event of an auction and increased bidding, broker may seek compensation. Need to discuss]

(b) Purchaser represents that there is no broker engaged by Purchaser in connection with the purchase of the Property who may be entitled to a commission or fee as a result of the purchase of the Property by Purchaser. Purchaser agrees to indemnify and hold Seller harmless from and against any loss, cost, damage, expense (including reasonable attorneys' fees and expenses) or liability resulting from any claims that may be made against Seller by any broker or other person claiming a fee or other compensation in connection with this transaction arising from the acts of Purchaser.

(c) The provisions of this Section 15 shall survive the Closing or the earlier termination of this Agreement.

16. <u>Assignment</u>. Purchaser shall have the absolute right and authority to assign its interest in this Agreement and all of its rights, title, interests, duties, obligations and liabilities hereunder to any person, firm, corporation, partnership, limited liability company, real estate investment trust or other entity organized by or which is a related party to or affiliated with Purchaser in which Purchaser or one of its affiliates owns a controlling interest.

17. <u>Successors and Assigns</u>. The terms and provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

18. <u>Choice of Law/Venue</u>. This Agreement shall be governed by and construed in accordance with (i) the laws of the State of Delaware without regard to its conflicts of laws rules and (ii) the Bankruptcy Code, as applicable. For so long as the Seller is subject to the jurisdiction of the Bankruptcy Court and provided the Bankruptcy Court does not decline to exercise jurisdiction, the Parties irrevocably elect, and consent to the jurisdiction of, the Bankruptcy Court as the sole judicial forum for the adjudication of any matters arising under or in connection with this Agreement. The parties hereby consent to the jurisdiction of such court and waive their right to challenge any proceeding involving or relating to this Agreement on the basis of lack of jurisdiction over the person or forum non conveniens.

19. <u>Entire Agreement; Miscellaneous Provisions</u>.

(a) This Agreement, together with Exhibits attached hereto, constitutes the entire agreement between Seller and Purchaser and supersedes all prior statements, agreements or representations from one party to the other.

(b)  All Exhibits attached hereto are incorporated herein by reference to the same and full extent as though such Exhibits were repeated in the body of this Agreement verbatim.

(c)  This Agreement may not be modified, terminated or amended or any of its provisions waived except by a written instrument signed by the party to be charged or by its agent duly authorized in writing.

(d)  The terms "herein," "hereof," "hereunder" and other words of similar import mean and refer to this Agreement as a whole and not merely to the specific paragraph or clause in which the respective word appears unless expressly so stated.

20.  <u>Notices</u>. Any notice, demand, or communication required, permitted, or desired to be given hereunder shall be deemed effectively given when personal delivery is tendered, the day after the notice is deposited with a reputable overnight delivery service for next-day delivery, postage or freight prepaid, or three (3) days after being  dispatched by United States certified mail, with postage prepaid, return receipt requested, which notices shall be addressed as follows:

<u>If to Purchaser</u>, to:

Ryan D. Smith, President and CEO
c/o Inperium, Inc.
120 Prospect Street
Reading, PA 19606

with a copy to:

Stevens & Lee, P.C.
111 North Sixth Street
P.O. Box 679
Reading, PA 19603-0679
Attention: G. Thompson Bell III, Esquire

<u>If to Seller</u>, to:

Don. A. Beskrone, Chapter 7 Trustee
500 Delaware Ave., 8th Floor
Wilmington, DE 19801


with a copy to:

Ashby & Geddes, P.A.
500 Delaware Ave., 8th Floor
Wilmington, DE 19801
Attention: Ricardo Palacio, Esquire

or to such other address or to such other person as any party shall designate to the others for such purpose in the manner hereinabove set forth.

21. <u>Survival of Representation and Warranties</u>. The parties agree that the representations and warranties contained in this Agreement shall survive until the Closing and none of the parties shall have any liability to each other after such time for any breach thereof except as relates to claims as to which notice has been given on or prior to the Closing. The parties agree that the covenants contained in this Agreement to be performed at or after the Closing shall survive the Closing hereunder, and each Party shall be liable to the other after the Closing for any breach thereof.

22. <u>Further Acts</u>. Each party hereto agrees to do, execute, acknowledge and deliver all such further acts, assignments, transfers, assurances and instruments that may reasonably be required to fully effectuate the transactions contemplated in this Agreement.

23. <u>Headings</u>. The section headings and captions in this Agreement are for convenience and reference only and shall not be deemed a part of or affect the interpretation of this Agreement.

24. <u>Gender; Plural; Singular</u>. A reference in this Agreement to any gender, whether masculine, feminine or neuter, shall be deemed a reference to the others, and the singular shall be deemed to include the plural and vice versa, unless the context otherwise requires.

25. <u>Partial Invalidity</u>. If for any reason any paragraph or provision of this Agreement or the application thereof to any person, entity or circumstance shall be held to any extent to be invalid, unenforceable or contrary to any existing or future laws, then the remainder of this Agreement or the application of such paragraph or provision to persons, entities or circumstances other than those with respect to which it has been held invalid or unenforceable shall not be affected thereby and each paragraph and provision shall be valid and enforced to the fullest extent permitted by law.

26. <u>Counterparts; Electronic Signatures</u>. This Agreement may be executed in counterparts, each of which shall be an original and all of which counterparts taken together shall constitute one and the same agreement. For purposes of this Agreement, a telecopy or scan of an executed counterpart shall constitute an original. Any party delivering an executed counterpart of this Agreement by facsimile or email shall also deliver an original executed counterpart of this Agreement, but the failure to deliver an original executed counterpart shall not affect the validity of this Agreement.

27. <u>Date of Possession</u>. Effective actual possession of the Property shall be delivered to Purchaser on the Closing Date.

*(Signature Page Follows)*

IN WITNESS WHEREOF, Seller and Purchaser have duly executed this Agreement as of the Effective Date.

**SELLER:**

**DON A. BESKRONE, in his capacity as CHAPTER 7 TRUSTEE FOR THE ESTATE OF CONNECTIONS COMMUNITY SUPPORT PROGRAMS, INC.**

By: _____

Name: _____

Title: _____

**PURCHASER:**

**CORAS WELLNESS AND BEHAVIORAL HEALTH, LLC**

By: _____

Name: _____

Title: _____

## Exhibit A

**(Property Description)**

EXHIBIT A
1 East Street, Suites 1-7  Spartan Station
MN09-17908-04-0700-0001/2


ALL THAT certain lot, piece or parcel of land, situate in the City of Harrington, Kent
County, State of Delaware as shown on a Change of Use Site Plan, prepared for
Connections CSP,LLC by Merestone Consultants, Inc., revised to May 20, 2015, and
being more particularly described as follows to wit:
BEGINNING at a point on the westerly side of East Street (KCR #350) (as recently
widened by Dedication to a point 30 feet from the centerline of East Street), being the
southerly end of a 30.00 feet radius junction curve joining the new westerly side of East
Street (KCR #350) with the new southerly side of Clark Street (KCR #60); thence from
the point and place of beginning along the westerly right-of-way of East Street, (said side
of East Street being 30 feet distant from the centerline of East Street) South 05 degrees
55minutes 23 seconds West, 217.01 feet to the point of intersection formed by new
westerly side of East Street with the northerly right-of-way of Mill Street; thence along
the northerly right of way of Mill Street North 78 degrees 10 minutes 55 seconds West,
262.71 feet to a common corner for this parcel, and lands, now or formerly, of Rockaway
Likeness, LLC; thence along the lands, now or formerly, of Rockaway Likeness, LLC,
North 11 degrees 29 minutes 29 seconds East, 127.00 feet to chain link fence post in line
of lands, now or formerly, of Sherman Mayle; thence along the lands, now or formerly,
of Sherman Mayle by the following two (2) two courses and distances: 1)South 81
degrees 37 minutes 55 seconds East, 70.45 feet to an iron pipe found; and 2) North 11
degrees 49 minutes 05 seconds East, 105.00 feet to a new corner on the southerly right-
of-way of Clark Street (KCR #60) as recently widened by Dedication; thence along the
new southerly right-of-way of Clark Street by the following five (5) courses and
distances: 1) South 78 degrees 10 minutes 55 seconds East, 14.22 feet to a point; 2) South
12 degrees 04 minutes 58 seconds West, 11.12 feet to a point; 3) along a line distant 3
inches northerly from the northerly face of the masonry building on this property and the
extension thereof, North 78 degrees 10 minutes 50 seconds West, 81.35 feet a to a point;
4) South 11 degrees 49 minutes 10 seconds West, 8.37 feet to a point; and 5) by curve to
the left having a radius of 1,185.92 feet, the chord of which bears South 83 degrees 06
minutes 16 seconds East, 42.41 feet, an arc distance of 42.41 feet to the westerly end of
the previously mentioned junction curve joining the new westerly side of East Street
(KCR #350) with the new southerly side of Clark Street (KCR #60); thence by said curve
to the right having a radius of 30.00 feet, the chord of which bears  South 39 degrees 06
minutes 11 seconds East, 42.45 feet, an arc distance of 47.15 feet to the point and place
of Beginning.

Tax Parcel No.: MN09-179.08-06-01.00-000

Prepared by:
> Steven T. Davis, Esquire
> Connections CSP, Inc.
> 3821 Lancaster Pike
> Wilmington, DE 19805

Return to:
> Connections CSP, Inc.
> 3821 Lancaster Pike
> Wilmington, DE 19805

## D E E D

**THIS DEED** is made this $\underline{13}$ day of **February**, 2018, between

**THE CITY OF HARRINGTON, a municipal corporation of the State of Delaware,** party of the first part,

### A N D

**CONNECTIONS COMMUNITY SUPPORT AND PROGRAMS, INC., a Delaware corporation,** party of the second part.

WITNESSETH, that the said party of the first part, for and in consideration of the sum of TEN and 00/100 DOLLARS ($10.00), lawful money of the United States of America, and other good and valuable consideration, the receipt of which is hereby acknowledged, hereby grants and conveys unto the said party of the second part, its successors and assigns, in fee simple

## Parcel No. 1:

**ALL** that certain lot, piece or parcel of lands and premises situated in the Town of Harrington, Kent County and State of Delaware, lying on the south side of Clark Street and on the east side of East Street, having a frontage on Clark Street of about 61 feet and a frontage on said East Street of about 91 feet and extending back from said East Street on the south line a distance of about 75 feet to lands now or formerly of Annie Wolcott Brown, be the contents whatsoever they may, together with all buildings and other improvements now erected thereon.

**Parcel No. 2**:

**ALL** that certain lot, piece or parcel of lands and premises situated in the  Town of Harrington, Kent County and State of Delaware, lying on the east side of East Street, bounded on the north by Parcel No. 1 herein and also adjoining lands now or formerly of Sarah Johnson, lands now or formerly of Robert Townsend and lands now or formerly of Annie Wolcott Brown, having a frontage on said  East Street of about 48 feet and extending back therefrom between parallel lines in an eastern direction a distance of about 75 feet, be the contents thereof whatsoever they may, together with all buildings and other improvements now erected thereon.

**BEING** the same lands and premises which Norman Wood, Sheriff of Kent County, by Deed dated September 5, 2012 and recorded in the Office of the Recorder of Deeds in and for Kent County and  State of Delaware in Document Number 2012-217918, Volume 6409, Page 84, did grant and convey unto the City of Harrington.

**THE** hereinabove described lands and premises designated as Parcel No. 1 and Parcel 2 being now more particularly bounded and described as one parcel in accordance with a survey prepared by Merestone Consultants, Inc. dated January 16, 2018, as follows, to-wit:

**BEGINNING** at a capped rebar set in the intersection of the southerly right of way of  Clark Street (K.C.R. #60) and the easterly right of way of East  Street (K.C.R. #350; thence following Clark Street, along a 1,170.68 feet radius bearing to the left having an arc distance of 60.57 feet with a chord equivalent of South 89 degrees 10 minutes 06 seconds East, 60.57 feet, to a capped rebar set along the right of way of Clark Street at a mutual corner for this parcel and lands now or formerly of Roberts I, LLC; thence following the lands of Roberts I, LLC, South 04 degrees 00 minutes 57 seconds East, 120.71 feet to an iron pipe found at a common corner for this parcel and lands now or formerly of Mark H Graybill and lands now or formerly of William Raynor; thence along lands now or formerly of William Raynor, North 87 degrees 43 minutes 35 seconds West, 81.43 feet to a pinch top pipe found along the right of way of  East Street at a mutual corner for this parcel and lands now or formerly of William Raynor; finally, following the right of way of East Street, North 05 degrees 58 minutes 26

seconds East, 118.71 feet to the place of Beginning, containing 8,450 square feet, more or less.

SUBJECT to all restrictions, easements, reservations and agreements of record, together with the benefit of same.

[EXECUTION PAGE FOLLOWS]

IN WITNESS WHEREOF, the said City of Harrington has caused
its hand and seal by Anthony Moyer, its Mayor, to be hereunto
set and the common and corporate seal of the City of Harrington
to be hereunto affixed, duly attested by its Clerk of Council,
the day and year aforesaid.

CITY OF HARRINGTON

Attest: *Kelly Blanchies*

Name:

Title: Clerk of Council

By: _____ (SEAL)

Name: Anthony Moyer

Title: Mayor of Harrington

SEAL:

GRANTEE'S ADDRESS:

3821 Lancaster Pike
Wilmington, DE 19805

STATE OF Delaware :
                    :
COUNTY OF Kent      :

BE IT REMEMBERED that on this 11th day of February, 2019,
personally came before me, the Subscriber, a Notary Public for
the State and County aforesaid, Anthony Moyer, Mayor of the City
of Harrington, a municipal corporation existing under the laws
of the State of Delaware, party to this Indenture, known to me
personally to be such, and acknowledged this Indenture to be his
act and deed and the act and deed of said corporation, that the
signature of the Mayor thereto is in his own proper handwriting
and the seal affixed is the common and corporate seal of said
corporation and that his act of sealing, executing,
acknowledging and delivery said Indenture was duly authorized by
a resolution of the City Council of said corporation.

Notary Public

Name:

Commission Expires:

**<u>Exhibit B</u>**

**(Procedures Order)**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 7 |
| CONNECTIONS COMMUNITY SUPPORT PROGRAMS, INC., | Case No. 21-10723 (MFW) |
| Debtor.[1] | RE:  D.I. _____ |

## ORDER APPROVING (1) PRIVATE SALE PROCESS, INCLUDING DESIGNATION OF STALKING HORSE BIDDER AND BID PROTECTIONS, AND (2) SETTING SALE HEARING

Upon consideration of the *Motion of Don A. Beskrone, Chapter 7 Trustee, for Orders (A) Approving (1) Private Sale Process, Including Designation of Stalking Horse Bidder and Bid Protections, and (2) Sale Of Certain Real Property, and (B) Granting Related Relief* (the "Sales Procedures Motion")[2] filed by Don A. Beskrone, Chapter 7 Trustee (the "Trustee") of Connections Community Support Programs, Inc. and its estate for entry of an order (i) approving and authorizing a private sale process, subject to higher and better offers, for the sale of the Harrington Property to Coras Wellness and Behavioral Health, LLC ("Coras"), free and clear of all liens, claims, encumbrances and other interests, and (ii) granting related relief; and due and proper notice of the Motion having been provided; and the Court having reviewed the Motion and the Beskrone Declaration and having heard the statements, if any, in support of the relief requested therein at a hearing before the Court; and consideration of the Sales Procedures Motion being a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and venue being proper in this District pursuant to 28 U.S.C. § 1408; and notice of the Sales Procedures Motion being adequate

---

[1] The Debtor in this chapter 7 case, along with the last four digits of its tax identification number, is as follows: Connections Community Support Programs, Inc. (3030).

[2] Capitalized terms not otherwise defined herein shall have the meaning ascribed in the Sales Procedures Motion.

and appropriate under the particular circumstances; and it appearing that the relief requested in the Sales Procedures Motion is in the best interest of the Debtor and its Estate; and it further appearing that the legal and factual bases set forth in the Sales Procedures Motion and the Beskrone Declaration establish just cause for the relief granted herein; and it appearing that the Court has jurisdiction over this matter; and after due deliberation thereon and sufficient cause appearing therefore,

**IT IS HEREBY ORDERED THAT:**

1.       The relief requested in the Sales Procedures Motion is **GRANTED** as set forth herein.

2.       A private sale process, subject to higher and better offers or bids, as set forth in the Sales Procedures Motion (and the Hilco Application), is approved in all respects.

3.       If prior to the hearing to consider the sale of the Harrington Property the Trustee receives a higher and better offer for the Harrington Property as the Trustee may determine following consultation with the USDA, the Trustee may convene an auction, or may engage in such other marketing and sale process as the Trustee and the USDA agree upon to obtain the highest and best bid for the Harrington Property, provided that in no event shall Trustee accept a higher and better offer for the Harrington Property without affording Coras the right to submit a topping bid(s) at an auction or otherwise.  The Trustee will retain the right and flexibility to conduct an auction, provided the Trustee, subject to prior consultation with the USDA, determines such an auction is necessary or appropriate.

4.       The Bid Protections are authorized and approved, and Coras is and shall be deemed the "stalking horse" bidder for the Harrington Property entitled to all such Bid Protections.

5.      The hearing to consider the sale of the Harrington Property shall be convened on June 22, 2022 at 2:00 p.m. (ET).

**Exhibit C**

**(Sale Order)**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 7 |
| CONNECTIONS COMMUNITY SUPPORT PROGRAMS, INC., | Case No. 21-10723 (MFW) |
| Debtor.[1] | **RE:  D.I. _____** |

### ORDER APPROVING MOTION OF
### DON A. BESKRONE, CHAPTER 7 TRUSTEE,
### FOR ORDER AUTHORIZING SALE OF CERTAIN REAL PROPERTY

Upon consideration of the motion [D.I. ___] (the "Motion")[2] filed by Don A. Beskrone, Chapter 7 Trustee (the "Trustee") of  Connections Community Support Programs, Inc. (the "Debtor") and its estate (the "Estate"), pursuant to sections 105(a) and 363 of Title 11 of the United States Code (as amended, the "Bankruptcy Code"), Rule 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), (i) approving and authorizing the private sale, subject to higher and better offers, of the Harrington Property to Coras Wellness and Behavioral Health, LLC ("Coras"), free and clear of all liens, claims, encumbrances and other interests, and (ii) granting related relief; and due and proper notice of the Motion having been provided; and the Court having reviewed the Motion and the Beskrone Declaration and having heard the statements, if any, in support of the relief requested therein at a hearing, if any, before the Court; and consideration of the Motion being a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and venue being proper in this District pursuant to 28 U.S.C. § 1408; and notice of this Motion being

---

[1] The Debtor in this chapter 7 case, along with the last four digits of its tax identification number, is as follows: Connections Community Support Programs, Inc. (3030).

[2] Capitalized terms not otherwise defined herein shall have the meaning ascribed in the Motion or Agreement, as applicable.

adequate and appropriate under the particular circumstances; and it appearing that the relief requested in the Motion is in the best interest of the Debtor and its Estate; and it further appearing that the legal and factual bases set forth in the Motion and the Beskrone Declaration establish just cause for the relief granted herein; and it appearing that the Court has jurisdiction over this matter; and after due deliberation thereon and sufficient cause appearing therefore,

**IT IS HEREBY ORDERED THAT:**

1.      The relief requested in the Motion is **GRANTED** as set forth herein.

2.      The Agreement, attached hereto as **Exhibit 1**, is hereby approved in its entirety.

3.      Coras' offer to purchase the Harrington Property, as set forth in the Agreement, is hereby determined to be the highest and best offer for the Harrington Property, as no superior bid for the Harrington Property was received.

4.      The Purchase Price as set forth in the Agreement represents the fair value of the Harrington Property.  The Agreement was negotiated, prepared and entered into by the parties without collusion, in good faith and from arm's length bargaining positions.

5.      The Trustee is authorized to sell the Harrington Property to Coras under the terms and conditions set forth in the Agreement, free and clear of any liens, claims, encumbrances and other interests, whether at law or in equity, including without limitation, free and clear of any rights or claims based on theories of transferee or successor liability under any applicable law, whether arising before or after the Petition Date, save and excepting only those liabilities, if any, expressly assumed by Coras in writing under the Agreement, pursuant to section 363(f) of the Bankruptcy Code.  Notwithstanding anything to the contrary in the Agreement or this Order, the Trustee is authorized to sell the Harrington Property free and clear of the lien of the USDA and

the USDA consents to such sale free and clear of it lien, only upon payment to the USDA of the sale proceeds as set forth in Paragraph 14 of this Order

6.      At Closing, all of the Debtors' right, title, and interest in and to, and possession of, the Harrington Property shall be immediately vested in Coras pursuant to sections 105(a), 363(b) and 363(f) of the Bankruptcy Code.  Such transfer shall constitute a legal, valid, enforceable, and effective transfer of the Harrington Property.  All persons or entities, presently or at any time hereafter, in possession of some or all of the Harrington Property, are directed to surrender possession of any and all portions of the Harrington Property to Coras on the Closing Date or at such time thereafter as Coras may request.

7.      All persons and entities are prohibited and enjoined from taking any action to adversely affect or interfere with, or which would be inconsistent with, the ability of the Trustee to transfer the Harrington Property to Coras in accordance with the Agreement and this Order.

8.      Coras is not an insider of the Debtor, is hereby found to have acted in good faith within the meaning of section 363(m) of the Bankruptcy Code and is entitled to the protections of section 363(m) of the Bankruptcy Code as a good faith purchaser of the Harrington Property.

9.      The Agreement and the transactions contemplated thereby shall, subject to the terms set forth therein, be specifically enforced against and binding upon, and not subject to rejection or avoidance by Trustee, the Debtor's Estate or any other chapter 7 trustee of the Debtor or other representative of its Estate.

10.     The sale of the Harrington Property to Coras as set forth in the Agreement is in the best interest of the Debtor and its Estate.

11.     On the Closing Date, this Order shall be construed and shall constitute for any and all purposes a full and complete general assignment, conveyance, and transfer to Coras of the

Debtor's interests in the Harrington Property.  This Order is and shall be effective as a determination that, on the Closing Date, all encumbrances or other interest of any kind or nature whatsoever existing as to the Harrington Property prior to the Closing Date, other than any assumed liabilities, shall have been unconditionally released, discharged, and terminated, and that the conveyances described herein have been effected.  This Order shall be binding upon and govern the acts of all entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, registrars of patents, trademarks, or other intellectual property, administrative agencies, governmental departments, secretaries of state, federal and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title; and each of the foregoing persons and entities is hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the Agreement.

12.    Except for any liabilities expressly assumed pursuant to the Agreement, or as otherwise expressly provided in this Order or the Agreement, Coras shall not have any liability or other obligation of the Debtor arising under or related to any of the Harrington Property or other unassumed liabilities expressly identified in the Agreement, including, but not limited to, any liability for any encumbrances, whether known or unknown as of the Closing, now existing or hereafter arising, whether fixed or contingent, with respect to the Debtor or any obligations of the Debtor, including, but not limited to, liabilities on account of any taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to the operation of the Debtor's business prior to the Closing Date, except as may be expressly set forth in the Interim Lease.

13.     Except with respect to any expressly assumed liabilities, or as otherwise expressly provided for in this Order or the Agreement, all persons and entities, including, but not limited to, all debt holders, equity security holders, governmental, tax, and regulatory authorities, lenders, trade creditors, litigation claimants, and other creditors, holding encumbrances or other interests of any kind or nature whatsoever against or in all or any portion of the Acquired Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, liquidated or unliquidated, senior or subordinate), arising under or out of, in connection with, or in any way relating to the Debtor, the Harrington Property, the Debtor's business, or the transfer of the Harrington Property to Coras in accordance with the Agreement, are hereby forever barred, estopped, and permanently enjoined from asserting against Coras, its successors or assigns, its property or the Harrington Property, such persons' or entities' encumbrances in and to the Harrington Property, including, without limitation, the following actions: (a) commencing or continuing in any manner any action or other proceeding against Coras, its successors, assets, or properties; (b) enforcing, attaching, collecting, or recovering, in any manner, any judgment, award, decree, or order against Coras, its successors, or their assets or properties; (c) creating, perfecting, or enforcing any encumbrance, lien, claim, or interest against Coras, its successors, their assets, or their properties; (d) asserting any setoff, right of subrogation, or recoupment of any kind against any obligation due Coras or its successors; (e) commencing or continuing any action, in any manner or place, that does not comply or is inconsistent with the provisions of this Order or other orders of this Court, or the agreements or actions contemplated or taken in respect thereof; or (f) revoking, terminating, or failing or refusing to transfer or renew any license, permit, or authorization to operate any of the Harrington Property or conduct any of the businesses operated within the Harrington Property.

Notwithstanding the foregoing or any other provision of this Order or the Agreement, any claims or causes of action held by the United States or any of its agencies or authorities are expressly excluded from any release, discharge, termination or injunction set forth in this Order or the Agreement, and nothing in the Order or Agreement shall affect or impair the United States' rights to pursue or enforce such claims.

14.    At the Closing the Trustee shall remit to the USDA the sale proceeds *less* the Estate Carve-Out, provided that USDA shall receive, net of the Estate Carve-Out, a minimum of $2,400,000.00 (the "USDA Minimum Payment") as a condition to USDA's consent to the sale free and clear of its lien.  In the event a sale is consummated for more than the Purchase Price, USDA shall receive, in addition to the Minimum USDA Payment, 96% of any sale proceeds in excess of the Purchase Price, as a condition to its consent to the sale free and clear of its lien, and the remaining 4% shall be added to the Estate Carve-Out.

15.    Moreover, and for the avoidance of doubt, in the event the sale is for more than the Purchase Price, Hilco's Reimbursable Expenses shall be paid from the sale proceeds with the USDA's consent (and not from the Estate Carve-Out), provided that in no event will payment of the Reimbursable Expenses reduce the net proceeds paid to USDA below the Minimum USDA Payment.  However, in the event the Harrington Property is sold to Coras (for the Purchase Price $2,500,000.00), Hilco's Reimbursable Expenses shall be paid from the Estate Carve-Out.

16.    Upon payment of the sale proceeds to the USDA as set forth herein, the USDA shall retain an unsecured claim for the unpaid balance due under the USDA Loan Agreement, and the USDA shall not be required to amend or supplement its proof of claim to reflect the reduction in the amount of its claim or the unsecured status of the remaining balance due thereon.  The United States reserves its rights pursuant to 11 U.S.C. §553 to offset any

prepetition obligation of the USDA or any other agency or component of the United States to the extent permitted by applicable law, whether such obligation is fixed, contingent or the subject of litigation as of the Debtor's petition date, against any portion of this claim.

17.     The Trustee is authorized and empowered to take such actions as may be necessary and appropriate to implement the terms of this Order and, for the avoidance of doubt, the Agreement.

18.     Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Order shall be immediately effective and enforceable upon its entry, and no automatic stay of execution shall apply to this Order.

19.     This Court shall retain jurisdiction to enforce the terms and provisions of this Order, the Bidding Procedures Order, and the Agreement, and to decide any disputes arising from or relating to the sale of the Harrington Property and any other matter that in any way relates to the foregoing.

20.     To the extent any provisions of this Order conflict with the terms and conditions of the Agreement, this Order shall govern and control.

## Exhibit 1

**(Agreement)**